FILED
CLERK, U.S. DISTRICT COURT

8/1/18

CENTRAL DISTRICT OF CALIFORNIA
BY: CS _____ DEPUTY

1  Thomas H. Bienert, Jr., State Bar No. 135311
   tbienert@bmkattorneys.com
2  Kenneth M. Miller, State Bar No. 151874
   kmiller@bmkattorneys.com
3  Anthony R. Bisconti, State Bar No. 269230
   tbisconti@bmkattorneys.com
4  BIENERT, MILLER & KATZMAN, PLC
   903 Calle Amanecer, Suite 350
5  San Clemente, California 92673
   Telephone (949) 369-3700
6  Facsimile (949) 369-3701
7
8  Attorneys for James Larkin

9           IN THE UNITED STATES DISTRICT COURT

10         FOR THE CENTRAL DISTRICT OF CALIFORNIA

11

12 | **In the Matter of the Seizure of:** | Case No. 2:18-cv-6742-RGK (MMAx)
                                            18-MJ-00722

13 | Any and all funds held in ▉▉▉▉▉      | Notice of Related Cases filed for: 18-MJ-
14 | ▉▉▉▉▉▉▉▉ Account(s) xxxx1889,        | 00712; 18-MJ-00713; 18-MJ-00715; 18-MJ-
   | xxxx2592, xxxx1938, xxxx2912, and,    | 00716; 18-MJ-00718; 18-MJ-00719; 18-MJ-
15 | xxxx2500.                             | 00720; 18-MJ-00721; 18-MJ-00723; 18-MJ-
                                            00724; 18-MJ-00751; 18-MJ-00797; 18-MJ-
16                                          00798; 18-MJ-00996; 18-MJ-00997; 18-MJ-
17                                          01427; and 18-MJ-1863

18                                          **NOTICE OF MOTION AND MOTION
19                                          TO VACATE OR MODIFY SEIZURE
                                            WARRANTS; DECLARATIONS OF
20                                          JAMES LARKIN, MICHAEL LACEY,
                                            JOHN BRUNST, SCOTT SPEAR,
21                                          MARGARET LARKIN, TROY LARKIN,
22                                          RAMONE LARKIN AND ANTOINETTE
                                            THOMAS WITH EXHIBITS**
23

24                                          Hearing Information
                                            Date: August 29, 2018
25                                          Time: 1:30 p.m.
                                            Place:
26                                               255 E. Temple Street, 7th Fl.
27                                               Los Angeles, CA 90012
28

---

1   **TO THE COURT AND ALL PARTIES ENTITLED TO NOTICE:**

2   **PLEASE TAKE NOTICE** that on August 28, 2018 at 1:30 p.m., or as soon

3   thereafter as counsel may be heard, claimant James Larkin will bring on for hearing the

4   following motion to vacate and/or modify the seizure pursuant to Amended Seizure Warrant

5   18-MJ-00722 on the grounds that seizure violates his rights under the First, Fourth and Fifth

6   Amendments to the United States Constitution.  This motion is based upon this Notice, the

7   attached Memorandum of Points and Authorities, the attached declarations and exhibits,

8   and this Court's entire file.

9       Mr. Larkin has concurrently filed a Notice of Related Cases pursuant to Local Rule

10   83-1.3.2 identifying all related civil forfeiture actions of which he is aware, including case

11   numbers:  18-MJ-00712; 18-MJ-00713; 18-MJ-00715; 18-MJ-00716; 18-MJ-00718; 18-

12   MJ-00719; 18-MJ-00720; 18-MJ-00721; 18-MJ-00723; 18-MJ-00724; 18-MJ-00751; 18-

13   MJ-00797; 18-MJ-00798; 18-MJ-00996; 18-MJ-00997; 18-MJ-1427; and, 18-MJ-1863.

14   Mr. Larkin submits that all these actions should be consolidated and resolved in a single

15   forum because the seizures are based on substantially the same facts, as are the arguments

16   for vacating them.[1]

17

18

19   Dated: July 31, 2018                BIENERT, MILLER & KATZMAN, PLC

20                                       By: /s/ Thomas H. Bienert
21                                          Thomas H. Bienert
                                            Kenneth M. Miller
22                                          Anthony R. Bisconti
23                                          Attorneys for James Larkin

24

25

26   [1] Local Rule 7-3 does not apply "in connection . . . with applications for temporary restraining orders or
27   preliminary injunctions. . . ."   "[A] pretrial order restraining assets . . . is a preliminary injunction for
     procedural purposes . . . ." *United States v. Roth*, 912 F.2d 1131, 1133 (9th Cir. 1990).  Because this motion
28   is in connection with a preliminary injunction, Local Rule 7-3 does not apply.

---

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................ 1

II.     RELEVANT FACTUAL AND PROCEDURAL BACKGROUND ..................... 3

        A.   Nature and Extent of Seizures ................................................ 3

             1.   Seizures Related to Carl Ferrer, Backpage.com LLC and
                  Affiliates .......................................................................... 4

             2.   Seizures Directly from Claimant/Defendants ..................... 5

        B.   Rationale for the Civil Seizure Warrants Issued by This Court ................... 11

        C.   Publishing Activities and First Amendment Rulings ................................ 12

III.    ARGUMENT ....................................................................................... 13

        A.   The Seizure of Assets Arising From the Operation of Backpage.com
             Violates the First Amendment and Must be Vacated ................................. 13

             1.   The First Amendment Prohibits Pre-Conviction Seizures of
                  Publishing Assets ................................................................ 13

             2.   The First Amendment Prohibits Pre-Conviction Seizures of
                  Publishing Proceeds ............................................................ 15

        B.   Even if Seizure of Publishing-Related Assets or Proceeds Could be
             Justified, the Procedures Employed Here Were Constitutionally
             Deficient .................................................................................... 18

        C.   The Government's Probable Cause Showing Was Defective and Any
             Hearing on the Validity of the Seizures Will Require the Government
             to Satisfy a Heightened Burden of Proof ............................................ 20

             1.   The Versoza Affidavits Do Not Even Establish Probable Cause
                  that Claimant/Defendants Committed Any Crimes ........................... 21

             2.   The Versoza Affidavits Omit Reference to Controlling Case
                  Law .................................................................................... 22

             3.   The Versoza Affidavits Contain False and Misleading
                  Statements ......................................................................... 25

        D.   Any Hearing on the Validity of Seizures of Proceeds From Publishing
             Must Satisfy Both Fourth and First Amendment Requirements ................... 29

             1.   The Government Must Link Any Seized Assets to Specific
                  Evidence of Illegal Activity on the Part of Claimant/Defendants ...... 30

             2.   The Government Must Support Any Seizure With More Than
                  the "Judgment" of a Law Enforcement Officer ............................ 34

i

E.  Assuming, Arguendo, any Pre-trial Seizure Is Appropriate, these Seizures Are Overinclusive and Must Be Vacated ...................................... 36

   1.  By Seizing Virtually All of Claimants/Defendants' Assets, the Government Improperly Reached Assets That Have Nothing To Do With Backpage ................................................................................. 37

   2.  Non-Backpage Assets Cannot Be Seized Merely Because They Were Commingled With Backpage Assets .......................................... 38

   3.  The Government Has Improperly Seized Backpage Proceeds that are Clearly Not Criminal Proceeds ............................................... 40

IV.  THE SEIZURES VIOLATE CLAIMANT/DEFENDANTS' SIXTH AMENDMENT RIGHT TO COUNSEL ................................................................ 40

V.  CONCLUSION ................................................................................................. 41

# TABLE OF AUTHORITIES

Page(s)

Cases

*Adult Video Ass'n. v. Barr*,
  960 F.2d 781 (9th Cir. 1992) .................................................................15, 17

*Adult Video Ass'n. v. Reno*,
  41 F.3d 503 (9th Cir. 1994) ........................................................................15

*American Library Ass'n. v. Barr*,
  956 F.2d 1178 (D.C. Cir. 1992)...................................................................17

*American Library Ass'n. v. Thornburgh*,
  713 F. Supp. 469 (D.D.C. 1989)..................................................................17

*Ashcroft v. Free Speech Coalition*,
  535 U.S. 234 (2002) .....................................................................................32

*Backpage.com, LLC v. Cooper*,
  939 F. Supp. 2d. 805 (D. Tenn. 2013).........................................................23

*Backpage.com, LLC v. Hoffman*,
  2013 WL 4502097 (D.N.J. 2013).................................................................23

*Backpage.com, LLC v. Lynch*,
  216 F. Supp. 3d 96 (D.D.C. 2016)...............................................................33

*Backpage.com, LLC v. McKenna*,
  881 F. Supp. 2d 1262 (W.D. Wash. 2012) ..................................................25

*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58 (1963) .......................................................................................19

*Bd. of Trustees v. State Univ. of N.J. v. Fox*,
  492 U.S. 469 (1989) .....................................................................................32

*Blount v. Rizzi*,
  400 U.S. 410 (1971) ...............................................................................19, 20

*Bright v. Firestone Tire & Rubber Co.*,

756 F.2d 193 (6th Cir. 1984 ...........................................................................25

*Center for Democracy & Tech. v. Pappert*,

337 F. Supp. 2d 6067 (E.D. Pa. 2004 ...............................................14, 15, 37

*Citizens United v. FEC*,

558 U.S. 310 (2010) .......................................................................................16

*Cohen v. Bd. of Supervisors*,

707 P.2d 840 (Cal. 1985)...............................................................................23

*United States v. Crozier*,

777 F.2d 1376 (9th Cir. 1985) .......................................................................21

*Curran v. Price*,

638 A.2d 93 (Md. 1994) .................................................................................18

*Dart v. Craigslist, Inc.*,

665 F. Supp. 2d 961 (N.D. Ill. 2009)..............................................................25

*Backpage.com, LLC v. Dart*,

807 F.3d 229 (7th Cir. 2015) .............................................................10, 24, 40

*Doe No. 1 v. Backpage.com, LLC*,

817 F.3d 12 (1st Cir. 2016) .....................................................................23, 24

*Elonis v. United States*,

135 S. Ct. 2001 (2015).....................................................................................33

*Fort Wayne Books v. Indiana*,

489 U.S. 46 (1989) ..................................................................................passim

*Franks v. Delaware*,

438 U.S. 154 (1978) ........................................................................................22

*Freedman v. Maryland*,

380 U.S. 51 (1965) ...................................................................................19, 20

*In re Opinion of the Justices to the Senate*,

764 N.E.2d 343 (Mass. 2002)..........................................................................18

*Keenan v. Superior Court of Los Angeles County*,

TABLE OF CONTENTS

40 P.3d 718  (Cal. 2002)..........................................................................................18

*Lee Art Theatre, Inc.*,

   392 U.S. ..............................................................................................................37

*Luis v. United States*,

   136 S. Ct. 1083 (2016)......................................................................................43

*M.A. v. Village Voice Media Holdings, LLC*,

   809 F. Supp. 2d 1041 (E.D. Mo. 2011) ..........................................................23

*Marcus v. Search Warrant*,

   376 U.S. 717 (1961) ....................................................................................31, 37

*Matal v. Tam*,

   137 S. Ct. 1744 (2017)......................................................................................16

*Minneapolis Star & Tribune Co. v. Minnesota Comm'r. of Revenue*,

   460 U.S. 575 (1983) .........................................................................................16

*Mishkin v. New York*,

   383 U.S. 502 (1966) .........................................................................................33

*Morrison v. Nat'l Australia Bank Ltd.*,

   561 U.S. 247 (2010) .........................................................................................43

*Pearce v. E.F. Hutton Grp., Inc.*,

   653 F. Supp. 810 (D.D.C. 1987)......................................................................25

*People v. Ferrer*,

   2016 WL 7237305 (Sup. Ct. Sacramento Cty. Dec. 9, 2016)....................13, 23

*Quantity of Books v. Kansas*,

   378 U.S. 205 (1964) .........................................................................................31

*Roaden v. Kentucky*,

   413 U.S. 496 (1973) ...............................................................................32, 35, 37

*Seres v. Lerner*,

   102 P.2d 91 (Nevada 2004) ..............................................................................18

*Simon & Schuster, Inc. v. Members of the New York State Crime Victims Bd.*,

502 U.S. 105 (1991) .................................................................................................... 17

*Smith v. California*,

361 U.S. 147 (1959) ............................................................................................ 32, 33

*Southeastern Promotions, Ltd. v. Conrad*,

420 U.S. 546 (1975) .................................................................................................... 19

*Spokane Arcades, Inc. v. Brockett*,

631 F.2d 135 (9th Cir. 1980) ..................................................................................... 16

*Stanford v. State of Texas*,

379 U.S. 476 (1965) .............................................................................. 14, 31, 36, 37

*State ex rel. Napolitano v. Gravano*,

60 P.3d 246 (Arizona App. 2002) ............................................................................. 18

*U.S. v. Thirty-Seven Photographs*,

402 U.S. 363 (1971) .................................................................................................... 20

*United States v. $3,148,884.40 U.S. Currency (Seized From Accounts of Bital)*,

76 F. Supp. 2d 1063 (C.D. Cal. 1999).................................................................... 42

*United States v. $52,100 in U.S. Currency*,

No. 17-CV-2002-BAS-JMA, 2018 WL 1782934 (S.D. Cal. Apr. 13, 2018) ................ 21

*United States v. All Monies ($477,048.62) In Account No. 90-3617-3, Israel Disc. Bank,*

*New York, N.Y.*,

754 F. Supp. 1467 (D. Haw. 1991)........................................................................... 41

*United States v. Approximately Six Hundred & Twenty Thousand Three Hundred &*

*Forty-Nine Dollars & Eighty-Five Cents*, No. 13 CV 3966 RJD SMG,

2015 WL 3604044 (E.D.N.Y. June 5, 2015)........................................................... 41

*United States v. California Publishers Liquidating Corp.*,

778 F. Supp. 1377 (N.D. Texas 1991).................................................................... 35

*United States v. Christakis*,

238 F.3d 1164 (9th Cir. 2001) .................................................................................. 22

*United States v. Contents in Account No. 059-644190-69*,

253 F. Supp. 2d 789 (D. Vt. 2003) ..................................................41, 42

*United States v. DeLeon,*

  979 F.2d 761 (9th Cir. 1992) ..................................................22

*United States v. Hall,*

  113 F.3d 157 (9th Cir. 1997) ..................................................22

*United States v. National Treasury Employees Union,*

  513 U.S. 454 (1995) ..................................................16

*United States v. One 1987 Mercedes Benz, 190E VIN: WDBDA28D*XHF373152,

  No. 90 C 3484, 1992 WL 198441 (N.D. Ill. Aug. 11, 1992) ...................22

*United States v. Playboy Entertainment Group, Inc.,*

  529 U.S. 803 (2000) ..................................................16, 32

*United States v. Roth,*

  912 F.2d 1131 (9th Cir. 1990) ..................................................1

*United States v. Treatman,*

  408 F.Supp. 944 (C.D. Cal. 1976) ..................................................20

*Vance v. Universal Amusement Co., Inc.,*

  445 U.S. 308 (1980) ..................................................15


Statutes

18 U.S.C. § 371 ..................................................1, 9

18 U.S.C. § 981(a)(1)(A) ..................................................41, 42

18 U.S.C. § 981(a)(1)(C) ..................................................10

18 U.S.C. § 982(a)(1) ..................................................10

18 U.S.C. § 984 ..................................................42

18 U.S.C. § 1591 ..................................................6, 23, 33, 34

18 U.S.C. § 1952 ..................................................6

18 U.S.C. § 1952(a) ..................................................1, 9

18 U.S.C. § 1952(b)(2) ..................................................43

18 U.S.C. § 1963(d) ........................................................................... 17

18 U.S.C. § 2421(A) ........................................................................... 34

18 U.S.C. §§ 1956 and 1957 ....................................................... passim

18 U.S.C. §§ 1956(c)(7)(A) and 1961(1) ........................................... 10

28 U.S.C. § 2461(c) ........................................................................... 10

47 U.S.C. § 230(c)(1) ......................................................................... 23

Cal. Penal Code § 647(b)(1) .............................................................. 33

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Michael Lacey, James Larkin, Scott Spear, John Brunst, Dan Hyer, Andrew Padilla and Joye Vaught are named in an indictment from the District of Arizona alleging conspiracy to violate the Travel Act (18 U.S.C. § 371), facilitation of prostitution in violation of the Travel Act (18 U.S.C. § 1952(a)), conspiracy to commit money laundering, concealment money laundering, international promotional money laundering, transactional money laundering (18 U.S.C. §§ 1956 and 1957), and two (2) forfeiture counts.  The government has also obtained *at least* nineteen separate civil seizure warrants in the Central District of California (the "Seizures") for substantially all assets belonging to Claimant/Defendants Lacey, Larkin, Spear, and Brunst (the "Shareholder Defendants"), as well as assets belonging to their family members.  Because the Seizures arise from the same facts and are subject to the same defenses,[2] Larkin requests that challenges to the Seizures be resolved in a single proceeding.   Accordingly, Larkin expects that other Claimants/Defendants (and their family members where appropriate) will join this motion, in whole or in part, assuming this Court consolidates the challenges to the Seizures.

The criminal allegations against Claimant/Defendants stem from their involvement with "Backpage.com" (or simply "Backpage"), which was an on-line publisher of third-party advertisements until the government silenced it.   On March 28, 2018, the government sought and obtained civil seizure warrants in this Court for most of the accounts and domain names identified in a criminal indictment brought the same day against Claimant/Defendants in the District of Arizona.  In addition to the criminal charges, the indictment seeks to forfeit bank accounts, real property and domain names.  On April 6, 2018, the day the government revealed the criminal indictment to the Claimant/Defendants, it (i) executed the civil seizure warrants, arrested Claimant/Defendants, searched the homes and properties of Claimant/Defendants Lacey and Larkin and seized anything of value law

---

[2] *See* Notice of Related Cases and Request for Judicial Notice filed concurrently herewith.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR
MODIFY SEIZURE WARRANTS

enforcement could find, and (ii) executed United States Postal Service ("USPS") administrative seizure warrants on many of the properties subject to the civil seizure warrants and additional assets as well.  On April 26, 2018, the government instituted a third wave of civil seizure warrants.

The government's efforts continue to this day.  Backpage's owner and CEO has pled guilty, begun cooperating with the government, and agreed to forfeit his and Backpage's interest in millions of dollars worth of assets.  Claimant/Defendants are still regularly receiving notices from the government and elsewhere of additional seizures.  For example, on June 11, 2018, Larkin received notice in an email from his financial service provider (not the government) that an account containing over ▆▆▆▆▆▆ of his family's trust funds had a new owner:  the "United States Marshal Service."  On July 25, 2018, the government filed a superseding indictment in the District of Arizona that sought the criminal forfeiture of virtually all assets that had previously been seized civilly, plus additional accounts and real property.  On July 27, 2018, Claimant/Defendants learned that the government had seized an account set up to receive moneys from the sale of their print media companies (not revenues from Backpage).

The government engaged in this nation-wide "takedown" of Backpage and virtually all of Claimant's/Defendants' assets, despite a long history of court decisions upholding Backpage's right to publish under the First Amendment, contrary to the government's theory of the case.  The government did this by omitting material facts from its seizure warrant applications and blatantly mischaracterizing other evidence.  The Seizures are an exercise in massive overkill, in which the government took preemptive steps not just to shutter a website but to use overlapping and redundant procedures to seize and tie up all Claimant/Defendants' assets and deprive them of any ability to mount an effective defense to pending criminal charges, as well as civil litigation across the country.[3]  The

---

[3] Claimant/Defendants currently face no fewer than three separate trials from the same basic allegations: (1) a federal criminal trial in the District of Arizona; (2) a state criminal trial in Sacramento, California; and (3) a civil forfeiture trial or trials in the Central District of California.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY
SEIZURE WARRANTS

government's actions violate not just Claimant/Defendants' First, Fourth and Fifth Amendment rights, but their Sixth Amendment rights as well. As set forth below, the seizures suffer from fundamental common flaws that require that they be vacated:

*First*, the Seizures are void because they are predicated on the erroneous premise that the government may seize the assets or proceeds of a publishing enterprise before trial based on a showing of probable cause regarding illegal activity.  *Second*, if the Court does not immediately vacate the Seizures, Claimant/Defendants are entitled to a prompt hearing on the validity of the Seizures, in which the government must satisfy a heightened burden of proof in which a showing of probable cause is inadequate and a law enforcement officer's broad pronouncements about the illegality of a website or the content on it will not suffice. *Third*, even without regard to the First and Fourth Amendments, the Seizures are markedly over-inclusive in violation of Claimant/Defendants' Fifth and Sixth Amendment rights.  For all these reasons, the seizure warrants must be vacated, and Claimant/Defendants' property returned promptly.

## II.   RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A.   Nature and Extent of Seizures

Immediately after the government started arresting the Claimant/Defendants, with great fanfare, the United States government announced it had seized and closed the Backpage website, on which it posted this notice:



As this was happening, and in some instances even before, the government instigated waves of *ex parte* asset seizures using various procedural tools with a goal of tying up or freezing all Claimant/Defendants' assets, asserting they were the proceeds of illegal activities associated with Backpage.  Sorting out what assets initially were seized, what procedures the government had employed to effect the seizures, and what justifications it advanced to support the seizures of publishing infrastructure and assets took months.  Claimants/Defendants do not believe the government has fully disclosed its past seizures, and the government continues to effect new seizures.

### 1. Seizures Related to Carl Ferrer, Backpage.com LLC and Affiliates

On April 5, 2018, Backpage.com's former owner and CEO, Carl Ferrer, pled guilty in the District of Arizona to one count of conspiracy to launder money and violate the Travel Act.  *See* D. AZ. CR-18-464-PHX-DJH, Doc. No. 7.  He also caused Backpage.com, LLC and certain affiliates to plead guilty to one count of money laundering.  *See* D. AZ. CR-18-465-PHX-DJH, Doc. No.  8.  On April 6, 2018, the government seized and shut down Backpage.[4]  The government has aggressively sought assets of Ferrer, Backpage.com, LLC and affiliates, both before and after their "takedown" and guilty pleas.

Ferrer stipulated to forfeiting his interest in at least $2,596,481 worth of assets and Backpage's interest in at least $65,545,123 worth of assets.  Exs. 6 & 7.[5]  Ferrer also agreed to forfeit his and Backpage's interest in 264 separate domain names.  Ex. 7.  The government's actions obviously preclude Backpage and its affiliates from publishing

---

[4] Claimant/Defendants do not know whether the government executed the seizure warrant it obtained for the Backpage.com domain to take down the site, or whether Carl Ferrer simply shuttered Backpage in response to government pressure.  Regardless, as noted above, several law enforcement agencies have taken credit for "seizing" Backpage.  *See also Daily Journal*, "New Central District US Attorney Outlines Priorities" (May 10, 2018) ("Hanna said the LA office's asset forfeiture section played a critical role in the recent takedown of Backpage.com . . . .").

[5] Unless otherwise specifically noted, all exhibit references are to the Declaration of Anttoinette Thomas filed concurrently herewith.

*anything.* The government is also attempting to forfeit any interest Claimant/Defendants may have in these same assets administratively—without judicial oversight.[6]

The government has also sought the forfeiture of additional assets in which Backpage and/or Ferrer had an interest. Pursuant to a March 2018 civil seizure warrant, the government seized thirty-five (35) Backpage-related domain names and the funds held in an IOLTA account[7] for the benefit of ███████ containing an unknown amount of money.[8] The Arizona indictment in which Claimant/Defendants are charged seeks forfeiture of these same assets. And administrative seizure warrants issued by the United States Postal Service ("USPS Administrative Seizure Warrants") reached additional assets in which Backpage.com, LLC or its affiliates appear to have an interest, including: $106,981 from ███████████; $499,910 from ███████████; $248,970 from ███████████; $50,000 from ███████████; and, $148,221 in digital currency.

### 2. Seizures Directly from Claimant/Defendants

Through waves of forfeiture proceedings, the government has seized assets from Claimant/Defendants and their families worth approximately: ███████ from Lacey; ███████ from Larkin; ███████ from Brunst; and ███████ from Spear.[9] Ex. 8-001, 8-004, 8-005, and 8-006.[10] The government's procedures are described in more detail below. In short, the government purports to trace Backpage's publishing proceeds to all seized accounts, so all the seizures implicate the First Amendment.

---

[6] Claimant/Defendants are entitled to the advancement of defense costs and to indemnification from Backpage.com, LLC, its affiliates, and Ferrer. An entity owned by Claimant/Defendants also has a security interest in the assets of Backpage.com, LLC and its affiliates, arising from the sale of Backpage to companies owned by Ferrer. Because of the government's tactics, Claimant/Defendants and entities they control were forced to file Petitions in the District of Arizona, as well as administrative claims, asserting their interests in those assets.

[7] IOLTA stands for "interest on lawyer trust account." Presumably this was a lawyer's trust account.

[8] Additionally, the government seized one (1) account in the name of ███████ (who worked for Backpage.com, LLC and/or an affiliate), containing an unknown amount of money.

[9] The government also seized about ███████ from defendant Hyer, who is not joining this challenge.

[10] Larkin has separately filed a request for a judicial notice of the files for each of these cases.

### a.    Central District of California Civil Seizure Warrants

### i.    March 2018 Seizure Warrants

On March 28, 2018, the government obtained at least thirteen (13) separate civil seizure warrants in the Central District of California for twenty-three separate domestic accounts, one safety deposit box and 35 separate domain names.[11]  In almost identical affidavits offered in support of the warrants, U.S. Postal Inspector Lyndon A. Versoza[12] swore that he believed most ads on the Backpage.com website related to prostitution in violation of California law, and sex trafficking in violation of 18 U.S.C. § 1591, and that Claimant/Defendants intended to facilitate those crimes in violation of the Travel Act, 18 U.S.C. § 1952.  Further, because those crimes are specified unlawful activities (or, "SUAs"), financial transactions with their proceeds allegedly violate federal money laundering laws, 18 U.S.C. §§ 1956 and 1957.  Versoza Aff. ¶¶13-18.  Based on these representations, the March 2018 seizure warrants were signed by the Honorable Patrick J. Walsh, United States Magistrate Judge.

Pursuant to these warrants, the government seized:

- Two accounts belonging to Lacey with a combined balance of at least ███████;

- Three accounts belonging to Larkin with a combined balance of about ████████[13] (and two additional accounts belonging to his sons with a combined balance of about ███████);

- Four accounts in Spear's name with a combined balance of at least ████████, two accounts in the name of ███████████ with a combined balance of about ███████, and one account in the name of Scott Spear and ████████████ with about ████████;

---

[11]  *See* case numbers 18-MJ-00711, 18-MJ-00712, 18-MJ-00713, 18-MJ-00715, 18-MJ-00716. Claimant/Defendants believe there have been additional warrants and seizures but have been unable to obtain any substantiating information from the government.

[12]  *See* Ex. 1 (Versoza Affidavit).

[13]  This included the seizure of ███████ from account xxxx1938 at ████████████████. That money is unrelated to Backpage.com, as it is proceeds from the sale of print-media companies and the affidavit in support of the warrant to seize those funds gives no justification for the seizure of those funds. *See infra* at 10-11.

6

- One account in the name of Brunst with about ▮▮▮▮▮;

- One account of Cereus Properties, LLC, a subsidiary of an entity owned by the Shareholder Defendants that collected the loan payments from the 2015 sale of Backpage to entities controlled by Ferrer, containing about ▮▮▮▮▮; and,

### ii.   April 2018 Seizure Warrants

On April 4, 2018, the government obtained another seizure warrant from Judge Walsh for seven (7) separate brokerage accounts in the name of the Brunst Family Trust, which had a combined balance of at least ▮▮▮▮▮ at the time of their seizure.[14]  Ex. 8-005.  The seizure warrant was again obtained with an affidavit from Inspector Versoza.  The probable cause portion of the affidavit was almost identical to his March 28 affidavit.

On April 9, 2018, the government obtained two more civil seizure warrants from Judge Walsh.  One was for a brokerage account in the name of Claimant Margaret Larkin (Claimant/Defendant Larkin's wife) which contained about ▮▮▮▮▮.  *Id.*  And another was for an account in the name of the Scott Spear and ▮▮▮▮▮ Family Trust, with a balance of about ▮▮▮▮▮.[15]  *Id.*  Both were obtained with affidavits by Inspector Versoza that contained probable cause allegations similar to those in the March 28 affidavits.

On April 26, 2018, the government sought and obtained an additional five (5) civil seizure warrants from the Honorable John E. McDermott, United States Magistrate Judge.  Again, they were based on a Versoza affidavit with similar probable cause allegations to the original March 28 affidavit.  Pursuant to these warrants,[16] the government seized:

- Six domestic accounts in the name of Lacey, containing about ▮▮▮▮▮ at the time of their seizure and one overseas account containing about ▮▮▮▮▮ at the time of seizure (Ex. 8-001);

- Three domestic accounts in the name of Larkin, containing about ▮▮▮▮▮ at the time of the seizure (Ex. 8-002); and,

---

[14] *See* case number 18-MJ-00798.

[15] *See* case numbers 18-MJ-00797 and 18-MJ-00718.

[16] *See* case numbers 18-MJ-00996, 18-MJ-00997, 18-MJ-00998, 18-MJ-00999, and 18-MJ-01001.  The government has not disclosed any information on 18-MJ-01000.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY
SEIZURE WARRANTS

- Eighteen separate foreign accounts controlled by Ferrer, Backpage.com, LLC, or its affiliates containing at least ▮▮▮▮▮ at the time of their seizure (Ex. 8-007-008; *see also* Exs. 6 & 7).

### iii.    June 2018 Seizure Warrant

On June 4, 2018, the government seized ▮▮▮▮▮ from a family trust account owned by Claimant/Defendant Larkin pursuant to a seizure warrant signed by the Honorable Jean P. Rosenbluth, United States Magistrate Judge.  The financial institution provided Mr. Larkin with a copy of the seizure warrant, but not the underlying affidavit. (The government gave no notice of the seizure whatsoever.)

### iv.    July 2018 Seizure Warrant

On July 27, Claimant/Defendants learned that the government has seized another account of ▮▮▮▮▮, account number xx4862.  This account received loan payments from the sale of Claimant's/Defendants' print media businesses.  The funds in the account are unrelated to Backpage.   Claimant/Defendants suspect the government has obtained other civil seizure warrants of which they have no notice.[17]

The civil seizures identified above brought the total amount of civil seizures (of which Claimant/Defendants are aware) to at least ▮▮▮▮▮, including

- ▮▮▮▮▮ from Claimant/Defendant Lacey and his family;
- ▮▮▮▮▮ from Claimant/Defendant Larkin and his family;
- ▮▮▮▮▮ from Claimant/Defendant Brunst and his family;
- ▮▮▮▮▮ from Claimant/Defendant Spear and his family; and
- ▮▮▮▮▮ from Cereus Properties, LLC.

*See* Ex. 8-001-007.

---

[17] Claimant/Defendants Larkin and Brunst have accounts to which they have been denied access, but for which they have not been formally or officially apprised of any seizure.  For example, the balance of Mr. Larkin's IRA account at ▮▮▮▮▮ went from about ▮▮▮▮▮ to ▮▮ with no notice of seizure or an explanation of how or why.  Presumably the government was involved.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY
SEIZURE WARRANTS

**b.** **Criminal Forfeiture Allegations in the Original District-of-Arizona Indictment**

As stated above, Claimant/Defendants were named in an indictment filed March 28, 2018 in the District of Arizona, which contained two forfeiture counts.  *United States v. Lacey, et al.*, D.C. AZ. No. CR-18-00422-PHX-SPL (Doc. No. 3) at ¶¶ 157-171.  Almost all assets listed in the criminal forfeiture counts were already seized pursuant to the March 28 civil seizure warrants described above.[18]

The government's legal theory behind the criminal forfeiture allegations is similar to its theory behind the civil seizure warrants discussed above:  Claimant/Defendants supposedly violated the Travel Act by promoting prostitution through the publication of adult advertisements on Backpage, and all funds traceable to Travel Act violations are forfeitable under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).  Further, the alleged Travel Act violations are SUAs under the federal money laundering statutes.  *See* 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1).  So financial transactions involving proceeds from these crimes allegedly violated federal money laundering statutes, 18 U.S.C. §§ 1956 and 1957.  Doc. 3 at 54 of 61.  Further, all funds traceable to violations of the money laundering statutes are forfeitable under 18 U.S.C. § 982(a)(1).  The linchpin of both of the government's criminal forfeiture theories is that Claimant/Defendants promoted prostitution through the publication of adult ads on Backpage.

**c.** **USPS Administrative Warrants**

Beginning on or about April 6, 2018, and continuing through at least May 2018, the USPS effected several *administrative* seizures.  These administrative seizures purport to reach about ███████ of assets from the Claimant/Defendants, including:

- ██████ from Lacey;

- ████████ from Larkin;

---

[18] In addition to the assets the government seized with the March 28 seizure warrants, the government also sought $██████ worth of real estate from Lacey and ████████ of real estate from Larkin.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY SEIZURE WARRANTS

1        • ███████ from Brunst; and,

2        • ███████ from Spear.

3   Ex. 8-001-007.  Unlike the civil and criminal seizures described above, the government is

4   trying to forfeit these assets "administratively" without any judicial oversight.  The bases

5   for these seizures is unclear as the government has not disclosed any supporting authority.

6                    **d.    Seizures Under Search Warrants after Government Raids**

7        On April 6, 2018, the government executed search warrants at properties owned by

8   Claimant/Defendants Lacey and Larkin.  The warrants authorized agents to seize, among

9   other things:

10       "Evidence of wealth, assets, and real estate obtained from the illicit activity"; and,

11       "Any property or proceeds resulting from money laundering. . . . to include

12       computers, currencies, coins, precious metals, artwork, jewelry, home furnishings

         and vehicles."

13

14  Ex. 16.  Because the government's view is that all proceeds from Backpage.com are from

15  illicit activities, the warrants authorized the law enforcement officers to seize anything of

16  value that they found.  The agents did just that.  The government seized cars, cash, jewelry,

17  art work, computers, collectable coins and numerous other items.

18                    **e.    Criminal Forfeiture Allegations in Superseding Indictment**

19       The government's forfeiture efforts are continuing.  On July 25, the government filed

20  a superseding indictment in the District of Arizona.  The superseding indictment added

21  some counts, but its basic theory of liability is the same as the original indictment described

22  above.  The superseding indictment also added numerous forfeiture allegations.  While the

23  vast majority seek the forfeiture of items the government has already seized through other

24  means, it added 66 additional accounts and 16 pieces of real property that were not

25  previously subject to seizure.  These include houses that Claimant/Defendants purchased

26  before Backpage ever existed.[19]

27
    _____

28  [19] About ███████ of these assets are also sought through the government's civil and criminal seizures.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY
SEIZURE WARRANTS

### f.   Additional Funds Frozen Because of Government Seizures

Mr. Larkin's wife (Claimant Margaret Larkin) was recently informed by ███████ ███████ that her six accounts would be closed, without a coherent explanation.  These accounts relate to her separate business and have nothing to do with Backpage.  In some cases, the government is informing attorneys that it intends to seize funds they have on retainer.

### B.   Rationale for the Civil Seizure Warrants Issued by This Court

The underlying premise for all the Seizures flows from the same claim, that most ads on Backpage promote the violation of California laws against prostitution (in violation of the Travel Act) and/or violate federal law against human trafficking.  Absent those assumptions, there is no predicate offense for purpose of the Travel Act allegations and no SUA under federal money laundering laws.  In support of the warrants, Inspector Versoza, averred that he believed most ads on Backpage related to illegal activity based on (1) his visiting the site and posing as an advertising purchaser, Versoza Aff. ¶ 25; (2) reviewing ads on Backpage.com as well as the records of a few cases, *id*. ¶ 28; (3) reviewing documents from various governmental agencies and authorities, including a 2010 letter from state attorney's general demanding that Backpage.com stop accepting ads in the adult category, *id*. ¶ 29a; a Senate subcommittee report, *id*. ¶ 29c; a letter from the mayor of Seattle, *id*. ¶ 29d; (4) reviewing certain internal emails of Backpage personnel, *id*. ¶ 30; (5) "conversations with law enforcement officers around the country, *id*. ¶ 32; and (6) his "training and experience" suggesting that words appearing in ads were "consistent with sex trafficking."  *Id*. ¶ 31a.

Inspector Versoza's Affidavit included no analysis of applicable law, including the numerous reported court decisions that considered and rejected identical allegations against Backpage's operations under applicable constitutional and statutory principles.  Versoza's Affidavits do not mention that, in actions recently brought by the

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY SEIZURE WARRANTS

government's "partners" at the California Department of Justice,[20] the California courts had twice rejected the specific theory on which these seizures are based and dismissed charges that the operations of Backpage.com violated California law prohibiting prostitution.  *See People v. Ferrer*, 2016 WL 7237305 (Sup. Ct. Sacramento Cty. Dec. 9, 2016) ("*Ferrer I*"); *People v. Ferrer*, No. 16FE024013 (Sup. Ct. Sacramento Cty. Aug. 23, 2017) ("*Ferrer II*").  The Affidavits also contain numerous other misstatements and material omissions.  For example, the Affidavits cherry-pick selected phrases in emails among various Backpage personnel to try to support the government's allegations, while omitting or distorting adjacent statements in the emails that directly contradict the government's theories.  The legal sufficiency of the Affidavits is addressed below.

## C.   Publishing Activities and First Amendment Rulings

Nearly all the assets the government seized in this case were derived from Claimant's/Defendants' activities as publishers.  Those assets include assets earned from decades in the newspaper publishing before Backpage was created, as well as assets related to Backpage that are presumptively protected by the First Amendment.  As explained below, those assets are not constitutionally subject to pre-conviction seizures.  Inspector Versoza's averments of probable cause fall far short of the type of showing required to support seizures of assets related either to Backpage or non-Backpage assets.

---

[20] U.S. Department of Justice Press Release, April 9, 2018 ("Last Friday, the Department of Justice seized Backpage . . . I want to thank . . . our partners with the Texas and California Attorney Generals' offices. *** The effort to seize Backpage was led by the Justice Department[] . . . with significant support from . . . the office of the California Attorney General . . ."); State of California Department of Justice Press Release, April 9, 2018 ("Today, California Attorney General Xavier Becerra announced that the world's largest online brothel, Backpage.com, and affiliated websites have been seized and shut down. The website's closure follows a joint law enforcement effort involving the California Department of Justice (CA DOJ), United States Attorney's Office for the District of Arizona" and others.)

# III.   ARGUMENT

## A.   The Seizure of Assets Arising From the Operation of Backpage.com Violates the First Amendment and Must be Vacated

### 1.   The First Amendment Prohibits Pre-Conviction Seizures of Publishing Assets

The wholesale seizure of assets and property in this case is invalid regardless of whether the property constituted proceeds from Backpage or came from non-Backpage sources. For more than five decades, the Supreme Court has held repeatedly that any seizure or pretrial forfeiture of expressive materials and related assets requires "special protection," contrary to the general presumption that "any and all contraband, instrumentalities, and evidence of crimes may be seized on probable cause." *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 63 (1989); *see also Stanford v. State of Texas*, 379 U.S. 476, 486 (1965) ("The point is that it was not any contraband of that kind which was ordered to be seized, but literary material."). In *Fort Wayne Books*, the Supreme Court invalidated a section of the Indiana RICO law that authorized the pretrial seizure of assets "subject to forfeiture" upon a showing of probable cause, which included all "property, real and personal, that 'was used in the course of, intended for use in the course of, derived from, or realized through' . . . racketeering activity." 489 U.S. at 51. The essential rationale underlying the seizure warrants the government obtained is constitutionally infirm.

In *Fort Wayne Books* the government obtained a forfeiture order based on a showing of probable cause, and the sheriff seized the real estate, publications, and other personal property of the defendants, padlocking three adult bookstores and hauling away their contents. *Id*. at 52. The Court held that the seizure violated the First Amendment because "[t]he remedy of forfeiture is not intended to restrain the future distribution of presumptively protected speech." *Id*.[21] The Supreme Court held the forfeiture order was

---

[21] This First Amendment rule cannot be circumvented by using "semantic device[s]." 489 U.S. at 65. Thus, it's immaterial whether the government attempts to sanitize the forfeiture by invoking some neutral sounding law. Regardless of whether it describes the underlying offense as violating the Travel Act or money laundering, any preemptive restriction on publishing activities is subject to strict First Amendment

unconstitutional even though the defendants in that case had 39 prior convictions for violating the state's obscenity laws as predicate offenses and even if the materials subject to seizure were themselves obscene.  Despite the fact the materials at issue could be forfeitable *upon conviction*, the Court held "the seizure at issue here is unconstitutional." 489 U.S. at 65; *see also Center for Democracy & Tech. v. Pappert*, 337 F. Supp. 2d 606, 649-650, 657 (E.D. Pa. 2004) (even for materials that may be "completely banned," *Fort Wayne Books* requires that a court "make a final determination that the material is [unprotected by the First Amendment] after an adversary hearing").

The Ninth Circuit extended this ruling to invalidate pretrial forfeiture provisions of the federal RICO statute in *Adult Video Ass'n. v. Reno*, 41 F.3d 503 (9th Cir. 1994) (readopting the court's earlier holding invalidating pretrial forfeitures as set forth in *Adult Video Ass'n. v. Barr*, 960 F.2d 781 (9th Cir. 1992)).  The court explained that "the reasoning of *Fort Wayne Books* is equally applicable to the federal RICO statute" and its authorization of pretrial forfeitures of constitutionally-protected materials "is unconstitutional on its face."[22]  It held that "[t]he First Amendment will not tolerate such seizures until the government's reasons for seizure weather the crucible of an adversary hearing."  *Id*.  The Ninth Circuit reiterated that it is not enough for the government to show probable cause to support a forfeiture order.  *Id*.; *see Fort Wayne Books*, 489 U.S. at 66 ("mere probable cause to believe a legal violation has transpired is not adequate to remove books or films from circulation").[23]

---

scrutiny.  *Id*. at 66 ("the State cannot escape the constitutional safeguards of our prior cases by merely recategorizing a pattern of obscenity violations as 'racketeering'").

[22] *Barr*, 960 F.2d at 788.  There is an even greater concern about the premature forfeiture of constitutionally-protected materials under the federal law than under the state statute invalidated in *Fort Wayne Books*.  Under the Indiana law, the government was required to show a prior conviction as a predicate act prior to forfeiture.  But the federal RICO statute only requires allegations of predicate offenses.  Consequently, the Ninth Circuit found the First Amendment problems were heightened under the federal law.  *Id*. at 788 n.5.

[23] The same principles preclude seizing, or disabling access to, a website before conviction, on a mere showing of probable cause.  *See Ctr. for Democracy and Tech. v. Pappert*, 337 F. Supp. 2d 606, 658 (E.D.

14

1        In this case, the government violated these basic First Amendment rules by using

2   seizure authority to shut down the second largest classified ad website on the internet.

3   Whether the government executed the seizure warrant to close down Backpage (as it

4   claimed to do in its public announcements) or Carl Ferrer shut it down at the

5   government's direction is immaterial.  The critical issue here is the validity of the

6   seizure orders, and all seizures of website assets, domains, and financial proceeds

7   were predicated on the same showing of probable cause.  Any order that authorizes

8   shuttering a publishing enterprise prior to trial and conviction is plainly unconstitutional.

9   *Id*.; *cf. Vance v. Universal Amusement Co., Inc*., 445 U.S. 308, 315-16 (1980)

10  (invalidating nuisance abatement law that authorized business closure prior to final

11  adjudication); *Spokane Arcades, Inc. v. Brockett*, 631 F.2d 135, 138-39 (9th Cir. 1980),

12  *aff'd mem*., 454 U.S. 1022 (1981) (same).  The same principles govern the seizure of

13  property and other assets of a publishing business, particularly where the government

14  is using the same assertions of probable cause to obtain authority to seize essentially

15  all the bank accounts and financial assets of Claimant/Defendants.

        **2.**    **The First Amendment Prohibits Pre-Conviction Seizures of**
16                **Publishing Proceeds**

17

18       Seizures of bank accounts, financial assets, and other property of

19  Claimant/Defendants must be vacated because the government cannot preemptively seize

20  the profits or proceeds of publishing before conviction any more than it can seize the

21  publications themselves.  The Supreme Court has stressed that laws restricting or

22  suppressing speech "may operate at different points in the speech process," including (1)

23  "restrictions requiring a permit from the outset," (2) "*imposing a burden by impounding*

24  *proceeds on receipts or royalties*," (3) "seeking to exact a cost after the speech occurs," or

25  (4) "subjecting the speaker to criminal penalties."  *Citizens United v. FEC*, 558 U.S. 310,

26

27  ───────────────────────

    Pa. 2004) ("Although evidence of probable cause is sufficient to make an arrest, *Fort Wayne* holds that a
28  finding of probable cause is not sufficient to completely remove a publication from circulation.").

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY
SEIZURE WARRANTS

336-337 (2010) (citations omitted) (emphasis added).   This follows from the well-established rule that depriving writers and publishers of compensation for their work violates the First Amendment.[24]   The Court explained that its holding in *Fort Wayne Books* extends to preclude precisely the type of pre-conviction seizures of bank accounts and other assets as took place here:

> [W]e assume without deciding that bookstores and their contents are forfeitable (like other property such as a bank account or a yacht) when it is proved that these items are property actually used in, or derived from, a pattern of violations of the State's obscenity laws.  *Even with these assumptions though, we find the seizure at issue here unconstitutional*.

*Fort Wayne Books*, 489 U.S. at 65; *see also id*. at 51 (invalidating pretrial forfeiture of assets, including all "property, real and personal, that 'was used in the course of, intended for use in the course of, *derived from, or realized through*' . . . racketeering activity") (emphasis added); *American Library Ass'n. v. Thornburgh*, 713 F. Supp. 469, 484 n.19 (D.D.C. 1989) ("pre-trial seizure of non-expressive material [including 'printing presses, bank accounts, etc.'] *ex parte* from a business engaged in expressive material also is unconstitutional"), *rev'd on standing grounds sub nom. American Library Ass'n. v. Barr*, 956 F.2d 1178, 1194-96 (D.C. Cir. 1992) ("Plaintiffs may be correct that [the government's assertion of seizure authority] is so indefensible when it comes to wholesale pretrial seizures of expressive material that only the occasion is needed to pronounce its doom.").

The Court applied these principles to hold the First Amendment prohibits government action to seize proceeds derived from publishing activities under a forfeiture regime in *Simon & Schuster, Inc. v. Members of the New York State Crime Victims Bd*., 502 U.S. 105 (1991).   In that case the Court found that the government cannot "freeze" profits

---

[24] *See U.S. v. Nat'l Treasury Empl's Union*, 513 U.S. 454, 468-69 (1995); *U.S. v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000) (reducing the profitability of a business can infringe the First Amendment because "[t]he distinction between laws burdening and laws banning speech is but a matter of degree"); *Matal v. Tam*, 137 S. Ct. 1744 (2017) (denial of the benefits of trademark registration violates the First Amendment); *cf. Minneapolis Star & Tribune Co. v. Minnesota Comm'r. of Revenue*, 460 U.S. 575, 583-84 (1983) (special taxes on the press act as "a form of prior restraint on speech").

from the sale of a book under a statutory scheme that generally authorizes forfeiture of proceeds of crime and prejudgment attachment procedures to ensure that wrongdoers "do not dissipate their assets."[25] The Court assumed without deciding that the income escrowed by the law "represents the fruits of crime," but nevertheless held that the law was "presumptively inconsistent with the First Amendment" to the extent it "imposes a financial burden on speakers because of the content of their speech." *Id*. at 115. Various similar state laws likewise have been invalidated as unconstitutional.[26] In the wake of *Simon & Schuster,* the Department of Justice updated the U.S. Attorney's Manual to state that the forfeiture provisions involved, targeting "proceeds 'received or to be received' from First Amendment activity "and similar 'Son of Sam' laws have fallen into disuse because *there is little doubt, if any, that they are inconsistent with the First Amendment*." USAM § 1104 (emphasis added); *see also id*. § 1105 (under *Simon & Schuster*, forfeiture laws "that single out the proceeds of speech concerning a crime committed by the speaker" are unconstitutional).

The First Amendment thus precludes the government's pre-trial actions to seize Claimant's/Defendants' bank accounts or other financial assets based on the allegation they represent illegal profits derived from Backpage. As a matter of basic constitutional law, the government cannot assert that a website hosts illegal content and impose restrictions in

---

[25] *Id*. at 111. In this regard, its purpose was identical to the RICO forfeiture provisions struck down in *Barr*, 960 F.2d at 788 (enjoining 18 U.S.C. § 1963(d) authorizing government action "to preserve the availability of property . . . for forfeiture").

[26] *See Seres v. Lerner*, 102 P.2d 91, 97-98 (Nevada 2004) (striking down Nevada law creating special cause of action allowing victims to sue to recover "all proceeds, regardless of the extent to which the work relates to the crime against the victim"); *Keenan v. Superior Court of Los Angeles County*, 40 P.3d 718 726 (Cal. 2002) (striking down California law that confiscates "all income from expressive materials, whatever their general themes or subjects"); *In re Opinion of the Justices to the Senate*, 764 N.E.2d 343, 350-51 (Mass. 2002) (finding Massachusetts' proposed "Son of Sam" law violated the First Amendment); *Curran v. Price*, 638 A.2d 93 (Md. 1994) (striking down Maryland law "because of the financial restrictions it placed on crime-related expression"); *see also State ex rel. Napolitano v. Gravano*, 60 P.3d 246, 255 (Arizona App. 2002) (upholding Arizona law to the extent forfeiture is restricted to the specific proceeds of racketeering and defendant is accorded full due process *before* seizure, including an adversary proceeding where the state has the burden of proof).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY SEIZURE WARRANTS

advance of trial and conviction based on those allegations.  *See Backpage.com, LLC v. Dart,* 807 F.3d 229, 230-31 (7th Cir. 2015) (enjoining Sheriff's actions to "suffocate" website financially based on allegations of illegality).  Such a theory would permit the government to penalize speech by assuming the truth of the very point it must prove at trial.  Consequently, this Court should immediately vacate all civil seizure warrants because they were predicated on the government's claim that it demonstrated probable cause to believe Backpage hosted illegal advertisements.

### B.   Even if Seizure of Publishing-Related Assets or Proceeds Could be Justified, the Procedures Employed Here Were Constitutionally Deficient

Whenever the law authorizes the seizure of materials (or proceeds therefrom) that are even arguably protected by the First Amendment, the Supreme Court has long held that more rigorous procedural protections must be used.  In circumstances such as these, the government must use "procedural safeguards designed to obviate the dangers of a censorship system."  *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559-560 (1975).  Such safeguards include placing "the burden of instituting judicial proceedings, and of proving that the material is unprotected . . . on the censor, limiting any restraint to "a specified brief period" to preserve the status quo, and ensuring "a prompt final judicial determination."  *Id.* at 560; *see Freedman v. Maryland*, 380 U.S. 51, 58 (1965).  None of these constitutionally-required procedures were followed in this case, where the government seized vast amounts of publishing-related assets using *ex parte* seizure warrants and other means and scheduled no subsequent hearings of any kind.  To make matters worse, the government continues to this day to seize additional assets on an *ex parte* basis.

These procedural requirements have been articulated in various contexts in which First Amendment rights were implicated.  In *Blount v. Rizzi*, 400 U.S. 410 (1971), the Supreme Court invalidated provisions of federal law that authorize the Postmaster General to halt use of the mails and of postal money orders for commerce in allegedly obscene materials, or to obtain a court order to detain the defendant's incoming mail pending the

outcome of administrative proceedings.  The Court observed that "the First Amendment requires that procedures be incorporated that 'ensure against the curtailment of constitutionally protected expression, which is often separated from obscenity only by a dim and uncertain line.'"  *Id*. at 416 (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66 (1963)).

Among other things, this places the burden of initiating judicial review and of proving that the material is unprotected expression on the censor and requires final judicial determination on the merits within a specified, brief period to prevent the administrative decision of the censor from achieving an effect of finality.  *Id*. at 417.  The Court stressed that only a judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression, and that a mere showing of probable cause cannot be sufficient to justify the seizure.  *Id*. at 418-20.  It held that the procedures were constitutionally deficient both because of the delay involved and because claimants were not guaranteed a final judicial determination on the issue of obscenity.  *Id*. at 421-22; *see, e.g., U.S. v. Treatman*, 408 F.Supp. 944, 954-56 (C.D. Cal. 1976) (applying *Blount* to invalidate postal law authorizing injunctions barring the mailing of sexually-oriented advertising because the provision "contains none of the required procedural safeguards").

Even where laws authorizing seizures are facially valid, the Supreme Court has held that the First Amendment requires that they be interpreted to incorporate adequate procedures.  Thus, in *U.S. v. Thirty-Seven Photographs*, 402 U.S. 363 (1971), the Supreme Court interpreted the seizure provisions set forth in Section 1305(a) of the Tariff Act of 1930 as including strict procedural requirements when U.S. Customs agents seized books, pamphlets, advertisements or other materials alleged to be obscene.  Applying *Freedman*, the Court held that seizures could be upheld under the Tariff Act only if the government initiated judicial proceedings "no more than 14 days from the seizure of the goods" and received a final judicial ruling on the merits within "60 days from the filing of the action."  *Id*. at 373-74.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY
SEIZURE WARRANTS

In this case, the seizure warrants must be vacated because the government followed none of the constitutionally-required procedures.  It obtained seizure warrants based on nothing more than a flawed showing of probable cause; it failed to initiate judicial proceedings of any kind to rule on the validity of the seizures (much less doing so within a reasonable period); and it has no process for obtaining a final judicial ruling on the merits of its claims that the publishing-related assets and proceeds are forfeitable.  The government's actions flout the constitutional procedures that exist to prevent the possibility that "the censor's determination may in practice be final."  *Blount*, 400 U.S. at 419 (quoting *Freedman*, 380 U.S. at 57-58).

### C.   The Government's Probable Cause Showing Was Defective and Any Hearing on the Validity of the Seizures Will Require the Government to Satisfy a Heightened Burden of Proof

While no pre-conviction seizure of assets or proceeds of publishing activities should have been permitted under the principles of *Fort Wayne Books*, the Court had no opportunity to assess the legality of the Seizures because the government improperly accomplished its objectives using *ex parte* procedures.  In this case, the Versoza Affidavits were deficient even to establish probable cause because they omitted any reference to relevant legal authority and were riddled with false statements, distortions, and material omissions.  In this case, because First Amendment considerations are involved, the Court should vacate the seizure warrants in their entirety.  But if it is inclined to permit the government to justify the Seizures after the fact, the government must support them with more than a probable cause showing.  Any hearing on the validity of the seizures must place the burden on the government to demonstrate that the specific challenged advertisements related to illegal activity, that Claimant/Defendants had actual knowledge of the specific ads at issue, that Claimant/Defendants knew those specific ads related to illegal activity, and that Claimant/Defendants acted with criminal intent with respect to those specific ads.  In meeting its burden, the government must provide specific evidence, and cannot reply on

20

the mere "judgment" or "belief" of the officer providing the affidavit nor on any presumption that ads related to unlawful activity.

### 1. The Versoza Affidavits Do Not Even Establish Probable Cause that Claimant/Defendants Committed Any Crimes

The Claimant/Defendants are entitled to a prompt hearing to challenge the sufficiency of warrants authorizing search or seizure under the Due Process Clause of the Fifth Amendment. *United States v. Crozier*, 777 F.2d 1376, 1383 (9th Cir. 1985); *United States v. $52,100 in U.S. Currency*, No. 17-CV-2002-BAS-JMA, 2018 WL 1782934, at *2 (S.D. Cal. Apr. 13, 2018). In this connection, a warrant obtained with an intentionally or recklessly false affidavit "must be voided and the fruits of the search excluded to the same extent as if probable cause were lacking."[27] Once it is shown that a statement in the affidavit is false, the Court must decide if there was probable cause for the warrant notwithstanding the false statement. *United States v. Christakis,* 238 F.3d 1164, 1167 n.1 (9th Cir. 2001). *Franks* also requires suppression when the search warrant was obtained with an affidavit that intentionally or recklessly omits material facts. *See Franks v. Delaware*, 438 U.S. at 156; *United States v. DeLeon,* 979 F.2d 761, 763 (9th Cir. 1992). In such a case, the Court must decide if there was probable cause for the warrant if the omitted information is included. *Id.* at 764.[28] These requirements apply any time the government seizes assets it alleges resulted from criminal activity. But here, as explained below, the government's burden is much higher.

---

[27] *United States v. Hall*, 113 F.3d 157, 159 (9th Cir. 1997) (quoting *Franks v. Delaware,* 438 U.S. 154, 156 (1978). *See United States v. One 1987 Mercedes Benz, 190E VIN: WDBDA28DXHF373152*, No. 90 C 3484, 1992 WL 198441, at *5–6 (N.D. Ill. Aug. 11, 1992) (finding of probable cause vacated where the court affidavit in support of a civil seizure warrant contained false statements that misled the judge signing the warrant).

[28] In this regard, "misstatements or omissions of government officials which are incorporated in an affidavit for a search warrant are grounds for [suppression], even if the official at fault is not the affiant." *DeLeon,* 979 F.2d at 764.

## 2. The Versoza Affidavits Omit Reference to Controlling Case Law

The Versoza Affidavits contained both errors of omission and commission. The most serious omission was his failure to mention any of the cases finding the First Amendment protects online classified advertising sites generally, and Backpage.com in particular. This omission is critical, since *all* the forfeiture allegations hinge on allegations that most ads on Backpage.com violate California laws against prostitution and/or federal law against human trafficking. Without the underlying "specified unlawful activities," there is no predicate for Versoza's allegations that resulting financial transactions violated federal money laundering laws or that the Travel Act was implicated. Yet the Versoza Affidavits do not disclose that the government knew that the California courts had *twice* rejected the specific theory on which *these* seizures are based: the allegation that the operations of Backpage.com violated California law prohibiting prostitution.[29] The Versoza Affidavits also do not disclose that claims against Backpage.com premised on 18 U.S.C. § 1591 also have been dismissed.[30]

---

[29] Those failed California prosecutions are intertwined with this case, as the government and the California DOJ "partnered" in their efforts to take down Backpage, yet the Versoza Affidavits *do not mention the failed prosecutions or disclose that both courts dismissed charges* based on the theory that hosting (or editing) classified ads for adult services promote prostitution. *See People v. Ferrer*, 2016 WL 7237305 (Sup. Ct. Sacramento Cty. Dec. 9, 2016) ("*Ferrer I*"); *People v. Ferrer*, No. 16FE024013 (Sup. Ct. Sacramento Cty. Aug. 23, 2017) ("*Ferrer II*") (holding the First Amendment and Communications Decency Act ("CDA") foreclose suit "against an online publisher when that suit is based on speech provided by a third party"). The courts explained that "the relevant question in this case is whether, and to what extent, Defendants' activities entitle them to protection *of their First Amendment rights* through the immunity provision of the CDA" *Ferrer I*, 2016 WL 7237305, at *3 (emphasis added d). *See Ferrer II*, slip op. 11 ("[T]he protections afforded by the First Amendment were the motivating factors behind … the CDA.").

[30] *E.g.*, *Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 21 (1st Cir. 2016). Although *Doe No. 1* was decided based on statutory immunity under 47 U.S.C. § 230(c)(1), the court also found the factual averments in the complaint were inadequate: "Though a website conceivably might display a degree of involvement sufficient to render its operator both a publisher and a participant in a sex trafficking venture (say, that the website operator helped to procure the underaged youths who were being trafficked), the facts pleaded . . . do not appear to achieve this duality." *Id*. No such allegations were ever made against Backpage.com, and the Versoza Affidavits contain none.

Inspector Versoza based his seizure analysis on his estimate that 90 percent of Backpage.com's revenues "are generated from 'adult' and 'escort' ads," Versoza Aff. 1 at ¶ 7.b. & n.1, but fails to disclose that numerous courts have rejected arguments seeking to equate ads in these categories on Backpage.com (or other websites) as synonymous with prostitution or trafficking. *Dart*, 807 F.3d at 234 ("[N]ot all advertisements for sex are advertisements for illegal sex.")[31] Indeed, no court to address that question has ever reached a contrary conclusion, but the Versoza Affidavits omit any mention of any of these cases. Under these circumstances, Inspector Versoza's claim that the evidence is sufficient to establish probable cause is demonstrably false.

More specifically, courts have also rejected the bases on which Inspector Versoza's broad-brush conclusions rest. For example, he based his allegation that "most" Backpage revenue was derived from illegal activity on what he calls "publicly available materials," *id.* at ¶ 9.a., including a 2010 letter from state attorneys general asserting that ads for prostitution and sex trafficking are "rampant" on Backpage.com, *id.* at ¶ 29.a., a January 2017 Senate subcommittee report, *id.* at ¶ 29.c., an August 2011 letter from the mayor of Seattle that took Backpage.com to task for not adopting an in-person age verification procedure, *id.* at ¶ 29.d., a 2015 statement from a detective in the Seattle Police Department, *id.* at ¶ 32, and a 2015 statement from a detective in the Boston Police Department. *Id.* at ¶ 32. Contrary to Inspector Versoza's allegation, the court in *Cooper*, 939 F. Supp. 2d at 816, 831-35, rejected Tennessee's reliance on *the same letter* from state attorneys general that

---

[31] *Accord Doe v. Backpage.com LLC*, 104 S Supp. 3d 149, 156-57 (D. Mass. 2015), *aff'd*, 817 F.3d 12 (1st Cir. 2016) ("The existence of an escorts section in a classified ad service, whatever its social merits, is not illegal."); *Backpage.com, LLC v. McKenna*, 881 F. Supp. 1262, 1282 (W.D. Wash. 2012) (escort ads have long been permitted and escort services are licensed and regulated in many states); *Backpage.com, LLC v. Cooper,* 939 F. Supp. 805, 816, 833-34 (D. Tenn. 2013) (ads on Backpage.com are protected speech under the First Amendment); *Backpage.com, LLC v. Hoffman*, 2013 WL 4502097, at *9-11 (D.N.J. 2013) (rejecting argument that escort ads on the website are unprotected speech); *M.A. v. Village Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041, 1049-50 (E.D. Mo. 2011)*; see also Dart v. Craigslist*, Inc., 665 F. Supp. 2d 961, 968 (N.D. Ill. 2009) ("We disagree … that the 'adult services' section is a special case. The phrase 'adult,' even in conjunction with 'services,' is not unlawful in itself nor does it necessarily call for unlawful content."); *Cohen v. Bd. of Supervisors*, 707 P.2d 840, 852 (Cal. 1985) ("An escort service may very well involve lawful activities relating to sex.") (internal quotation marks omitted).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY SEIZURE WARRANTS

Versoza referenced (as well as a 2011 letter from the AGs to the same effect) and held that the state could not constitutionally presume that classified advertisements deemed "adult" or that were sexually-oriented relate to illegal activity (nor could it enact legislation to prohibit such ads). *Id*. at 834 (noting "numerous legal activities unrelated to child sex trafficking that could comprise a 'sexual act,' from 'phone sex services, nude dancing, online chat services, [and] adult-pay-for-view websites [to] other legal sexually oriented material").[32]  The court in *McKenna*, 881 F. Supp. 2d at 1282, likewise considered anecdotal evidence from police detectives but found such evidence could not support equating "adult" advertising with criminality. *Id*. at 1277-78.  The courts in *McKenna* and *Cooper* likewise rejected Inspector Versoza's assumption that the absence of an age-verification mechanism is evidence of criminal behavior or intent. *Id*. at 1277; *Cooper*, 639 F. Supp. 2d at 830.  Reliance on congressional reports is likewise insufficient to reach a conclusion about the legality of a website and is of doubtful admissibility in any event.[33]

Courts also have rejected the other bases on which Inspector Versoza asserted probable cause for a seizure, including his visit to Backpage.com to pose as a purchaser in the website's "dating" section, Versoza Aff. ¶ 25, his purported "review" of "several thousand" ads (out of millions) "in the various 'adult' categories of Backpage," and his conclusion that more than half of those ads used terms and phrases "consistent with sex trafficking and prostitution." *Id*. at ¶ 31.  These are precisely the same "indicia" of prostitution the court rejected in *Dart v. Craigslist*.[34]

---

[32] *See also Backpage.com, LLC v. Dart*, 807 F.3d at 234 (listing additional examples of legal adult ads on Backpage.com, including ads relating to fetishism, phone sex, and striptease artists); *Craigslist, Inc.*, 665 F. Supp. 2d at 968 ("A woman advertising erotic dancing for male clients ('w4m') is offering an 'adult service,' yet this is not prostitution.").

[33] *E.g.*, *Pearce v. E.F. Hutton Grp., Inc.*, 653 F. Supp. 810, 813-16 (D.D.C. 1987) ("Given the obviously political nature …, it is questionable whether any report by a committee or subcommittee of [Congress] could be admitted … against a private party."); *Bright v. Firestone Tire & Rubber Co.*, 756 F.2d 19, 22-23 (6th Cir. 1984) (*per curium*) (excluding House subcommittee report as inadmissible).

[34] Phrases Inspector Versoza said were "indicative" of illegal activity include "roses," "in-call," "outcall," "GFE," and "PSE."  Other asserted indicia of criminality included "sexually provocative pictures" that in his "training and experience" are indicative of ads for prostitution, including

In *Dart,* the sheriff of Cook County, Illinois, alleged that Craigslist was aiding and abetting prostitution because most of the ads in its erotic services section "are veiled (sometimes very thinly) using code words," such as "'roses' mean dollars and 'greek' refers to anal sex."   Sheriff Dart relied on third party claims for his conclusion that "Craigslist is now the single largest source for prostitution, including child exploitation, in the country," and he also pointed to his own use of sting operations as "evidence" of the website's culpability.  665 F. Supp. 2d 961, 962-63 (N.D. Ill. 2009).  But the court concluded that Sheriff Dart "is simply wrong when he insists that these terms are all synonyms for illegal sexual services," and rejected his "conclusory allegations to support the contention that Craigslist induces users to post ads for illegal services."  *Id*. at 968-69.  The court held that providing a platform for the speech of someone who might commit illegal acts "does not satisfy the ordinary understanding of culpable assistance to a wrongdoer."  *Id*.  at 967;  *see also McKenna*, 881 F. Supp. 2d at 1279 ("where an online service provider publishes advertisements that employ coded language, a reasonable person could believe that facts exist that do not in fact exist: an advertisement for escort services may be just that").   Any hearing to assess the government's probable cause showing must consider these applicable decisions (as well as the government's failure to mention them).

### 3.    The Versoza Affidavits Contain False and Misleading Statements

The Versoza Affidavits also contain numerous false and misleading factual statements regarding Claimant/Defendants' level of knowledge of, and involvement with, illegal third-party ads on Backpage.com.  Such allegations start with a faulty premise that equates a general *awareness* of some illegal third-party speech with *criminal responsibility* for specific advertisements, and Inspector Versoza further distorts the meaning of the evidence he cites.  For example, he describes a September 25, 2010, email Ferrer wrote after receiving a

---

"woman's cleavage," "buttocks presented in a sexual manner," and "women posing in sexual positions wearing lingerie and woman bending over revealing her naked buttocks."  Versoza Aff. at ¶ 31.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY SEIZURE WARRANTS

letter from several state attorneys general and mischaracterizes it as saying "Backpage was unwilling to delete ads that included terms indicative of prostitution because doing so would 'piss[] off a lot of users who will migrate elsewhere' and force Backpage to refund those customers' fees."  Versoza Aff. at ¶ 29(b).  Contrary to this claim, the document refers neither to prostitution nor ads that are "indicative of prostitution," but only to ads that violate Backpage's terms of use (violations that could be for any number of reasons, *e.g.*, excessive nudity).  Contrary to the averments in Versoza's Affidavits, the Ferrer's notes do not say he was unwilling to delete ads, but rather discusses the pros and cons of deleting ads versus removing only the offensive content from ads.[35]

Inspector Versoza's claim that internal Backpage.com communications proved "Backpage has instituted policies and procedures designed to maintain its promotion of sex trafficking and prostitution" materially distorts the documents he references.  Versoza claimed that Backpage internal communications showed its editorial practices sought to "'sanitize' some of the language Backpage customers use to advertise in order make the advertising of sex trafficking less overt," Versoza Aff. at ¶ 30, but Versoza supported this claim by cherry-picking isolated phrases from certain emails, while omitting adjacent text that changed the import of the quoted material, sometimes entirely reversing their meaning.  For example:

| Versoza's Claims | What the Emails Actually Said |
|---|---|
| ¶ 30(a):  Inspector Versoza swore that "[i]n April 2008, Ferrer wrote an email explaining that although he was 'under pressure to clean up phoenix's [sic] adult content,' he was unwilling to delete prostitution | The actual email does not mention "prostitution ads."  It does say Ferrer is unwilling to delete entire ads that contain certain terms (none of which reference "prostitution" or sex for money) ***because*** "[d]eleting ads and dealing with chargebacks |

---

[35] Ferrer's notes say that if the ad is simply removed, the "[u]ser does not know what they did wrong."  The document then states, "I would like to go back to having our moderators remove bad content in a post and then locking the post from being edited."  Also, contrary to the false impression given by Versoza's Affidavit, there is no indication that the document was written in response to the law-enforcement letter from which Versoza quotes.  Ex. 17.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY
SEIZURE WARRANTS

| | |
|---|---|
| ads because doing so 'would put us in a very uncompetitive position with craig[slist.'" | is messy.  They will just re-post and I get no where [sic]."  *See* Ex. 9 (emphasis added). Versoza distorted the email's meaning. |
| ¶30(b):  Versoza swore that "[o]n October 8, 2010, a Backpage manager sent an email threatening to fire any Backpage employee who acknowledged, in writing that a customer was advertising prostitution:  'Leaving notes on our site that imply that we're aware of prostitution, or in any position to define it, is enough to lose your job over. . . .  This isn't open for discussion.  If you don't agree with what I'm saying completely, you need to find another job." | Inspector Versoza used an ellipse and omitted the following from the middle of the email:  "There was no mention of prostitution in the power point presentation. That was a presentation designed to create a standard for what images are allowed and not allowed on the site.  If you need a definition of 'prostitution', get a dictionary.  Backpage and you are no position to redefine it."  *See* Ex. 10.  Versoza's description of the email is misleading. |
| ¶30(d):  Inspector Versoza swore that on October 16, 2010, a Backpage manager sent an internal email stating "'I'd like to still avoid Deleting ads when possible,' that 'we're still allowing phrases with nuance,' and that '[i]n the case of lesser violations, editing should be sufficient.'" | The email actually said in relevant part:  [W]e need to intensify our efforts in cleaning Escorts, Body Rubs, Male Escorts, TS Escorts and Dom & Fetish.  This intensification will come in the form of extra staff and overtime but most importantly in stricter standards for language and images in ads.  I'd still like to avoid Deleting ads when possible, but *if an ad makes a clear reference to sex for money or an image displays a sex act, don't hesitate deleting it.  Those are not the types of ads we want on our site at all.*  In the case of lesser violations, editing should be sufficient.  *We're still allowing HBO type nudity but if an image makes you think twice, remove the image.*  There is zero tolerance for closeups of exposed |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY
SEIZURE WARRANTS

| | |
|---|---|
| | genitalia.<br><br>. . .<br><br>***If you find yourself locking ads for any user more than twice, lock their entire account . . . .***<br><br>Ex. 11 (emphasis supplied).   Versoza seriously misrepresented the content of this email. |
| ¶30(e):   Inspector Versoza swore that an October 25, 2010 email stated "'[i]llegal content removed' through Backpage's moderation processes was 'usually money for sex act.' This email also explained that, after the 'sex act pics are removed,' the 'ad text may stay.'"   Versoza's description suggests the email says that an advertisement for prostitution may remain after sex-act pictures are removed. | The email Inspector Versoza cited is actually a list of recommendations that deal with various types of problems.   One involves advertisements of "money for sex act."   The email actually says two times that such advertisements are not allowed and says three separate times that they are deleted. The email separately says that "sex act pics are a common problem," that the sex act pictures are removed and that after that the remaining text may remain.   By combining the issues of ads for prostitution and sexually explicit pictures—issues that the email treats separately—Versoza falsely implies the email says ads for prostitution may remain after sexually explicit pictures are removed. *See* Ex. 12. |

On balance, the Versoza Affidavits were wholly deficient even under a standard *Franks* analysis.   The affidavits asserted broad conclusions of law without disclosing the controlling cases that addressed the dispositive issues, including cases that undermined the specific allegations that Backpage.com was being operated in violation of California law prohibiting prostitution.   The affidavits also are rife with affirmative misstatements of the evidence that further undermine any findings of probable case.   Even if the affidavits were

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY
SEIZURE WARRANTS

not deficient, however, a finding of probable cause would be insufficient to justify the seizures, as explained below.

### D. Any Hearing on the Validity of Seizures of Proceeds From Publishing Must Satisfy Both Fourth and First Amendment Requirements

Because the orders in this case apply to seizures involving publishing assets and proceeds, the government must do more than satisfy a *Franks* analysis. The Supreme Court has explained that "while the general rule under the Fourth Amendment is that any and all contraband, instrumentalities, and evidence of crimes may be seized on probable cause (and even without a warrant in various circumstances), *it is otherwise when materials are presumptively protected by the First Amendment*." *Fort Wayne Books*, 489 U.S. at 65. Publishing-related materials (and proceeds) cannot be equated with other criminal contraband and must satisfy not just the Fourth Amendment but the First Amendment as well. *E.g.*, *A Quantity of Books v. Kansas*, 378 U.S. 205, 211-12 (1964) ("It is no answer to say that obscene books are contraband, and that consequently the standards governing searches and seizures of allegedly obscene books should not differ from those applied with respect to narcotics, gambling paraphernalia and other contraband.").[36]

As explained above, where the proceeds of publishing are involved, the government should have been barred from conducting a pre-conviction seizure and its actions should have been restrained by strict procedural safeguards. However, the government already acted preemptively to seize the proceeds of a publishing venture, and the Court must decide how to evaluate its actions. Claimant's/Defendants' position is that the seizure orders should be vacated immediately. But, if the Court decides instead to hold a hearing on the validity of the seizures, certain guiding First Amendment requirements must govern:

---

[36] *See also  Stanford v. State of Texas*, 379 U.S. 476, 486 (1965) ("The point is that it was not any contraband of that kind which was ordered to be seized, but literary material."); *Marcus v. Search Warrant*, 376 U.S. 717, 730-31 (1961) ("The Missouri Supreme Court's assimilation of obscene literature to gambling paraphernalia or other contraband for purposes of search and seizure does not therefore answer appellants' constitutional claim, but merely restates the issue whether obscenity may be treated in the same way.").

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY SEIZURE WARRANTS

- ***First***, the burden of proof rests firmly on the government, and it cannot justify a seizure with a mere showing of probable cause.[37]

- ***Second***, the government's burden includes proving that the *specific* advertisements for which it seeks to seize proceeds related to unlawful conduct, that Claimant/Defendants knew those *specific* advertisements related to unlawful conduct, and also proving scienter – that Claimant/Defendants had the required guilty state of mind with respect to those *specific* advertisements. *Smith v. California*, 361 U.S. 147 (1959).

- ***Third***, the government cannot justify a seizure simply because it is convinced the material at issue "looks like" unprotected speech, *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244, 255 (2002), and this is true notwithstanding a police officer's sworn belief the expressive materials he reviewed promote illegality. *Roaden*, 413 U.S. at 506 (seizure of expressive materials cannot be based "solely on a police officer's conclusions.").

## 1. The Government Must Link Any Seized Assets to Specific Evidence of Illegal Activity on the Part of Claimant/Defendants

For Claimant/Defendant to be considered culpable for advertisements published on Backpage (and thus to justify any seizure of proceeds), it is not enough for the government to allege that ads for prostitution sometimes (or even often) appeared on Backpage, or even to claim that Claimant/Defendants were aware of the possibility (or even the likelihood) of such postings. The Supreme Court has long held that under the First Amendment the government cannot impose liability for distributing expressive materials without proof of scienter. In *Smith v. California*, 361 U.S. at 153-54, for example, the Supreme Court struck down a Los Angeles ordinance making it a crime for booksellers to possess obscene books. Even though the First Amendment does not protect obscene speech, the Court concluded that a bookseller could not be held liable without proof of

---

[37] *See United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."); *id.* at 818 ("When First Amendment compliance is the point to be proved, the risk of nonpersuasion … must rest with the Government, not with the citizen."); *Bd. of Trustees v. State Univ. of N.J. v. Fox*, 492 U.S. 469, 480 (1989) ("the State bears the burden of justifying its restrictions"); *Fort Wayne Books*, 489 U.S. at 63 (seizure cannot be based on probable cause).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY
SEIZURE WARRANTS

knowledge concerning the contents of a given book because in the absence of scienter, there is "the hazard of self-censorship of constitutionally protected material ....". *Mishkin v. New York*, 383 U.S. 502, 511 (1966)*; see also Elonis v. United States*, 135 S. Ct. 2001, 2009 (2015) ("[W]rongdoing must be conscious to be criminal.").  Where a website publishes millions of advertisements, the government cannot justify a wholesale seizure of assets based on allegations that the website's former owners had some general level of awareness that third-parties posted ads for prostitution.  This is particularly true under the offenses alleged in the Versoza affidavits.  Versoza's legal theory supporting the seizure warrants was that most ads on Backpage.com related to prostitution in violation of California law, and sex trafficking in violation of 18 U.S.C. § 1591, both of which require a showing of specific intent.  In the case of Section 1591, the Justice Department has argued "[e]ven if an advertisement for illegal sex trafficking appeared on [its] website, an operator could not be convicted under [the law] *without proving that* [*it*] *knew* that the advertisement at issue related to illegal sex trafficking of a minor or of a victim of force, fraud, or coercion." DOJ's Reply in Support of Motion to Dismiss at 7-8, *Backpage.com, LLC v. Lynch*, No. 1:15-2155 (RBW), ECF No. 13 (emphasis added).   The district court accepted this interpretation of the statute. *Backpage.com, LLC v. Lynch*, 216 F. Supp. 3d 96, 107 (D.D.C. 2016).  Likewise, prostitution under California law is a specific intent crime. *See* Cal. Penal Code § 647(b)(1) ("An individual agrees to engage in an act of prostitution when, with specific intent to so engage . . . .).  If the government cannot obtain a conviction without such evidence, it cannot preemptively seize the proceeds of publishing without such proof.

Further, this month, in response to challenges to Allow States and Victims to Fight Online Sex Trafficking Act of 2017 ("FOSTA"), 18 U.S.C. § 2421(A), the U.S. Department of Justice stated:

> •"Only actions taken with the intent to promote or facilitate the prostitution of another person in a jurisdiction where prostitution is illegal, per Section 2421A and Section 4(a) of FOSTA, or knowing sex trafficking under Section 1591, fall with the specifications of the Act."  Ex. 15 at 10 of 29.

31

•"Case law concerning 18 USC § 1956, the federal money laundering statute . . . [e]ssentially [require] the government [to] show the transaction at issue was conducted with the intent to promote the carrying on of a specified unlawful activity. . . . [T]here must be evidence of *intentional* promotion.  In other words, the evidence must show that the defendant's conduct not only promoted a specified unlawful activity but that he engaged in it *with the intent* to further the progress of that activity."  *Id.* at 13-14 of 29 (emphasis in original).

•[H]ere, plaintiffs fail to show a credible threat of prosecution because they do not allege that they have the intent to ***further specific acts*** of prostitution."  *Id.* at 16 (emphasis added).

•[A]ll FOSTA did with respect to criminal law was create a new federal offense that mirrors one that already exists."  *Id.*

•The criminal act prohibited in Section 2421A(b)(2) is . . . the intentional promotion or facilitation of prostitution.  Critically proof of intent is a higher *mens rea* than knowledge."  *Id.* at 22 of 29.

Thus, under the applicable and widely-recognized legal standard, the government has the burden to prove that Claimant/Defendants had the requisite knowledge and intent *with respect to the particular advertisements for which the government claims authority to forfeit proceeds*.  The generalized averments in the Versoza Affidavits at most attempt to establish that certain bank accounts or assets can be traced to earnings from Backpage.com. However, such a showing paints with much too broad a brush.  The government has the burden to trace assets it seeks to seize to (i) particular ads relating to unlawful conduct, (ii) *about which Claimant/Defendants had the requisite knowledge*, and (iii) *as to which Claimant/Defendants had the intent to promote the illegal conduct being advertised*. Absent such proof, the government will be unable to show any offense was committed by the publication of an ad for which Claimant/Defendants could be culpable, and the government will have no basis on which to support a seizure of assets.

Such a requirement flows not just from the need to prove scienter, but also from bedrock law that a special showing of particularity is required when "the things to be seized" implicate the First Amendment. *Roaden*, 413 U.S. at 504. For example, the government could not constitutionally seize the entire contents of a bookstore or its assets based on an allegation that some books (or even many of the books) sold were unlawful or promoted illegality. *See, e.g.*, *United States v. California Publishers Liquidating Corp.*, 778 F. Supp. 1377, 1388-89 (N.D. Texas 1991) (forfeiture limited to materials found to be obscene). Here, however, virtually all assets asserted to be proceeds from Backpage.com were seized based on Inspector Versoza's averments that he saw ads on Backpage.com that he believed were "indicative of" prostitution and his estimates as to the proportion of legal versus illegal content on the website.

Seizures based on such general allegations overlook the fact that profiting from the sale of advertisements for adult services is a legal activity protected by the First Amendment, even if some (or even many) of the advertisements ultimately are found to promote illegal services.[38] Indiscriminately seizing the proceeds from the sale of all ads on a website based on an allegation that some proportion of them (in the government's estimation) promoted illegal services has the feel of a general warrant, which the Supreme Court has long held to be "constitutionally intolerable." *Stanford v. Texas*, 379 U.S. at 486. In *Stanford*, the Court voided a warrant and ordered the return of property seized from a mail order book business that prosecutors alleged violated a state law prohibiting communist activity. Even though the Court assumed the warrant was duly

---

[38] *McKenna*, 881 F. Supp. 2d at 1281 ("The third-party publication of offers to engage in illegal transactions does not fall within 'well-defined and narrowly-limited classes of speech' that fall outside First Amendment protection."); *Cooper*, 939 F. Supp. 2d at 830 ("While prostitution may be illegal in Tennessee, the statute at issue here does not criminalize prostitution – it criminalizes the sale or potential sale of advertisements."); *Dart v. Craigslist*, 665 F. Supp. 2d at 967 (providing a platform for the speech of someone who might commit illegal acts "does not satisfy the ordinary understanding of culpable assistance to a wrongdoer"); *Ferrer II*, No. 16FE024013, slip op. 13 ("Here, there is no dispute that Backpage charged money for the placement of advertisements. Providing a forum for online publishing is a recognized legal purpose").

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY SEIZURE WARRANTS

issued upon a showing of probable case, it held it was the kind of warrant "which it was the purpose of the Fourth Amendment to forbid – a general warrant."  379 U.S. at 480.  The seizure warrants here suffer from the same overbreadth.

The seizures here are even more egregious, however, because they also ignore the requirement of proving scienter.  Accordingly, in any hearing on the validity of the seizures, the government must prove not just that any assets it has seized are proceeds derived from the sale of particular ads it has shown were for illegal activity, but that Claimant/Defendants knew those particular ads promoted illegal activity and that Claimant/Defendants intended to promote the illegal activity in those particular ads.

### 2.   The Government Must Support Any Seizure With More Than the "Judgment" of a Law Enforcement Officer

In any hearing on the seizures, the government's burden of proof cannot be met by statements from Inspector Versoza (or second-hand statements of other law enforcement officials or political figures) that they believed Backpage.com hosted advertisements for prostitution.  The mere judgment of a police officer has never been held to be sufficient to seize material affected with a First Amendment interest.  Inspector Versoza's statements that he believed most ads on the website (and proceeds therefrom) related to illegal activity based on his visiting the website and reviewing ads, his "conversations with law enforcement officers around the country," and conclusions drawn from his "training and experience" ignore the basic rule that the government cannot justify restricting speech by relying upon "the conclusory assertions of the police officer."  *Lee Art Theatre, Inc.*, 392 U.S. at 637.

The Supreme Court has described "leaving the protection of [First and Fourth Amendment] freedoms to the whim of the officers charged with executing the warrant" as a "constitutional impossibility."  *Stanford*, 379 U.S. at 485; *see Marcus*, 367 U.S. at 724-29; *Pappert*, 337 F. Supp. 2d at 658.  Nor can Inspector Versoza's references to his "training and experience," his "conversations with law enforcement officers around the country," or his "review of law enforcement officers' statements and reports regarding

34

Backpage" distinguish the allegations in the Affidavits from prior cases.  Such statements are insufficient to support allegations "that the majority of Backpage ads that appear in the traditional 'adult' categories (such as 'escort,' massage,' or 'body rubs') are actually advertisements promoting sex trafficking or prostitution," Versoza Aff. at ¶¶ 31.i, ¶ 32, under bedrock law that expressive materials (and related assets) cannot be seized based simply on "a police officer's conclusions." *Roaden*, 413 U.S. at 506; *see Lee Art Theatre, Inc.*, 392 U.S. 636 (seizure of film as allegedly obscene cannot be justified based on the affidavit of a police officer).  It does not matter whether the affidavits are based on Inspector Versoza's individual judgment or on the collective judgment of various officers through second and third-hand accounts.[39]

In this context, seizing wholesale the proceeds derived from publishing based on a law enforcement  officer's statement that he looked at some advertisements and believed they related to prostitution, or that he thought the ads used language or images that he believed were "indicative" of wrongdoing, cannot be justified.  The Seventh Circuit enjoined a sheriff's efforts to impose an economic boycott on Backpage.com based on the same type of claim – that he believed most ads were for prostitution – observing "a majority is not all, and not all advertisements for sex are for illegal sex." *Dart*, 807 F.3d at 203.  The court observed that governmental efforts to choke off financial resources violates the First Amendment "unless there is *no* constitutionally protected speech in the ads on Backpage's website – and no one is claiming that." *Id.* at 231 (emphasis in original).  The Affidavits supporting the asset seizures in this case certainly make no

---

[39] In addition to claiming he reviewed and personally evaluated content on Backpage.com, Inspector Versoza claimed to review and rely on documents from various governmental agencies and authorities, including a 2010 letter from state attorney's general, a Senate subcommittee report, and a letter from the mayor of Seattle.  Inspector Versoza's claims must be subjected to constitutional scrutiny.  The same type of claims by "governmental agencies and authorities" (including, specifically, the 2010 letter from state attorneys general) have been cited by state legislators to justify laws seeking to ban sex-oriented online classified advertisements. *E.g.*, *Cooper*, 939 F. Supp. 2d at 815-16.  But courts have uniformly rejected restrictions on speech based on such "evidence" or on assumptions that all classified ads for adult services are by definition illegal. *Id.* at 831-32; *see also McKenna*, 881 F. Supp. 2d at 1280-83.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY SEIZURE WARRANTS

such claim. And even if they did, the First Amendment would bar the government from imposing penalties (financial or otherwise) based on such allegations without a judicial ruling to that effect, finding the requisite knowledge and intent.

In any hearing on the validity of the seizures of Claimant's/Defendants' assets, the government must present competent evidence, beyond Inspector Versoza's beliefs or similar claims by other law enforcement officials whose second-hand accounts he quoted in his affidavits. Any such evidence must be sufficient to satisfy the heightened scrutiny required where First Amendment interests are implicated.

### E.   Assuming, Arguendo, any Pre-trial Seizure Is Appropriate, these Seizures Are Overinclusive and Must Be Vacated

The Versoza Affidavits attempt to trace a handful of transactions from Backpage to various accounts and then justify the seizure of ***those entire accounts***. But, as explained above, the Versoza affidavits do not even allege an intent to promote a specific instance of prostitution through a specific advertisement. Because the government has not even tried to show Claimant/Defendants' "intent to further specific acts of prostitution," they have not alleged an actual crime. Without such a showing, there are no criminal proceeds. Nonetheless, the seizure warrants are overinclusive for at least two additional reasons.

First, the Versoza Affidavits led to the seizure of some assets that were simply unrelated to Backpage. Such seizures are improper under any standard. Second, by seizing all Backpage assets, the government's net included assets that the government does not even argue could be criminal proceeds, including Backpage money from overseas operations, Backpage money that is not derived from adult advertising, and adult advertising revenues that were not related (even in the government's overly-expansive view) to prostitution or human trafficking.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY
SEIZURE WARRANTS

1. **By Seizing Virtually All of Claimants/Defendants' Assets, the Government Improperly Reached Assets That Have Nothing To Do With Backpage**

Beginning in the late 1970s, Michael Lacey and James Larkin acquired *Phoenix New Times* and over the next three decades built a small newspaper empire. By 2001, their company, New Times, Inc. ("New Times"), had grown to 13 weekly newspapers in major cities across the United States. In 2006, with the acquisition of the Village Voice group of publications, the company operated 17 weekly papers through Village Voice Media Holdings ("VVM"). Declaration of John Brunst ("Brunst Decl.") at ¶3. VVM sold its interests in the newspapers in 2013 to a group of long-time company executives. *Id.* at ¶¶ 4, 14. After the sale, New Times was renamed Medalist Holdings, Inc. ("Medalist"). *Id.* None of the assets of these publishing ventures, or the proceeds of the sale, are tied to any of the allegations in the Indictments. In 2004, as the Internet (and, more particularly, Craigslist) was eroding newspaper classified advertising, New Times, Inc. launched Backpage.com as an online classified advertising service. VVM sold its interests in Backpage.com, LLC to Carl Ferrer in April 2015.

The assets derived from these publishing ventures generally fall into two categories: pre-Backpage funds and non-Backpage funds. First, as to the pre-Backpage funds, New Times issued approximately █████████ in distributions to the Shareholder Defendants from 2000 to 2006. *Id.* at ¶¶ 6, 12. These distributions were made in connection with a private equity firm's investment in New Times in 2000, and debt recapitalizations of New Times. *Id.* at ¶¶ 7-12.

Second, the Shareholder Defendants received non-Backpage distributions in connection with the sale of the print publication business in January 2013. Most of the newspapers, including the Village Voice, were sold to Voice Media Group, Inc. ("VMG") in a seller-financed deal. From January 2013 to March 2018, VMG made loan and rent payments to Cereus Properties. Of these payments, about █████████ were distributed to the Shareholder Defendants. *Id.* at ¶14.

1  Collectively, about ▮▮▮▮▮▮▮ in distributions unconnected to Backpage's

2  operations were made to the Shareholder Defendants.  *Id* at ¶¶ 13-14.  Inspector Versoza's

3  Affidavits do not disclose these distributions, let alone make any effort to trace such

4  distributions back to Backpage.  As such, there is no viable theory under which the

5  government could seize such funds.  Nevertheless, the government has done so anyways.

6  For example, the government seized ▮▮▮▮▮▮ from account xxxx1938 at ▮▮▮▮▮▮▮

7  ▮▮▮▮a.  That money is proceeds from the sale of print-media companies and unrelated

8  to Backpage.  The Versoza Affidavit does not even try to justify this seizure.  *See* at ___.[40]

9  This seizure must be vacated under any standard.  The government also recently seized an

10  additional account of Cereus Properties, LLC.

### 2.  Non-Backpage Assets Cannot Be Seized Merely Because They Were Commingled With Backpage Assets

13  The government has informed counsel for Claimant/Defendants that it intends to seek

14  civil forfeiture of the entire balances of their bank and brokerage accounts on the basis that

15  these accounts contain commingled funds, and untainted funds were purportedly used to

16  "facilitate" the laundering of Backpage-related funds.  The seizure affidavits, however, do

17  not establish probable cause that any such facilitation occurred and, as explained below,

18  there is no viable theory under which the government could ultimately forfeit such funds.

19  Under the civil forfeiture statute, specifically section 18 U.S.C. § 981(a)(1)(A),

20  "property involved" in an alleged money laundering offense "includes property used to

21  facilitate" that offense.  *U.S. v. All Monies ($477,048.62) In Account No. 90-3617-3, Israel*

22  *Disc. Bank, New York, N.Y.*, 754 F. Supp. 1467, 1473 (D. Haw. 1991).  Facilitation takes

23  place "when the property makes the prohibited conduct less difficult or more or less free

24  from obstruction or hindrance."  *U.S. v. Approximately Six Hundred & Twenty Thousand*

25  *Three Hundred & Forty-Nine Dollars & Eighty-Five Cents*, No. 13 CV 3966 RJD SMG,

26

27  [40] In addition, the government withdrew its sworn explanation for the seizure of over ▮▮▮▮▮ of

certificates of deposit through a "Notice of Errata," leaving no explanation of the basis for the seizure.

28  *Compare* 18-mj-00996, Versoza Aff. at ¶63(e) with 18-mj-00996 at Doc. No. 5 (notice of errata).

2015 WL 3604044, at *3 (E.D.N.Y. June 5, 2015) (citations omitted).  "To prove that property 'facilitated' money laundering, the government must establish more than a mere showing that tainted and untainted funds were pooled together." *Id.* (citations omitted).

*United States v. Contents in Account No. 059-644190-69*, 253 F. Supp. 2d 789 (D. Vt. 2003), is instructive as to the limitations of the facilitation theory of forfeiture here. There, the government seized and sought civil forfeiture of the entire balances of five commingled accounts owned by the claimant under a facilitation theory. *Id.* at 790-91. The claimant was alleged to have illegally transferred funds from the Law Centers for Consumer Protection ("LCCP") into her own accounts for her personal use. *Id.*  The court noted that, because the alleged money laundering occurred through the transfer of funds from LCCP to the claimant, "the money laundering would have been equally as effective if it had not involved any untainted funds but merely the transfer of LCCP funds to accounts in [claimant's] personal control." *Id.* at 800.  The court therefore ultimately held that, because the claimant's commingling of funds in her accounts amounted to the mere "pooling of tainted and untainted funds," the government lacked probable cause to seize the accounts in their entirety. *Id.*  Instead, the court held that the government was required to satisfy the tracing requirement of section 981(a)(1)(A), which would have resulted in the return of over $1 million of the approximately $2.7 million in funds seized from the claimant. *Id.*

The facilitation theory of forfeiture fails here for the same reasons.  First, the seizure Affidavits merely set forth that Claimant/Defendants' bank and brokerage accounts contain some funds derived from Backpage, but altogether ignore the funds contained in these accounts that are unrelated to Backpage.   In other words, the affidavits allege that Claimants/Defendants' accounts contain pooled tainted and untainted assets, but go no further, which is plainly insufficient to establish probable cause to seize all such assets. *Id.*; *Approximately Six Hundred & Twenty Thousand Three Hundred & Forty-Nine Dollars & Eighty-Five Cents*, 2015 WL at *3.  Second, the alleged money laundering here would have been "equally as effective" had it involved only funds derived from Backpage.  Indeed, the

funds the Shareholder Defendants received in connection with debt recapitalizations of New Times and the sale of the newspaper business cannot be traced back to Backpage. *Contents in Account No. 059-644190-69*, 253 F. Supp. 2d at 800 ("If 'facilitation' means nothing more than the commingling of funds in a complicated series of transactions, the tracing requirement would be a dead letter.").[41]

### 3. The Government Has Improperly Seized Backpage Proceeds that are Clearly Not Criminal Proceeds

Numerous courts have established that at least *some* of Backpage's adult content is legal in the United States. *See, e.g., Backpage.com LLC v. Dart,* 807 F.3d 229, 231 (7th Cir. 2015). So (at a minimum) proceeds of that content does not violate the Travel Act. Likewise, the Travel Act does not reach overseas activities.[42] The government must admit that a significant portion of Backpage's adult-content revenue came from overseas. Therefore, proceeds from those ads cannot be criminal proceeds. And the government does not even allege that proceeds from Backpage's non-adult sections are criminal. Therefore, the government's seizures are patently overinclusive.

## IV. THE SEIZURES VIOLATE CLAIMANT/DEFENDANTS' SIXTH AMENDMENT RIGHT TO COUNSEL

The government's seizure of Claimant/Defendants' "legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment." *Luis v. United States*, 136 S. Ct. 1083, 1088 (2016). In *Luis*, the government sought the pretrial restraint of defendants' untainted funds. *Id*. The Supreme Court held that "insofar as innocent (*i.e.,* untainted) funds are needed to obtain counsel of choice, we believe that the Sixth

---

[41] This District has questioned the viability of the facilitation theory. *See U.S. v. $3,148,884.40 U.S. Currency (Seized From Accounts of Bital)*, 76 F. Supp. 2d 1063, 1067 (C.D. Cal. 1999) (rejecting the facilitation theory as "incompatible" with 18 U.S.C. § 984, which allows for the substitution of fungible property, and provides for a one-year statute of limitations to seek forfeiture of such property).

[42] Domestic laws should not be applied extraterritorially unless Congress clearly denotes foreign application. *See Morrison v. Nat'l Australia Bank Ltd.,* 561 U.S. 247, 255 (2010). But the Travel Act's text plainly demonstrates its domestic focus. *See* 18 U.S.C. § 1952(b)(2) ("unlawful conduct" means "extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.").

Amendment prohibits the court order that the Government seeks." *Id*. at 1093. The Court also distinguished prior cases in which it had upheld the pretrial restraint of assets traceable to the alleged crime, noting that "the law has tracing rules that help courts implement the kind of distinction we require in this case." *Id*. at 1095.

Here, those tracing rules make clear that the government has engaged in a massive overreach in its seizure of Claimant/Defendants' undeniably innocent funds that are wholly unconnected to Backpage. Likewise, the government's seizure of Backpage proceeds, but without connecting them to specific illegal ads of which Claimant/Defendants had knowledge and intended to promote, is a further violation of Claimant/Defendants' Sixth Amendment rights. Under *Luis*, the government's seizure of the entire balances of Claimant/Defendants' bank and brokerage accounts therefore plainly deprives Claimant/Defendants of their Sixth Amendment right to obtain counsel of choice.

# V. CONCLUSION

For the foregoing reasons, this Court should vacate the Seizures. Alternatively, this Court should order an evidentiary hearing and require the government to justify any seizures with sufficiently reliable evidence to meet First Amendment standards that any seized assets are proceeds from specific illegal advertisements for illegal prostitution or human trafficking of which Claimant/Defendants had knowledge and specifically intended to promote, or are funds used to facilitate the laundering of such proceeds. At a minimum, this Court must vacate the seizure of all funds unrelated to Backpage and all Backpage funds that are the proceeds of Backpage's legal activities.

Dated: July 31, 2018                    BIENERT, MILLER & KATZMAN, PLC

                                        By: /s/ Thomas H. Bienert
                                           Thomas H. Bienert
                                           Kenneth M. Miller
                                           Anthony R. Bisconti
                                           Attorneys for James Larkin

## <u>DECLARATION OF ANTOINETTE THOMAS</u>

I, Antoinette Thomas, declare as follows:

1.      I am an individual over the age of eighteen.  I submit this declaration based upon my own personal knowledge and, if called as a witness, could and would competently testify thereto under oath.

2.      I submit this declaration in support of the *Notice of Motion and Motion to Vacate or Modify Seizure Warrants* (the "Motion") with which this declaration is being concurrently filed.

3.      I am a paralegal with the law firm of Bienert, Miller & Katzman, LLC.  Based on my research for this case, including reviewing the discovery and pleadings provided by the government, I have personal knowledge of the following.

4.      Attached hereto as <u>Exhibit 1</u> is a true and correct copy of the Affidavit of U.S. Postal Inspector Lyndon A. Versoza submitted in support of the seizure warrant in case number 18-MJ-0722.  The defense has separately filed and requested judicial notice of the seizure warrants, Versoza's supporting affidavits, and the orders unsealing Versoza affidavits in cases 18-MJ-00712, 18-MJ-00713, 18-MJ-00715, 18-MJ-00716, 18-MJ-00718, 18-MJ-00719, 18-MJ-00720, 18-MJ-00721, 18-MJ-00723, 18-MJ-00724, 18-MJ-00751, 18-MJ-00797, 18-MJ-00798, 18-MJ-00996, and 18-MJ-00997.

5.      The defense has not been provided with the Affidavits supporting the seizure warrants in case numbers 18-MJ-001427 and 18-MJ-1863.  However, a representative of █████████ provided a copy of the seizure warrant in response to a request.  True and correct copies of the request for information and the seizure warrant they provided are attached as <u>Exhibit 2</u>.  Unfortunately, the copy we received was of poor quality and is difficult to read.  The defense has also been informed that the government's seizure Cereus Properties, LLC account xxxxxx4862 at █████████ was seized pursuant to case number 18-MJ-1863 in the Central District of California.

6.      Attached hereto as <u>Exhibit 3</u> is a true and correct copy of a notice of seizure from the U.S. Postal Service for █████████ Account XXXX1938.  That is

also "Subject Account" 7(E) from the Versoza Affidavit submitted in case number 18-MJ-00722.  Larkin received 3 other similar notices, Lacey received 5, Brunst received 4, and Spear received 4.

7.    Attached hereto as Exhibit 4 is a true and correct copy of the criminal forfeiture allegations from the original indictment in *United States v. Lacey, et. al.,* CR-18-00422-SPL in the District of Arizona.  Attached hereto as Exhibit 5 is a true and correct copy of the criminal forfeiture allegations from the first superseding indictment in that case.

8.    Attached hereto as Exhibits 6 and 7 are true and correct copies of the Preliminary Orders of Forfeiture from Case Nos. 18-CR-00464 and 18-CR-00465, respectively, both pending in the District of Arizona.  Claimant/Defendants Larkin, Lacey, Brunst and Spear all received notice of the forfeiture orders and were directed to file claims or any interest they had in these assets would be lost.

9.    Attached hereto as Exhibit 8 are spreadsheets that attempt to summarize the various seizures and estimate the value of the seized assets based on information received to date.  The summaries are based on descriptions and amounts stated in the seizure warrants, notices of postal seizures, the Arizona criminal indictments and Preliminary Orders of Forfeiture described above, as well as "Zillow" estimates of real property values and other sources.  However, Claimant/Defendants do not know the full extent of the government's seizures, (in some cases) they do not know the exact amount in their accounts at the time they were seized, and estimates as to the value of real property are just that.  The values assigned to digital currencies are even more imprecise given their fluctuating value on the open market.  In some instances, it was necessary to estimate the value of a Claimant/Defendants' interests in specific accounts.

10.    Attached hereto as Exhibits 9-12 & 17 are true and correct copies of emails our firm has obtained in connection with this case and the related criminal action against Larkin.  Based on the date and subject matter, they appear to be the actual emails that Inspector Versoza purports to describe in his affidavits.

11.     Attached hereto as exhibits <u>13 and 14</u> are the Sacramento Superior Court rulings sustaining demurrers in *People v. Ferrer*, 2016 WL 7237305 (Sup. Ct. Sacramento Cty. Dec. 9, 2016) ("*Ferrer I*"); and, *People v. Ferrer*, No. 16FE024013 (Sup. Ct. Sacramento Cty. Aug. 23, 2017) ("*Ferrer II*").

12.     Attached hereto as <u>Exhibit 15</u> is the Government's Opposition to Woodhull Freedom Foundation, et al.'s Motion for Preliminary Injunction and Motion to Dismiss Plaintiffs' Complaint (Doc. No. 16) in *Woodhull Freedom Foundation v. United States of America, et al.,* Civil Action No. 18-01552 (RJL), filed in the District of Columbia.

13.     Attached hereto as <u>Exhibit 16</u> is a true and correct copy of the *Search and Seizure Warrant* dated April 5, 2018 and assigned case number 18-9126-MB in the District of Arizona.


I swear under penalty of perjury of the laws of the United States of America that the forgoing is true and correct.  Executed this 31st of July 2018 in San Clemente, California.

                                         *Antoinette Thomas*

                                         Antoinette Thomas

440881-1

# INDEX OF EXHIBITS FOR DECLARATION OF ANTOINETTE THOMAS

| Exhibit | Description |
|---|---|
| 1 | March 28, 2018 Amended Seizure Warrant and Affidavit for ███████████ Accounts case no 18-MJ-00722 |
| 2 | June 19, 2018 Correspondence with ███████ related to Seizure Warrant issued in case no 18-MJ-01427 |
| 3 | June 5, 2018 U.S. Postal Notice for ███████████ account xxxx1938 |
| 4 | March 28, 2018 Original Indictment in *United States v. Lacey, et al.,* CR-18-00422-SPL |
| 5 | July 25, 2018 Superseding Indictment in *United States v. Lacey, et al.,* CR-18-00422-SPL |
| 6 | May 16, 2018 Preliminary Order of Forfeiture Case No. CR-18-00464 *United States v. Carl Ferrer* |
| 7 | May 16, 2018 Preliminary Order of Forfeiture Case No. CR-18-00465 *United States v. Backpage et al.* |
| 8 | Spreadsheets created by Antoinette Thomas summarizing the various seizures from Claimant/Defendant (and family members and estimating the calue of seizued assets based upon information received to date |
| 9-12 & 17 | True and Correct Copies of Emails our firm has obtained in connection with this case and related criminal action against Larkin |
| 13-14 | Sacramento Superior Court Rulings sustaining demurrers in People v. Ferrer, 2016 WL 7237305 (Sup. Ct. Sacramento Cty. Dec. 9, 2016) (*"Ferrer I"*) and *People v. Ferrer* No. 16FE024013 (Sup. Ct. Sacramento Cty. AUgust 23, 2017) (*"Ferrer II"*) |
| 15 | Government's Opposition to Woodhull Freedom Foundation, et al.'s Motion for Preliminary Injunction and Motion to Dismiss Plaintiffs' Complaint (Doc. No. 16) in *Woodhull Freedom v. United States of America, et al.*, Civil Action No. 18-01552 (RJL) Filed in the District of Columbia |
| 16 | April 5, 2018 Signed Search and Seizure warrant for ██████████ ████████████████████████, Arizona |
| 17 | September 25, 2010 Document |

Exhibit 1

# United States District Court

_____ CENTRAL _____ DISTRICT OF _____ CALIFORNIA _____

**In the Matter of the Seizure of**
<sub>(Address or Brief description of property or premises to be seized)</sub>

Any and all funds held in ████████████
████████Accounts: #████1889, #████2592;
#████1938; #████2912 and #████2500

**AMENDED SEIZURE WARRANT**

**CASE NUMBER:**  2:18-MJ-00722

TO:   United States Postal Service   (USPIS)  and any Authorized Officer of the United States, Affidavit(s) having been made before me by POSTAL INSPECTOR LYNDON A. VERSOZA  who has reason to believe that in the District of Arizona there is now certain property which is subject to forfeiture to the United States, namely (describe the property to be seized)

Any and all funds held in ████████████████ Accounts: #████1889, #████2592; #████1938;
#████2912 and #████2500

**which is** (state one or more bases for seizure under United States Code)

subject to seizure and forfeiture under  18 U.S.C. § 981 (a)(1)(A) and (C)

**concerning a violation of Title   18__ United States Code, Sections  1952, 1956, and 1957**.

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the property so described is subject to seizure and that grounds exist for the issuance of this seizure warrant.

_____  is ordered to deliver said funds immediately and forthwith upon presentation of this warrant to the law enforcement agent serving the warrant, in the form of a cashier's check made payable to the United States Marshals Service.

YOU ARE HEREBY COMMANDED to seize within 14 days the property specified, serving this warrant and making the seizure in the daytime - 6:00 A.M. to 10:00 P.M., leaving a copy of this warrant and receipt for the property seized, and prepare a written inventory of the property seized and promptly return this warrant to the undersigned judicial officer as required by law.

**3/28/18  6:30 p.m.**
_____
**Date and Time Issued**

Los Angeles, California
_____
**City** and State

*Patrick J. Walsh*
_____

**Hon. PATRICK J. WALSH, U.S. Magistrate Judge**
**Name and Title of Judicial Officer**

**Signature of Judicial Officer**

**JOHN J. KUCERA/smb**

## RETURN

| DATE WARRANT RECEIVED | DATE AND TIME WARRANT EXECUTED | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH |
|---|---|---|
| | | |

INVENTORY MADE IN THE PRESENCE OF

INVENTORY OF PROPERTY SEIZED PURSUANT TO THE WARRANT

## CERTIFICATION

*I declare under penalty of perjury that I am an officer who executed this warrant and that this inventory is correct and will be returned through a filing with the Clerk's Office.*

*Date*: _____

_____

*Executing Officer's Signature*

_____

*Printed Name and Title*

Case 2:18-cv-06742-RGK-PJW Document 6 Filed 08/01/18 Page 59 of 233 Page ID #:170
Case 2:18-mj-00722-DUTY *SEALED* Document 2 *SEALED* Filed 03/28/18 Page 1 of 117
Page ID #:45

# United States District Court ~ORIGINAL~

<u>__CENTRAL__</u>  __DISTRICT OF__  <u>__CALIFORNIA__</u>

**In the Matter of the Seizure of**
(Address or Brief description of property or premises to be seized)

Any and all funds held in ▮▮▮▮▮▮▮ ▮▮▮▮ Accounts: # ▮▮▮ 889, # ▮▮▮ ▮592;
# ▮▮▮ 1938; # ▮▮▮ ▮912 and # ▮▮▮ 2500

**AMENDED APPLICATION AND
AFFIDAVIT
FOR SEIZURE WARRANT**

**CASE NUMBER:** 2:18-MJ-00722

*(FILED CLERK, U.S. DISTRICT COURT MAR 28 2018 CENTRAL DISTRICT OF CALIFORNIA stamp)*

I, <u>LYNDON A. VERSOZA</u>, being duly sworn, depose and say:

I am a United States Postal Inspector with the United States Postal Inspection Service, and I have reason to believe that
in the District of _____ <u>ARIZONA</u>
there is now concealed a certain person or property, namely (describe the person or property to be seized)

Any and all funds held in ▮▮▮▮▮▮▮▮▮▮ Accounts: # ▮▮▮ 1889, # ▮▮▮ 2592; # ▮▮▮ ▮938;
# ▮▮▮ ▮912 and # ▮▮▮ 500

**which is** (state one or more bases for seizure under United States Code)

subject to seizure and forfeiture under 18 U.S.C. § 981 (a)(1)(A) and (C)

**concerning a violations of Title** _18_ **United States Code, Sections** <u>1952(a)(3)(A) and (b), 1956 and 1957</u>.

**The facts to support a finding of Probable Cause for issuance of a Seizure Warrant are as follows:**

**Continued on the attached sheet and made a part hereof.** <u>X</u> Yes __ No

_____
**Signature of Affiant**

Sworn to before me, and subscribed in my presence

_3/28/18_
**Date**

_____
**City and State**

_Patrick J. Walsh_
**Signature of Judicial Officer**

**Hon. PATRICK J. WALSH, U.S. Magistrate Judge**
**Name and Title of Judicial Officer**

**John Kucera:smb**

## AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT

I, Lyndon A. Versoza, being duly sworn, hereby depose and state as follows:

### I.   TRAINING AND EXPERIENCE

1.   I am a United States Postal Inspector employed by the United States Postal Inspection Service ("USPIS"), Los Angeles Division, in Los Angeles, California, where I have served since June 2005.  Currently, I am responsible for investigating criminal violations of money laundering and structuring laws, such as when United States Postal Service ("USPS") Money Orders or the United States Mail are used as a means to launder or structure funds.  During my career as a Postal Inspector, I have participated in or investigated financial violations including money laundering, darknet investigations, digital currency investigations, structuring, bank, wire and mail fraud, and identity theft.  In addition, I have received both formal and informal training from USPIS and other agencies regarding money laundering and financial crimes.  For approximately five years prior to investigating money laundering, I was assigned to investigate child exploitation and sex trafficking.  In that assignment, I worked both independently and in a task force where I led and participated in investigations related to crimes involving the exploitation of children and sex trafficking.

2.    Prior to my service as a U.S. Postal Inspector, I
attended the University of Southern California in Los Angeles,
where, in 2001, I received a bachelor's degree.  While in
college, I was the website administrator for a non-profit media
company in Los Angeles where, among other things, I learned
about domain names, domain name servers, and remote hosting.
Following college, from 2002 to 2005, I served as a law
enforcement officer with the U.S. Immigration and Naturalization
Service, which later became U.S. Customs and Border Protection.
There, among other things, I worked on cases involving human
smuggling and international sex trafficking.

3.    I am familiar with the facts and circumstances
described herein.  This affidavit is based upon my personal
involvement in this investigation, my training and experience,
and information obtained from various law enforcement personnel
and witnesses, including information that has been reported to
me either directly or indirectly.  This affidavit does not
purport to set forth my complete knowledge or understanding of
the facts related to this investigation.  Unless specifically
indicated otherwise, all conversations and statements described
in this affidavit are related in substance and part only.  All
figures, times, and calculations set forth herein are
approximate.

- 2 -

## II.    SUMMARY AND PURPOSE OF AFFIDAVIT

4.    This affidavit is made in support of applications for warrants to seize all funds held in certain SUBJECT ACCOUNTS and certain SUBJECT DOMAINS, all owned or controlled by "Backpage.com" (referred to herein as "Backpage"), associated entities, and the owners and operators of each.

### A. Background

5.    This case is being investigated by the USPIS, the Federal Bureau of Investigation ("FBI") and the Internal Revenue Service-Criminal Investigation ("IRS-CI"), with assistance from the Los Angeles Joint Regional Intelligence Center.

6.    The focus of the investigation has been on violations by Backpage, its associated entities, and the owners and operators of each of Title 18, United States Code, Sections 1952(a)(3)(A) and (b)(i)(1) (Interstate and Foreign Travel in Aid of Racketeering Enterprise); and Title 18 U.S.C. §§ 1956 and 1957, (Money Laundering).

7.    From speaking with other agents in this investigation, and reviewing emails, internal documents, and other records related to this investigation, I know the following:

a.    Backpage.com, LLC, incorporated in Delaware in 2004, is an internet-based company that allows customers to post on-line classified advertisements.  These advertisements include sections dedicated to a variety of matters, including adult,

- 3 -

automotive, community, dating, jobs, local places, musicians, rentals and services. Backpage receives between 75 million to 100 million unique internet visitors per month.

     b.    Backpage realizes profits in the tens of millions of dollars per year from adult advertisement. Historically, adult ads, where Backpage advertisers post sex trafficking ads, constitute less than ten percent of all advertisements posted on the website. However, the adult ads generate over 90 percent of Backpage's revenue. In short, Backpage derives almost all its revenue and profits from adult service ads, including advertising for sex trafficking.[1]

     c.    In or about 2004, operators Michael Lacey ("Lacey"), James Larkin ("Larkin"), and Carl Ferrer ("Ferrer") created Backpage. There were also two minority owners; John Brunst ("Brunst"), who owned 5.67 percent; and Scott Spear

---

[1] According to Backpage accounting records, for the period May 1 to May 31, 2014, over 90% of Backpage's revenues derived from what they characterized as "adult entertainment." Backpage's internal documents suggest that this 90% figure has been consistent since its 2004 inception.
 For example, between October 6, 2014, and May 31, 2015, Backpage grossed almost ███████████ from advertising "adult entertainment." During this same period, Backpage grossed only ███████████ from all other advertisements combined. Assuming that Backpage has accurately estimated that 90% of its revenues are generated from "adult" and "escort" ads, Backpage has generated as much as ███████████ in prostitution-related revenue since 2004.

("Spear"), who owned 4.09 percent. From 2004 until 2015, Lacey and Larkin oversaw the website's policies and strategic direction. In 2015, Lacy and Larkin purportedly sold all or substantially all of their interests in Backpage to Ferrer.[2] However Lacey and Larkin retained significant control over the website, and both Lacey and Larkin continue to receive tens of millions of dollars of annual distributions of Backpage revenue.

d.    While not an original owner, Ferrer was one of the original officers of Backpage, having initially served as Backpage's vice-president, and later as CEO. Ferrer is also the CEO of several Backpage related entities in the Netherlands, including "Website Technologies," "Amstel River Holdings," and "Ad Tech BV."

e.    ████████████████████████ has no formal position at Backpage, but is the President, Chief Executive Officer, Treasurer, and Secretary of another Backpage controlled entity, "Posting Solutions," a wholly owned subsidiary of Backpage that receives payments from Backpage advertisers. According to his social media profile, ████ is also the Chief

---

[2] From my review of financial records related to Ferrer's 2015 agreement to purchase Backpage, it appears that, through a series of loans from other Backpage Operators to be repaid by Ferrer, Ferrer agreed to purchase Backpage for approximately ████████████.

- 5 -

Financial Officer of Website Technologies.  Based on emails he
has sent and wire transfer information, ███ appears to control
much of the international and domestic financial transactions of
Backpage and its related entities.

     f.   Daniel Hyer ("Hyer") at one time was the Sales
and Marketing Director of Backpage.  He remains an account
signatory for Backpage controlled entities, including Website
Technologies.

     8.   Throughout this affidavit, the individuals identified
in paragraphs 7(c) through (f), along with others not named in
this affidavit, are collectively referred to as the "Backpage
Operators."

     9.   Based on a review of publicly available materials
obtained in the course of the investigation, and my review of
the Backpage website, I have learned the following:

     a.   The majority of the paid advertisements on the
Backpage website relate to prostitution activities in violation
of 18 U.S.C. §§ 1591 and 1252.

     b.   As further described below, Backpage itself, as
well as its operators, who are in control of the SUBJECT
ACCOUNTS and SUBJECT DOMAINS (as those terms are defined below),
is in the business of promoting the trafficking of children and
adults for sex.  Sex trafficking of adults is a violation of 18
U.S.C. § 1952, and sex trafficking of children is a violation of

- 6 -

18 U.S.C. 1591, each of which statutes is a Specified Unlawful
activity ("SUA") within the meaning of federal law. (*see* 18
U.S.C. § 1956(c)(7)(vii)).

c.   The SUBJECT ACCOUNTS (all of which are located in
the United States) have received wire transfers from places
outside of the United States or have received funds traceable to
wire transfers from places outside of the United States, which
funds Backpage would then use to promote sex trafficking, in
violation of 18 U.S.C. § 1956(a)(2)(A) (International Money
Laundering).  Some of the SUBJECT ACCOUNTS have received
transfers or deposits in excess of $10,000 traceable to the SUA,
in violation of 18 U.S.C. § 1957 (Money Laundering Spending
Statute).

d.   The SUBJECT DOMAINS are registered by "ASCIO
TECHNOLOGIES INC" DBA "NETNAMES," a domain registrar that
manages the reservation of internet domain names for Backpage.
A domain registrar serves to ensure that a registered domain
name, like each of the SUBJECT DOMAINS, is not double sold.
Additionally, a domain registration will allow the owner of the
domain to direct internet traffic to a company's webserver.  The
SUBJECT DOMAINS have been acquired and maintained with funds
traceable to the money laundering scheme described herein,
specifically with funds from SUBJECT ACCOUNT 1, and the SUBJECT
DOMAINS are the mechanism Backpage uses to promote the

- 7 -

prostitution and sex trafficking activity described below.

10. From my review of publically available materials and bank statements obtained in the course of this investigation, I have learned the following:

a. Verizon Digital Media Services in Los Angeles, California ("Verizon") provides various media solutions for internet related activities, including web acceleration, commerce acceleration, cloud security and video streaming. Based on my training and experience, I know that these type of services would be necessary for a high-volume website like Backpage to operate efficiently and handle internet traffic without delay for the end user.

b. Beginning when the account was opened in February 2017, and continuing until at least December 2017, SUBJECT ACCOUNT 1 has directed $570,530 dollars to Verizon to pay for Backpage related expenses.

B. SUBJECT ACCOUNTS

11. This affidavit is offered in support of applications for warrants to seize all funds held in the following U.S. bank accounts (hereinafter referred to collectively as the "SUBJECT ACCOUNTS"):

a. SUBJECT ACCOUNT 1: ███████████ account number ███████, is a business bank account held in the name of "Posting Solutions LLC." ████ is identified in the records of

- 8 -

the account as the President, Chief Executive Officer, Treasurer, and Secretary of Posting Solutions LLC, and is the sole signatory on SUBJECT ACCOUNT 1. As further described below, SUBJECT ACCOUNT 1 is one of Backpage's main operating accounts, used to receive funds from customers paying for Backpage advertising, including advertising to promote sex trafficking.



b.     SUBJECT ACCOUNT 2A: ▇▇▇▇▇▇▇ Account number ▇▇▇▇▇▇ is a business bank account held in the name of "Cereus Properties LLC." Spear is the sole signatory on the account.

c.     SUBJECT ACCOUNT 2B: ▇▇▇▇▇▇▇ Account number ▇▇▇▇▇▇ is held in the name of Brunst.

d.     SUBJECT ACCOUNT 3A: ▇▇▇▇▇▇▇▇▇▇ Account number ▇▇▇▇▇ is a checking account held in the name of Spear.

e.     SUBJECT ACCOUNT 3B: ▇▇▇▇▇▇▇▇▇▇ Account number ▇▇▇▇▇ is a checking account held in the name of Spear.

f.     SUBJECT ACCOUNT 3C: ▇▇▇▇▇▇▇▇▇▇ Account number ▇▇▇▇▇ is a checking account held in the name of Spear.

g.     SUBJECT ACCOUNT 4: ▇▇▇▇▇ Bank Account Number ▇▇▇▇▇▇▇▇ is a checking account held in the name of Spear.

- 9 -



h.    SUBJECT ACCOUNT 5A: ████████████████████ ████████ Account Number ████████████ is an account held in the name of ███████████████, Spear's adult daughter.

i.    SUBJECT ACCOUNT 5B: ████████████████████ ████████ account Number ████████████ is an account held in the name of ███████████████.

j.    SUBJECT ACCOUNT 6: ████████████████████████ ████████████ account number ████████████ is an account held in the name of Lacey.

k.    SUBJECT ACCOUNT 7A: ████████████████████ account number ████████████is an account held in the name of Larkin.

l.    SUBJECT ACCOUNT 7B: ████████████████████ account number ████████████ is an account held in the name of Larkin.

m.    SUBJECT ACCOUNT 7C: R████████████████████ account number ████████████ is an account held in the name of Ferrer.

n.    SUBJECT ACCOUNT 7D: ████████████████████ account number ████████████is an account held in the name of Ferrer.

o.    SUBJECT ACCOUNT 7E: ████████████████████ account number ████████████ is an account held in the name of Larkin.

p.    SUBJECT ACCOUNT 8A: ██████████████████ number ████████████████ is a checking account held in the name of Troy Larkin, James Larkin's adult son.

q.    SUBJECT ACCOUNT 8B: ██████████████████ number ████████████████ is an account held in the name of Ramon Larkin, James Larkin's adult son.

r.    SUBJECT ACCOUNT 8C: ████████████████Account number ████████████████ is a checking account held in the name of Hyer.

s.    SUBJECT ACCOUNT 8D: ████████████████Account number ██████████████████is a savings account held in the name of Hyer.

t.    SUBJECT ACCOUNT 9: ██████████████████ ████████ccount Number ██████████████████is held in the name of Lacey.

u.    SUBJECT ACCOUNT 10: ██████████Account Number ████████████ is an account held in the name of Spear.

v.    SUBJECT ACCOUNT 11: ████████████████████ Bank account number ████████████████ is an account held in the name of Gage.

w.    SUBJECT ACCOUNT 12A: ████████████Account number ████████ is an account held in the name of Ferrer.

x.    SUBJECT ACCOUNT 12B:██████████████Account number ████████████ is an account held in the name of Ferrer.

y.   SUBJECT ACCOUNT 13: ██████████████ account number ████████ is an Interest on Lawyers Trust Account ("IOLTA") held in the name of Phillip Linder, identifying ████ ████ (who is or was Carl Ferrer's spouse) as the sole beneficiary.

C. <u>SUBJECT DOMAINS</u>

12.   This affidavit also supports an application for a warrant to seize the following domain names managed by "Ascio Technologies," incorporated in Delaware, the domain registrar for the SUBJECT DOMAINS, (hereinafter, collectively referred to as "SUBJECT DOMAINS"):

a.   atlantabackpage.com

b.   backpage.be

c.   backpage.com

d.   backpage.com.br

e.   backpage.cz

f.   backpage.dk

g.   backpage.ee

h.   backpage.es

i.   backpage.fi

j.   backpage.fr

k.   backpage.gr

l.   backpage.hu

m.   backpage.ie

- 12 -

n.   backpage.it

o.   backpage.lt

p.   backpage.mx

q.   backpage.net

r.   backpage.no

s.   backpage.pl

t.   backpage.pt

u.   backpage.ro

v.   backpage.si

w.   backpage.sk

x.   backpage.us

y.   backpage-insider.com

z.   bestofbackpage.com

aa.  bestofbigcity.com

bb.  bigcity.com

cc.  chicagobackpage.com

dd.  denverbackpage.com

ee.  newyorkbackpage.com

ff.  phoenixbackpage.com

gg.  sandiegobackpage.com

hh.  seattlebackpage.com

ii.  tampabackpage.com

## III.  APPLICABLE LAW

13.  There is probable cause to believe that the SUBJECT

ACCOUNTS and SUBJECT DOMAINS are subject to seizure and forfeiture by the United States under the following provisions:

      a.  18 U.S.C. § 981(a)(1)(A), because those SUBJECT ACCOUNTS and SUBJECT DOMAINS are involved in, and traceable to, one or more transactions or attempted transactions in violation of 18 U.S.C. § 1956(h) (Conspiracy to Launder Money), 18 U.S.C. § 1956(a)(2) (International Money Laundering for Promotion), and 18 U.S.C. § 1957 (Financial Transactions Involving Illicit Proceeds). Pursuant to 18 U.S.C. § 981(a)(1)(A), any property involved in a transaction, or attempted transaction, in violation of 18 U.S.C. §§ 1956 or 1957, or any property traceable to such property, is subject to forfeiture to the United States; and

      b.  18 U.S.C. § 981(a)(1)(C), because those SUBJECT ACCOUNTS and SUBJECT DOMAINS constitute and are derived from proceeds traceable to one or more violations of 18 U.S.C. § 1956(h), 18 U.S.C. § 1956(a)(2), and 18 U.S.C. § 1957.

14. Title 18 U.S.C. § 1956 prohibits, among other things, financial transactions involving the proceeds of SUAs -- committed or attempted (1) with the intent to promote further predicate offenses; (2) with the intent to evade taxation; (3) knowing the transaction is designed to conceal the source, location, ownership or control of the proceeds; or (4) knowing the transaction is designed to avoid anti-laundering financial

- 14 -

reporting requirements. 18 U.S.C. § 1956(h) prohibits two or more parties agreeing to accomplish the unlawful purpose of money laundering.

15. Title 18 U.S.C. § 1957 prohibits a party from knowingly engaging in a monetary transaction in excess of $10,000 with property that is criminally derived from some SUA.

16. Title 18 U.S.C. § 1956(a)(2) (International Money Laundering for Promotion) makes it a crime to transport, transmit, or transfer, or attempt to transport, transmit, or transfer, monetary instruments or funds (including funds that are not criminal proceeds) from the United States to or through a place outside the United States, or to the United States from or through a place outside the United States, with the intent to promote some SUA, as that term is defined in 18 U.S.C. § 1956(c)(7).

17. The "Travel Act," 18 U.S.C. § 1952(a), an SUA, prohibits, in part, the use of the mail or any facility in interstate or foreign commerce with the intent to otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of any unlawful activity, by any person who thereafter performs or attempts to perform an act to promote, manage, establish, carry on, or facilitate the promotion, management, establishment and carrying on of such unlawful activity. "Unlawful Activity," as

defined in 18 U.S.C. § 1952(b), includes prostitution offenses
in violation of the laws of the state in which such acts are
committed or in violation of the laws of the United States.
Prostitution is illegal in the State of California.  (*See, e.g.*,
Cal. Penal Code § 647(b).)

18.  Sex trafficking of juveniles or any person by means of
force, fraud or coercion, is a violation of 18 U.S.C. § 1591, an
SUA.

### IV.  **DIGITAL CURRENCY/BITCOIN**

19.  Digital currency (also known as crypto-currency) is
generally defined as an electronic-sourced unit of value that
can be used as a substitute for fiat currency (*i.e.*, currency
created and regulated by a sovereign government).  It exists
entirely on the Internet and is not stored in any physical form.
It is not issued by any government, bank, or company, but is
instead generated and controlled through computer software
operating on a decentralized peer-to-peer network.  Digital
currency is not illegal in the United States and may be used for
legitimate financial transactions.  However, it is often used to
conduct illegal transactions, such as the sale of controlled
substance, or as in this investigation, to purchase ads to
promote prostitution.

20.  Bitcoin is a type of digital currency accepted by
Backpage.  Bitcoin payments are recorded on a public ledger that

is maintained by peer-to-peer verification, and is thus not maintained by a single administrator or entity. Individuals can acquire Bitcoins either by "mining" them or purchasing Bitcoins from other individuals. An individual can "mine" Bitcoins by allowing his/her computing power to verify and record the Bitcoin payments into a public ledger. Individuals are rewarded for this by being given newly created Bitcoins. Bitcoins can be bought and sold in fractions.

21. Backpage also accepts other digital currencies, including Litecoin, Bitcoin Cash, and Ether. Sometimes called "alt-coins," because they are alternatives to Bitcoins, these digital currencies were created after Bitcoin to address perceived weaknesses or problems with Bitcoin technology. Based on my review of Backpage transactions, the majority of Backpage's digital currency transactions are in Bitcoin.

22. An individual can send and receive Bitcoins through peer-to-peer digital transactions or by using a third-party broker. Such transactions can be done on any type of computer, including laptop computers and smart phones.

23. Digital currency is generally stored in digital "wallets," which essentially store the access codes that allows individuals to conduct digital currency transactions on the public ledger. To access digital currency on the public ledger, an individual must use a public address (or "public key") and a

- 17 -

private address (or "private key"). The public address can be analogized to a bank account number, while the private key is like a password used to access an online account.

24. Even though the public addresses of those engaging in Bitcoin transactions are recorded on the public ledger, the true identities of the individuals or entities behind the public addresses are not. If, however, an individual or entity is linked to a public address, it would be possible to determine what transactions were conducted by that individual or entity. For these reasons, digital currency transactions are described as "pseudonymous," meaning they are partially anonymous.

## V. STATEMENT OF PROBABLE CAUSE

### A. Buying a Backpage Ad

25. In February 2018, I visited Backpage.com and, posing as an advertising purchaser, engaged in the regular process of posting an ad in the Backpage "Dating" section, which is one of the places on Backpage.com where prostitution ads are commonly found. Through this process, I learned the following:

a. A person looking to post an advertisement on Backpage (an "advertiser") must first create an account. Once an account is created, the advertiser clicks on a link called "Post an ad," which will then toggle certain categories regarding where the ad should be posted (e.g., "Los Angeles," "Riverside," etc.) and under what category the ad should appear

- 18 -

(*e.g.*, "Dating," "Adult," etc.).  The advertiser also has the option to post pictures and videos.  In the adult sections, opting to post in more than one geographical area, or opting to post more frequently occurring ads will increase the advertisement price.  Currently, Backpage.com charges $5 per ad posted in the adult sections.  In some of the non-adult and non-dating sections I checked, there was no charge at all to post an ad.

   b.   Once an advertiser selects the desired options, he or she is required to enter a phone number, a link to a social media page (such as Facebook), and an email address.  The Backpage website claims to verify the advertiser's phone number before he or she can continue on to actually purchasing an ad.

   c.   In order to pay for Backpage ads, an advertiser must first buy "credits."  Backpage offers several ways for an advertiser to acquire credits:

      i.   A Backpage advertiser may mail gift cards, checks, and money orders to "Posting Solutions" at a P.O. Box in Dallas, Texas (as further described below, this P.O. Box is associated with Posting Solutions and SUBJECT ACCOUNT 1).[3]

---

[3] I have reviewed the cash purchase of USPS money orders subsequently directed to this P.O. Box.  Between September 2014 and June 2016, several millions of dollars in money orders were

ii.      Backpage directly accepts credit card payment through a third-party credit card payment processor.

iii.      Backpage also accepts several types of digital currency (specifically, Backpage accepts Bitcoin, Bitcoin Cash, Litecoin, and Ethereum).  If the advertiser selects this option, Backpage provides a digital currency wallet address where the advertiser can send the electronic transfer of the digital currency.

iv.      Backpage also accepts cash, but only through third party payment processors.  Based on information gathered during this investigation, I believe that once the third-party payment processor receives cash, it converts the cash into digital currency and then electronically transfers that digital currency to a Backpage digital currency wallet.

26.  Digital Currency is processed through the subject accounts in the following way:

a.   When Backpage receives digital currency, it will aggregate the digital currency and then transfer it to a third-

---

purchased in what appears to have been structured transactions (*i.e.*, transactions carried out in a manner intended to avoid certain reporting requirements that USPS maintains for money order purchases greater than $3000).  Based on my review, hundreds of these money orders include email addresses with words consistent with prostitution, such as "sex" or "sexy."

party exchanger like GoCoin.[4]

b.    In exchange for the digital currency, the exchanger transfers U.S. dollars from its foreign bank accounts into Backpage operating accounts, such as SUBJECT ACCOUNT 1.  The exchanger, if it so elects, may then sell its Bitcoin on various Bitcoin markets.

27.  I reviewed records obtained from GoCoin.  From this review, I estimate that between 5 to 10 percent of the ads posted on Backpage.com are ads within the Central District of California (including Los Angeles and Orange Counties).  For example, between January 10 and February 3, 2016, approximately 500,000 ads were posted on Backpage.com and paid for with Bitcoin, for which Backpage received over ▮▮▮▮▮▮ in revenue.  Of these approximately 500,000 ads, approximately 28,400 were posted only in LosAngeles.Backpage.com, Ventura.Backpage.com, SanLuisObispo.Backpage.com, OrangeCounty.Backpage.com, and SanGabrielValley.Backpage.com.  These specific ads generated approximately ▮▮▮▮▮ in revenue.

---

[4] GoCoin is a digital currency exchanger that converts Bitcoin, Litecoin and another digital currency into fiat currency, like the U.S. Dollar or the Euro.  GoCoin is owned by Manx Broadcasting Corporation, based in the Isle of Man.  GoCoin has offices in Singapore and Santa Monica, California and appears to hold bank accounts in several countries outside the United States.

- 21 -

B. Backpage Promotion of Prostitution and Sex Trafficking

28.   I have reviewed several Backpage ads that were used to sell minors for sex and forcibly traffic adult women for sex.   I have also reviewed the criminal records of certain of the pimps and sex traffickers, most of whom were convicted after having used Backpage to advertise their victims.   From this review, I learned the following:

a.   Between 2014 and 2015, a pimp sold S.F., a minor girl, for sex.   The pimp advertised S.F. on Backpage's "Escort" section in the Los Angeles area of California and in Arizona.   The ad contained phrases such as "New In Town" and "Sexy Dark Asain Bombshell with a Nice & Tight {Booty}."   The ad selling S.F. on Backpage included multiple pictures showing her legs, stomach, shoulders and buttocks.   Later, the pimp was arrested and convicted on state sex trafficking charges, and sentenced to 196 years imprisonment.

b.   Between 2014 and 2015, the same pimp sold A.C., a minor girl, for sex.   In November 2014, at the age of 17, A.C. was first sold for sex through a Backpage ad using phrases such as "NEW IN TOWN," "sexy sweet," and "sweet like honey but super hot like fire."   The Backpage ad selling A.C. included pictures of her showing her legs, stomach, shoulder, and buttocks, and posed her in sexually provocative positions.

c.   Between November 2015 and December 2015, in a

- 22 -

different incident, a pimp drove two women and four minor girls (T.S., S.L., K.O., and R.W.) from Columbus, Ohio to a hotel in St. Charles, Missouri. The next day, the pimp told the girls to post ads on Backpage.com. Some of the girls took calls and engaged in paid sex acts with Backpage customers who responded to the ads. The ads the girls posted included pictures of themsitting on the bed showing their buttocks. Another image I saw was of a naked girl's body pressed against a mirror. Other pictures appeared more mundane, such as images of girls posing clothed in front of a mirror. However, these ads used phrases like "I'm sweet as a treat maybe even sweeter" and "not a lot need to be said. my pic are 100% real." In 2017, this pimp was convicted on sex trafficking charges and a federal court sentenced him to 300 months in prison.

   d. In or around 2010, in Washington, J.S., a minor girl, was sold for sex through the use of Backpage ads. J.S.'s pimp drafted the ads that were placed a Backpage that contained words and phrases such as, "W'E'L'L_W'O'R'T'H_I'T***^***150HR" and "IT WONT TAKE LONG AT ALL." The ads also included pictures of J.S. in provocative positions showing her breasts and buttocks. On March 29, 2011, the pimp who sold J.S. for sex was sentenced to over 26 years imprisonment on charges related to sex trafficking.

   e. Between in or around 2011 and 2016, a female victim, D.O., who was between the ages of 14 and 19 during those

years, was sold for sex through Backpage ads. D.O.'s female pimp instructed D.O. that Backpage was the safest place to advertise because Backpage did not require age verification. D.O.'s Backpage ads included words and phrases that were indicative of prostitution, such as "roses" (money) and "back door" (anal sex). Some of the customers who responded to D.O.'s Backpage ads forced D.O. to perform sexual acts at gunpoint, choked her to the point of having seizures, and gang-raped her.[5]

29. I have reviewed documents and reports from multiple state and government agencies and authorities regarding Backpage's promotion of sex trafficking and prostitution. From these reports, and from my review of internal Backpage correspondence following Backpage management receiving these reports, I am aware

_____

[5] Using these examples, I also reviewed financial transactions for some of these ads. Using email addresses and other identifiers associated with the Backpage ads, I reviewed GoCoin records for some of these transactions. From these records, I found bitcoin payments associated with the email addresses used to post the ads, which transactions were processed by GoCoin. For example, in the case involving victims S.F. and A.C. (described in paragraphs 28(a) and (b)) prosecuted in Arizona, the bitcoin payments for these ads were made in November and October 2015. In the case involving T.S., S.L., K.O., and R.W. (described in paragraph 28(c)) prosecuted in Missouri, the bitcoin payments were made in October and November 2015. As described in paragraph 48 of this affidavit, between December 2015 and June 2016, over 130 wires from Slovakia from GoCoin, totaling over ▮▮▮▮▮▮▮▮ was sent to a Website Technologies account at B▮▮▮▮▮▮▮▮▮▮▮▮ account number ▮▮▮▮▮▮2008. Between December 2015 and October 2016, 32 wires totaling ▮▮▮▮▮▮ were sent from the ▮▮▮▮▮▮ to a Cereus Properties Account ▮▮▮▮▮▮ at ▮▮▮▮▮▮, which made its way into SUBJECT ACCOUNTS 3A, 3B, and 3C.

that all levels of Backpage management are aware of Backpage's role in promoting criminal activity.  For example:

    a.   On September 21, 2010, a group of state attorneys general wrote a letter to Backpage observing that "ads for prostitution—including ads trafficking children—are rampant on the site," and arguing that "[b]ecause Backpage cannot, or will not, adequately screen these ads, it should stop accepting them altogether."  The state AGs acknowledged that this step would cause Backpage to, "lose the considerable revenue generated by the adult services ads," but stated that "no amount of money can justify the scourge of illegal prostitution, and the misery of the women and children who will continue to be victimized in the marketplace provided by backpage."

    b.   Following this letter, on September 25, 2010, Ferrer wrote an email explaining that Backpage was unwilling to delete ads that included terms indicative of prostitution because doing so would "piss[] off a lot of users who will migrate elsewhere" and force Backpage to refund those customers' fees.

    c.   In January 2017, the U.S. Senate Subcommittee on Permanent Investigations ("Subcommittee") conducted a lengthy investigation into sex trafficking and Backpage.  I have reviewed the Subcommittee's 50-page report entitled "Backpage.com's Knowing Facilitation of Online Sex Trafficking."  This report concluded, among other things, that virtually all of Backpage's "adult" ads

are actually solicitations for illegal prostitution services and that "Backpage has maintained a practice of altering ads before publication by deleting words, phrases, and images indicative of criminality, including child sex trafficking . . . . Those practices served to sanitize the content of innumerable advertisements for illegal transactions—even as Backpage represented to the public and the courts that it merely hosted content others had created." In response to the Subcommittee's report, Backpage purported to shut down the "adult" section of its website. However, based on my review of several thousands of Backpage ads, I believe that the prostitution ads simply migrated to other sections of the website, where they remain to this day.

        d. On August 5, 2011, Backpage received a letter from the mayor of Seattle. This letter warned, "Seattle Police have identified an alarming number of juvenile prostitutes advertised on Backpage.com since January 2010," and explained that Backpage was dissimilar from other companies whose products and services are "occasionally or incidentally" utilized by criminals because "[y]our company is in the business of selling sex ads" and "your services are a direct vehicle for prostitution." The letter also recommended that Backpage require in-person age verification for all of the "escorts" depicted in its ads. Based on knowledge gained through this investigation, I do not believe that Backpage has ever instituted an in-person age verification.

30.   I have reviewed internal documents, emails, and correspondence among Backpage employees and management.  From those emails I have learned that Backpage has instituted policies and procedures designed to maintain its promotion of sex trafficking and prostitution, but which "sanitize" some of the language Backpage customers use to advertise in order to make the advertising of sex trafficking less overt.  From my review of Backpage documents, I know that Backpage refers to this practice as "moderation."  For example:

a.   In April 2008, Ferrer wrote an email explaining that, although he was "under pressure to clean up phoenix's adult content," he was unwilling to delete prostitution ads because doing so "would put us in a very uncompetitive position with craig[slist]"[6] and result in "lost pageviews and revenue."  Thus, Ferrer instructed Backpage's technical staff to edit the wording of such ads by removing particular terms that were indicative of prostitution, and then allow the remainder of the ad to be featured on Backpage's website.

b.   On October 8, 2010, a Backpage manager sent an email threatening to fire any Backpage employee who acknowledged, in writing, that a customer was advertising prostitution:

_____

[6] Craigslist is a competing internet based advertising company that features classified ads.

- 27 -

"Leaving notes on our site that imply that we're aware of prostitution, or in any position to define it, is enough to lose your job over. . . . This isn't open for discussion. If you don't agree with what I'm saying completely, you need to find another job."

       c.   On October 16, 2010, the same Backpage manager again sent an email to a large group of Backpage employees that contained two attachments providing guidance on how to "moderate" ads.  The first was a PowerPoint presentation that displayed a series of 38 nude and partially-nude photographs, some of which depicted graphic sex acts.  Next to each picture was an instruction as to whether it should be approved or disapproved by a Backpage moderator.  These instructions included "Approve.  Nude rear shots are okay as long the model is not exposing her anus or genitalia." and "Approve.  Rear shot okay.  Transparent wet panties okay."  The second was an Excel spreadsheet identifying 50 terms (all of which were indicative of prostitution) that should be "stripped" from ads before publication.  The Backpage manager concluded the email by stating, "[I]t's the language in ads that's really killing us with the Attorneys General.  Images are almost an afterthought to them."

       d.   On October 16, 2010, the same Backpage manager sent a separate internal email explaining, "I'd like to still avoid Deleting ads when possible," that "we're still allowing phrases

with nuance," and that "[i]n the case of lesser violations, editing should be sufficient."

e.   On October 25, 2010, Ferrer sent an email acknowledging that the "[i]llegal content removed" through Backpage's moderation processes was "usually money for sex act." This email also explained that, after the "sex act pics are removed," the "ad text may stay."

f.   On October 27, 2010, a different Backpage manager sent an internal email stating that Backpage was "editing 70 to 80%" of the ads it received from customers.

g.   On June 7, 2011, Ferrer received an inquiry from a law enforcement official about a particular ad that included the term "amber alert."  In response, Ferrer acknowledged this might be "some kind of bizarre new code word for an under aged person." Ferrer then forwarded this exchange to a Backpage manager and instructed that the term "amber alert" be added to Backpage's "strip out" list.  I believe that this email indicates that Backpage did not require all future ads involving this particular coded term for the prostitution of a child to be blocked from Backpage, but merely required that such ads be edited before publication.

h.   On August 31, 2011, Backpage managers exchanged emails in which they discussed a list of 100 "solid sex for money terms."  Later emails indicate that this list of terms would

- 29 -

change but, in general, the list prohibited use of certain terms

that Backpage management and employees too closely identified with

the obvious promotion of sex trafficking and prostitution.

i.    Based on knowledge gained during this investigation

and my training and experience, I believe that this manager

acknowledged that a large proportion of the ads originally

submitted by Backpage's customers contained text and pictures that

were indicative of sex trafficking.  Nevertheless, Backpage would

still publish those ads after editing them to appear less obvious

in promoting illegal activity.  Using the words the Backpage

manager used in the email described in paragraph 30(d) above, I

believe that Backpage sex trafficking ads have adapted to

Backpage's moderation policy by using "phrases with nuance" when

promoting sex trafficking.  Also, based on knowledge gained during

this investigation, and my training and experience, I believe

that, following the implementation of "moderation," Backpage's

list of prohibited terms needed to change and evolve to adjust to

the reality of Backpage advertisers' use of new code words to

promote prostitution.  That is, once a coded word or phrase not

previously associated with sex-for-money would become too familiar

and associated with certain sex trafficking activities in the

Backpage community of advertisers, Backpage's "moderation" policy

would need to adapt by adding such words or phrases to the

"blocked" list or risk being too obvious in its promotion.

- 30 -

31.  Based on my review of several thousand Backpage ads and
internal Backpage documents and correspondence, I believe that
Backpage's policy of "moderation" only caused ads explicitly
promoting sex trafficking to become more coded and implicit in the
ads' purpose.  I have reviewed several thousand Backpage ads
posted in the various "adult" categories of Backpage (including
"massage," "dating," "escort" and others).  From this review, I
learned the following:

a.  Well over half of the Backpage classified ads in
these categories use terms and phrases that, in my training and
experience, I believe to be consistent with sex trafficking and
prostitution.  These terms and phrases include, "roses" (money,
e.g., "150 roses/half hour"), "in-call" (where the customer goes
to the prostitute's location), "outcall" (where the prostitute
goes to the customer's location), "GFE" (girlfriend experience),
and "PSE" (porn star experience).

b.  Other Backpage ads use language that can be mostly
free of coded language, but that include sexually provocative
pictures.  In my training and experience, the sexually suggestive
images included in these ads are typical of ads for prostitution.
For example, one such ad posted in Backpage's Los Angeles dating
section depicted images of a woman on a bed with her buttocks
presented in a sexual manner; another included a picture of a
woman's cleavage; others included pictures of women posing in

- 31 -

sexual positions wearing lingerie and pictures of a woman bending over revealing her naked buttocks.

       c.   Based on knowledge gained through this investigation, and my training and experience, I believe that Backpage's policy of moderation has had its intended effect. Moderation has caused and allowed otherwise neutral or innocuous terms to be understood within the Backpage community as coded language for sex trafficking and prostitution. Because of this evolving use of coded terms, a reader of such ads who is familiar with the particular vocabulary used in Backpage "adult" ads may readily identify coded terms and images indicating an ad for prostitution, while an uninitiated reader may not understand these terms at all, or at least not as being associated with sex-for-money.

      32.  Notwithstanding many Backpage advertisements' use of seemingly innocuous language in promoting prostitution, based on my conversations with law enforcement officers around the country and from my review of law enforcement officers' statements and reports regarding Backpage, I believe that the majority of Backpage ads that appear in the traditionally "adult" categories (such as "escort," "massage," or "body rubs") are actually advertisements promoting sex trafficking or prostitution. For example, in August 2015, the Detective-Sergeant in charge of the Seattle Police Department's Vice/High Risk Victims Unit and Human

- 32 -

Trafficking Task Force made a sworn statement that provided, in

pertinent part,

> Since 2014, the Seattle Police Department has made arrests
> that include hundreds of related charges, such as charges
> for patronizing a prostitute/sexual exploitation, hundreds
> of charges for prostitution, dozens of charges [of]
> Promoting Prostitution, up to 100 charges for Commercial
> Sexual Abuse against a Minor and have investigated dozens
> of rape reports involving victims who are prostitutes and
> one murder of a prostitute. As a result of hundreds of
> investigations, the Seattle Police Department Vice/High
> Risk Victims Unit has found that Backpage.com has become
> the primary web site in Seattle/Washington State for those
> looking to solicit a prostitute, post prostitution ads or
> traffic prostitutes and minors.
>
> Vice/High Risk Victims Unit Detectives also make use of
> this site to respond to ads posted under the 'escorts' and
> 'body rubs' categories posing as male customers and
> successfully arrest females and males who charge
> undercover operatives money in exchange for sex.  To date,
> no Detective within the Seattle Police Department's
> Vice/High Risk Victims Unit has ever found a legitimate
> 'escort', (person who charges simply for companionship
> with no offer of sex) or 'masseuse', (person offering
> legitimate and licensed massage therapy rather than sex)
> while responding to ads placed in these categories on
> Backpage.com.
>
> As stated previously, every time the Seattle Police
> Department Vice/High Risk Victims Unit has responded to an
> ad in the adult section of Backpage.com, we have found
> that the ad was a posting for illegal activity. The
> Seattle Police Department Vice/High Risk Victims Unit has
> not once found that the individual posting or responding
> to one of our decoy ads in the adult section of
> Backpage.com was in fact seeking any type of innocent,
> legal activity. In my professional experience, the adult
> section of Backpage.com not only contains ads for illegal
> activity, including prostitution, solicitation and
> trafficking, but it is a primary source for such ads and
> is well known for that purpose in the sex trafficking
> industry in the city of Seattle and State of Washington.

Additionally, in August 2015, the Sergeant Detective who is

- 33 -

Commander of the Human Trafficking Unit ("HTU") for the Boston,

Massachusetts Police Department made a sworn statement that

provided, in pertinent part,

> Since 2009, the [HTU] has made numerous arrests that
> include enticement of a minor into prostitution, sex
> trafficking of a minor, sex trafficking of an adult,
> forcible rape . . . and sex for a fee for soliciting a
> prostitute.
>
> As a result of investigations, the HTU has found that
> Backpage.com is the go-to Web site in Boston for those
> looking to solicit a prostitute, post prostitution ads,
> and recruit and traffic young women and minors.  The
> detectives have been able to identify numerous would-be
> exploiters by setting up decoy ads and responding to ads
> on the site.  The have arrested pimps, traffickers and
> buyers who facilitate prostitution and fuel the harmful
> and violent sex trade.  Backpage.com is the number one
> site that detectives go to in order to look for underage
> girls who are on the run and are being commercially
> sexually exploited by pimps.
>
> Since 2010, the HTU has arrested over 100 buyers of sex of
> both adults and minors through Backpage.com ads
> exclusively in hotel stings.
>
> Since 2013, 12 individuals have been charged in federal
> court for sex trafficking of both minors and adults.  In
> all these aforementioned cases, Backpage.com played a
> pivotal role in facilitating these crimes.
>
> Detectives of the HTU often get tips about illegal
> activity concerning ads posted on the escort, adult and
> massage sections of Backpage.com.  In almost every case
> detectives have found that in fact there was illegal
> activity which resulted in fines, arrests, or further
> investigations of sex trafficking.
>
> Therefore, in my professional experience as a law
> enforcement officer for over thirty years, the adult
> section of Backpage.com not only contains ads for illegal
> activity, including prostitution, solicitation and
> trafficking, but it is also the primary source for such
> ads and well known for that purpose in the sex trafficking

industry in Boston, Massachusetts.  Backpage.com's adult
section provides a vehicle and anonymity for its users who
exploit and traffic young women and girls.  . . . It is my
humble opinion that the adult section of Backpage.com
serves no legitimate service and nearly all the cases we
find associated with it involve pimp controlled
prostitution.

33.  Almost all "adult"-type Backpage ads list phone numbers

or emails for a potential customer to use to make contact with the

advertiser.  I have compared a sample of phone numbers and emails

found within Backpage ads with phone numbers and emails that

frequently are included in the memo section of some of the checks

that Backpage advertisers use to pay Backpage for those ads.  From

my review, I have found that very often the same number and/or

email appears in multiple Backpage ads as the contact information

to make an appointment.  For example:

     a.  A $25 USPS Money Order purchased on June 15, 2017,

in Duarte, California, made payable to "Posting Solutions PO BOX

802426, Dallas, TX," and thereafter deposited into SUBJECT ACCOUNT

1, included writing on the money order listing a phone number and

the words "Dulce Latina."  From a search of Backpage ads, I found

almost 800 advertisements listing the same phone number found on

the $25 USPS Money Order.

     b.  A $20 USPS Money Order purchased in Sacramento,

California, and later deposited into SUBJECT ACCOUNT 1, included

writing listing a phone number and the words "love my lips."  From

a search of Backpage ads, I found almost 1300 advertisements

listing the same phone number found on the $20 USPS Money Order.

     c.  A $150 Wells Fargo Bank Money Order, purchased in Arizona, and made payable to "Posting Solutions," included an email and the words, "red hot stuff". From an internet search of the email address listed on this $150 money order, I found advertisements on several female escort websites that directed customers to contact an Arizona phone number ending in 2397. I then searched Backpage.com for this phone number and found approximately 760 ads that included this same phone number. My review of these Backpage ads revealed images indicative of prostitution. For example, one such ad posted on Backpage's "massage" section included sexual images such as a woman lying on a bed wearing lingerie and a woman laying naked on her stomach. One of the ads describes, "Pampering provider | Body Rub Massage | Body Shampoo | Body Scrub | 4 hands | Walk ins or appointment." From my training and experience, I know that legal massage advertisements do not typically depict sexual images. This advertisement depicted sexual images and included terms like "4 hands," which I know to be coded language describing a massage given to a customer by two women. Such advertisements are often indicative of prostitution.

    34.  Despite the fact that several thousand Backpage ads shared the exact same phone number or email address to contact the advertiser, these same ads included sexually suggestive images of

hundreds of *different* women.  Based on my training and experience,
multiple different women do not share the same email address or
phone number when posting ads for dating.  Rather, in my training
and experience, such ads are consistent with ads posted by pimps
or prostitution agencies that are using the same phone number or
email to advertise several different women (or girls) to
prospective prostitution clients.

35.  On March 28, 2018, a grand jury returned a 93 count
indictment charging certain Backpage Operators with criminal
violations of 18 U.S.C. § 371 (Conspiracy), § 1952 (Travel Act—
Facilitation of Prostitution), § 1956 (Money Laundering), § 1957
(Financial Transactions Involving Illicit Proceeds), and including
Forfeiture Allegations pursuant to 18 U.S.C. §§ 981 and 982
(seeking criminal forfeiture of, among other assets, the SUBJECT
ACCOUNTS and the SUBJECT DOMAIN NAMES).  A copy of that indictment
is attached hereto (as Exhibit A) and incorporated herein as
though fully set forth.

C. THE SUBJECT ACCOUNTS

1. SUBJECT ACCOUNT 1

i. Foreign Transfers Into SUBJECT ACCOUNT 1

36.  While Backpage accepts payments for ads from third-
parties, for the purpose of this affidavit, I will focus on
advertising payments made via the Posting Solutions' P.O. BOX
using cash, money orders, or digital currency.

37.  From my review of Posting Solutions' application for the USPS Dallas, Texas P.O. BOX, I learned that it was registered to "Website Technologies, LLC/Backpage.com."  Also listed on the P.O. BOX Application were the names of several Backpage Operators, including Ferrer.

38.  I have reviewed bank records for SUBJECT ACCOUNT 1. Based on my review, I know the following:

a.  On February 15, 2017, Posting Solutions LLC, located at ███████████████ Dallas, Texas 75240, opened ███████████ account number ████████ (SUBJECT ACCOUNT 1, which lists ████ as the sole signatory on the account).

b.  ████ is the President, Chief Executive Officer, Treasurer and Secretary of Posting Solutions LLC.

39.  Based on my knowledge of this investigation, having spoken to law enforcement personnel, and my review of the financial records, when an advertiser purchases an ad for prostitution using digital currency, the payments to Backpage (and certain subsequent expenditures) then proceed in the following manner:

a.  A "poster" of a prostitution ad on backpage.com would pick a payment method, for example, through Bitcoin payments as previously described above.

b.  The poster would already have Bitcoin or Backpage would direct the poster to a third-party exchanger in order to buy

- 38 -

Bitcoin.

     c.   Backpage would then provide the poster with a wallet address to send the specific amount of Bitcoin.

     d.   The poster would receive credit to then post ads on Backpage.

     e.   In batches, generally valued in hundreds of thousands of dollars, Backpage would sell the Bitcoin to a third party exchanger, frequently "GoCoin," in order to convert the Bitcoin into U.S. or foreign currency, which GoCoin generally holds in foreign bank accounts.

     f.   GoCoin would wire funds from these foreign accounts to either 1) Backpage controlled foreign accounts, or 2) Backpage controlled domestic operating accounts.

     g.   Backpage operators would hold these receiving accounts in the names of entities controlled by Backpage, such as Ad Tech BV, Posting Solutions (SUBJECT ACCOUNT 1 is held in the name of Posting Solutions), Website Technologies, or Cereus Properties (SUBJECT ACCOUNT 2A is held in the name of Cereus Properties).

     h.   These funds that originated from foreign transactions would be used to pay for services, like Verizon in Los Angeles, or would be transferred to Backpage Operators' accounts and accounts held in their family members' names.

     40.  I have reviewed records of wire transfers from countries

- 39 -

outside the United States deposited into the SUBJECT ACCOUNT 1.
Just for the period of August 1 through September 1, 2017, SUBJECT
ACCOUNT 1 received over ███████ in wire transfers from
outside the United States.  For example:

      a.   On or about August 16, 2017, a company called
"Binary Trading SG PTE LTD" ("Binary Trading") wired ██████ from
an account in Singapore into SUBJECT ACCOUNT 1.  Based on my
review of records related to this transaction, Binary Trading is a
name used by GoCoin.[7]

      b.   On or about August 17, 2017, Binary Trading wired
another ███████ from a Singapore account into SUBJECT ACCOUNT 1.

      c.   On or about August 30, 2017, a company named
"TRILIX PTE LTD," listing the same Singapore address as Binary
Trading and GoCoin, in four wires ranging from ██████ to
██████ , sent approximately ██████ from a Singapore account
into SUBJECT ACCOUNT 1.  Memo lines from these wires list "GC" or
"GC FOR INTERNET SERVICES."  I understand "GC" to mean GoCoin.

      ii.  SUBJECT ACCOUNT 1 Payments for Backpage Operations

    41.  I have reviewed outgoing payments from SUBJECT ACCOUNT 1
and found that substantial percentages of these payments are for
the operation of Backpage.com.  For example, between July and

---

   [7]  Further, according to GoCoin's website, GoCoin maintains
offices at the Singapore address listed on the $535,500 wire
from "Binary Trading."

October, 2017, SUBJECT ACCOUNT 1 wired over ███████████ to pay
for the following:

 a. Between July and October 2017, SUBJECT ACCOUNT 1
wired ████████ to Verizon Digital Media Services in Los Angeles.

 b. On August 4, 2017, SUBJECT ACCOUNT 1 wired ██████
to "Netnames," also known as ASCIO, to pay for the registration
renewal of all the SUBJECT DOMAINS, including Backpage.com.

 c. In August 2017, SUBJECT ACCOUNT 1 sent numerous
automated clearinghouse payments to "Netchex Tax Prep Clients"
totaling over ███████ From a review of their website, I learned
Netchex is a human resources company that provides payroll and
other such services to Backpage.

 d. Within a one-week period beginning on August 2,
2017, SUBJECT ACCOUNT 1 wired approximately ██████ to S&W Payroll
Services.  An online search of S&W Payroll indicated that S&W
Payroll is owned by Netchex.  As stated above, Netchex is a human
resource service, and S&W Payroll appears to be Netchex's payroll
division.

 e. On August 11, 2017, SUBJECT ACCOUNT 1 wired
████████ to the Telesign Corporation, located in Marina del Ray,
California.  According to their website, Telesign is a
communications platform that delivers security for websites.

 f. On August 18, 2017, SUBJECT ACCOUNT 1 wired ██████
and ████████ respectively, to two separate data backup companies

- 41 -

for Backpage's on-line data backup.

42. Based on my review of bank records for SUBJECT ACCOUNT 1 throughout the existence of the account, these types of transactions and expenditures were typical.

2. SUBJECT ACCOUNT 2A

i. Transfers From SUBJECT ACCOUNT 1

43. From my review of bank documents, I have learned that SUBJECT ACCOUNT 2A is a ███████████ business bank account owned by "Cereus Properties LLC," identifying Spear as the sole signatory. My review revealed that this account was funded with transfers from SUBJECT ACCOUNT 1. On average, during each month of 2017, SUBJECT ACCOUNT 1 transferred several hundred thousand dollars into SUBJECT ACCOUNT 2A. For example:

a. On July 25, 2017, SUBJECT ACCOUNT 1 sent two wire transfers totaling about ███████████ to SUBJECT ACCOUNT 2A.

b. On August 8, 2017, SUBJECT ACCOUNT 1 sent a wire totaling ███████ to SUBJECT ACCOUNT 2A.

c. On August 31, 2017, SUBJECT ACCOUNT 1 sent a wire transfer totaling ████████ to SUBJECT ACCOUNT 2A.

d. On September 15, 2017, SUBJECT ACCOUNT 1 sent a wire transfer totaling ████████ to SUBJECT ACCOUNT 2A.

e. On October 2, 2017, SUBJECT ACCOUNT 1 sent a wire transfer totaling ███████ to SUBJECT ACCOUNT 2A.

ii. Foreign Transfers into SUBJECT ACCOUNT 2A

- 42 -

44.    I have reviewed financial records from a foreign bank in the Netherlands (the "Foreign Account").  I have also reviewed emails related to this account.  From my review of these records, I learned the following:

a.    The Foreign Account was opened in March 2015 and is held in the name of Ad Tech BV, a Netherlands based company, and identifies Ferrer as the CEO and ███ as the CFO.

b.    From March 2015 through November 2017, Foreign Account A received millions of dollars from Binary Trading SG PTE, Limited, the same company GoCoin used to wire funds into SUBJECT ACCOUNT 1.  In an April 4, 2017, email to employees of the bank that maintains the Foreign Account, ███ explained,

Binary Capital is our trading partner, they hold money in trust for Go Coin [sic].  Rather than incurring 3 sets of wire fees which make our transactions unprofitable, they act as our agent and disburse payments directly from our trust account to our merchant.

c.    During this same period, Foreign Account A wire transferred ███████████ into SUBJECT ACCOUNT 2A. For example, an April 25, 2017, an email from ███ to individuals at the bank holding the Foreign Account directed the bank to wire "███████████" to SUBJECT ACCOUNT 2A. Thereafter, I reviewed a wire record and confirmed that on April 25, 2017, the Foreign Account wired $██████ into SUBJECT ACCOUNT 2A, as ███ directed in his email.  In reviewing the records, I found the following additional wires sent to SUBJECT

- 43 -

ACCOUNT 2A:

        i.     In December 2016, the Foreign Account wired approximately ██████████ to SUBJECT ACCOUNT 2A.

        ii.    On February 28, 2017, the Foreign Account wired ███████ into SUBJECT ACCOUNT 2A.

        iii.   On March 30, 2017, the Foreign Account A wired ███████ into SUBJECT ACCOUNT 2A.

        iv.    On May 31, 2017, the Foreign Account wired ████████ to SUBJECT ACCOUNT 2A.

        v.     On June 28, 2017, the Foreign Account A wired ███████ to SUBJECT ACCOUNT 2A.

        vi.    July 27, 2017, the Foreign Account A wired ██████ to SUBJECT ACCOUNT 2A.

    iii.    <u>SUBJECT ACCOUNT 2A Payments for Backpage Operations</u>

45. I then reviewed SUBJECT ACCOUNT 2A records for payments to promote Backpage operations. From March through December 2017, SUBJECT ACCOUNT 2A paid over ██████ to "Cox Communications," an internet services company that provides voice-over-internet phone and cable services. I believe that Backpage uses Cox Communications to facilitate its internet presence and promote its sale of prostitution advertising.

    3. <u>SUBJECT ACCOUNT 2B</u>

46. I reviewed records SUBJECT ACCOUNT 2A and SUBJECT ACCOUNT 2B. On February 2, 2018, SUBJECT ACCOUNT 2A wired

- 44 -

transferred ███████████ into SUBJECT ACCOUNT 2B.  I am aware of no other funding sources for SUBJECT ACCOUNT 2B.

####    4. SUBJECT ACCOUNTS 3A, 3B, 3C

47.  I have reviewed records for SUBJECT ACCOUNT 3A as well as the following accounts: ███████████████ account number ███████████, belonging to Website Technologies (as detailed above, a Backpage controlled entity), held in Arizona ("███████████"); ████████████████ account number ███████████ belonging to Cereus Properties, held in Arizona (████ ███████████).  From this review, I learned the following:



a.    Between December 14, 2015, and January 15, 2016, in approximately 26 wires, a GoCoin account in Slovakia transferred over ███████████ to the ███████████ in the United States.

b.    On January 15, 2016, the ███████████ wired ███████████ to Verizon in Los Angeles, California, in payment for Backpage internet services.

c.    Between January 21, 2016, and August 31, 2016, in approximately 27 wires, the ███████████ transferred approximately ███████████ to the ███████████.

d.    Between March 1, 2016, and July 1, 2016, the ████ ███████████ wired ███████████ into SUBJECT ACCOUNT 3A.

48.  According to records for SUBJECT ACCOUNTS 3A, 3B, and 3C:

- 45 -

a.   On September 14, 2017, SUBJECT ACCOUNT 2A wired ▮▮▮▮▮▮▮ into SUBJECT ACCOUNT 3A.

b.   On October 12, 2017, SUBJECT ACCOUNT 3A wired approximately ▮▮▮▮▮ into SUBJECT ACCOUNT 3B.

c.   On January 5, 2018, SUBJECT ACCOUNT 3A wired approximately ▮▮▮▮▮ into SUBJECT ACCOUNT 3C.



SUBJECT ACCOUNT 3A



SUBJECT ACCOUNT 3A through 3C and SUBJECT SAFE DEPOSIT BOX 1

5. <u>SUBJECT ACCOUNT 4</u>

49.   From my review of the records for SUBJECT ACCOUNT 4 (belonging to Spear), I learned that on or about March 16, 2016, SUBJECT ACCOUNT 3A transferred ▮▮▮▮▮ into SUBJECT ACCOUNT 4

as an opening deposit.  On March 20, 2018, █████████

confirmed that these funds have remained in SUBJECT ACCOUNT 4

since the account was opened.

     6.  SUBJECT ACCOUNT 5A and 5B

    50.  I have reviewed financial records related to SUBJECT

ACCOUNTS 5A and 5B, held in the name of █████████, Scott

Spear's adult daughter.  From this review, I learned the

following:

      a.  On February 23, 2017, SUBJECT ACCOUNT 3A wired

approximately ███████ into SUBJECT ACCOUNT 5A.

      b.  On the February 23, 2017, SUBJECT ACCOUNT 3A

wired ███████ into SUBJECT ACCOUNT 5B.

     7.  SUBJECT ACCOUNT 6

    51.  From my review of financial records related to SUJBECT

ACCOUNTS 2A, 2B and 6, I learned the following:

      a.  On October 2, 2017, SUBJECT ACCOUNT 2A wired

approximately ███████ into SUBJECT ACCOUNT 6.



8. <u>SUBJECT ACCOUNTS 7A through 7E</u>

52.　From my review of financial records of SUBJECT
ACCOUNTS 2A and 2B, 7A through 7D, and 12A, I learned the
following:

　　　　a.　On July 6, 2017, SUBJECT ACCOUNT 2A wired
▮▮▮▮▮▮▮▮▮ into SUBJECT ACCOUNT 7A.

　　　　b.　On July 28, 2017, SUBJECT ACCOUNT 7A wired
▮▮▮▮▮▮▮ into SUBJECT ACCOUNT 7B.

53.　From my review of financial records of SUBJECT
ACCOUNTS 1 and 7C, and those concerning the ▮▮▮▮▮▮▮▮account
ending in -1462, held in the name of Posting Solutions ("Account
-1462"),[8] I learned the following:

　　a.　On January 13, 2017 and January 20, 2017, a GoCoin
account in Singapore wired a total of approximately ▮▮▮▮▮▮▮▮
into Account -1462.

　　b.　In February 2017, Account -1462 wired a total of
▮▮▮▮▮ to Verizon, in Los Angeles.

　　c.　On August 8, 2017, SUBJECT ACCOUNT 1 wired ▮▮▮▮▮▮▮
into SUBJECT ACCOUNT 12A.

---

[8] ▮▮▮▮▮▮▮▮▮▮is a U.S. bank located in Dallas, Texas.　Posting
Solutions opened ▮▮▮▮▮▮▮▮account -1462 on or about January
5, 2017.

d. On November 3, 2017, SUBJECT ACCOUNT 12A wired

███████ to SUBJECT ACCOUNT 7D.

9. <u>SUBJECT ACCOUNTS 8A, 8B, 8C, and 8D</u>

54. From my review of the records for SUBJECT ACCOUNTS 2A

and 2B, 8A, and 8B, I learned the following:

a. On February 2, 2018, SUBJECT ACCOUNT 2A wired

███████ into SUBJECT ACCOUNT 8A.

b. Also on February 2, 2018, SUBJECT ACCOUNT 2A

wired ██████ into SUBJECT ACCOUNT 8B.

55. From my review of SUBJECT ACCOUNTS 1, 8C, and 8D, I

learned the following:

a. On August 2 and August 8, 2017, SUBJECT ACCOUNT 1

wired ███████ and ████████, respectively, to S&W Payroll, a

company Backpage uses to pay its employees.

b. Between August 11, 2017, and December 1, 2017,

S&W Payroll wired a total of ████████ into SUBJECT ACCOUNT

8C.

c. Between November 3, 2017, and December 8, 2017,

SUBJECT ACCOUNT 8C wired ██████ into SUBJECT ACCOUNT 8D.

10. <u>SUBJECT ACCOUNT 9</u>

56. From my review of the records for SUBJECT ACCOUNTS 2A

2B, and 9, I learned that on February 2, 2018, SUBJECT ACCOUNT

2A wired ████████ into SUBJECT ACCOUNT 9.

- 49 -

11.    SUBJECT ACCOUNT 10

57.    From my review of records for SUBJECT ACCOUNTS 2A and 10, I learned that on February 2, 2018, SUBJECT ACCOUNT 2A wired ▮▮▮▮▮▮▮ into SUBJECT ACCOUNT 10.

12.    SUBJECT ACCOUNT 11

58.    From my review of SUBJECT ACCOUNTS 1, 8C, 8D, and 11, as well as Account -1462 (as described above, a Posting Solutions' ▮▮▮▮▮▮▮ account), I learned the following:

a.    On January 4, 2017, GoCoin's Singapore account wired ▮▮▮▮▮ into Account -1462, and on January 20, 2017, GoCoin's Singapore account directed two additional wires, for ▮▮▮▮▮ and ▮▮▮▮▮, respectively, into Account -1462 (for a total of ▮▮▮▮▮ wired from GoCoin's Singapore account into Account -1462).

b.    On January 24, 2017, Account -1462 wired approximately ▮▮▮▮▮▮ into S&W Payroll.

59.    On January 27, 2017, an S&W Payroll account wired a total of ▮▮▮▮▮ into SUBJECT ACCOUNT 11.

13.    SUBJECT ACCOUNTS 12A and 12B

60.    From my review of financial records for SUBJECT ACCOUNTS 1, 12A, and 12B, I learned the following:

a.    On August 8, 2017, SUBJECT ACCOUNT 1 wired ▮▮▮▮▮ into SUBJECT ACCOUNT 12A.

61.  On December 8, 2017, SUBJECT ACCOUNT 12A wired ████████ into SUBJECT ACCOUNT 12B.

14.  <u>SUBJECT ACCOUNT 13</u>

62.  From my review of financial records for SUBJECT ACCOUNTS 1, 12A, and 13, I learned the following:

a.  In January 2017, SUBJECT ACCOUNT 1 wired ████████ into SUBJECT ACCOUNT 12A.

b.  On August 16, 2017, SUBJECT ACCOUNT 12A wired ████████ into SUBJECT ACCOUNT 13.

15.  <u>SUBJECT DOMAINS</u>

63.  From my review of records from Ascio Technologies ("ASCIO"), the domain registrar for the SUBJECT DOMAINS, I learned the following:

a.  ASCIO is a domain registrar that manages the reservation of internet domain names for Backpage, and ASCIO is the registrar for over 300 domain names registered by Ferrer and Backpage.com, LLC.

b.  On or about August 4, 2017, SUBJECT ACCOUNT 1 wired ██████ to ASCIO/WMB Inc. as payment for the renewal of the SUBJECT DOMAINS.  From my training and experience and review of online sources, I know that, in general, to reach a website on the Internet, a person types an address into a web browser or computer.  That address is usually in the form of a name or a number and has to be unique so computers can locate the

- 51 -

website.  The Internet Corporation for Assigned Names and
Numbers or "ICANN," coordinates these unique identifiers across
the world with registrars.  Domain renewal fees are paid
annually and are in part used to maintain this service.  This
allows visitors to be pointed to Backpage controlled servers
when they point their web browser to addresses such as
www.backpage.com.

      c.  In order to maintain an on-line presence,
companies like Backpage must renew their domains yearly,
generally for a fee.  Without this payment, the domain could be
resold to others and Backpage customers would not be able to
find the Backpage servers when the customer types the domain
name in their web browser.

64.  Of the over 300 domain names registered by
Backpage.com LLC and/or Ferrer, all of which I reviewed, I
believe the 35 SUBJECT DOMAINS are specifically used to promote
and advertise prostitution for the following reasons:

      a.  I visited each of the SUBJECT DOMAINS and found
that, with the exception of "Backpage-insider.com", the SUBJECT
DOMAINS that begin with the word "Backpage" automatically
redirected my internet browser to Backpage.com.  These
particular SUBJECT DOMAINS act and appear exactly as
Backpage.com.

- 52 -

b.   I visited Backpage.com and navigated to the Los Angeles/Dating/Women for Men section.  I clicked on the first ad listed (Post ID 142685832).  This ad contained approximately one dozen pictures of women posing sexually, many on a bed wearing lingerie.  Super-imposed over a few of the images was the text: "JENNY HERE TODAY – FBSM – BETTER THAN NURU."  An open source search for "FBSM" indicated that FBSM is code language for "Full Body Massage."  An open source search for "NURU" produced the following description:

> NURU is a Japanese erotic massage technique in which one or more masseuses would rub their body against the client's body after both parties are nude.

c.   Based on this review, I believe this to be an advertisement in promotion of prostitution.  From my further review, I observed thousands of other ads that posted similar content consistent with advertising prostitution.

65.  I also attempted to visit Backpage-Insider.com, bestofbackpage.com, bestofbigcity.com, but these domains did not have a landing page and were unavailable.

66.  On March 22, 2018, I visited bigcity.com and, similar to Backpage.com, I found sexual content and additional advertisements promoting prostitution.  On the initial landing page for bigcity.com, there was a disclaimer noting that the website included sexual content.

67.  I also attempted to visit chicagobackpage.com, denverbackpage.com, newyorkbackpage.com, phoenixbackpage.com, sandiegobackpage.com, seattlebackpage.com, and tampabackpage.com.  Each of these domains automatically directed me to a landing page with links to other websites with sexual content, including Backpage.com.

68.  Based on the above, there is probable cause to believe that funds wire transferred into the SUBJECT ACCOUNTS have been used to support and maintain each of the SUBJECT DOMAINS that promote prostitution.  Therefore, each of the SUBJECT DOMAINS is subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), because those SUBJECT DOMAINS are involved in, and traceable to, one or more transactions or attempted transactions in violation of 18 U.S.C. §§ 1956(a)(2)(A) and 1956(h) (International Money Laundering for Promotion and Money Laundering Conspiracy, respectively), and 18 U.S.C. § 1957 (Financial Transactions Involving Illicit Proceeds).

## VI.    CONCLUSION

69.  For the reasons stated above, there is probable cause to believe that the SUBJECT ACCOUNTS and SUBJECT DOMAINS are subject to seizure and forfeiture by the United States under the following provisions:

a.   18 U.S.C. § 981(a)(1)(A), because each of the SUBJECT ACCOUNTS and SUBJECT DOMAINS are involved in, and

- 54 -

traceable to, one or more transactions or attempted transactions

in violation of 18 U.S.C. § 1956(h) (Conspiracy to Launder

Money), 18 U.S.C. § 1956(a)(2) (International Money Laundering

for Promotion), and 18 U.S.C. § 1957 (Financial Transactions

Involving Illicit Proceeds); and

      b.    18 U.S.C. § 981(a)(1)(C), because those SUBJECT

ACCOUNTS and SUBJECT DOMAINS constitute and are derived from

proceeds traceable to one or more violations of 18 U.S.C. §

1956(h), 18 U.S.C. § 1956(a)(2), and 18 U.S.C. § 1957.


                                      _____
                                        Lyndon Versoza
                                        U.S. Postal Inspector

Subscribed to and sworn to me
this 28th day of March, 2018

_____
United States Magistrate Judge

- 55 -

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | | |
|---|---|---|
| Plaintiff, | | **INDICTMENT** |
| v. | VIO: | 18 U.S.C. § 371 (Conspiracy) Count 1 |
| 1. Michael Lacey<br>Counts 1-70, 81, 83-84, 86, 88-92 | | 18 U.S.C. § 1952(a)(3)(A) (Travel Act—Facilitate Prostitution) Counts 2-51 |
| 2. James Larkin<br>Counts 1-68, 80, 87 | | 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering) Count 52 |
| 3. Scott Spear<br>Counts 1-68, 71-78, 85, 93 | | |
| 4. John "Jed" Brunst<br>Counts 52-70, 78-84, 86-93 | | 18 U.S.C. § 1956(a)(1)(B)(i) (Concealment Money Laundering) Counts 53-62 |
| 5. Dan Hyer<br>Counts 1-68 | | 18 U.S.C. § 1956(a)(2)(A) (International Promotional Money Laundering) Counts 63-68 |
| 6. Andrew Padilla<br>Counts 1-51 | | |
| 7. Joye Vaught<br>Counts 1-51 | | 18 U.S.C. § 1957(a) (Transactional Money Laundering) Counts 69-93 |
| Defendants. | | 18 U.S.C. §§ 981, 982 21 U.S.C. § 853, 28 U.S.C. § 2461 (Forfeiture Allegations) |

THE GRAND JURY CHARGES:

A.   <u>Introduction</u>

1.     The website www.backpage.com ("Backpage") is notorious for being the

internet's leading source of prostitution advertisements. Backpage derives the overwhelming majority of its revenue from such ads. These practices have enabled Backpage to earn over $500 million in prostitution-related revenue since its inception.

2.      Backpage was created in 2004 by defendant MICHAEL LACEY ("LACEY"), defendant JAMES LARKIN ("LARKIN"), and a third individual, C.F. From 2004-15, LACEY and LARKIN oversaw the website's policies and strategic direction. Additionally, LACEY and LARKIN have retained significant control over the website (and have continued receiving tens of millions of dollars of Backpage-related distributions) since purportedly selling their interests in Backpage in 2015.

3.      Defendant SCOTT SPEAR served as the Executive Vice President of one of Backpage's parent companies and held, at times, an ownership interest in Backpage of approximately 4%.

4.      Defendant JOHN "JED" BRUNST ("BRUNST") served as the Chief Financial Officer of Backpage and several of Backpage's parent companies and held, at times, an ownership interest in Backpage of approximately 6%.

5.      Defendant DAN HYER ("HYER") joined Backpage's marketing department in or around 2006 and served as Backpage's Sales and Marketing Director.

6.      Defendant ANDREW PADILLA ("PADILLA") served as Backpage's Operations Manager.

7.      Defendant JOYE VAUGHT ("VAUGHT") served as Backpage's assistant Operations Manager.

8.      The defendants identified above are referred to at times in this indictment as the "BACKPAGE DEFENDANTS."

9.      As explained in detail below, the BACKPAGE DEFENDANTS have utilized a variety of strategies to make it appear that the prostitution ads appearing on Backpage are actually ads for "escort" services, "adult" companionship, dating, or other lawful activities. For example, Backpage purports to bar customers from offering illegal services

- 2 -

1    and has periodically used computerized filters and human "moderators" to edit the wording

2    of (or block) ads that explicitly offer sexual services in return for money.

3        10.    These strategies are a fiction designed to conceal the true nature of

4    Backpage's ads and customers.    Indeed, the BACKPAGE DEFENDANTS have

5    admitted—in internal company documents and during private meetings—that they know

6    the overwhelming majority of the website's ads involve prostitution.    In one internal

7    document, LACEY actually bragged about the company's contributions to the prostitution

8    industry:  "Backpage is part of the solution.  Eliminating adult advertising will in no way

9    eliminate or even reduce the incidence of prostitution in this country. . . .  For the very first

10   time, the oldest profession in the world has transparency, record keeping and safeguards."

11       11.    Notwithstanding    these    private    admissions,    the    BACKPAGE

12   DEFENDANTS have taken pains to mislead the public, regulators, and law enforcement

13   officials concerning the supposed sincerity of Backpage's efforts to prevent the publication

14   of prostitution-related ads.  For example, after reviewing LACEY's written description of

15   Backpage's contributions to the prostitution industry and editing practices, LARKIN

16   instructed C.F. to prevent "any of the information in this being made public."  PADILLA,

17   who helped supervise Backpage's moderators, threatened to fire any employee who

18   acknowledged in writing that the "escorts" depicted in the website's ads were actually

19   prostitutes:  "Leaving notes . . . implying that we're aware of prostitution . . . is enough to

20   lose your job over."    And in one internal document, Backpage's media strategy was

21   described simply as "Do not acknowledge the prostitution."

22       12.    Many of the ads published on Backpage depicted children who were victims

23   of sex trafficking.  Once again, although Backpage has sought to create the perception that

24   it diligently attempts to prevent the publication of such ads, the reality is that Backpage has

25   allowed such ads to be published while declining—for financial reasons—to take necessary

26   steps to address the problem.  For example, for several years, Backpage's official policy,

27   when presented with an ad featuring the prostitution of a child, was to delete the particular

28

- 3 -

words in the ad denoting the child's age and then publish a revised version of the ad. Such editing, of course, did nothing to change the fact the ad featured the prostitution of a child—it only created a veneer of deniability and helped Backpage's customers (*i.e.,* pimps trafficking children) evade detection.

13. Backpage has also contributed to the proliferation of ads featuring the prostitution of children in other ways. For example, an anti-sex trafficking organization once suggested that Backpage provide an automatic warning message whenever a customer searched for particular terms indicative of the prostitution of a child. In response, C.F. acknowledged the proposal was a good one but declined to adopt it because Backpage would not derive any public-relations benefit from doing so: "This is a good idea but it is not visible to AGs [state attorneys general] so it has little PR value. It is a low priority." Backpage has also claimed it does everything in its power to alert the National Center for Missing and Exploited Children ("NCMEC") whenever it becomes aware that a child is being advertised on its website. However, the BACKPAGE DEFENDANTS implemented policies to artificially limit such referrals. In one email, PADILLA instructed VAUGHT that "if we don't want to blow past 500 [referrals to NMCEC] this month, we shouldn't be doing more than 16 per day." In another training document, moderators were instructed not to send emergency alerts to NCMEC in response to complaints filed by the grandparents and other extended family members of children being advertised on the website: "Neice [sic], nephew, grandchild, cousin, etc. doesn't count."

14. Virtually every dollar flowing into Backpage's coffers represents the proceeds of illegal activity. In fact, by 2015, the major credit card companies stopped processing payments for Backpage and some banks closed Backpage's accounts out of concern they were being used for illegal purposes. In response, the BACKPAGE DEFENDANTS have pursued an array of money laundering strategies. These strategies have included (a) instructing customers to send checks and money orders to particular Post Office box, depositing those payments in bank accounts held in the name of entities with

- 4 -

no apparent connection to Backpage, and then giving customers a corresponding "credit" on Backpage to purchase new ads, (b) wiring the proceeds of Backpage's business to bank accounts held in foreign countries and then redistributing the funds to certain BACKPAGE DEFENDANTS (as compensation) or redepositing the funds in bank accounts held in the United States (to conceal the nature of those funds and promote Backpage's ongoing operations), and (c) converting customer payments, and the proceeds of Backpage's business, into and out of cryptocurrency.

15.     The BACKPAGE DEFENDANTS have also engaged in other financial transactions designed to conceal their misconduct and evade seizure by law enforcement. For example, in November 2016, LACEY asked employees of an Arizona-based bank for advice on how to move his assets "offshore" to protect them from seizure by the government.  Soon afterward, $16.5 million in Backpage-derived cash was wired from LACEY's bank accounts in the United States to an overseas bank account in Hungary.

16.     For all of these reasons, the BACKPAGE DEFENDANTS are charged in this indictment with the crimes of facilitating prostitution (18 U.S.C. § 1952), concealment, transactional, and international promotional money laundering (18 U.S.C. §§ 1956 and 1957), and/or conspiracy to commit these offenses (18 U.S.C § 371 and 1956).

B.     Backpage's Origins, Ownership, and Control

17.     LACEY and LARKIN are the founders of the *Phoenix New Times*, an alternative newspaper based in Arizona.  Over time, LACEY and LARKIN acquired several other alternative newspapers, which they came to operate through an entity called Village Voice Media Holdings ("VVMH").  Additionally, SPEAR served as VVMH's Executive Vice President and BRUNST served as VVMH's Chief Financial Officer.

18.     The publications within the VVMH newspaper chain routinely featured illegal prostitution ads.  In fact, more than 30 years ago, a federal court affirmed the conviction of the operator of a prostitution business (which masqueraded as a massage parlor) for publishing ads in the classified section of the *Village Voice*.  *See United States*

- 5 -

*v. Sigalow*, 812 F.2d 783 (2d Cir. 1987). The conviction was for violating 18 U.S.C. § 1952, one of the same crimes charged in this indictment.

19. By 2000, the rise of the internet—and, in particular, the website www.craigslist.com ("Craigslist"), which offered free classified ads—began to significantly disrupt VVMH's business model, which depended on classified advertising revenue for survival.

20. LACEY and LARKIN, with assistance from C.F., sought to address this threat by creating Backpage. Their decision to create Backpage was later described in an internal company document as follows: "In 2004, in response to the Craigslist threat that was decimating daily newspapers, VVM launched its own online classified site, Backpage.com, named after the back page of VVM's print publication."

21. During its first few years of operation, Backpage accounted for only a fraction of VVMH's overall revenue. In January 2006, for example, VVMH estimated that Backpage supplied only 1% of its overall advertising revenue but also noted that Backpage had "tremendous upside potential."

22. This prediction proved prophetic. By 2008, Backpage was generating over $5 million in annual profit. This annual profit figure increased to over $10 million in 2009.

23. In 2010, Craiglist chose to shut down its "adult" section due to the prevalence of ads for prostitution and other illegal services. The BACKPAGE DEFENDANTS, sensing an opportunity, made an aggressive push for Backpage to capture Craiglist's share of this market. In one internal document, LARKIN commented: "Craigslist has folded . . . . It is possible that this will mean a deluge of adult content ads for backpage.com . . . . We have with the Village Voice probably the longest run of adult content advertising in the US and it is, like it or not, in our DNA."

24. This push was successful. In internal documents, Backpage stated that it experienced "explosive growth" by "capitalizing on displaced Craiglist ad volume." Backpage's annual profits grew to over $26 million in 2010, over $52 million in 2011, and

- 6 -

Attachment A

over $78 million in 2012.

25.     These figures dwarfed the profits that VVMH's print publications were generating.  In fact, Backpage became so profitable that the BACKPAGE DEFENDANTS decided to get rid of VVMH's publishing business so they could focus on Backpage's further development and expansion.  Accordingly, in or around November 2012, the BACKPAGE DEFENDANTS spun off VVMH's print publications and began utilizing several new corporate entities, including Medalist Holdings, Inc. ("Medalist"), Dartmoor Holdings LLC ("Dartmoor"), and Camarillo Holdings, LLC ("Camarillo"), to serve as Backpage's parent companies.

26.     Following these transactions, LACEY held an ownership interest in Medalist (and, therefore, in Backpage) of approximately 45%, LARKIN held an ownership interest of approximately 43%, BRUNST held an ownership interest of approximately 6%, and SPEAR held an ownership interest of approximately 4%.

27.     Backpage's annual profits continued to skyrocket during and after these changes.  They grew to over $112 million in 2013 and over $134 million in 2014.

28.     In or around April 2015, LACEY, LARKIN, SPEAR, and BRUNST purported to sell their ownership interests in Backpage and several related entities for around $600 million to various Dutch entities.  These Dutch entities included Atlantische Bedrijven, C.V., which agreed to purchase Backpage's U.S. operations for around $526 million, and UGC Tech Group C.V., which agreed to purchase Backpage's overseas operations for around $77 million.

29.     In fact, these Dutch entities were controlled by C.F., who borrowed most of the $600 million from entities controlled by the sellers to finance the purchase.  Due to this financial arrangement, LACEY, LARKIN, SPEAR, and BRUNST retained a significant financial interest in Backpage after the transactions were completed.

30.     Additionally, LACEY, LARKIN, SPEAR, and BRUNST retained significant operational control over Backpage following these transactions.  For example, the April

- 7 -

2015 loan agreement required C.F. to sign a six-year employment agreement, required C.F. to provide the lenders with full access to Backpage's books and records, required C.F. to provide the lenders with an annual listing of all of C.F.'s personal assets, and prohibited C.F. from opening any new bank accounts on Backpage's behalf without the lenders' consent.

C.  Backpage's Knowledge And Facilitation Of Prostitution Ads

31.  By 2008, if not earlier, the BACKPAGE DEFENDANTS were aware that the overwhelming majority of the website's "adult" ads involved prostitution. Nevertheless, the BACKPAGE DEFENDANTS made a financial decision to continue displaying those ads.

32.  The BACKPAGE DEFENDANTS also sought to sanitize the ads by editing them—that is, by removing terms and pictures that were particularly indicative of prostitution and then publishing a revised version of the ad. This process was sometimes referred to as "moderation."

33.  For example, in April 2008, C.F. wrote an email explaining that, although he was "under pressure to clean up phoenix's adult content," he was unwilling to delete prostitution ads because doing so "would put us in a very uncompetitive position with craig[slist]" and result in "lost pageviews and revenue." Thus, he instructed Backpage's technical staff to edit the wording of such ads, by removing particular terms that were indicative of prostitution, and then allow the remainder of the ad to be featured on Backpage's website.

34.  On February 26, 2009, C.F. received an email from the classified-ads manager of a newspaper within the VVMH chain asking why Backpage's terms of service purported to prevent customers from "suggest[ing] an exchange of sexual favors for money" in light of the fact that "[c]learly everyone on the entire backpage network breaks the rules." In response, C.F. didn't dispute the author's characterization and explained that Backpage had simply added the terms of service at the behest of "our attorney in SF" in an

Attachment A

1    attempt to avoid liability in civil lawsuits.

2         35.    On May 25, 2009, SPEAR received an email summarizing a plan to begin

3    "remov[ing] sex act pics and coded terms" from Backpage ads.  Later that day, C.F.

4    forwarded this email to HYER with the explanatory note that "We do not intend to be a

5    craig[slist] here, just get out the most egregious stuff."

6         36.    On March 8, 2010, C.F. testified in federal court (the United States District

7    Court for the Southern District of Florida) in the criminal trial of a pimp who had used

8    Backpage to post prostitution ads.  During his testimony, C.F. acknowledged the defendant

9    had used the email address "Youngpimpin86" when posting the ads.  C.F. also

10    acknowledged that the ads described one so-called escort as "five-foot-three, with a small

11    waist and amazing ass you'll have to see to believe. XL, XL, XL, Lollipop" and described

12    a different so-called escort as "discrete, sincere and extremely naughty. I am the type of

13    girl who absolutely adores a man who understands the many desires of a young beautiful

14    woman and how to accommodate a variety of fantasies."  This episode provided notice to

15    Backpage that it was implausible to pretend such ads were merely offering lawful escort

16    services.

17         37.    On September 1, 2010, PADILLA sent an email to HYER and C.F. stating

18    that customers who engaged in "extreme and repeat" violations of Backpage's posting rules

19    would have their ads deleted and be banned from the website.  However, PADILLA also

20    stated the bans would only be temporary and that "we'll do everything we can to affect

21    only the worst apples."

22         38.    On September 1, 2010, SPEAR received an email acknowledging that

23    Backpage's moderators were being instructed to "Remove any sex act pics in escorts [ads]"

24    and "Remove any illegal text in escorts [ads] to include any code words for sex act for

25    money."

26         39.    On September 21, 2010, a group of state attorneys general wrote a letter to

27    Backpage.  This letter observed that "ads for prostitution—including ads trafficking

28

- 9 -

children—are rampant on the site" and argued that "[b]ecause Backpage cannot, or will not, adequately screen these ads, it should stop accepting them altogether." The letter acknowledged that this step would cause Backpage to "lose the considerable revenue generated by the adult services ads" but stated that "no amount of money can justify the scourge of illegal prostitution, and the misery of the women and children who will continue to be victimized, in the marketplace provided by backpage."

40. On September 25, 2010, C.F. wrote an email explaining that Backpage was unwilling to delete ads that included terms indicative of prostitution because doing so would "piss[] off a lot of users who will migrate elsewhere" and force Backpage to refund those customers' fees. Thus, C.F. announced that Backpage would "go back to having our moderators remove bad content in a post . . . ."

41. On September 30, 2010, C.F. testified in federal court (the United States District Court for the District of Minnesota) in the criminal trial of a pimp who had used Backpage to post prostitution ads. During his testimony, C.F. acknowledged that Backpage's servers are located in Arizona and that the ads posted by the Minnesota-based defendant had therefore "traveled across state lines."

42. On October 8, 2010, PADILLA sent an email (on which VAUGHT was cc'd) threatening to fire any Backpage employee who acknowledged, in writing, that a customer was a prostitute: "Leaving notes on our site that imply that we're aware of prostitution, or in any position to define it, is enough to lose your job over. . . . This isn't open for discussion. If you don't agree with what I'm saying completely, you need to find another job."

43. On October 16, 2010, PADILLA sent an email to a large group of Backpage employees (including HYER and VAUGHT). The email had two attachments that provided guidance on how to "moderate" ads. The first was a Powerpoint presentation that displayed a series of 38 nude and partially-nude photographs, some of which depicted graphic sex acts. Next to each picture was an instruction as to whether it should be

Attachment A

approved or disapproved by a Backpage moderator. These instructions included "Approve. Nude rear shots are okay as long the model is not exposing her anus or genitalia." and "Approve. Rear shot okay. Transparent wet panties okay." The second was an Excel spreadsheet identifying 50 terms (all of which were indicative of prostitution) that should be "stripped" from ads before publication. PADILLA concluded the email by stating: "[I]t's the language in ads that's really killing us with the Attorneys General. Images are almost an afterthought to them."

44. On October 16, 2010, PADILLA sent a separate internal email (which also included HYER and VAUGHT as recipients). In this email, PADILLA explained that "I'd like to still avoid Deleting ads when possible," that "we're still allowing phrases with nuance," and that "[i]n the case of lesser violations, editing should be sufficient."

45. On October 25, 2010, C.F. sent an email to SPEAR, HYER, and PADILLA acknowledging that the "[i]llegal content removed" through Backpage's moderation processes was "usually money for sex act." This email also explained that, after the "sex act pics are removed," the "ad text may stay."

46. On October 26, 2010, HYER and PADILLA received an email explaining: "We will not remove ads with vaginas or penis showing, just the images unless they are a frequent offender. We will not remove ads with rates under an hour, just the text with the minimum rates. Users need time to react to this change."

47. On October 27, 2010, PADILLA sent an email to the head of a group of contractors from India who had been hired to moderate Backpage's adult ads. In this email, PADILLA criticized the contractors for deleting too many ads, stated that this approach was bad for business, and instructed the contractors to simply edit the ads to remove the more-obvious language: "As long as your crew is editing and not removing the ad entirely, we shouldn't upset too many users. Your crew has permission to edit out text violations and images and then approve the ad."

48. On October 27, 2010, HYER sent an internal email stating that Backpage

- 11 -

was "editing 70 to 80%" of the ads it received from customers.  In other words, HYER acknowledged that a large proportion of the ads originally submitted by Backpage's customers contained text and pictures that were indicative of prostitution and that Backpage was still choosing to publish those ads after editing them.

49.   On November 4, 2010, C.F. sent an email to Backpage's India-based moderators (on which PADILLA was cc'd) explaining that "[m]any of the ads need to have 15 minute and 30 minute pricing removed" and that "I'm being evaluated by lawyers [*i.e.*, state attorneys general] later this week so cleaning up old stuff is important."

50.   On November 17, 2010, HYER and PADILLA received an email acknowledging that the term Lolita is "code for under aged girl" but explaining that this term could simply be stripped out from ads (as opposed to refusing to publish the ad).  The email also explained that customers should be allowed to include their identification numbers from a notorious prostitution website, The Erotic Review:  "[A]llow users to put in TER IDs (just no live links)."

51.   On November 30, 2010, LARKIN, SPEAR, and other Backpage representatives participated in a conference call with representatives from NCMEC. During this call, the Backpage representatives were advised that a large portion of the ads on Backpage were blatant prostitution ads, that many of those ads featured children, and that the posting of such ads was illegal in every state.

52.   In December 2010, HYER, PADILLA, and others exchanged a series of emails entitled "Deep cleaning strip out."  These emails identified a lengthy list of terms that were indicative of prostitution and discussed plans for removing the terms from the old ads in Backpage's archives.  During this exchange, C.F. stated that Backpage wasn't willing to delete the old prostitution ads because "our users love" having access them, "[s]o, best to do deep cleaning and not kill a valuable feature."  C.F. later encouraged Backpage's staff to complete the project quickly to avoid scrutiny:  "This task is urgent since CNN is runing [sic] a report soon."

- 12 -

Attachment A

53.     On January 13, 2011, HYER and PADILLA received an email summarizing instructions that had been provided to members of Backpage's technical staff.  It explained that the technical staff had been instructed "not to display the moderation log" in a particular section of Backpage's database "since we pdf this page for subpoenas.  I would rather not testify in court as to why my staff 'approved' . . . postings."

54.     In January 2011, LARKIN and LACEY met with a representative from NCMEC.  During this meeting, LACEY asked which types of sex ads would be acceptable from NCMEC's perspective.  When the NCMEC representative declined to say that any such ads would be acceptable, LACEY made a statement to the effect of "adult prostitution is none of your business."

55.     On January 31, 2011, and February 1, 2011, C.F. engaged in an email exchange concerning whether to remove links to other prostitution websites (such as The Erotic Review) from expired Backpage ads.  C.F. stated that, although SPEAR and his "internet safety guy" were recommending that such ads be removed, he thought this would "be a stupid move" because it would hurt Backpage financially (by reducing the number of referrals from other sites).  C.F. added that "this overly zealous focus on moderation at the expense of other development is a lot of bullshit . . . ."

56.     On February 2, 2011, C.F. sent an email acknowledging that "[t]he strip out affects almost every adult ad."  In other words, C.F. acknowledged that "almost every adult ad" on Backpage was a prostitution ad that had been edited to remove the most damning text and pictures.

57.     On February 3, 2011, a Backpage customer who went by the name "Licks Alot" wrote an email to Backpage complaining that all of the pictures in one of her ads (entitled "Athletic SWF Guaranteed Low Mileage Boys!!!") had been deleted.  C.F. responded to "Licks Alot" by explaining that one of her photos had been removed because "[o]ur crazy internet safety experts do not want any genitalia showing up around the thong."  However, C.F. proceeded to apologize to "Licks Alot" over the removal of her

Attachment A

Case 2:18-cv-06742-RGK-PJW Document 1 Filed 08/07/18 Page 128 of 233 Page ID #:197
Case 2:18-cv-06742-RGK-PJW Document 16 Filed 08/09/18 Page 128 of 233 Page ID #:1243
117

remaining photos, allowed her ad (which was obviously for prostitution) to remain on the website, and offered her a free upgrade.

58.    On February 8, 2011, C.F. testified in federal court (the United States District Court for the Middle District of Florida) in the criminal trial of a pimp who had used Backpage to post prostitution ads. During his testimony, C.F. authenticated one of the ads the defendant had placed on Backpage, whose title was "Extra horny sexy newbie," confirmed that Backpage had allowed this ad to be posted multiple times in various East Coast cities, and acknowledged that Backpage published "a lot" of similar ads. This episode provided further notice to Backpage that it was implausible to pretend such ads were merely offering lawful escort services.

59.    On February 16, 2011, PADILLA sent an email to Backpage's India-based moderators (on which VAUGHT was cc'd) explaining that Backpage was adopting a "more lenient policy" and that he was instructing his Phoenix-based employees to "go easy on some types of violations." PADILLA acknowledged this approach would "likely" result in more "violations" but emphasized that "moderators should err on the side of the user."

60.    On February 16, 2011, PADILLA sent a separate email discussing whether several terms should remain on Backpage's "filtered terms" list. During this discussion, PADILLA acknowledged—by placing quote marks around the term "companionship"—that he didn't actually believe the women being advertised on Backpage were providing lawful escort services: "[The term] implies some exchange of bodily fluids which kills our 'companionship' argument, but i don't think we've ever really gotten in trouble for it."

61.    On February 22, 2011, PADILLA received an email requesting Backpage's "list of banned, stripped out adult terms." In response, PADILLA sent an Excel spreadsheet entitled "Phrase List 02211," which PADILLA described as "the latest greatest version of the list." The enclosed spreadsheet identified over 660 words or phrases that are indicative of prostitution, including an array of terms that are suggestive of child prostitution (*e.g.,* "lolita," "fresh," "high school," "tight," "young"). The spreadsheet

- 14 -

explained that most such terms were simply to be "filtered" from the ads in which they appeared.

62.    On February 23, 2011, PADILLA received an email concerning a particular ad that had recently been edited by Backpage's India-based moderators.  The ad was obviously for prostitution—its title was "new-new-new-put me in your favorite position" and the poster had attempted to include two photographs that violated Backpage's posting rules.  In response, the India-based moderators had deleted both of those photos, as well as a third photo that depicted the prostitute's face, and then allowed the ad to be published.  The email received by PADILLA did not criticize the moderators for allowing an obvious prostitution ad to be published after editing.  To the contrary, it emphasized that the ad should remain on Backpage and criticized the moderators for removing the third photo, threatening to fire them if they did it again:  "2 out of 3 pics should have been removed.  But [the] moderator deleted all three pics.  This is plain wrong . . . .  I would fire a moderator in Phoenix if they did this."

63.    In March 2011, LARKIN, LACEY, SPEAR, and other Backpage representatives met with representatives from NCMEC.  During this meeting, the Backpage representatives were again advised that a large portion of the ads on Backpage were blatant prostitution ads.  The Backpage representatives also were advised they could be criminally prosecuted under federal law for their conduct.

64.    On April 5, 2011, PADILLA sent an email whose recipients included VAUGHT and the supervisor of Backpage's Indian moderation team.  The email was entitled "relaxed image standards" and included, as an attachment, a document that displayed a series of 30 nude and partially-nude photographs.  Next to each picture was an instruction as to whether it should be approved or disapproved by a moderator.  One picture showed a woman sitting on a bed, wearing only a bra and panties, with her legs spread open and her hand partially covering her crotch.  The caption provided in part:  "okay – but barely."

- 15 -

65.     Between April 2011 and March 2012, PADILLA, C.F., and others participated in an email exchange acknowledging that Backpage was deleting thousands of pictures from customer ads each week and seeking assistance in collecting all of the deleted pictures so they could be used for "entertainment" or to generate user "traffic for other projects."  The email explained that the deleted pictures could be made available to the public on a new website called "nakedpics.backpage.com" or "badpics.backpage.com."

66.     On April 19, 2011, LARKIN and SPEAR received an email seeking permission to terminate the contract of a third-party vendor that had been receiving $17,000 per month to "remov[e] any nude pics" from the expired ads in Backpage's database. LARKIN responded:  "do it!"

67.     On June 7, 2011, C.F. received an inquiry from a law enforcement official about a particular ad that included the term "amber alert."  In response, C.F. acknowledged this might be "some kind of bizarre new code word for an under aged person."  C.F. then forwarded this exchange to PADILLA and stated that he had instructed HYER to add "amber alert" to Backpage's "strip out" list.  In other words, HYER, PADILLA, and C.F. did not require all future ads involving this particular coded term for the prostitution of a child to be blocked from Backpage—they merely required such ads to be edited before publication.

68.     On June 30, 2011, several Backpage representatives met with representatives from the office of the Washington State Attorney General.  During this meeting, the Backpage representatives initially attempted to claim that no prostitution ads appeared on their website.  In response, a representative from the Attorney General's office stated: "You mean to tell me that if someone responded to an advertisement, the woman they called for services would be offering to go out for coffee?"  A Backpage representative responded to this question by looking at C.F., laughing, and acknowledging that Backpage couldn't "deny the undeniable."

69.     On July 27, 2011, C.F. sent an email to HYER and PADILLA, and a nearly-

- 16 -

identical email to LARKIN and LACEY, concerning the possibility of using age-verification software.  In this email, C.F. acknowledged the software might be beneficial ("This might be our solution") but recommended against its wholesale adoption because it would cost "79 to 99 cents per query" and would thus cut into Backpage's profits.

70.     On July 28, 2011, LACEY sent LARKIN a draft editorial entitled "BackPage understood."  In this document, LACEY bragged about Backpage's contributions to the prostitution industry:  "Backpage is part of the solution.  Eliminating our adult advertising will in no way eliminate or even reduce the incidence of prostitution in this country. . . . For the very first time, the oldest profession in the world has transparency, record keeping and safeguards."  LACEY also acknowledged that Backpage used an automatic filter to remove particular phrases from ads that were indicative of prostitution but still published the ads after editing them.

71.     Soon afterward, LARKIN forwarded the editorial to C.F., with a cover note cautioning against some of LACEY's statements "being made public" because "we need to stay away from the very idea of 'editing' the posts, as you know."  C.F., in turn, revised the editorial to take out the paragraph lauding Backpage's contributions to the prostitution industry.

72.     On August 5, 2011, Backpage received a letter from the mayor of Seattle. This letter warned that "Seattle Police have identified an alarming number of juvenile prostitutes advertised on Backpage.com since January 2010" and explained that Backpage was dissimilar from other companies whose products and services are "occasionally or incidentally" utilized by criminals because "[y]our company is in the business of selling sex ads" and "your services are a direct vehicle for prostitution."  The letter also recommended that Backpage require in-person age verification for all of the "escorts" depicted in its ads.  Afterward, Backpage declined to adopt these recommendations.

73.     On August 15, 2011, PADILLA received an email containing an updated version of Backpage's moderation guidelines.  This six-page document provided the

- 17 -

following instructions concerning photographs: "Nude rear shots are okay as long the model is not exposing her anus or genitalia," "Transparent wet panties okay should not be able to see personal private part," and "cherry, Ice-cream keeping in mouth [is okay]." The document also explained that "Bikini, lingerie, g-string, thong, and hands covering nipples are all allowed," "Hourly rates are OK," and "Sessions are okay. E.g $50 session."

74. On August 31, 2011, Backpage received a letter from the National Association of Attorneys General. This letter characterized Backpage as "a hub" for human trafficking, identified "more than 50 instances, in 22 states over three years, of charges filed against those trafficking or attempting to traffic minors on Backpage.com," and noted that "[n]early naked persons in provocative positions are pictured in nearly every adult services advertisement on Backpage.com and the site requires advertisements for escorts, and other similar 'services,' to include hourly rates. It does not require forensic training to understand that these advertisements are for prostitution."

75. On October 6, 2011, C.F. sent an email discussing various proposals for addressing "the under aged issue." With respect to one particular proposal, C.F. acknowledged it was a good one but recommended against adopting it because Backpage would not derive any public-relations benefit from doing so: "This is a good idea but it is not visible to AG's [state attorneys general] so it has little PR value. It is a low priority."

76. In the fall of 2011, Backpage sought the assistance of a public relations firm based in Washington, D.C. On October 12, 2011, C.F. received a written copy of the firm's presentation. Later, some of the BACKPAGE DEFENDANTS attended a meeting at which the presentation was discussed in more detail. The presentation warned that Backpage's business practices would inevitably result in legal trouble ("One day the proverbial is going to hit the fan") and characterized Backpage's "media strategy" as "Do not acknowledge the prostitution." The presentation also noted that the "ads on the backpage.com site" generally fall into three categories, one of which is "Pimps and Men Looking for Kids."

- 18 -

77.    On October 21, 2011, LARKIN received an email discussing whether the Backpage website should include a warning message concerning the prostitution of children.  This email contained the following joke:  "Andrew [PADILLA] thinks it to[o] heavy handed and thinks our web site name will be entrapment.com (Hilarious)."

78.    On November 16, 2011, HYER and PADILLA received an email asking for "urgent" assistance in eliminating the word "teen" from the ads appearing on Backpage's website:  "Remove ads with teens or remove the text teen from . . . ads."  The following day, PADILLA wrote back with an update that he had found "76 pages of results" and that he had simply "edited" all of the ads posted within the last two months (*i.e.*, allowed those ads to remain on the website after sanitizing them).

79.    Between around January and March 2012, many of Backpage's moderators (who were supervised in part by PADILLA and VAUGHT) underwent performance appraisals.  These appraisals revealed that many of the moderators did "not report young looking escorts."  Nevertheless, these moderators were allowed to keep their jobs, and sometimes were given strong overall performance ratings.

80.    On February 16, 2012, PADILLA sent an email to VAUGHT stating that Backpage should limit the number of child-exploitation referrals it was making to NCMEC:  "If we don't want to blow past 500 this month, we shouldn't be doing more than 16 a day."

81.    On February 23, 2012, C.F. was forwarded a legal notice claiming that several of Backpage's ads included copyrighted content from two competing websites called RubMaps.com and EroticMP.com.  C.F. also received copies of the underlying ads from the competing websites, which clearly involved prostitution.  In one of the ads, a customer stated that, in return for $45 and a $5 tip, he had received a "Blow Job . . . w/ condom" from a woman who "had nice breasts."  In a different ad, a customer stated that, in return for $60, he had oral and vaginal sex with a prostitute.  And in a different ad, a customer stated:  "Her bj was slow and erotic, and she was happy to go with whatever

- 19 -

position I wanted." When C.F. forwarded these materials to Backpage's staff, he was asked whether the corresponding ads appearing on Backpage's website should be removed immediately. C.F. replied that they should be allowed to remain on Backpage for another few weeks without any modification.

82. On March 15, 2012, HYER received an email concerning the ads with the copyrighted material. This email stated that the ads shouldn't be deleted and that Backpage's technical staff should merely "strip out" the names of the competing prostitution websites: "Copyright infringement issue. We need to strip out every appearance of rubmaps.com and eroticmp.com." When a staff member sought more guidance, HYER interjected: "We don't need to delete ads or users."

83. On April 7, 2012, PADILLA was informed that a woman had contacted Backpage to report that one of the "escorts" depicted on the site was only 17 years old. The woman provided the juvenile's full name and birth year and further stated that the juvenile had been attempting to recruit the complaining party's daughter (who was 15). In response, PADILLA instructed his staff to refuse to remove the ad because "she's isn't claiming her own daughter is in the ad."

84. On April 8, 2012, LACEY sent an email emphasizing that "jim [LARKIN] and I believe in legalized prostitution" and stating that Backpage's efforts to prevent the prostitution of children on the site were "not perfect, by any means."

85. On April 25, 2012, a Backpage representative spoke at a meeting of the New York City Council's Women's Issues Committee. During this meeting, the representative stated it was better to have ads for sex work appear on Backpage than have them move to other places on the internet. The representative further stated: "I don't deny that Backpage is part of the problem, but the problem is the internet."

86. On April 27, 2012, a woman wrote an email to Backpage's support department stating that her underage daughter had been kidnapped, drugged, and was being advertised as a prostitute against her will. The email identified the specific phone number

Attachment A

associated with the ads (754-229-xxxx), stated that the ads appeared on a website called BackpagePics.com, and asked that the ads be removed immediately: "This is a drugged and held against her will child who had photos taken under threat and duress . . . . Please remove." This email was forwarded to PADILLA by a subordinate, who asked "should we respond?" PADILLA replied by explaining that, because the website BackpagePics.com wasn't owned by Backpage, there was no need to respond to the mother.

87. On April 30, 2012 (three days later), the same woman wrote another email to Backpage's support department. In this email, the woman stated that "I have contacted backpage on several occassions [sic] to remove these pictures which were posted against her will and while she was drugged and held captive. I have yet to receive a reply." This time, the woman provided a link to her daughter's ad on Backpage (not BackpagePics.com), which included the same phone number (754-229-xxxx) that had been included in the other ad.

88. On May 1, 2012 (the next day), the same woman wrote a third email to Backpage's support department. In this email, the woman included a link to another ad on Backpage depicting her underage daughter and stated: "I also found a pix of my daughter within this url both girls are in protective custody." Later that day, the woman received an email from Backpage's support department stating: "The post is confirmed removed."

89. Some of these emails were forwarded to LACEY and LARKIN. In response, LARKIN applauded Backpage's "good solid response" to the woman and remarked: "this whole rigamarole seems a little odd to me."

90. On May 10, 2012, the television news station CNN ran an expose on Backpage that emphasized "how young some of these girls look" and deemed the website "a hub for the sex trade."

91. On May 11, 2012, PADILLA sent an email to VAUGHT and other Backpage employees entitled "forbidden planet." Enclosed with the email was an Excel spreadsheet

Attachment A

that identified over 600 words and phrases that are indicative of prostitution. The spreadsheet also specified, for each word and phrase, whether an ad containing the offending language should be banned or whether Backpage should simply "strip term from ad" and then publish it after the revision.

92.    On July 12, 2012, PADILLA sent an email (which was also shared with VAUGHT) to the head of Backpage's Indian moderation team. In this email, PADILLA criticized the moderators for deleting too many ads and provided the following instruction: "I agree that 'over cautiousness' is as big of a problem as moderators that miss a lot of violations."

93.    In or around November 2012, a researcher at Arizona State University published a study concluding that most of the ads on Backpage's Phoenix page involved prostitution and that many of the ads depicted juvenile trafficking victims. On December 19, 2012, LACEY was forwarded a copy of the study's results. The researcher responsible for the study also met with a Backpage representative to propose various mechanisms for reducing or eliminating the prostitution of children on the website. Backpage declined to adopt these proposals.

94.    Between around September 2010 and October 2012, C.F. became aware that a particular Backpage customer, P.R., was posting prostitution ads. Rather than bar this customer from posting future ads, C.F. repeatedly restored her posting privileges and gave her advice on how to conform to Backpage's publication standards. The communications involving this woman's ads included the following:

•    On September 26, 2010, C.F. received an email from a woman who was obviously posting prostitution ads on Backpage. The woman, whose email address included the phrase "provider4u," wrote to complain that her escort ad ("50 Red Roses special – Dont Miss out !!!") had been removed even though "[o]ther women have more explicit ads than me and they are up!" The woman continued: "I can not afford to have this ad removed. This is the only way I can get by and if its not on all the time I will not

- 22 -

be able to pay my bills . . . . My fiancé is in jail and he is not able to help me at this point." In response, C.F. arranged for the woman to be allowed to continue posting ads.

•  On October 6, 2010, C.F. received another email from the same woman. In this email, she complained that her most recent ad had been removed because it included an explicit picture of her body. She provided a copy of the picture to C.F. and stated: "If the person [who removed the ad] is such a prude well maybe they should check out the other women's ads in that [escorts] section." On November 15, 2010, C.F. wrote back to the woman to encourage her to edit the ad so it could be re-posted: "Ok, please try editing the ad now." After this exchange, the woman was permitted to resume posting ads on Backpage.

•  On June 6, 2011, C.F. received another email from the same woman. It stated: "I would really appreciate it if you would please take the block off my ad for editing . . . . I wont post any more objectionable pics, ok?" In response, C.F. arranged for the woman's editing and posting privileged to be restored: "You should be able to edit now. Please let us know if you are still having trouble." After this exchange, the woman resumed posting ads on Backpage.

•  On July 14, 2012, C.F. received another email from the same woman. It stated: "would you please take the edit block off my ad. I need to change some info on it and update it. I promise i wont put no more nude pics in it, you have my word. . . . [M]y ad says: 50 red roses special – dont miss out." After this exchange, the woman was allowed to continue posting ads on Backpage.

•  On September 17, 2012, C.F. received another email from the same woman. This time, she complained that Backpage was editing her ads (whose title continued to feature the obvious prostitution term "50 Red roses special") to remove the most explicit pictures. She stated: "I would like to know why my ad in the escort section of backpage keeps getting messed with. . . . [S]omeone keeps erasing the link to my pics on the ad. that is so wrong. I am being deprived of income that I sorely need . . . . There

- 23 -

Attachment A

are other woman posting pics on their ads that show more nudity . . . ." After this exchange, the woman was permitted to continue posting ads on Backpage.

• On October 16, 2012, the woman wrote another email to Backpage. In this email, she again complained about how Backpage was editing her ads to remove the most explicit pictures. She stated: "It is very hard for me to make any income from this ad as they continually go into my ad and remove the link from the ad that goes to my pictures. They wont allow me to post my pics on the ad yet other women with other ads show more nudity than my pictures ever did."

• This email was forwarded to VAUGHT and to PADILLA, who asked another Backpage employee to "dig into this one a little." On October 17, 2012, PADILLA received a follow-up email from his co-worker stating that the woman's ad had been posted on September 27, was still on the Backpage website, and that the pictures the woman had originally attempted to include in the ad (which had been stripped by Backpage) were "topless shots."

• Following these exchanges, between October 2012 and November 2015, the same customer was allowed to post over a dozen new ads on Backpage, many of which utilized the same identifying information, coded prostitution terms, and contact phone number as before.

95. On January 7, 2013, VAUGHT was informed by a moderator that Backpage wasn't diligently pursuing reports of child exploitation: "We've supposedly been checking them, but some seem to be ignored. They get 'marked as read', but nothing gets done with them. It's aggravating and irresponsible."

96. On June 6, 2013, Backpage received a letter from NCMEC recommending the adoption of several specific security measures to prevent the trafficking of children. The recommended security measures included (a) verifying the age and identity of users who submitted adult ads, (b) verifying the age and identity of individuals depicted in photographs within adult ads, (c) prohibiting the use of anonymous payment sources such

- 24 -

as prepaid credit cards, and (d) requiring users to utilize verified email addresses and telephone numbers. Afterward, Backpage declined to follow any of these recommendations.

97. On August 30, 2013, LARKIN, SPEAR, BRUNST, HYER, and C.F. received an email notifying them that "Chase [Bank] was no longer accepting transactions from Backpage.com, due to their involvement in human trafficking." In response, C.F. informed the group that he intended to begin "giv[ing] users free ads if they complain while we wait on directly transactions to another processor."

98. On September 11, 2013, a Backpage representative made a presentation to the Arizona Governor's Task Force on Human Trafficking. Following this presentation (which took place in Phoenix), the representative was asked whether there would be any "cons" to requiring verifiable identification of all escorts being advertised on Backpage's website. In response, the representative did not identify any financial or logistical hurdles to the adoption of such a requirement. Instead, the representative stated that such a requirement would simply cause Backpage to lose business to other prostitution websites like myRedBook.com or to overseas prostitution websites. During this meeting, members of the task force also provided the representative with evidence showing that Backpage's moderation efforts were ineffective at preventing the publication of prostitution ads.

99. On April 3, 2014, PADILLA and VAUGHT were forwarded an email that had been sent to Backpage by a credit card processing company in Canada. The email stated that "[w]e have multiple user accounts that are paying for your services for what I understand to be prostitution advertisements" and sought information about "how you are processing these transactions."

100. On April 14, 2014, LARKIN and BRUNST received an email from C.F. discussing why Backpage had experienced "past high growth" and identifying various ideas for achieving "future growth." This email stated that Backpage had been the beneficiary of "[m]igration of content from other . . . marketplaces to the internet" and

- 25 -

identified one particular marketplace as a key source of Backpage's customers: "[N]et loss for brick and mortar marketplaces: Strip clubs, hotels, and gathering spots displaced by the internet." In other words, the email acknowledged that the supposed "escorts" advertising on Backpage were actually prostitutes (lawful escorts did not congregate at strip clubs, hotels, and other brick-and-mortar "gathering spots" during the pre-internet age). This email also attributed Backpage's success in part to its adoption of policies that allowed customers to post ads without leaving any meaningful identifying information—in a list of Backpage's advantageous policies, it identified "Anonymous," "Prepaid card friendly," "User can post paid ads without a valid email address," and "bitcoin."

101. On April 24, 2014, VAUGHT sent an email to Backpage's moderators (while cc'ing PADILLA). In this email, VAUGHT explained that if a moderator came across an ad containing a link to a "sex for money" website, the moderator should add the link to a list of banned terms but "don't bother removing it from the current ad."

102. On September 4, 2014, Backpage was served with a brief that had been filed by NCMEC in a lawsuit in Washington state court. In this brief, NCMEC criticized the sincerity of Backpage's efforts to prevent child sex trafficking: "Backpage has repeatedly claimed in public statements and court filings that it is working to reduce child sex trafficking on its website. The unpleasant reality is that Backpage publicizes carefully selected operational processes as a subterfuge to avoid increased scrutiny, while providing traffickers with easy access to an online venue to sell children for sex. In practice, Backpage's stated interest in doing something meaningful to stop child sex trafficking ads on its site is apparently overridden by the enormous revenue it generates from its escort ads, including ads selling children for sex."

103. On March 17, 2015, a law enforcement officer with the California Department of Justice spoke with a Backpage representative concerning the prevalence of blatant prostitution ads on Backpage. In response, the representative did not dispute the officer's characterization and said the internet and prostitution were not going away.

- 26 -

104.     On July 30, 2015, a document entitled "trainingJuly2015" was distributed to Backpage's moderators.  This training manual specifically told moderators that, if they saw a photograph depicting "a person [who] looks young/minor," they should "approve dont delete the ad unless it has a banned term."  The training manual also identified, under the heading "THESE ARE ALL OKAY," a long list of terms that are indicative of prostitution, such as "99% CUM BACK FOR MORE," "car service," and "lollipop special."

105.     In or around August 2015, as part of a lawsuit in Illinois, Backpage was served with an affidavit from a detective employed by the Seattle Police Department.  In this affidavit, the detective avowed that "[t]o date, no Detective within the Seattle Police Department's Vice/High Risk Victims Unit has ever found a legitimate 'escort' (person who charges simply for companionship with no offer of sex) or 'masseuse' (person offering legitimate and licensed massage therapy rather than sex) while responding to ads placed in these categories on Backpage.com" and that "every time the Seattle Police Department's Vice/High Risk Victims Unit has responded to an ad in the adult section of Backpage.com, we have found that the ad was a posting for illegal activity."

106.     In or around August 2015, during the same lawsuit in Illinois, Backpage was served with a different affidavit from a detective employed by the Boston Police Department.  In this affidavit, the detective avowed that "Backpage.com is the number one site in Boston for prostitution and sex trafficking," that his unit had "[s]ince 2010 . . . arrested over 100 buyers of sex of both adults and minors through Backpage.com ads," and that "nearly all the cases we find associated with it [Backpage] involve pimp controlled prostitution."

107.     On October 7, 2015, PADILLA received an email from another Backpage employee (which was later forwarded to VAUGHT) disclosing that there were "massive numbers of live ads with banned terms and pictures out on the site."

108.     On December 9, 2015, Backpage received an email from a reporter stating that "[o]f the 359 sex trafficking incidents Toronto Police have been involved in since

- 27 -

2013, every single girl that was rescued was advertised on Backpage." The email also asked: "Why hasn't Backpage closed down the adult escort ads portion of its site like Craigslist when it's known that underage girls are being exploited via Backpage?"

109.   In or around January 2016, Company A was retained to serve as a payment processor for some of Backpage's websites.  On April 29, 2016, Company A informed C.F. that it had conducted "a review of your website, and unfortunately we had to suspend your account . . . [because] advertising of illegal activities is strictly forbidden."

110.   Beginning in or around January 2016, Backpage's moderators were instructed to stop removing ads that contained the phrase "GFE."  For example, on January 28, 2016, VAUGHT was sent an email from a Backpage moderator explaining that "As far as I am aware we are no longer removing ads for GFE."  Similarly, on March 9, 2016, a Backpage moderator sent an email to his coworkers explaining that "Andrew [PADILLA] and I talked about the GFE thing, going forward we will not be removing ads for GFE" and clarifying "this includes even gfe with price."  And again, on March 25, 2016, an email was sent to Backpage's moderation staff stating that "We are no longer removing ads for 'GFE' or 'PSE.'"

111.   In fact, the BACKPAGE DEFENDANTS repeatedly acknowledged that the term "GFE" (girlfriend experience) is a coded term for prostitution.  For example:

•       On October 26, 2010, SPEAR, HYER, and PADILLA received an email from C.F. that explained:  "No coded sex act for money: GFE, PSE, BBBJ, DATY, etc."

•       On May 4, 2011, HYER sent an email to PADILLA and others identifying GFE as a "code word" that should be forbidden.

•       On August 31, 2011, PADILLA and C.F. exchanged emails in which they discussed a list of 100 "solid sex for money terms."  The list included "GFE = girlfriend experience."

•       On November 2, 2011, PADILLA and VAUGHT received an email from a co-worker identifying GFE in a list of "sex phrases and coded terms" that are "not

- 28 -

allowed."

112.    HYER, PADILLA, and other BACKPAGE DEFENDANTS periodically received a "Google alert" when articles discussing Backpage appeared in the news.  Many of the news articles identified in these alerts discuss instances in which prostitutes who had been advertised on Backpage were kidnapped, raped, or murdered.

113.    In January 2017, after conducting a lengthy investigation, the Senate Subcommittee on Permanent Investigations ("Subcommittee") issued a 50-page report entitled "Backpage.com's Knowing Facilitation of Online Sex Trafficking."  This report concluded, among other things, that virtually all of Backpage's "adult" ads are actually solicitations for illegal prostitution services and that "Backpage has maintained a practice of altering ads before publication by deleting words, phrases, and images indicative of criminality, including child sex trafficking . . . .  Those practices served to sanitize the content of innumerable advertisements for illegal transactions—even as Backpage represented to the public and the courts that it merely hosted content others had created."

114.    In response to the Subcommittee's report, Backpage purported to shut down the "adult" section of its website.  However, the prostitution ads simply migrated to other sections of the website, where they remain to this day.

D.      International Operations

115.    In addition to facilitating prostitution through its U.S. website, Backpage has also facilitated prostitution through its websites in foreign countries.  In this context, Backpage often affirmatively creates the content of the illegal prostitution ads being published.

116.    Around 2013 or 2014, Backpage hired a Philippines-based company (Company B) in an attempt to increase the profitability of Backpage's international operations.  Company B's employees were instructed to (1) visit rival prostitution websites in other countries, (2) obtain the email addresses of prostitutes who were posting ads on those websites (often by falsely posing as prospective customers), (3) use the information

- 29 -

from the other website to create a competing prostitution ad on Backpage (a process referred to internally as "preboarding"), and then (4) transmit the new ad to the prostitute, often using the previously-harvested email account information, in an attempt to persuade the prostitute to become a Backpage customer. Company B's employees were paid bonuses based on the amount of ad revenue they generated for Backpage using these techniques.

117. Backpage's executives were fully aware of the plan to use Company B to create prostitution ads outside the United States. For example, on or around November 6, 2013, C.F. made a presentation to LARKIN, SPEAR, and BRUNST. Among other things, this presentation summarized Backpage's plans for "International Planning and Expansion." One of the plans was to use the Philippines as a "test" market and hire Filipino contractors to "contact by email leads, secure email address, add ad and email address in [computer system] and assign to American staff. American staff makes contact."

118. On August 7, 2014, HYER sent an email stating that Company B was "an efficient and cost effective way for us to bring new users to backpage." This email also contained the following summary of how Company B would operate: "Process after hiring company offering BPO services: 1. Backpage provides BPO with sites, categories & countries to target. Backpage also provides sample 'scripts' and examples of phone calls. 2. BPO contacts users via phone from sites backpage provided, obtains user email address & permission to preboard ad. 3. BPO preboards ad as public user. 4. After ad is preboarded, users receive verification link to verify the ad." This email also stated that Backpage would offer a "bonus per verified authenticated ad."

119. On April 10, 2015, a "five-year business plan" was emailed to LARKIN, BRUNST, SPEAR, and C.F. One of the goals for 2015 was "Off shore marketing staff in the Philippines to grow to 166 and main task is international market content acquisition." This email also included a separate attachment stating that HYER should be considered for promotion because "his strengths are strong marketing and revenue growth skills" and he

- 30 -

had been "heavily involved in the user experience development" and that VAUGHT should be considered for a promotion because "[h]er strengths include six years of experience managing moderators."

120. On May 15, 2015, a Company B employee posing as a Backpage employee sent an email to an apparent prostitute. The subject line was "Offering Free Advertisement from Backpage.com" and the text of the email sought to persuade the prostitute to "upgrade your ad with sponsor placement or automatic repost." In response, the prostitute wrote back that she had "managed to activate my ad and could buy credits as well. thanks for your help. I'm traveling today to [London] how can I change my location." This email exchange was later forwarded by HYER to C.F. with a cover note stating: "[I]deal scenario for [Company B] agent – user activates ad, user purchases credit."

121. On December 14, 2015, C.F. was part of an email exchange concerning an ad that had an IP address associated with Company B. This email contained the following description of Company B's process for creating and selling prostitution ads on Backpage: (1) "Staff found lead in assigned area." (2) "Staff entered all relevant into [database] (phone/email/etc.)" (3) "Staff called lead to discuss creation of free ad" (4) Staff created free ad for lead (verification email sent). (5) Staff followed under with an email reminding lead of phone conversation and detailing verification of ad."

E. <u>Select Victim Summaries</u>

122. Between in or around 2009 and 2013, Victim 1 was sold for sex, through the use of Backpage ads, in Ohio, Indiana, and Georgia. Victim 1's Backpage ads often included words and phrases that were indicative of prostitution, such as "roses" (money). On at least one occasion, Victim 1 contacted Backpage after a proposed ad had been rejected because it contained banned words and phrases. In response, a Backpage representative coached Victim 1 on how to re-write the ad using different words. Victim 1's trafficker took all of the money that was earned through her acts of prostitution.

123. Between in or around 2009 and 2011, Victim 2 was sold for sex, through the

- 31 -

use of Backpage ads, in Arizona, Georgia, North Carolina, Texas, New York, New Jersey, and Louisiana. Victim 2's trafficker drafted her Backpage ads and Victim 2 initially did not know she was being offered on Backpage. The ads contained words and phrases to make customers believe Victim 2 was "barely legal" and also contained words and phrases indicative of prostitution, such as "roses" (money).

124. Between in or around 2009 and 2012, Victim 3 was sold for sex, through the use of Backpage ads, in Colorado and North Dakota. Victim 3's pimp instructed her to review existing prostitution ads on Backpage to learn how to draft her own ads. During a portion of this period, Victim 3 was required by her pimp to make week-long trips to North Dakota to work as a prostitute. During these trips, which would generate as much as $2,000 in prostitution-derived revenue each day, Victim 3 was forced to leave her children at home in the care of her pimp.

125. In or around 2010, Victim 4 was sold for sex, through the use of Backpage ads, in Washington. During this period, Victim 4 was a juvenile (15 years old). Victim 4's pimp drafted the ads that were placed on Backpage. The wording of these ads was edited by Backpage before publication. The ads contained words and phrases such as "W'E'L'L_W'O'R'T'H_I'T***^***150HR" and "IT WONT TAKE LONG AT ALL" and included pictures of Victim 4 in provocative positions showing her breasts and buttocks.

126. Between in or around 2011 and 2016, Victim 5 was sold for sex, through the use of Backpage ads, in Massachusetts and Rhode Island. During much of this period, Victim 5 was a juvenile (14-19 years old). Victim 5's female pimp instructed Victim 5 that Backpage was the safest place to advertise because it did not require age verification. On one occasion, Backpage declined to accept a proposed ad that indicated Victim 5 was only 17 years old. In response, the ad was simply resubmitted with a new (false) age of 19. On other occasions, Backpage removed provocative pictures of Victim 5 from ads and then allowed edited versions of the ads to be published. Victim 5's Backpage ads included

words and phrases that were indicative of prostitution, such as "roses" (money) and "back door" (anal sex). Some of the customers who responded Victim 5's Backpage ads forced Victim 5 to perform sexual acts at gun point, choked her to the point of having seizures, and gang-raped her.

127. In or around June 2012, Victim 6 was sold for sex, through the use of Backpage ads, in Arizona. Her traffickers utilized Backpage ads that did not offer a specific person but instead generally offered a woman with a particular type of hair color and build. On June 22, 2012, Victim 6 was dispatched to a customer who had responded to a Backpage ad featuring "Nadia," who was described as a slender brunette woman. Upon her arrival at the location, Victim 6 was stabbed to death.

128. Between in or around 2012 and 2015, Victim 7 was sold for sex, through the use of Backpage ads, in Washington and Oregon. Victim 7's pimp drafted the ads that were placed on Backpage. The wording of these ads was edited by Backpage before publication. The ads contained provocative nude pictures of Victim 7.

129. Between in or around 2013 and 2014, Victim 8 was sold for sex, through the use of Backpage ads, in Maine, Connecticut, and Massachusetts. During this period, Victim 8 was a juvenile (15 years old). Victim 8's uncle, as well as his friends, placed the ads on Backpage, which included words and phrases that were indicative of prostitution, such as "roses" (money), "fetish friendly," and 150 for 1/2 hour, 200 for full hour. Through these ads, Victim 8 was forced to do "in-calls" (where she was raped in hotels) as well as "out-calls" (where she was raped at other locations chosen by the men paying for her).

130. In or around 2013, Victim 9 was sold for sex, through the use of Backpage ads, in Florida. Victim 9's pimp taught her how to use code words in her Backpage ads to indicate how much she was charging for certain sex acts. Victim 9 was brutally attacked by her trafficker, causing bruises and a fractured cheek bone.

131. Between in or around 2014 and 2015, Victim 10 was sold for sex, through

- 33 -

the use of Backpage ads, in California and Arizona.  During some of this period, Victim 10 was a juvenile (17 years old).  An associate of Victim 10's pimp took pictures of her and drafted the ads that were placed on Backpage.  The Backpage ads contained words and phrases such as "NEW IN TOWN," "sexy sweet," and "sweet like honey but super hot like fire" and included pictures of Victim 10 in provocative positions showing her legs, stomach, shoulder, and buttocks.

132.    Between in or around 2014 and 2015, Victim 11 was sold for sex, through the use of Backpage ads, in Arizona, Colorado, Minnesota, Oregon, California, Montana, Nevada, New Mexico, and Utah.  The Backpage ads contained words and phrases indicative of prostitution and included pictures of Victim 11 in provocative positions.  On some occasions, Backpage would remove certain explicit photos from the ads but publish the remaining text and other photos.  Victim 11's trafficker gave her drugs, took her identification documents, sexually assaulted her with a firearm, and forced her to work full-time as a prostitute.

133.    In or around 2015, Victim 12 was sold for sex, through the use of Backpage ads, in California and Arizona.  Victim 12 was first advertised on Backpage in San Bernardino, California, but moved to the Phoenix metro area because the Super Bowl was being held there.  Victim 12's advertisements on Backpage contained words and phrases such as "New In Town" and "Sexy Dark Asian Bombshell with a Nice & Tight {Booty}" and included pictures showing Victim 12's legs, stomach, shoulders and buttocks.

134.    In or around 2015, Victim 13 was sold for sex, through the use of Backpage ads, in California.  During this period, Victim 13 was a juvenile (15 years old).  Victim 13 and her trafficker both posted the Backpage ads, which falsely represented that Victim 13 was 19 years old and showed pictures of her face and body.  On at least one occasion, a Backpage representative contacted Victim 13 with instructions on how to fix an ad so it could be published.

135.    In or around June 2015, Victim 14 was sold for sex, through the use of a

- 34 -

Backpage ad, in Texas. This ad contained words and phrases such as "fun, young, exotic," "Ready to be your fantasy girl," "OUT CALLS ONLY," and "NO BLACK MEN" and included pictures of Victim 14's stomach, breasts, shoulders, and buttocks. On or around June 20, 2015, Victim 14 was murdered by a customer. Afterward, the customer attempted to destroy Victim 14's corpse by lighting it on fire. Victim 14's father later contacted Backpage to request that the ads showing his deceased daughter be removed. Backpage did not immediately comply with this request.

136. In or around June 2015, Victim 15 was sold for sex, through the use of Backpage ads, in Texas and Louisiana. These ads contained words and phrases such as "Thick Glass of Chocolate Milk Looking for a GoodTime!!!" and "sexy certified freak" and contained pictures showing Victim 15's legs, shoulders and buttocks. On June 10, 2015, Victim 15 was forced into a vehicle with her trafficker, who was attempting to take her to Texas against her will. In an attempt to escape, Victim 15 jumped out of the vehicle onto Interstate 10 and was killed after being hit by several vehicles at high speeds.

137. In or around July and August 2015, Victim 16 was sold for sex, through the use of Backpage ads, in Michigan. These ads contained words and phrases such as "OUTCALLS ONLY," "Juicy Caramel Lady On Duty," "Sexy, Erotic Caramel Dream," and "No Thugs, Pimps Or Weirdos" and contained pictures showing Victim 16's breasts, legs, lips, buttocks, and face. On August 15, 2015, Victim 16 was murdered by a customer. Afterward, the customer dumped her corpse in a park.

138. Between in or around 2015 and 2016, Victim 17 was sold for sex, through the use of Backpage ads, in Arizona and California. Victim 17 averaged ten customers a day during this time and turned over all of her prostitution earnings (approximately $1,500 per day) to her pimp. An associate of Victim 17's pimp took pictures of her and drafted the ads that were placed on Backpage. The Backpage ads contained words and phrases such as "IN/CALLS ONLY," "I'm here to make your wildest fantasies come true!" and "Sorry, but NO BLACK MEN" and included pictures of Victim 17's buttocks and face.

- 35 -

F.    Money Laundering Activities

139.    Backpage's customers have overwhelmingly used the proceeds of criminal activity (*i.e.,* money earned from pimping and prostitution) when purchasing ads on Backpage.  In addition, because Backpage's publication of such ads is an independent crime (*e.g.,* violation of 18 U.S.C. § 1952), the fees it collects from customers posting prostitution ads—estimated at more than $500 million since 2004—constitute the proceeds of unlawful activity.

140.    For these and other reasons, banks and financial institutions have repeatedly refused to do business with Backpage.  In response, the BACKPAGE DEFENDANTS have pursued a variety of money laundering strategies.  For example, on August 27, 2013, C.F. was forwarded an array of emails from Backpage customers who were complaining that their credit card companies had refused to process Backpage-related transactions.  One customer wrote:  "Have you resolved the issue of Chase Bank not honoring payment for you for ethical reasons?"  C.F. forwarded these complaint emails to LARKIN, SPEAR, and BRUNST and proposed, as a "solution" to the problem, that Backpage reconfigure its website to fool credit card companies into believing the charges were being incurred on a different website.

141.    During a November 2013 presentation by C.F. to LARKIN, SPEAR, and BRUNST, C.F. again discussed strategies for fooling credit card companies into believing that Backpage-associated charges were being incurred on different websites, including a proposal to set up shell companies without any apparent connection to Backpage ("create new companies with new principals") and use their bank accounts to accept payment.  Another "solution" was to "allow users to fund an account thru several other sites" that "have no adult or images."

142.    On November 6, 2013, LARKIN, SPEAR, and BRUNST received an email entitled "Options for the future of Backpage."  This email discussed various strategies for creating new entities to process Backpage-related payments "without ever disclosing ties

- 36 -

to Backpage."

143.    On April 1, 2015, BRUNST and C.F. were informed that Mastercard was "snooping around" Backpage and might stop processing payments for Backpage.    In response, C.F. offered several suggestions for setting up new payment channels that would conceal Backpage's involvement.    One such proposal was to begin routing Backpage-related transactions through banks located in the country of Mauritius.    In response, BRUNST stated:  "Didnt we go down the Mauritius path once and the banks had the same issue with our content?"

144.    Notwithstanding these strategies, the three major credit card companies stopped doing business with Backpage.  On or about April 30, 2015, Backpage learned that American Express would no longer allow its cards to be used for any purchases in Backpage's adult section.  In or around July 2015, Backpage learned that Mastercard would no longer allow its cards to be used for Backpage-related transactions.  When discussing this decision, MasterCard stated that it "has rules that prohibit our cards from being used for illegal activities."  Around the same time, Backpage learned that Visa would no longer allow its cards to be used for Backpage-related transactions.    When discussing this decision, Visa stated that its "rules prohibit our network from being used for illegal activity."

145.    Similarly, some banks closed accounts that were held by Backpage (or Backpage-related entities) out of concern the accounts were being used for illegal purposes.  For example, on April 2, 2014, BRUNST received a letter from U.S. Bank that was addressed to "Backpage.com."  The letter explained:  "Dear Jed . . . please be advised that we have elected to close your Account with us."

146.    Backpage responded to these developments in several ways.  One was to encourage customers to send checks and money orders to a Post Office box held in the name of a seemingly-unrelated entity called Posting Solutions LLC ("Posting Solutions") and give such customers a corresponding credit on Backpage.  For example, on July 31,

- 37 -

2015, C.F. exchanged email correspondence with a representative from a payment processing company. In this email, C.F. identified himself as the CEO of Posting Solutions, described Backpage as a "brand" operated by Posting Solutions, and explained he was seeking to "find a way to position payments under another company."

147. The following episode provides an example of how the Posting Solutions payment process worked. On October 16, 2015, Backpage received an email from a customer complaining about her inability to pay for ads using a credit card. In response, a Backpage representative explained—in an email exchange later forwarded to VAUGHT—that "[i]f you would like to pay for upgrades or buy credits, we suggest posting with alternative payment methods such as Bitcoin. If you are in the United States, you can also pay by check or money order. Please make payable to 'Posting Solutions.' WE CAN ONLY ACCEPT CHECKS OR MONEY ORDERS MADE OUT TO 'POSTING SOLUTIONS.' Posting Solutions. Attn: Accounts. P.O. Box 192307. Dallas, TX 75219. Please send through the United States Postal Service. FedEx, UPS, or other mail delivery alternatives cannot deliver to a P.O. Box. When sending your payment please be sure to include your email address. Please do not make your payments out to backpage.com as we will no longer be able to accept them."

148. Between around September 2015 and June 2016, over $7.1 million of checks and money orders sent by Backpage customers were deposited in bank accounts held by Posting Solutions.

149. Backpage also utilized a different entity, called Website Technologies, LLC ("Website Technologies"), to process Backpage-related funds and took steps to make it appear that Backpage and Website Technologies were independent entities. For example, on March 10, 2014, BRUNST, SPEAR, and others participated in an email exchange with the subject line "Website Technologies vs Backpage (Vendors, audits, risk assessments, email)." During this exchange, one person stated "[C.F.] and I were just discussing company names and the possibility of updating our email addresses to

websitetechnologies.com." In response, BRUNST cautioned: "We need to think this thru or all the work to separate it from BP will be lost." Similarly, on April 3, 2014, BRUNST sent an email to SPEAR and others explaining that "[b]y May 1 we will have to be out of US Bank. We will move all banking under Website Technologies at [a different bank, BMO Harris]."

150. In many instances, Backpage-related money that was initially deposited into accounts held by Posting Solutions was later transmitted to accounts held by Website Technologies. For example:

• On October 27, 2015, C.F. received an email entitled "Two packages coming your way! (Money Orders)." The email stated that two UPS packages filled with money orders were being sent—one containing $47,647.25 of money orders made out to Backpage and the other containing $52,251.48 of money orders made out to Posting Solutions.

• Similarly, on November 16, 2015, C.F. received an email entitled "Three packages sent today $441,408.69." The email stated that three packages filled with money orders were being sent—one containing $129,193.61 of money orders made out to Backpage, another containing $244,353.63 of money orders made out to Posting Solutions, and the last containing an additional $67,861.75 of money orders made out to Posting Solutions.

• And again, on January 29, 2016, a Posting Solutions account wired $2.4 million to a Website Technologies account. PADILLA and C.F. were both authorized signers on the recipient account.

151. In addition to receiving millions of dollars from Posting Solutions, the Website Technologies accounts also served as the repository for millions of dollars of wires from international bank accounts controlled by Backpage-associated entities. For example, between January 2015 and December 2016, Website Technologies accounts received over $45.4 million in wire transfers from Backpage-associated bank accounts in Liechtenstein, over $30.1 million in wire transfers from Backpage-associated bank accounts in Iceland,

- 39 -

and over $3.9 million in wire transfers from Backpage-associated bank accounts in the Netherlands.

152.    In many instances, the next stage of the money-laundering process was for money to be wired from Website Technologies accounts to bank accounts held by a different entity called Cereus Properties LLC ("Cereus Properties").   The authorized signers on the Cereus Properties accounts included SPEAR and BRUNST.   Between around December 2015 and October 2016, Website Technologies accounts sent wire transfers totaling over $47 million to accounts held by Cereus Properties.

153.    Accounts held by Cereus Properties also received money directly from international bank accounts controlled by Backpage-associated entities.   For example, between around August 2016 and November 2016, Cereus Properties accounts received over $11.3 million in deposits and wire transfers from Backpage-associated accounts in the Netherlands.

154.    After money reached Cereus Properties, large portions of it were funneled back to Backpage or to certain BACKPAGE DEFENDANTS.   For example, between January 2016 and January 2017, LACEY (and LACEY's family members) received distributions totaling over $30.3 million and LARKIN separately received distributions totaling over $21 million.

155.    Backpage also furthered its money laundering efforts through the use of bitcoin processing companies.  Over time, Backpage utilized companies such as CoinBase, GoCoin, Paxful, Kraken, and Crypto Capital to receive payments from customers and/or route money through the accounts of related companies.

156.    Backpage also furthered its money laundering efforts by developing ways for customers to purchase ads using gift cards issued by third-party vendors.  This process was described in a July 23, 2015, email exchange between various Backpage employees on which HYER and others were copied.  This exchange included the following:  "[W]hat if we used a customers [sic] payment method, say visa prepaid card, to buy [bitcoin] from

Attachment A

our seller account . . . giving said bitcoin to our catch-all wallet elsewhere (instead of to user), simultaneously adding credits/purchasing paid ad or upsells?  From the user's perspective they just input their prepaid card and get their credits or purchase."

## COUNT 1

### (Conspiracy)

157.    The factual allegations in Paragraphs 1-156 are incorporated by reference and re-alleged as though fully set forth herein.

158.    Beginning in or around 2004, and continuing through the present, in the District of Arizona and elsewhere, defendants LACEY, LARKIN, SPEAR, HYER, PADILLA, and VAUGHT, and others known and unknown to the grand jury, knowingly and intentionally agreed, confederated, and conspired with each other, and with others known and unknown to the grand jury, to commit the following offenses against the United States:

  a.    18 U.S.C. § 1952(a)(3)(A) (Travel Act—Facilitate Prostitution).

### OBJECT OF THE CONSPIRACY

159.    The object of the conspiracy was to obtain money.

### MANNER AND MEANS OF THE CONSPIRACY

160.    The manner and means of the conspiracy are described in paragraphs 1-156 above, incorporated by reference and re-alleged as though fully set forth herein.

### OVERT ACTS

161.    Overt acts were committed in furtherance of the conspiracy, including but not limited to those described in paragraphs 1-156 above, incorporated by reference and re-alleged as though fully set forth herein.

In violation of 18 U.S.C. § 371.

- 41 -

Attachment A

## COUNTS 2-51

### (Travel Act—Facilitate Prostitution)

162.    The factual allegations in Paragraphs 1-161 are incorporated by reference and re-alleged as though fully set forth herein.

163.    On or about the dates set forth below, each instance constituting a separate count of this Indictment, in the District of Arizona and elsewhere, defendants LACEY, LARKIN, SPEAR, HYER, PADILLA, and VAUGHT, and others known and unknown to the grand jury, used the mail and any facility in interstate and foreign commerce with intent to otherwise promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, to wit: prostitution offenses in violation of the laws of the State in which they are committed and of the United States, including but not limited to Title 13, Arizona Revised Statutes, Section 13-3214, and thereafter performed and attempted to perform an act that did promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of the unlawful activity, as follows:

| Count | Date | Description |
|---|---|---|
| 2. | Sept. 10, 2013 | Publish ad depicting Victim 5 entitled "Get freaky Tuesday . . Come spend ur day with us – 19," with accompanying text "Doin incalls and outcalls" |
| 3. | Jan. 27, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  -  DONT MISS OUT!!!!!" |
| 4. | Jan. 29, 2014 | Publish ad depicting Victim 8 entitled "Puerto Rican mami in walpole area INCALLS –19" after deleting one picture from the originally-submitted ad |
| 5. | Jan. 31, 2014 | Publish ad depicting Victim 8 entitled "Exotic latina, south portland area, ready to play, INCALLS, 30 min specials!!! – |

| | | 19" after deleting one picture from the originally-submitted ad |
|---|---|---|
| 6. | Feb. 6, 2014 | Publish ad involving P.R. entitled "75 Red R*O*S*E*S S*P*E*C*I*A*L  -  DONT MISS OUT!!!!!" |
| 7. | Apr. 20, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  -  DONT MISS OUT!!!!!" |
| 8. | May 7, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  -  DONT MISS OUT!!!!!" |
| 9. | May 31, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  -  DONT MISS OUT!!!!!" |
| 10. | July 1, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  -  DONT MISS OUT!!!!!" |
| 11. | Aug. 19, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  -  DONT MISS OUT!!!!!" |
| 12. | Nov. 23, 2014 | Publish ad depicting Victim 10 entitled "New in Town Super Hot Skinny Mixed Cuban Girl With Long Black Hair – 18" after deleting picture from originally-submitted ad |
| 13. | Jan. 29, 2015 | Publish ad depicting Victim 12 entitled "New in Town Sexy Dark Asain Bombshell with a Nice & Tight {Booty} – 23" after deleting one picture from the originally-submitted ad |
| 14. | Jan. 31, 2015 | Publish ad depicting Victim 10 entitled "NEW IN TOWN sexy sweet European mixed Cuban California girl – 21" |
| 15. | Jan. 31, 2015 | Publish ad depicting Victim 12 entitled "New in Town Sexy Dark Asian mixed Bombshell – 23" after deleting one picture from the originally-submitted ad |
| 16. | Feb. 4, 2015 | Publish ad depicting Victim 11 entitled "Upscale Independent BRUNETTE BOMBSHELL 5-Star Fantasy – 26," after |

- 43 -

| | | deleting pictures from originally-submitted ad |
|---|---|---|
| 17. | Feb. 18, 2015 | Publish ad depicting Victim 11 entitled "Alexis Foxx the HOTTEST in town!!!!! – 26," after deleting six pictures from the originally-submitted ad |
| 18. | Feb. 26, 2015 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  -  DONT MISS OUT!!!!!" |
| 19. | May 18, 2015 | Publish ad depicting Victim 15 entitled "GORGEOUS ebony PLAYMATE Perfect Curves…Skills to make ur TOES CURL – 19," after removing one picture of originally-submitted ad, with accompanying text "you agree . . . you are not affiliated with any law enforcement agency" and "Incalls & Outcall!!!" |
| 20. | May 19, 2015 | Publish ad depicting Victim 15 entitled "Hot & Driping Submissive Ebony Playmates – 20," after removing one picture of originally-submitted ad, with accompanying text "you agree . . . you are not affiliated with any law enforcement agency" and "We're ready to please and accommodate all of your needs and wants!!  With a mouth that'll ROCK your [] and a [picture of cat] that'll leave you purring for more" |
| 21. | July 1, 2015 | Publish ad depicting Victim 17 entitled "AbSoLuTeLy AmAziNg CoMe PLaY WiTh Me #1 MoST WaNtEd SwEeT SEXii PlAymate – 20," with accompanying text "By contacting me you agree that you are not affiliated with any form of law enforcement," PERFECT & Will satisfy your every need," and "IN/CALLS – ONLY" |
| 22. | July 2, 2015 | Publish ad depicting Victim 17 entitled "SeXy!! Exotic playmate Call me! the girl you NEED to See! – 20," with |

- 44 -

Attachment A

| | | accompanying text "I DO NOT OFFER 40\$, 50\$, 60\$ SPECIALS" and "IN/CALLS – ONLY" |
|---|---|---|
| 23. | Aug. 13, 2015 | Publish ad depicting Victim 13 entitled "Young SEXY PUERTO RICAN – 19," which accompanying text "I do half hour sessions that vary in donation prices, 80 for head, 120 for hooking up without head and 150 for hooking up with head" |
| 24. | Aug. 15, 2015 | Publish ad depicting Victim 16 entitled "Outcalls Now Freaky Curvy Caramel Lady OUTCALLS NOW – 23" |
| 25. | Sept. 13, 2015 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  -  DONT MISS OUT!!!!!" |
| 26. | Nov. 28, 2015 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  -  DONT MISS OUT!!!!!" |
| 27. | Apr. 21, 2016 | Publish ad entitled "Finally!!  PSE & GFE – Kimber Rae and MIA Marie Together BOOK NOW" |
| 28. | Nov. 3, 2016 | Publish ad entitled "GFEE New – 18" |
| 29. | Nov. 11, 2016 | Publish ad entitled "Mind blowing Tiffany. Incall in Taunton – 37," with accompanying text "Soft GFE . . . Im real and reviewed" |
| 30. | Nov. 14, 2016 | Publish ad entitled "Top Model  2016 Special  'Best Looking Young Asian' . . . – 22," with accompanying text "Sexy Asian Girl Incall Service" and "GFE" |
| 31. | Nov. 14, 2016 | Publish ad entitled "Sometimes It's All About The Journey, And The Destination…..Erectile Dysfunctional  G  F  E Provider – 44," with accompanying test "You can find a few current reviews at T3R xxxxxx#" and "I have been EROS authenticated" |

- 45 -

| 32. | Nov. 19, 2016 | Publish ad entitled "The True (G)irl (F)riend (E)xperience… Visiting November 27th Sunday ~ PRE-BOOKING SPECIAL ~ - 100," with accompanying text "Let's blur restrictions between financial transaction & Romantic Connection" |
| 33. | Nov. 24, 2016 | Publish ad entitled "Top Asian Grand Opening 100% Young 100% Sexy  . . . – 23," with accompanying text "BEST INCALL IN TOWN!" and "GFE" |
| 34. | Nov. 26, 2016 | Publish ad entitled "I LOVE MEN!! I'm a GFE. OutCall and Incall with exception on the Incall!! – 42" |
| 35. | Dec. 20, 2016 | Publish ad entitled "OMG  Sexy Sensual 36DD-24-36 Stacked College Coed With The Best Mouth Ever! BOOK NOW! -24," with accompanying text "I do ALL the things YOU Wish Your Wife Did!!" and "(G).(F).(E) 30 min/$180" |
| 36. | Jan. 15, 2017 | Publish ad entitled "Real & Reviewed Girlfriend Theonesweet.weebly.com – 30," with accompanying text "250 G F E" |
| 37. | Apr. 4, 2017 | Publish ad entitled "KISSING & GFE KOREAN GIRLS – 20" |
| 38. | Apr. 11, 2017 | Publish ad entitled "Pettit Sexy #Corey# 4407239339 – 39," with accompanying text "complete GFE experience" |
| 39. | July 3, 2017 | Publish ad entitled "WANNA HANG OUT NOW UpScale New In Town! Call ME now for an unforgettable visit – 20," with accompanying text "100% GFE with 100% no Pimps" |
| 40. | July 15, 2017 | Publish ad entitled "Ready for some fun daddy? This is your chance too have a amazing time - 21," with accompanying text "Slim body, nice tits, freaky, GFE" |

Attachment A

| 41. | July 15, 2017 | Publish ad entitled "New in town BiGBubble Booty SWEETLiPS HOT BODY – 24," with "GFE" in accompanying text |
|-----|---------------|---------|
| 42. | July 21, 2017 | Publish ad entitled "Pettit Sexy #Corey# 4407239339 – 30," with accompanying text "complete GFE experience" |
| 43. | July 23, 2017 | Publish ad entitled "ASIAN GODDESS young – 20," with accompanying text "100% Discreet service" and "#GFE" |
| 44. | Jan. 26, 2018 | Publish ad entitled "GFE Service Available!  Private Encounters w/ Pampering Beauty" |
| 45. | Jan. 30, 2018 | Publish ad entitled "241 & white plans area  Carfun  Perfect Treat  Available No Rush," with "Sweet Sexy GFE" in accompanying text |
| 46. | Jan. 30, 2018 | Publish ad entitled "GFE REAL HOT Sweet DREAM AMAZING BEST RELAX" |
| 47. | Jan. 30, 2018 | Publish ad entitled "Tall, Slim & Sexy Luxe Goddess * NARCISA * Sensual Body Rub + Fetish Sessions," with accompanying text "gfe Hh: $160  H:  $220" |
| 48. | Jan. 31, 2018 | Publish ad entitled "Exotic Asian Beauty," with accompanying text "I am an independent GFE with excellent massage skills" |
| 49. | Feb. 1, 2018 | Publish ad entitled "Nuru (Best GFE ever) incall only" |
| 50. | Feb. 6, 2018 | Publish ad entitled "Tuesday with Ashleigh. Available now," with "GFE" in accompanying text |
| 51. | Feb. 6, 2018 | Publish ad entitled "GFE  Kisskisspop 100% Real Photo Choice 9Asian girl Nurunude" |

In violation of 18 U.S.C. § 1952(a)(3)(A) and (b)(1)(i).

- 47 -

## COUNT 52

### (Conspiracy To Commit Money Laundering)

164.    The factual allegations in Paragraphs 1-163 are incorporated by reference and re-alleged as though fully set forth herein.

165.    Beginning in or around 2004, and continuing through the present, in the District of Arizona and elsewhere, defendants LACEY, LARKIN, SPEAR, BRUNST, and HYER, and others known and unknown to the grand jury, knowingly and intentionally agreed, confederated, and conspired with each other, and with others known and unknown to the grand jury, to commit the following offenses against the United States:

        a.      18 U.S.C. § 1956(a)(1)(A)(i) (Promotional Money Laundering)

        b.      18 U.S.C. § 1956(a)(1)(B)(i) (Concealment Money Laundering)

        c.      18 U.S.C. § 1956(a)(2)(A) (Int'l Promotional Money Laundering)

        d.      18 U.S.C. § 1956(a)(2)(B)(i) (Int'l Concealment Money Laundering)

        e.      18 U.S.C. § 1597 (Transactional Money Laundering)

In violation of 18 U.S.C. § 1956(h).

## COUNTS 53-62

### (Concealment Money Laundering)

166.    The factual allegations in Paragraphs 1-165 are incorporated by reference and re-alleged as though fully set forth herein.

167.    On or about the dates set forth below, each instance constituting a separate count of this Indictment, in the District of Arizona and elsewhere, defendants LACEY, LARKIN, SPEAR, BRUNST, and HYER, and others known and unknown to the grand jury, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, conducted and attempted to conduct such a financial transaction which in fact involved the proceeds of specified unlawful activity knowing that the transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of the specified

- 48 -

unlawful activity, as follows:

| Count | Date | Amount | Description |
|---|---|---|---|
| 53. | May 18, 2016 | $1,476,505.00 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 54. | May 18, 2016 | $264,438.00 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 55. | May 31, 2016 | $3,171,675.80 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 56. | May 31, 2016 | $432,961.87 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 57. | June 20, 2016 | $842,878.00 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 58. | June 30, 2016 | $3,076,147.75 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 59. | July 27, 2016 | $3,252,681.62 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 60. | July 27, 2016 | $438,818.86 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 61. | Aug. 16, 2016 | $804,250.00 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 62. | Aug. 31, 2016 | $3,171,264.42 | Website Technologies (x2008) to Cereus Properties (x6211) |

In violation of 18 U.S.C. § 1956(a)(1)(B)(i).

- 49 -

## **COUNTS 63-68**

### **(International Promotional Money Laundering)**

168.   The factual allegations in Paragraphs 1-167 are incorporated by reference and re-alleged as though fully set forth herein.

169.   On or about the dates set forth below, each instance constituting a separate count of this Indictment, in the District of Arizona and elsewhere, defendants LACEY, LARKIN, SPEAR, BRUNST, and HYER, and others known and unknown to the grand jury, transported, transmitted, and transferred, and attempted to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, as follows:

| Count | Date | Amount | Description |
|-------|------|--------|-------------|
| 63. | Mar. 4, 2014 | $6,450.00 | U.S. Bank (x1165) to S.B. (web developer in India) |
| 64. | Aug. 5, 2016 | $5,005,732.86 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |
| 65. | Sept, 22, 2016 | $2,916,955.00 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |
| 66. | Oct. 3, 2016 | $354,050.84 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |
| 67. | Nov. 2, 2016 | $2,726,170.00 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |
| 68. | Nov. 15, 2016 | $351,403.54 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |

In violation of 18 U.S.C. § 1956(a)(2)(A).

Attachment A

**<u>COUNTS 69-93</u>**

**(Transactional Money Laundering)**

170.   The factual allegations in Paragraphs 1-169 are incorporated by reference and re-alleged as though fully set forth herein.

171.   On or about the dates set forth below, each instance constituting a separate count of this Indictment, in the United States and in the District of Arizona and elsewhere, the specified defendant, and others known and unknown to the grand jury, knowingly engaged and attempted to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, as follows:

| <u>Count</u> | <u>Defendant</u> | <u>Date</u> | <u>Amount</u> | <u>Description</u> |
|---|---|---|---|---|
| 69. | LACEY, BRUNST | Aug. 21, 2013 | $30,000.00 | Bank of America (x1793) to Stewart Title (partial payment for Sedona property) |
| 70. | LACEY, BRUNST | Sept. 13, 2013 | $62,491.47 | BMO Harris to Stewart Title (partial payment for Sedona property) |
| 71. | SPEAR | June 11, 2014 | $300,000.00 | National Bank of Arizona (x0178) to Spear Family Trust |
| 72. | SPEAR | June 20, 2014 | $200,000.00 | National Bank of Arizona (x0178) to TD Ameritrade |
| 73. | SPEAR | Nov. 4, 2014 | $1,000,000.00 | National Bank of Arizona (x0178) to UBS Financial |
| 74. | SPEAR | May 14, 2015 | $250,000.00 | National Bank of Arizona (x0178) to Lincoln National Life |
| 75. | SPEAR | May 26, 2015 | $50,000.00 | National Bank of Arizona (x0178) to Industrial Property |

Attachment A

| | | | | Trust |
|---|---|---|---|---|
| 76. | SPEAR | Nov. 3, 2015 | $300,000.00 | National Bank of Arizona (x0178) to Ally Bank |
| 77. | SPEAR | Dec. 1, 2015 | $200,000.00 | National Bank of Arizona (x0178) to Wells Fargo |
| 78. | SPEAR, BRUNST | Jan. 11, 2016 | $133,045.00 | Cereus Properties (x6211) to National Bank of Arizona (x0178) |
| 79. | BRUNST | Jan. 26, 2016 | $101,974.00 | Cereus Properties (x6211) to Wells Fargo (x4891) |
| 80. | LARKIN, BRUNST | Feb. 3, 2016 | $1,507.944.00 | Cereus Properties (x6211) to Charles Schwab |
| 81. | LACEY, BRUNST | Mar. 1, 2016 | $1,692,020.00 | Cereus Properties (x6211) to Bank of America (x5554) |
| 82. | BRUNST | Apr. 1, 2016 | $220,944.00 | Cereus Properties (x6211) to Wells Fargo (x4891) |
| 83. | LACEY, BRUNST | June 27, 2016 | $397,9500.00 | Arizona Bank & Trust (x1793) to Fidelity Title (partial payment for San Francisco property) |
| 84. | LACEY, BRUNST | July 20, 2016 | $12,859,152.57 | Arizona Bank & Trust (x1793) to Fidelity Title (partial payment for San Francisco property) |
| 85. | SPEAR | July 22, 2016 | $50,000.00 | National Bank of Arizona (x0178) to Strategic Storage Trust II |
| 86. | LACEY, BRUNST | Aug. 2, 2016 | $16,243.00 | Cereus Properties (x6211) to Wells Fargo (x0495) |

Attachment A

| 87. | LARKIN, BRUNST | Oct. 6, 2016 | $1,206,356.00 | Cereus Properties (x6211) to Charles Schwab (x4693) |
|---|---|---|---|---|
| 88. | LACEY, BRUNST | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x1967) |
| 89. | LACEY, BRUNST | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x1972) |
| 90. | LACEY, BRUNST | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x1986) |
| 91. | LACEY, BRUNST | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x1991) |
| 92. | LACEY, BRUNST | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x2014) |
| 93. | SPEAR, BRUNST | Oct. 6, 2016 | $141,444.00 | Cereus Properties (x6211) to National Bank of Arizona (x0178) |

In violation of 18 U.S.C. § 1957.

Attachment A

**FORFEITURE ALLEGATION ONE**

[18 U.S.C. 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction under Counts 1 through 51 of this Indictment.  Each defendant so convicted shall forfeit to the United States the following:

a.    All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense.  Such property includes, but is not limited to, the real property located at the following addresses:



i.    ███████████ SAN FRANCISCO CA ███████

ii.    ███████████ SEBASTOPOL CA ███████

iii.    ██████████, SAN FRANCISCO, CA ████

iv.    ██████████ SAN FRANCISCO, CA ████

v.    ██████████ PARADISE VALLEY, ███████

vi.    ██████████ DALLAS, TX ██████

vii.    ███████████, SEDONA, AZ

viii.    ██████████ ST HELENA, CA ██████

ix.    ██████████, PARADISE VALLEY, AZ ██████

x.    █████████, CHICAGO, IL ██████

Such property also includes, but is not limited to, funds held in the following bank accounts:

i.    ██████████ account number XXXXX7188

ii.    █████████ Account number XXXXXX3873

iii.    █████████ Account number XXXXXX3825

- 54 -



1    iv.    Account number XXXX0178

2    v.    Account number XXXX0151

3    vi.    Account number XXXX3645

4    vii.    Account Number XXXXXXXXXX2523

5    viii.    Account Number XXXXX6943-01

6    ix.    account Number XXXXX5280-01

7    x.    account number XXXX3620

8    xi.    account number XXXX1889

9    xii.    account number XXXX2592

10    xiii.    account number XXXX2912

11    xiv.    account number XXXX2500

12    xv.    account number XXXX1938

13    xvi.    Account number XXXXXXXXXXX8225

14    xvii.    Account number XXXXXXXXXXXX7054

15    xviii.    Account number XXXXXXXXXXXX9342

16    xix.    Account number XXXXXXXXXXXX0071

17    xx.    Account Number XXXXXXXXX2523

18    xxi.    Account Number XXXXXX6292

19    xxii.    account number XXXXXXXXX0218

20    xxiii.    Account number XXX4832

21    xxiv.    Account number XXXXXX4293

22    xxv.    account number XXXXXX1098

23    Such property further includes, but is not limited to, the following domain names:

24    i.    atlantabackpage.com

25    ii.    backpage.be

26    iii.    backpage.com

27    iv.    backpage.com.br

28

Attachment A

| | | |
|---|---|---|
| 1 | v. | backpage.cz |
| 2 | vi. | backpage.dk |
| 3 | vii. | backpage.ee |
| 4 | viii. | backpage.es |
| 5 | ix. | backpage.fi |
| 6 | x. | backpage.fr |
| 7 | xi. | backpage.gr |
| 8 | xii. | backpage.hu |
| 9 | xiii. | backpage.ie |
| 10 | xiv. | backpage.it |
| 11 | xv. | backpage.lt |
| 12 | xvi. | backpage.mx |
| 13 | xvii. | backpage.net |
| 14 | xviii. | backpage.no |
| 15 | xix. | backpage.pl |
| 16 | xx. | backpage.pt |
| 17 | xxi. | backpage.ro |
| 18 | xxii. | backpage.si |
| 19 | xxiii. | backpage.sk |
| 20 | xxiv. | backpage.us |
| 21 | xxv. | backpage-insider.com |
| 22 | xxvi. | bestofbackpage.com |
| 23 | xxvii. | bestofbigcity.com |
| 24 | xxviii. | bigcity.com |
| 25 | xxix. | chicagobackpage.com |
| 26 | xxx. | denverbackpage.com |
| 27 | xxxi. | newyorkbackpage.com |
| 28 | | |

Attachment A

1   xxxii.   phoenixbackpage.com

2   xxxiii.   sandiegobackpage.com

3   xxxiv.   seattlebackpage.com

4   xxxv.   tampabackpage.com

5   b.   To the extent such property is not available for forfeiture, a sum of

6   money equal to the total value of the property described in subparagraph (a).

7   2.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by

8   Title 28, United States Code, Section 2461(c), the defendant shall forfeit substitute

9   property, up to the total value of the property described in the preceding paragraph if, as

10   the result of any act or omission of the defendant, the property described in the preceding

11   paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence;

12   (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond

13   the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been

14   commingled with other property that cannot be divided without difficulty.

15   **FORFEITURE ALLEGATION TWO**

16   [18 U.S.C. § 982(a)(1)]

17   1.   Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is

18   hereby given that the United States will seek forfeiture as part of any sentence, pursuant

19   Title 18, United States Code, Section 982(a)(1), in the event of any defendant's conviction

20   under Counts 52 through 93 of this Indictment.  Each defendant so convicted shall forfeit

21   to the United States the following:

22   a.   All right, title, and interest in any and all property, real or personal,

23   involved in or traceable to any transaction set forth in Counts 52 through 93 of this

24   Indictment.  Such property includes, but is not limited to, the real property located at the

25   following addresses:

26   i.   ███████████████   SAN FRANCISCO CA   ████████

27   ii.   ███████████████████   SEBASTOPOL CA   ████████

28

- 57 -

Attachment A



iii.　SAN FRANCISCO, CA

iv.　SAN FRANCISCO, CA

v.　PARADISE VALLEY, AZ

vi.　DALLAS, TX

vii.　, SEDONA, AZ

viii.　ST HELENA, CA

ix.　PARADISE VALLEY, AZ

x.　CHICAGO, IL

Such property also includes, but is not limited to, funds held in the following bank accounts:

i.　account number XXXXX7188

ii.　Account number XXXXXX3873

iii.　Account number XXXXXX3825

iv.　Account number XXXX0178

v.　Account number XXXX0151

vi.　Account number XXXX3645

vii.　Account Number XXXXXXXXXX2523

viii.　Account Number XXXXX6943-01

ix.　account Number XXXXX5280-01

x.　account number XXXX3620

xi.　account number XXXX1889

xii.　account number XXXX2592

xiii.　account number XXXX2912

xiv.　account number XXXX2500

xv.　account number XXXX1938

xvi.　Account number XXXXXXXXXXXX8225

Attachment A



xvii.   Account number XXXXXXXXXXXX7054

xviii.   Account number XXXXXXXXXXXX9342

xix.   Account number XXXXXXXXXXXX0071

xx.   Account Number XXXXXXXXXX2523

xxi.   Account Number XXXXXX6292

xxii.   account number XXXXXXXXX0218

xxiii.   Account number XXX4832

xxiv.   Account number XXXXXX4293

xxv.   account number XXXXXX1098

Such property further includes, but is not limited to, the following domain names:

i.   atlantabackpage.com

ii.   backpage.be

iii.   backpage.com

iv.   backpage.com.br

v.   backpage.cz

vi.   backpage.dk

vii.   backpage.ee

viii.   backpage.es

ix.   backpage.fi

x.   backpage.fr

xi.   backpage.gr

xii.   backpage.hu

xiii.   backpage.ie

xiv.   backpage.it

xv.   backpage.lt

xvi.   backpage.mx

- 59 -

Attachment A

xvii.   backpage.net

xviii.   backpage.no

xix.   backpage.pl

xx.   backpage.pt

xxi.   backpage.ro

xxii.   backpage.si

xxiii.   backpage.sk

xxiv.   backpage.us

xxv.   backpage-insider.com

xxvi.   bestofbackpage.com

xxvii.   bestofbigcity.com

xxviii.   bigcity.com

xxix.   chicagobackpage.com

xxx.   denverbackpage.com

xxxi.   newyorkbackpage.com

xxxii.   phoenixbackpage.com

xxxiii.   sandiegobackpage.com

xxxiv.   seattlebackpage.com

xxxv.   tampabackpage.com

   b.   To the extent such property is not available for forfeiture, a sum of money equal to the total value of such property.

   2.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), each defendant convicted under Counts 52 through 93 of this Indictment shall forfeit substitute property, if, by any act or omission of that defendant, the property described in the preceding paragraph, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to, or

- 60 -

1   deposited with a third party; has been placed beyond the jurisdiction of the court; has been

2   substantially diminished in value; or has been commingled with other property that cannot

3   be divided without difficulty.

4                                          A TRUE BILL

5

6                                          *S/*
                                           _____
7                                          FOREPERSON OF THE GRAND JURY
                                           Date:  March 28, 2018

8   ELIZABETH A. STRANGE
    First Assistant United States Attorney
9   District of Arizona

10  JOHN P. CRONAN
    Acting Assistant Attorney General
11  Criminal Division, U.S. Department of Justice

12

13  *S/*
    _____
    KEVIN M. RAPP
14  DOMINIC LANZA
    MARGARET PERLMETER
15  JOHN J. KUCERA
    Assistant U.S. Attorneys

16  REGINALD E. JONES
    Senior Trial Attorney
17  U.S. Department of Justice, Criminal Division
    Child Exploitation and Obscenity Section

18

19

20

21

22

23

24

25

26

27

28

                                      - 61 -

Exhibit 2

## Ken Miller

**From:** ████████, Chris   (Citco) <█████████████████
**Sent:** Tuesday, June 19, 2018 11:43 AM
**To:** Ken Miller
**Subject:** RE: ████████████████████████.
**Attachments:** ████████████████pdf

Dear Ken,

Please see attached notice with regards to the below request.

Kind Regards,

Chris ████████ | Vice President| Investor Relations

████████████████████████████████████

---

**From:** Ken Miller [mailto:kmiller@bmkattorneys.com]
**Sent:** Tuesday, June 12, 2018 5:06 AM
**To:** FATCA Request
**Subject:** A████████████████████.

Dear Sir or Madam:

My firm represents James Larkin in connection with various seizure actions.  Mr. Larkin received the below email last night.  However, he has not received any notice (besides the email) that the "United States Marshall Service" has become the owner of *his family's* trust account.   Please provide me with an explanation of why you think this has happened.   We would also appreciate documents explaining this supposed transmogrification.

Thank you for your attention to this matter.

Sincerely,

*Kenneth M. Miller*

**BIENERT, MILLER & KATZMAN, PLC**
903 Calle Amanecer  Suite 350
San Clemente, CA. 92673
Tel. (949) 369-3700
Fax (949) 369-3701
kmiller@bmkattorneys.com
www.bmkattorneys.com

The foregoing message is confidential and intended for the designated recipient only.  The foregoing information may be protected by attorney/client and/or work product privilege.  Accordingly, if you have received this message in error, please contact BIENERT, MILLER & KATZMAN at (949) 369-3700 immediately and delete the message without reviewing, copying, or making further use of the information contained herein

On June 10, 2018 8:24 PM, ◀████████████████ > wrote:

REF: ████████████████████.

Account: UNITED STATES MARSHALL SERVICE

Dear Investor,

We have recently received a notification indicating your registered name has changed to **UNITED STATES MARSHALL SERVICE**, which no longer corresponds with the FATCA documentation we have on file for this account.

Could you please complete the updated FATCA documentation with your current information and return by replying to this email at your earliest convenience.

We appreciate your assistance in this matter. Please send any inquiries in relation to this communication to ▮▮▮▮▮▮▮▮▮▮▮. Documentation may also be returned by fax or post to the details below.

With thanks and regards,

Case 2:18-... 'SEALED'   Document 1-1 'SEALED'   Filed 06/04/18   Page 1 of 1
Page ID #:135

# United States District Court

CENTRAL _____ DISTRICT OF _____ CALIFORNIA _____

SEIZURE WARRANT

CASE NUMBER: 2:18-MJ-01427

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

TO: ▮▮▮▮▮▮▮▮ and any Authorized Officer of the United States. Affidavit(s) having been made before
▮▮▮▮▮▮▮▮▮▮▮▮▮ who has reason to believe that in the Southern District of New York there is now
▮▮▮▮▮▮▮▮▮▮▮▮▮ United States, namely (describe the property to be seized)

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

I find that the affidavit(s) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮ establish probable cause to believe that the property so described is subject
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ by means of a seizure warrant.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ finds immediately and forthwith upon presentation of this warrant to the
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ cashier's check made payable to the United States Marshals Service

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ the property specified; serving this warrant and making the seizure in the
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ warrant and receipt for the property seized; and prepare a written inventory
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ to the undersigned judicial officer as required by law. The recipient of this
Warrant ▮▮▮▮▮▮▮▮▮▮▮ comply with the duties and obligations set out in Attachment A attached hereto.

June 4, 2018  4:20 PM
Date and Time Issued

Los Angeles, California
City and State

Hon. Jean Rosenbluth, U.S. Magistrate Judge
Name and Title of Judicial Officer

Signature of Judicial Officer

JOHN J. KUCERA 602

## RETURN

| DATE WARRANT RECEIVED | DATE AND TIME WARRANT EXECUTED | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH |
|---|---|---|
|  |  |  |

INVENTORY MADE IN THE PRESENCE OF

INVENTORY OF PROPERTY SEIZED PURSUANT TO THE WARRANT

## CERTIFICATION

*I declare under penalty of perjury that I am an officer who executed this warrant and that this inventory is correct and will be returned through a filing with the Clerk's Office*

Date _____

_____
*Executing Officer's Signature*

_____
*Printed Name and Title*

### ATTACHMENT A

I.   **Seizure Procedure**

A.   The seizure warrant will be presented in person or transmitted via facsimile or email to personnel of ███████ ██████████████ who will be directed to:

1.   pay all USD Cash, Money Funds and Bank Deposits in the Subject Accounts forthwith to the United States Marshals Service ("USMS");

2.   place the Subject Account, and each of them, in the name and under the control of the USMS;

3.   maintain and continue to manage the securities held in the Subject Account numbered ██████ (including USD Fixed Income assets, Non-USD Fixed Income assets, USD Equities assets and Non-USD Equities assets), as well as any USD Cash that may accrue in the Subject Account following the presentation of the seizure warrant;

4.   suspend all trading of securities in the remaining Subject Account pending the receipt of joint instructions from the government and the current account holders concerning such trading, or a further order of this Court; and

5.   provide any and all statements for the Subject Account, monthly or otherwise, to the USMS in care of John Kucera, Assistant United States Attorney, Asset Forfeiture Section, United States Attorney's Office, 312 North Spring Street, 14th Floor, Los Angeles, California 90012. Acacia Conservation Fund, LP, shall also continue to provide such statements to the pre-seizure account holders.

2

Exhibit 3



UNITED STATES POSTAL INSPECTION SERVICE

ASSET FORFEITURE

Mr. James Larkin
c/o Thomas Henry Bienert Jr.
Bienert Miller & Katzman PLC
903 Calle Amanecer
Suite 350
San Clemente, CA 92673-6253

## NOTICE OF SEIZURE OF PROPERTY AND INITIATION OF ADMINISTRATIVE FORFEITURE PROCEEDINGS

### SEIZED PROPERTY IDENTIFYING INFORMATION

| | |
|---|---|
| **Notice Date:** June 5, 2018 | **Asset ID Number:** Multiple Assets |
| **Notice Letter ID:** ▇▇▇▇ (use ID when searching for assets during online filing) | |
| **Description of Seized Property:** See Attached List | |
| **Seizure Date and Location:** See Attached List | |
| **Forfeiture Authority:** See Attached List | |

I.   **THE GOVERNMENT MAY CONSIDER GRANTING PETITIONS FOR REMISSION OR MITIGATION, WHICH PARDONS ALL OR PART OF THE PROPERTY FROM THE FORFEITURE.**

**TO REQUEST A PARDON OF THE PROPERTY YOU MUST FILE A PETITION FOR REMISSION OR MITIGATION**

A.   **What to File**: You may file both a claim (see section II below) and a Petition for Remission or Mitigation (Petition).  If you file only a petition and no one else files a claim, your petition will be decided by the seizing agency.

B.   **To File a Petition:** A petition should be filed online or by mailing it via the U.S. Postal Service to the USPIS, P.O. Box 91100, Washington, DC 20090-1100 or a Commercial Delivery Service to 900 Brentwood Road, NE Suite 2187, Washington, DC 20066-6096. It must be received no later than 11:59 PM EST thirty (30) days of your receipt of this Notice. *See* 39 C.F.R. 233.7.

C.   **Requirements for Petition:** The petition must include a description of your interest in the property supported by documentation and any facts you believe justify the return of the property and be **signed under oath**, subject to the penalty of perjury or meet the requirements of an unsworn statement under penalty of perjury.  See 28 U.S.C. § 1746.

D.   **Petition Forms:** A petition need not be made in any particular form but a standard petition form and the link to file the petition online are available at https://www.forfeiture.gov/FilingPetition.htm.  If you wish to file a petition online for the assets referenced in the asset list of this letter, please use the Notice Letter ID referenced above.

E.   **Supporting Evidence**: Although not required, you may submit supporting evidence (for example, title paperwork or bank records showing your interest in the seized property) to substantiate your petition.

F.   **No Attorney Required:** You do not need an attorney to file a petition.  You may, however, hire an attorney to represent you in filing a petition.

G.   **Petition Granting Authority:**  The ruling official in administrative forfeiture cases is the Chief Counsel.  The ruling official in judicial forfeiture cases is the Chief, Money Laundering and Asset Recovery Section, Criminal Division, Department of Justice.  *See* 39 C.F.R. 233.9(d).

H.   **Regulations for Petition:**  The Regulations governing the petition process are set forth in 39 C.F.R. 233.9, and are available at www.forfeiture.gov.

I.   **Penalties for Filing False or Frivolous Petitions:**  A petition containing false information may subject the petitioner to criminal prosecution under 28 U.S.C. § 1001 and 28 U.S.C. § 1621.

Mr. James Larkin                                    Notice of Seizure

   J.  **Online Petition Exclusions:**  If you cannot find the desired assets online, you must file your petition in writing at the address listed above. For more details regarding what assets can be petitioned online, please see the Frequently Asked Questions at https://www.forfeiture.gov/FilingPetitionFAQs.htm.

## II.  TO CONTEST THE FORFEITURE OF THIS PROPERTY IN UNITED STATES DISTRICT COURT YOU MUST FILE A CLAIM.  *If you do not file a claim, you will waive your right to contest the forfeiture of the asset.  Additionally, if no other claims are filed, you may not be able to contest the forfeiture of this asset in any other proceeding, criminal or civil.*

   A.  **To File a Claim:**  A claim must be filed to contest the forfeiture.  A claim should be filed online or by mailing it via the U.S. Postal Service to the U.S. Postal Inspection Service (USPIS), P.O. Box 91100, Washington, DC 20090-1100 or a Commercial Delivery Service to the USPIS, 900 Brentwood Road, NE Suite 2187, Washington, DC 20066-6096.

   B.  **Time Limits**:  A claim must be filed within 35 days of the date of this letter; therefore, you must file your claim by **11:59 PM EST** on **July 10, 2018**.  *See* 18 U.S.C. § 983(a)(2).  A claim is deemed filed on the date received by the agency at the address listed above.

   C.  **Requirements for Claim**:  A claim must be filed online or in writing, describe the seized property, state your ownership or other interest in the property and be **made under oath**, subject to penalty of perjury or meet the requirements of an unsworn statement under penalty of perjury.  *See* 18 U.S.C. § 983(a)(2)(C) and 28 U.S.C. § 1746.

   D.  **Claim Forms**:  A claim need not be made in any particular form, but a standard claim form and the link to file the claim online are available at https://www.forfeiture.gov/FilingClaim.htm.  *See* 18 U.S.C. § 983(a)(2)(D).  If you wish to file a claim online for the assets referenced in the asset list of this letter, please use the Notice Letter ID referenced above.

   E.  **Supporting Evidence:**  Although not required, you may submit supporting evidence (for example, title paperwork or bank records showing your interest in the seized property) to substantiate your claim.

   F.  **No Attorney Required:**  You do not need an attorney to file a claim. You may, however, hire an attorney to represent you in filing a claim.

   G.  **When You File a Claim:**  A timely claim stops the administrative forfeiture proceeding. The seizing agency forwards the timely claim to the U.S. Attorney's Office for further proceedings.  You may also file a petition for remission or mitigation.

   H.  **Penalties for Filing False or Frivolous Claims:**  If you intentionally file a frivolous claim you may be subject to a civil fine.  See 18 U.S.C. § 983(h).  If you intentionally file a claim containing false information, you may be subject to criminal prosecution.  See 18 U.S.C. § 1001.

   I.  **If No Claim is Filed:**  Failure to file a claim by **11:59 PM EST** on **July 10, 2018** may result in the property being forfeited to the United States.

   J.  **Online Claim Exclusions:**  If you cannot find the desired assets online, you must file your claim in writing and send to the address listed above.  For more details regarding what assets can be claimed online, please see the Frequently Asked Questions at https://www.forfeiture.gov/FilingClaimFAQs.htm.

## III.  TO REQUEST RELEASE OF PROPERTY BASED ON HARDSHIP

   A.  **Hardship Release**:  Upon the filing of a proper claim, a Claimant may request release of the seized property during the pendency of the forfeiture proceeding due to hardship if the Claimant is able to meet specific conditions.  *See* 18 U.S.C. § 983(f); 39 C.F.R. 233.7(m).

   B.  **To File Hardship Release:**  The hardship request cannot be filed online and must be in writing. The Claimant must establish the following:
- Claimant has a possessory interest in the property;
- Claimant has sufficient ties to the community to assure that the property will be available at the time of trial; and
- Government's continued possession will cause a substantial hardship to the Claimant.

   C.  **Regulations for Hardship:**  A complete list of the hardship provisions can be reviewed at 18 U.S.C. § 983(f) and 39 C.F.R. 233.7(m). Some assets are not eligible for release.

Mr. James Larkin                                   Notice of Seizure

**Asset List**

**Seizure Date and Location:** The asset(s) referenced in this notice letter were seized on April 6, 2018 by the USPIS at Dallas, Texas.

**Forfeiture Authority:** The forfeiture of this property has been initiated pursuant to 18 USC 981 and the following additional federal laws: 19 U.S.C. §§ 1602-1619, 18 U.S.C. § 983 and 39 C.F.R. 233.7.



| ASSET ID | ASSET DESCRIPTION | ASSET VALUE | ACCT/VIN/SERIAL NO |
|---|---|---|---|
| 18-USP-001426 | Funds in ▓▓ account #▓▓ 2207 in name of ▓▓ | $ ▓▓ | ▓▓ 12207 |
| 18-USP-001427 | Funds in ▓▓ 0239 A in the name of ▓▓ | $ | ▓▓ 0239 |
| 18-USP-001434 | Funds in ▓▓ Acct #▓ 2177 in the name of ▓▓ | | ▓ 2177 |
| 18-USP-001542 | Funds in ▓▓ Acct #▓▓ 0457 in the name of ▓▓ | $ | ▓▓ 60457 |

**Seizure Date and Location:** The asset(s) referenced in this notice letter were seized on April 6, 2018 by the USPIS at Phoenix, Arizona.

**Forfeiture Authority:** The forfeiture of this property has been initiated pursuant to 18 USC 981 and the following additional federal laws: 19 U.S.C. §§ 1602-1619, 18 U.S.C. § 983 and 39 C.F.R. 233.7.



| ASSET ID | ASSET DESCRIPTION | ASSET VALUE | ACCT/VIN/SERIAL NO |
|---|---|---|---|
| 18-USP-001112 | Funds in ▓▓ Acct #▓ 1938 in the name of J▓▓ 1 1 | $ ▓▓ | ▓ 1938 4432 4474 |

**Seizure Date and Location:** The asset(s) referenced in this notice letter were seized on April 6, 2018 by the USPIS at Wilmington, Delaware.

**Forfeiture Authority:** The forfeiture of this property has been initiated pursuant to 18 USC 981 and the following additional federal laws: 19 U.S.C. §§ 1602-1619, 18 U.S.C. § 983 and 39 C.F.R. 233.7.



| ASSET ID | ASSET DESCRIPTION | ASSET VALUE | ACCT/VIN/SERIAL NO |
|---|---|---|---|
| 18-USP-001517 | Funds in ▓▓ Acct #7054 in the name of | $ ▓▓ | 7054 |
| 18-USP-001518 | Funds in ▓▓ Acct 8225 in the name of ▓▓ | $ ▓▓ | 8225 |

Karen A. Houser
Program Manager
Asset Forfeiture Unit
▓▓

Exhibit 4

_____ RECEIVED _____ COPY

MAR 2 8 2018

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ M DEPUTY

# SEALED

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

United States of America,

           Plaintiff,

      v.

1. Michael Lacey
Counts 1-70, 81, 83-84, 86, 88-92

2. James Larkin
Counts 1-68, 80, 87

3. Scott Spear
Counts 1-68, 71-78, 85, 93

4. John "Jed" Brunst
Counts 52-70, 78-84, 86-93

5. Dan Hyer
Counts 1-68

6. Andrew Padilla
Counts 1-51

7. Joye Vaught
Counts 1-51

           Defendants.

CR-18-00422-PHX-SPL (BSB)

**INDICTMENT**

VIO:  18 U.S.C. § 371
(Conspiracy)
Count 1

18 U.S.C. § 1952(a)(3)(A)
(Travel Act—Facilitate Prostitution)
Counts 2-51

18 U.S.C. § 1956(h)
(Conspiracy to Commit Money
Laundering)
Count 52

18 U.S.C. § 1956(a)(1)(B)(i)
(Concealment Money Laundering)
Counts 53-62

18 U.S.C. § 1956(a)(2)(A)
(International Promotional Money
Laundering)
Counts 63-68

18 U.S.C. § 1957(a)
(Transactional Money Laundering)
Counts 69-93

18 U.S.C. §§ 981, 982
21 U.S.C. § 853, 28 U.S.C. § 2461
(Forfeiture Allegations)

THE GRAND JURY CHARGES:

A.   <u>Introduction</u>

    1.   The website www.backpage.com ("Backpage") is notorious for being the

## FORFEITURE ALLEGATION ONE

[18 U.S.C. 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

1.      Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction under Counts 1 through 51 of this Indictment. Each defendant so convicted shall forfeit to the United States the following:

        a.      All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense. Such property includes, but is not limited to, the real property located at the following addresses:



i.      ███████████ SAN FRANCISCO CA ███████████

ii.     ███████████ SEBASTOPOL CA ███████████

iii.    ███████████ SAN FRANCISCO, CA ███████

iv.     ███████████ SAN FRANCISCO, CA ███████

v.      ███████████ PARADISE VALLEY, AZ ███████

vi.     ███████████ DALLAS, TX ███████

vii.    ███████████ SEDONA, AZ

viii.   ███████████ ST HELENA, CA ███████

ix.     ███████████ PARADISE VALLEY, AZ ███████

x.      ███████████ CHICAGO, IL ███

Such property also includes, but is not limited to, funds held in the following bank accounts:

i.      ███████████ account number XXXXX7188

ii.     ███████████ Account number XXXXXX3873

iii.    ███████████ Account number XXXXXX3825

- 54 -

iv. ▓▓▓▓▓▓▓▓▓ Account number XXXX0178

v. ▓▓▓▓▓▓▓▓▓ Account number XXXX0151

vi. ▓▓▓▓▓▓▓▓▓ Account number XXXX3645

vii. ▓▓▓▓▓ Account Number XXXXXXXXXX2523

viii. ▓▓▓▓▓▓▓▓▓▓▓ Account Number XXXXX6943-01

ix. ▓▓▓▓▓▓▓▓▓▓▓ account Number XXXXX5280-01

x. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ account number XXXX3620

xi. ▓▓▓▓▓▓▓▓▓ account number XXXX1889

xii. ▓▓▓▓▓▓▓▓▓ account number XXXX2592

xiii. ▓▓▓▓▓▓▓▓▓ account number XXXX2912

xiv. ▓▓▓▓▓▓▓▓▓ account number XXXX2500

xv. ▓▓▓▓▓▓▓▓▓ account number XXXX1938

xvi. ▓▓▓▓▓▓▓ Account number XXXXXXXXXXXX8225

xvii. ▓▓▓▓▓▓▓ Account number XXXXXXXXXXXX7054

xviii. ▓▓▓▓▓▓ Account number XXXXXXXXXXXX9342

xix. ▓▓▓▓▓▓▓ Account number XXXXXXXXXXXX0071

xx. ▓▓▓▓▓▓▓▓▓▓▓▓▓ Account Number XXXXXXXXXX2523

xxi. ▓▓▓▓ Account Number XXXXXX6292

xxii. ▓▓▓▓▓▓▓▓▓▓▓▓ account number XXXXXXXXX0218

xxiii. ▓▓▓▓▓▓ Account number XXX4832

xxiv. ▓▓▓▓▓ Account number XXXXXX4293

xxv. ▓▓▓▓▓▓▓ account number XXXXXX1098

Such property further includes, but is not limited to, the following domain names:

i. atlantabackpage.com

ii. backpage.be

iii. backpage.com

iv. backpage.com.br

- 55 -

| 1 | v. | backpage.cz |
| 2 | vi. | backpage.dk |
| 3 | vii. | backpage.ee |
| 4 | viii. | backpage.es |
| 5 | ix. | backpage.fi |
| 6 | x. | backpage.fr |
| 7 | xi. | backpage.gr |
| 8 | xii. | backpage.hu |
| 9 | xiii. | backpage.ie |
| 10 | xiv. | backpage.it |
| 11 | xv. | backpage.lt |
| 12 | xvi. | backpage.mx |
| 13 | xvii. | backpage.net |
| 14 | xviii. | backpage.no |
| 15 | xix. | backpage.pl |
| 16 | xx. | backpage.pt |
| 17 | xxi. | backpage.ro |
| 18 | xxii. | backpage.si |
| 19 | xxiii. | backpage.sk |
| 20 | xxiv. | backpage.us |
| 21 | xxv. | backpage-insider.com |
| 22 | xxvi. | bestofbackpage.com |
| 23 | xxvii. | bestofbigcity.com |
| 24 | xxviii. | bigcity.com |
| 25 | xxix. | chicagobackpage.com |
| 26 | xxx. | denverbackpage.com |
| 27 | xxxi. | newyorkbackpage.com |
| 28 | | |

1  xxxii.  phoenixbackpage.com

2  xxxiii.  sandiegobackpage.com

3  xxxiv.  seattlebackpage.com

4  xxxv.  tampabackpage.com

5       b.  To the extent such property is not available for forfeiture, a sum of

6  money equal to the total value of the property described in subparagraph (a).

7      2.  Pursuant to Title 21, United States Code, Section 853(p), as incorporated by

8  Title 28, United States Code, Section 2461(c), the defendant shall forfeit substitute

9  property, up to the total value of the property described in the preceding paragraph if, as

10  the result of any act or omission of the defendant, the property described in the preceding

11  paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence;

12  (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond

13  the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been

14  commingled with other property that cannot be divided without difficulty.

15                             **FORFEITURE ALLEGATION TWO**

16                             [18 U.S.C. § 982(a)(1)]

17      1.  Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is

18  hereby given that the United States will seek forfeiture as part of any sentence, pursuant

19  Title 18, United States Code, Section 982(a)(1), in the event of any defendant's conviction

20  under Counts 52 through 93 of this Indictment. Each defendant so convicted shall forfeit

21  to the United States the following:

22       a.  All right, title, and interest in any and all property, real or personal,

23  involved in or traceable to any transaction set forth in Counts 52 through 93 of this

24  Indictment. Such property includes, but is not limited to, the real property located at the

25  following addresses:

26      i.                    SAN FRANCISCO CA

27      ii.                    SEBASTOPOL CA

28



iii.  ██████████████ SAN FRANCISCO, CA ██████

iv.  ██████ SAN FRANCISCO, CA ██████

v.  ████████████ PARADISE VALLEY, AZ ██████

vi.  ██████████████ DALLAS, TX ██████

vii.  ████████████████, SEDONA, AZ

viii.  ██████████ ST HELENA, CA ██████

ix.  ██████████████ PARADISE VALLEY, AZ ██████

x.  ████████████ CHICAGO, IL ██████

Such property also includes, but is not limited to, funds held in the following bank accounts:

i.  ██████████ account number XXXXX7188

ii.  ██████████ Account number XXXXXXX3873

iii.  ██████████ Account number XXXXXXX3825

iv.  ██████████████ Account number XXXX0178

v.  ████████ Account number XXXX0151

vi.  ████████ Account number XXXX3645

vii.  ████████ Account Number XXXXXXXXXX2523

viii.  ████████████████ Account Number XXXXX6943-01

ix.  ████████████████ account Number XXXXX5280-01

x.  ██████████████████ account number XXXX3620

xi.  ████████ account number XXXX1889

xii.  ████████ account number XXXX2592

xiii.  ████████ account number XXXX2912

xiv.  ████████ account number XXXX2500

xv.  ████████ account number XXXX1938

xvi.  ██████████ Account number XXXXXXXXXXXX8225



xvii.     Account number XXXXXXXXXXXX7054

xviii.    Account number XXXXXXXXXXXX9342

xix.      Account number XXXXXXXXXXXX0071

xx.       Account Number XXXXXXXXXX2523

xxi.      Account Number XXXXXX6292

xxii.     account number XXXXXXXXX0218

xxiii.    Account number XXX4832

xxiv.     Account number XXXXXX4293

xxv.      account number XXXXXX1098

Such property further includes, but is not limited to, the following domain names:

i.     atlantabackpage.com

ii.    backpage.be

iii.   backpage.com

iv.    backpage.com.br

v.     backpage.cz

vi.    backpage.dk

vii.   backpage.ee

viii.  backpage.es

ix.    backpage.fi

x.     backpage.fr

xi.    backpage.gr

xii.   backpage.hu

xiii.  backpage.ie

xiv.   backpage.it

xv.    backpage.lt

xvi.   backpage.mx

xvii.   backpage.net

xviii.   backpage.no

xix.   backpage.pl

xx.   backpage.pt

xxi.   backpage.ro

xxii.   backpage.si

xxiii.   backpage.sk

xxiv.   backpage.us

xxv.   backpage-insider.com

xxvi.   bestofbackpage.com

xxvii.   bestofbigcity.com

xxviii.   bigcity.com

xxix.   chicagobackpage.com

xxx.   denverbackpage.com

xxxi.   newyorkbackpage.com

xxxii.   phoenixbackpage.com

xxxiii.   sandiegobackpage.com

xxxiv.   seattlebackpage.com

xxxv.   tampabackpage.com

b.   To the extent such property is not available for forfeiture, a sum of money equal to the total value of such property.

2.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), each defendant convicted under Counts 52 through 93 of this Indictment shall forfeit substitute property, if, by any act or omission of that defendant, the property described in the preceding paragraph, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to, or

1  deposited with a third party; has been placed beyond the jurisdiction of the court; has been

2  substantially diminished in value; or has been commingled with other property that cannot

3  be divided without difficulty.

4                                      A TRUE BILL

5

6                            _S/_____
                             FOREPERSON OF THE GRAND JURY
7                            Date: March 28, 2018

8  ELIZABETH A. STRANGE
   First Assistant United States Attorney
9  District of Arizona

10 JOHN P. CRONAN
   Acting Assistant Attorney General
11 Criminal Division, U.S. Department of Justice

12

13 _S/_____
   KEVIN M. RAPP
14 DOMINIC LANZA
   MARGARET PERLMETER
15 JOHN J. KUCERA
   Assistant U.S. Attorneys

16 REGINALD E. JONES
   Senior Trial Attorney
17 U.S. Department of Justice, Criminal Division
   Child Exploitation and Obscenity Section
18

19

20

21

22

23

24

25

26

27

28

Exhibit 5

```
                                    ___ FILED        ___ LODGED
                                    ___ RECEIVED      ___ COPY

                                         JUL 2 5 2018

                                    CLERK U S DISTRICT COURT
                                       DISTRICT OF ARIZONA
                                    BY_____DEPUTY
                                       REDACTED FOR
                                       PUBLIC DISCLOSURE
```

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR 18-422-PHX-SPL (BSB) |
| Plaintiff, | |
| v. | **SUPERSEDING INDICTMENT** |
| 1. Michael Lacey<br>    (Counts 1-70, 81, 83-84, 86, 88-92,<br>    and 94-100) | VIO: 18 U.S.C. § 371<br>        (Conspiracy)<br>        Count 1 |
| 2. James Larkin<br>    (Counts 1-68, 80, and 87) | 18 U.S.C. § 1952(a)(3)(A)<br>(Travel Act—Facilitate Prostitution)<br>Counts 2-51 |
| 3. Scott Spear<br>    (Counts 1-68, 71-78, 85, and 93) | 18 U.S.C. § 1956(h)<br>(Conspiracy to Commit Money<br>Laundering)<br>Count 52 |
| 4. John "Jed" Brunst<br>    (Counts 1-70, 78-84, and 86-93) | 18 U.S.C. § 1956(a)(1)(B)(i)<br>(Concealment Money Laundering)<br>Counts 53-62 |
| 5. Dan Hyer<br>    (Counts 1-68) | 18 U.S.C. § 1956(a)(2)(A)<br>(International Promotional Money<br>Laundering)<br>Counts 63-68 |
| 6. Andrew Padilla<br>    (Counts 1-51) | 18 U.S.C. § 1957(a)<br>(Transactional Money Laundering)<br>Counts 69-99 |
| 7. Joye Vaught<br>    (Counts 1-51) | |
| Defendants. | 18 U.S.C. § 1956(a)(2)(B)(i)<br>(International Concealment Money<br>Laundering)<br>Count 100 |

## FORFEITURE ALLEGATION ONE

### [18 U.S.C. 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

1.      The factual allegations in Paragraphs 1-211 are incorporated by reference and re-alleged as though fully set forth herein.

2.      Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction under Counts 1 through 51 of this Superseding Indictment. Each defendant so convicted shall forfeit to the United States the following:

a.      All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense. Such property includes, but is not limited to, the real property located at the following addresses:



1.      ██████████████, Sedona, ████

2.      ████████████, San Francisco, CA ████

3.      ████████████ Chicago, IL ████

4.      ████████████, Paris, France ████

5.      ████████████ Sebastopol, CA ████

6.      ████████., Phoenix, AZ ████

7.      ████████████, Frisco, TX ████

8.      ████████ San Francisco, CA ████

9.      ████████████ Paradise Valley, AZ ████

10.     ████████████, Paradise Valley, AZ ████

11.     ████████████, Paradise Valley, AZ ████

12.     ████████████ Paradise Valley, AZ ████

13.     ████████████, Pinetop, AZ ████

14.     ████████████, San Francisco, CA ████

- 63 -



15. ████████████, Plano, TX ███████████████

16. ████████████, Saint Helena, CA ████

17. ███████████████Phoenix, AZ ████

18. ██████████ ██████ Frisco, TX ████

19. ████████████████████ Paradise Valley, AZ ████

20. ████████████ Scottsdale, AZ████

21. ████████████████████████ Phoenix, AZ ████

22. █████████████ Paradise Valley, AZ ████

23. ████████████, Paradise Valley, AZ ████

24. ██████████████ The Colony, TX ████

25. ██████████████ Scottsdale, AZ████

26. ████████████ Plano, TX ████

Such property also includes, but is not limited to, all funds, securities, and/or other assets held in the following bank accounts:

1. ████████████ account number XXXXX7188

2. ████████████ Account number XXXXXX3873

3. ████████████ Account number XXXXXX3825

4. █████████████████ Account number XXXX0178

5. █████████████████ Account number XXXX0151

6. █████████████████ Account number XXXX3645

7. ████████████ Account Number x6910

8. ████████████████████ Account Number XXXXX6943-01

9. ████████████████████ account Number XXXXX5280-01

10. ██████████████████████████ account number XXXX3620

11. ████████████████ account number XXXX1889

12. ████████████████ account number XXXX2592

13. ████████████████ account number XXXX2500

14. ████████████████ account number XXXX1938



15.       Account number XXXXXXXXXXXX8225

16.       Account number XXXXXXXXXXXX7054

17.       Account number XXXXXXXXXXXX9342

18.       Account number XXXXXXXXXXXX0071

19.       Account Number XXXXXXXXXX2523

20.       Account Number XXXXXX6292

21.       account number XXXXXXXXX0218

22.       Account number XXX4832

23.       Account number XXXXXX4293

24.       Account number xxxxxx7012

25.       Assets xxxxxxx0012

26.       number xxxx6878

27.       Account number xxxx4954

28.       Account number xxxx7892

29.       Account number xxxx7888

30.       Account number xxxx6485

31.       Account number xxxx2485

32.       Account number xxxx1897

33.       Account number xxxx3126

34.       xxxxxx8316

35.       Certificate of Deposit xxxxxx8324

36.       Certificate of Deposit xxxxxx8332

37.       Certificate of Deposit xxxxxx8103

38.       Certificate of Deposit xxxxxx8162

39.       Certificate of Deposit xxxxxx8189

40.       number xxxxx0457

41.       xxx7177

42.       number xxxxxxxxxxxxxxxxxxxxxxxx1210



43. ▮▮▮▮▮▮▮ number xxxxxxxxxxxxxxxxxxx5803

44. ▮▮▮▮▮▮▮ number xxxxxxxxxxxxxxxxxxx5801

45. ▮▮▮▮▮▮▮ number xxxxxxxxxxxxxxxxxxx5805

46. ▮▮▮▮▮▮▮ number xxxxxxxxxxxxxxxxxxx2226

47. ▮▮▮▮▮▮▮ number xxxxxxxxxxxxxxxxxxx2231

48. ▮▮▮▮▮▮▮ number xxxxxxxxxxxxxxxxxxx2230

49. ▮▮▮▮▮▮▮ number xxxxxxxxxxxxxxxxxxx4194

50. ▮▮▮▮▮▮▮ number xxxxxxxxxxxxxxxxxxx4196

51. ▮▮▮▮▮▮▮ number xxxxxxxxxxxxxxxxxxx4198

52. ▮▮▮▮▮▮▮ number xxxxxxxxxxxxxxxxxxx8083

53. ▮▮▮▮▮▮▮ number xxxxxxxxxxxxxxxxxxx8086

54. ▮▮▮▮▮▮▮ number xxxxxxxxxxxxxxxxxxx8080

55. ▮▮▮▮▮▮▮t number xxxxxxxxxxxxxxxx LI090x

56. ▮▮▮▮▮▮▮ number xxxxxxxxxxxxxxxx LI300x

57. ▮▮▮▮▮▮▮ number xxxxxxxxxxxxxxxx LI740x

58. ▮▮▮▮▮▮▮ number xxxxxxxxxxxxxxxx LI900x

59. ▮▮▮▮▮▮▮ number xxxxxxxxxxxxx7664

60. ▮▮▮▮▮▮▮ number xxxxxxxxxxxxx2452

61. ▮▮▮▮▮▮▮ number xxxxxxxxxxxxx4721

62. ▮▮▮▮▮▮▮▮▮▮ number x2020

63. ▮▮▮▮▮ number x1262

64. ▮▮▮▮▮ number xxxxxxxxxxxxxxxx4431

65. ▮▮▮▮ in the amount of 6 BTC

66. ▮▮▮▮ in the amount of 199.99995716 BTC

67. ▮▮▮▮ in the amount of 404.9984122 BTC

68. ▮▮▮▮ account number xxxxx4455 in the amount of ▮▮▮

69. ▮▮▮▮ account number xxxxx4455 in the amount of $▮▮▮

70. ▮▮▮▮ account number xxxxx4455 in the amount of ▮▮▮



71. ████████████ account number xxxxx4455 in the amount of ████

72. ████████████ in the amount of 3,673.59306905 BCH

73. ████████ in the amount of 16,310.79413202 LTC

74. ████████ in the amount of 173.97319 BTC

75. ████████ in the amount of 55.5 BCH

76. ████████ in the amount of 411.00019 BTC

77. ████████ in the amount of 2.00069333 BTC

78. ████████ in the amount of 136.6544695 BTC

79. ████████ in the amount of 73.62522241 BCH

80. ████████ in the amount of 783.9735116 LTC

81. ████████████ in the amount of 509.81904619 BTG

82. ██████ account number x1124

83. ██████ account number x1933

84. Any and all bank funds, securities, cryptocurrency, or other assets on deposit or seized from an account held at ████ in the name of Ad Tech BV.

85. ████████ Bank account number xxxxx4155 in the amount of ████

86. ████████ account x7889

87. ████████ account x0582

88. ██████ account x4139

89. ██████ account number x6886

Such property further includes, but is not limited to, the following domain names:

1. admoderation.com (Versio)

2. admoderators.com (Versio)

3. adnet.ws (NetNames)

4. adplace24.com (Versio)

5. adplaces24.com (Versio)

6. adpost24.com (Versio)

7. adpost24.cz (GoDaddy)

- 67 –

| 1 | 8. | adquick365.com (Versio) |
| 2 | 9. | adreputation.com (NetNames) |
| 3 | 10. | ads-posted-mp.com (Versio) |
| 4 | 11. | adsplace24.com (Versio) |
| 5 | 12. | adspot24.com (Versio) |
| 6 | 13. | adspots24.com (Versio) |
| 7 | 14. | adsspot24.com (Versio) |
| 8 | 15. | adtechbv.co.nl (NetNames) |
| 9 | 16. | adtechbv.com (NetNames) |
| 10 | 17. | adtechbv.nl (NetNames) |
| 11 | 18. | advert-ep.com (Versio) |
| 12 | 19. | adverts-mp.com (Versio) |
| 13 | 20. | axme.com (GoDaddy) |
| 14 | 21. | back0age.com (NetNames) |
| 15 | 22. | backpa.ge (NetNames) |
| 16 | 23. | backpaee.com (NetNames) |
| 17 | 24. | backpage-insider.com (NetNames) |
| 18 | 25. | backpage.adult (NetNames) |
| 19 | 26. | backpage.ae (NetNames) |
| 20 | 27. | backpage.at (NetNames) |
| 21 | 28. | backpage.ax (NetNames) |
| 22 | 29. | backpage.be (NetNames) |
| 23 | 30. | backpage.bg (European domains) |
| 24 | 31. | backpage.bg (NetNames) |
| 25 | 32. | backpage.ca (NetNames) |
| 26 | 33. | backpage.cl (NetNames) |
| 27 | 34. | backpage.cn (European domains) |
| 28 | 35. | backpage.cn (NetNames) |

| | | |
|---|---|---|
| 1 | 36. | backpage.co.id (NetNames) |
| 2 | 37. | backpage.co.nl (European domains) |
| 3 | 38. | backpage.co.nl (NetNames) |
| 4 | 39. | backpage.co.nz (NetNames) |
| 5 | 40. | backpage.co.uk (NetNames) |
| 6 | 41. | backpage.co.ve (NetNames) |
| 7 | 42. | backpage.co.za (NetNames) |
| 8 | 43. | backpage.com (NetNames) |
| 9 | 44. | backpage.com.ar (NetNames) |
| 10 | 45. | backpage.com.au (NetNames) |
| 11 | 46. | backpage.com.ph (NetNames) |
| 12 | 47. | backpage.cz (NetNames) |
| 13 | 48. | backpage.dk (NetNames) |
| 14 | 49. | backpage.ec (NetNames) |
| 15 | 50. | backpage.ee (European domains) |
| 16 | 51. | backpage.ee (NetNames) |
| 17 | 52. | backpage.es (NetNames) |
| 18 | 53. | backpage.fi (European domains) |
| 19 | 54. | backpage.fi (NetNames) |
| 20 | 55. | backpage.fr (European domains) |
| 21 | 56. | backpage.fr (NetNames) |
| 22 | 57. | backpage.gr (European domains) |
| 23 | 58. | backpage.gr (NetNames) |
| 24 | 59. | backpage.hk (European domains) |
| 25 | 60. | backpage.hk (NetNames) |
| 26 | 61. | backpage.hu (European domains) |
| 27 | 62. | backpage.hu (NetNames) |
| 28 | 63. | backpage.ie (NetNames) |

| | | |
|---|---|---|
| 1 | 64. | backpage.in (NetNames) |
| 2 | 65. | backpage.it (NetNames) |
| 3 | 66. | backpage.jp (NetNames) |
| 4 | 67. | backpage.kr (NetNames) |
| 5 | 68. | backpage.lt (NetNames) |
| 6 | 69. | backpage.lv (European domains) |
| 7 | 70. | backpage.lv (NetNames) |
| 8 | 71. | backpage.me (NetNames) |
| 9 | 72. | backpage.mx (NetNames) |
| 10 | 73. | backpage.my (NetNames) |
| 11 | 74. | backpage.net (NetNames) |
| 12 | 75. | backpage.nl (NetNames) |
| 13 | 76. | backpage.no (European domains) |
| 14 | 77. | backpage.no (NetNames) |
| 15 | 78. | backpage.nz (NetNames) |
| 16 | 79. | backpage.pe (NetNames) |
| 17 | 80. | backpage.ph (NetNames) |
| 18 | 81. | backpage.pk (NetNames) |
| 19 | 82. | backpage.pl (NetNames) |
| 20 | 83. | backpage.porn (NetNames) |
| 21 | 84. | backpage.pt (NetNames) |
| 22 | 85. | backpage.ro (European domains) |
| 23 | 86. | backpage.ro (NetNames) |
| 24 | 87. | backpage.se (NetNames) |
| 25 | 88. | backpage.sex (NetNames) |
| 26 | 89. | backpage.sg (NetNames) |
| 27 | 90. | backpage.si (European domains) |
| 28 | 91. | backpage.si (NetNames) |

| | | |
|---|---|---|
| 1 | 92. | backpage.sk (European domains) |
| 2 | 93. | backpage.sk (NetNames) |
| 3 | 94. | backpage.sucks (NetNames) |
| 4 | 95. | backpage.tw (NetNames) |
| 5 | 96. | backpage.uk (NetNames) |
| 6 | 97. | backpage.uk.com (NetNames) |
| 7 | 98. | backpage.us (NetNames) |
| 8 | 99. | backpage.vn (NetNames) |
| 9 | 100. | backpage.xxx (NetNames) |
| 10 | 101. | backpage.xyz (NetNames) |
| 11 | 102. | backpagecompimp.com (NetNames) |
| 12 | 103. | backpagecompimps.com (NetNames) |
| 13 | 104. | backpagepimp.com (NetNames) |
| 14 | 105. | backpagepimps.com (NetNames) |
| 15 | 106. | backpagg.com (NetNames) |
| 16 | 107. | backpagm.com (NetNames) |
| 17 | 108. | backpagu.com (NetNames) |
| 18 | 109. | backpaoe.com (NetNames) |
| 19 | 110. | backpawe.com (NetNames) |
| 20 | 111. | backqage.com (NetNames) |
| 21 | 112. | backrage.com (NetNames) |
| 22 | 113. | backxage.com (NetNames) |
| 23 | 114. | bakkpage.com (NetNames) |
| 24 | 115. | bcklistings.com (NetNames) |
| 25 | 116. | bestofbackpage.com (NetNames) |
| 26 | 117. | bestofbigcity.com (NetNames) |
| 27 | 118. | bickpage.com (NetNames) |
| 28 | 119. | bigcity.com (NetNames) |

| 1 | 120. | bpclassified.com (NetNames) |
| 2 | 121. | bpclassifieds.com (NetNames) |
| 3 | 122. | carlferrer.com (NetNames) |
| 4 | 123. | clasificadosymas.com (NetNames) |
| 5 | 124. | clasificadosymas.net (NetNames) |
| 6 | 125. | clasificadosymas.org (NetNames) |
| 7 | 126. | classifiedsolutions.co.uk (NetNames) |
| 8 | 127. | classifiedsolutions.net (NetNames) |
| 9 | 128. | classyadultads.com (Versio) |
| 10 | 129. | columbusbackpage.com (NetNames) |
| 11 | 130. | connecticutbackpage.com (NetNames) |
| 12 | 131. | cracker.co.id (NetNames) |
| 13 | 132. | cracker.com (NetNames) |
| 14 | 133. | cracker.com.au (NetNames) |
| 15 | 134. | cracker.id (NetNames) |
| 16 | 135. | cracker.net.au (NetNames) |
| 17 | 136. | crackers.com.au (NetNames) |
| 18 | 137. | crackers.net.au (NetNames) |
| 19 | 138. | ctbackpage.com (NetNames) |
| 20 | 139. | dallasbackpage.com (NetNames) |
| 21 | 140. | denverbackpage.com (NetNames) |
| 22 | 141. | easypost123.com (Versio) |
| 23 | 142. | easyposts123.com (Versio) |
| 24 | 143. | emais.com.pt (NetNames) |
| 25 | 144. | evilempire.com (NetNames) |
| 26 | 145. | ezpost123.com (Versio) |
| 27 | 146. | fackpage.com (NetNames) |
| 28 | 147. | fastadboard.com (Versio) |

| | | |
|---|---|---|
| 1 | 148. | guliettagroup.nl (Versio) |
| 2 | 149. | htpp.org (NetNames) |
| 3 | 150. | ichold.com (NetNames) |
| 4 | 151. | internetspeechfoundation.com (nameisp) |
| 5 | 152. | internetspeechfoundation.org (nameisp) |
| 6 | 153. | loads2drive.com (NetNames) |
| 7 | 154. | loadstodrive.com (NetNames) |
| 8 | 155. | loadtodrive.com (NetNames) |
| 9 | 156. | losangelesbackpage.com (NetNames) |
| 10 | 157. | mediafilecloud.com (NetNames) |
| 11 | 158. | miamibackpage.com (NetNames) |
| 12 | 159. | minneapolisbackpage.com (NetNames) |
| 13 | 160. | mobileposting.com (Versio) |
| 14 | 161. | mobilepostings.com (Versio) |
| 15 | 162. | mobilepostlist.com (Versio) |
| 16 | 163. | mobilposting.com (Versio) |
| 17 | 164. | naked.city (NetNames) |
| 18 | 165. | nakedcity.com (NetNames) |
| 19 | 166. | newyorkbackpage.com (NetNames) |
| 20 | 167. | paidbyhour.com (NetNames) |
| 21 | 168. | petseekr.com (NetNames) |
| 22 | 169. | petsfindr.com (NetNames) |
| 23 | 170. | phoenixbackpage.com (NetNames) |
| 24 | 171. | posteasy123.com (Versio) |
| 25 | 172. | postfaster.com (NetNames) |
| 26 | 173. | postfastly.com (NetNames) |
| 27 | 174. | postfastr.com (NetNames) |
| 28 | 175. | postonlinewith.com (Versio) |

1     176.   postonlinewith.me (Versio)

2     177.   postseasy123.com (Versio)

3     178.   postsol.com (GoDaddy)

4     179.   postszone24.com (Versio)

5     180.   postzone24.com (Versio)

6     181.   postzones24.com (Versio)

7     182.   rentseekr.com (NetNames)

8     183.   results911.com (NetNames)

9     184.   sandiegobackpage.com (NetNames)

10     185.   sanfranciscobackpage.com (NetNames)

11     186.   seattlebackpage.com (NetNames)

12     187.   sellyostuffonline.com (Versio)

13     188.   sfbackpage.com (NetNames)

14     189.   simplepost24.com (Versio)

15     190.   simpleposts24.com (Versio)

16     191.   svc.ws (NetNames)

17     192.   truckrjobs.com (NetNames)

18     193.   ugctechgroup.com (NetNames)

19     194.   universads.nl (Versio)

20     195.   villagevoicepimps.com (GoDaddy)

21     196.   websitetechnologies.co.uk (NetNames)

22     197.   websitetechnologies.com (NetNames)

23     198.   websitetechnologies.net (NetNames)

24     199.   websitetechnologies.nl (NetNames)

25     200.   websitetechnologies.org (NetNames)

26     201.   weprocessmoney.com (GoDaddy)

27     202.   wst.ws (NetNames)

28     203.   xn--yms-fla.com (NetNames)

204.   ymas.ar.com (European domains)

205.   ymas.br.com (European domains)

206.   ymas.br.com (NetNames)

207.   ymas.bz (European domains)

208.   ymas.bz (NetNames)

209.   ymas.cl (European domains)

210.   ymas.cl (NetNames)

211.   ymas.co.bz (European domains)

212.   ymas.co.bz (NetNames)

213.   ymas.co.cr (European domains)

214.   ymas.co.cr (NetNames)

215.   ymas.co.ni (European domains)

216.   ymas.co.ni (NetNames)

217.   ymas.co.ve (European domains)

218.   ymas.co.ve (NetNames)

219.   ymas.com (NetNames)

220.   ymas.com.br (European domains)

221.   ymas.com.br (NetNames)

222.   ymas.com.bz (European domains)

223.   ymas.com.bz (NetNames)

224.   ymas.com.co (European domains)

225.   ymas.com.co (NetNames)

226.   ymas.com.do (European domains)

227.   ymas.com.do (NetNames)

228.   ymas.com.ec (European domains)

229.   ymas.com.ec (NetNames)

230.   ymas.com.es (European domains)

231.   ymas.com.es (NetNames)

1    232.   ymas.com.gt (European domains)

2    233.   ymas.com.gt (NetNames)

3    234.   ymas.com.hn (European domains)

4    235.   ymas.com.hn (NetNames)

5    236.   ymas.com.mx  (NetNames)

6    237.   ymas.com.ni (European domains)

7    238.   ymas.com.ni (NetNames)

8    239.   ymas.com.pe (European domains)

9    240.   ymas.com.pe (NetNames)

10   241.   ymas.com.pr (European domains)

11   242.   ymas.com.pr (NetNames)

12   243.   ymas.com.pt  (NetNames)

13   244.   ymas.com.uy (European domains)

14   245.   ymas.com.uy (NetNames)

15   246.   ymas.com.ve (European domains)

16   247.   ymas.com.ve (NetNames)

17   248.   ymas.cr (European domains)

18   249.   ymas.cr (NetNames)

19   250.   ymas.do (European domains)

20   251.   ymas.do (NetNames)

21   252.   ymas.ec (European domains)

22   253.   ymas.ec (NetNames)

23   254.   ymas.es (European domains)

24   255.   ymas.es (NetNames)

25   256.   ymas.org (NetNames)

26   257.   ymas.pe (European domains)

27   258.   ymas.pe (NetNames)

28   259.   ymas.pt (NetNames)

1  260.  ymas.us (European domains)

2  261.  ymas.us (NetNames)

3  262.  ymas.uy (European domains)

4  263.  ymas.uy (NetNames)

5  264.  ymas.uy.com (European domains)

6  265.  atlantabackpage.com (NetNames)

7  266.  backpage.com.br (NetNames)

8  267.  chicagobackpage.com (NetNames)

9  268.  tampabackpage.com (NetNames)

10  b.  To the extent such property is not available for forfeiture, a sum of money

11  equal to the total value of the property described in subparagraph (a).

12  3.  Pursuant to Title 21, United States Code, Section 853(p), as incorporated by

13  Title 28, United States Code, Section 2461(c), the defendant shall forfeit substitute

14  property, up to the total value of the property described in the preceding paragraph if, as

15  the result of any act or omission of the defendant, the property described in the preceding

16  paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence;

17  (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond

18  the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been

19  commingled with other property that cannot be divided without difficulty.

20  **FORFEITURE ALLEGATION TWO**

21  **[18 U.S.C. § 982(a)(1)]**

22  1.  The factual allegations in Paragraphs 1-211 are incorporated by reference

23  and re-alleged as though fully set forth herein.

24  2.  Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is

25  hereby given that the United States will seek forfeiture as part of any sentence, pursuant

26  Title 18, United States Code, Section 982(a)(1), in the event of any defendant's conviction

27  under Counts 52 through 100 of this Superseding Indictment. Each defendant so convicted

28  shall forfeit to the United States the following:

1        a.    All right, title, and interest in any and all property, real or personal, involved

2  in or traceable to any transaction set forth in Counts 52 through 100 of this Superseding

3  Indictment. Such property includes, but is not limited to, the real property located at the

4  following addresses:

5  1.    ██████████████████, Sedona, AZ ████

6  2.    ████████████████, San Francisco, CA ████

7  3.    ██████████████, Chicago, IL ████

8  4.    ████████████████, Paris, France ████

9  5.    ████████████████, Sebastopol, CA ████

10  6.    ██████████., Phoenix, AZ████

11  7.    ██████████████ Frisco, TX ████

12  8.    ██████████ San Francisco, CA ████

13  9.    ████████████, Paradise Valley, AZ ████

14  10.    ████████████, Paradise Valley, AZ ████

15  11.    ████████████, Paradise Valley, AZ ████

16  12.    ████████████, Paradise Valley, AZ ████

17  13.    ████████████, Pinetop, AZ ████

18  14.    ██████████, San Francisco, CA ████

19  15.    ████████████, Plano, TX ████ (Rental)

20  16.    ██████████, Saint Helena, CA ████

21  17.    ██████████████, Phoenix, AZ ████

22  18.    ██████████., Frisco, TX ████

23  19.    ████████████████, Paradise Valley, AZ ████

24  20.    ██████████, Scottsdale, AZ ████

25  21.    ████████████████ Phoenix, AZ ████

26  22.    ████████, Paradise Valley, AZ ████

27  23.    ████████████, Paradise Valley, AZ ████

28  24.    ██████████, The Colony, TX ████



25.                                ., Scottsdale, AZ

26.                         , Plano, TX

Such property also includes, but is not limited to, all funds, securities, and/or other assets held in the following bank accounts:

1.                      account number XXXXX7188

2.                      Account number XXXXXX3873

3.                      Account number XXXXXX3825

4.                      Account number XXXX0178

5.                      Account number XXXX0151

6.                      Account number XXXX3645

7.                      Account Number x6910

8.                      Account Number XXXXX6943-01

9.                      account Number XXXXX5280-01

10.                     account number XXXX3620

11.                     account number XXXX1889

12.                     account number XXXX2592

13.                     account number XXXX2500

14.                     account number XXXX1938

15.                     Account number XXXXXXXXXXXXX8225

16.                     Account number XXXXXXXXXXXX7054

17.                     Account number XXXXXXXXXXXX9342

18.                     Account number XXXXXXXXXXXX0071

19.                     Account Number XXXXXXXXXX2523

20.                     Account Number XXXXXX6292

21.                     account number XXXXXXXXX0218

22.                     Account number XXX4832

23.                     Account number XXXXXX4293

24.                     Brokerage Account number xxxxxx7012

| | | |
|---|---|---|
| 1 | 25. | ██████████ Liquid Assets xxxxxxx0012 |
| 2 | 26. | ██████████ Brokerage Account number xxxx6878 |
| 3 | 27. | ██████████ Brokerage Account number xxxx4954 |
| 4 | 28. | ██████████ Brokerage Account number xxxx7892 |
| 5 | 29. | ██████████ Brokerage Account number xxxx7888 |
| 6 | 30. | ██████████ Brokerage Account number xxxx6485 |
| 7 | 31. | █████████████ Brokerage Account number xxxx2485 |
| 8 | 32. | █████████████ Brokerage Account number xxxx1897 |
| 9 | 33. | █████████████ Brokerage Account number xxxx3126 |
| 10 | 34. | █████████████ Certificate of Deposit xxxxxx8316 |
| 11 | 35. | █████████████ Certificate of Deposit xxxxxx8324 |
| 12 | 36. | █████████████ Certificate of Deposit xxxxxx8332 |
| 13 | 37. | █████████████ Certificate of Deposit xxxxxx8103 |
| 14 | 38. | █████████████ Certificate of Deposit xxxxxx8162 |
| 15 | 39. | █████████████ Certificate of Deposit xxxxxx8189 |
| 16 | 40. | ██████████ Account number xxxxx0457 |
| 17 | 41. | ████████████ xxx7177 |
| 18 | 42. | ██████ Account number xxxxxxxxxxxxxxxxxxxxxxxx1210 |
| 19 | 43. | ██████ Account number xxxxxxxxxxxxxxxxxxx5803 |
| 20 | 44. | ██████ Account number xxxxxxxxxxxxxxxxxxx5801 |
| 21 | 45. | ██████ Account number xxxxxxxxxxxxxxxxxxx5805 |
| 22 | 46. | ██████ Account number xxxxxxxxxxxxxxxxxxxx2226 |
| 23 | 47. | ██████ Account number xxxxxxxxxxxxxxxxxxxx2231 |
| 24 | 48. | ██████ Account number xxxxxxxxxxxxxxxxxxxx2230 |
| 25 | 49. | ██████ Account number xxxxxxxxxxxxxxxxxxxx4194 |
| 26 | 50. | ██████ Account number xxxxxxxxxxxxxxxxxxxx4196 |
| 27 | 51. | ██████ Account number xxxxxxxxxxxxxxxxxxxx4198 |
| 28 | 52. | ██████ Account number xxxxxxxxxxxxxxxxxxxx8083 |

| | | |
|---|---|---|
| 1 | 53. | ███████ Account number xxxxxxxxxxxxxxxxxxxx8086 |
| 2 | 54. | ███████ Account number xxxxxxxxxxxxxxxxxxxx8080 |
| 3 | 55. | ███████ Account number xxxxxxxxxxxxxxx LI090x |
| 4 | 56. | ███████ Account number xxxxxxxxxxxxxxx LI300x |
| 5 | 57. | ███████ Account number xxxxxxxxxxxxxxx LI740x |
| 6 | 58. | ███████ Account number xxxxxxxxxxxxxxx LI900x |
| 7 | 59. | ███████ Account number xxxxxxxxxxxxx7664 |
| 8 | 60. | ███████ Account number xxxxxxxxxxxxx2452 |
| 9 | 61. | ███████ Account number xxxxxxxxxxxxx4721 |
| 10 | 62. | ███████████ Brokerage Account number x2020 |
| 11 | 63. | ███████ Account number x1262 |
| 12 | 64. | ███████ Account number xxxxxxxxxxxxxxx4431 |
| 13 | 65. | Bitcoin Wallet -6Lix5 in the amount of 6 BTC |
| 14 | 66. | Bitcoin Wallet -6Lix5 in the amount of 199.99995716 BTC |
| 15 | 67. | Bitcoin Wallet -6Lix5 in the amount of 404.9984122 BTC |
| 16 | 68. | ███████████ account number xxxxx4455 in the amount of ███████ |
| 17 | 69. | ███████████ account number xxxxx4455 in the amount of ███████ |
| 18 | 70. | ███████████ account number xxxxx4455 in the amount of ███████ |
| 19 | 71. | ███████████ account number xxxxx4455 in the amount of ███████ |
| 20 | 72. | Bitcoin Cash Wallet –t8v7e in the amount of 3,673.59306905 BCH |
| 21 | 73. | Litecoin Wallet -goaeV in the amount of 16,310.79413202 LTC |
| 22 | 74. | Bitcoin Wallet -6Lix5 in the amount of 173.97319 BTC |
| 23 | 75. | Bitcoin Cash Wallet –t8v7e in the amount of 55.5 BCH |
| 24 | 76. | Bitcoin Wallet -6Lix5 in the amount of 411.00019 BTC |
| 25 | 77. | Bitcoin Wallet -6Lix5 in the amount of 2.00069333 BTC |
| 26 | 78. | Bitcoin Wallet -6Lix5 in the amount of 136.6544695 BTC |
| 27 | 79. | Bitcoin Cash Wallet –t8v7e in the amount of 73.62522241 BCH |
| 28 | 80. | Litecoin Wallet –goaeV in the amount of 783.9735116 LTC |

1   81.   Bitcoin Gold Wallet -KK1mJ in the amount of 509.81904619 BTG

2   82.   ███████ account number x1124

3   83.   ███████ account number x1933

4   84.   Any and all bank funds, securities, cryptocurrency, or other assets on deposit or

5         seized from an account held at ███ in the name of Ad Tech BV.

6   85.   ████████ account number xxxxx4155 in the amount of ███

7   86.   ███████ Brokerage account x7889

8   87.   ████████ Brokerage account x0582

9   88.   ███████ account x4139

10  89.   ███████ account number x6886

11   Such property further includes, but is not limited to, the following domain names:

12   1.     admoderation.com (Versio)

13   2.     admoderators.com (Versio)

14   3.     adnet.ws (NetNames)

15   4.     adplace24.com (Versio)

16   5.     adplaces24.com (Versio)

17   6.     adpost24.com (Versio)

18   7.     adpost24.cz (GoDaddy)

19   8.     adquick365.com (Versio)

20   9.     adreputation.com (NetNames)

21   10.    ads-posted-mp.com (Versio)

22   11.    adsplace24.com (Versio)

23   12.    adspot24.com (Versio)

24   13.    adspots24.com (Versio)

25   14.    adsspot24.com (Versio)

26   15.    adtechbv.co.nl (NetNames)

27   16.    adtechbv.com (NetNames)

28   17.    adtechbv.nl (NetNames)

| 1 | 18. | advert-ep.com (Versio) |
| 2 | 19. | adverts-mp.com (Versio) |
| 3 | 20. | axme.com (GoDaddy) |
| 4 | 21. | back0age.com (NetNames) |
| 5 | 22. | backpa.ge (NetNames) |
| 6 | 23. | backpaee.com (NetNames) |
| 7 | 24. | backpage-insider.com (NetNames) |
| 8 | 25. | backpage.adult (NetNames) |
| 9 | 26. | backpage.ae (NetNames) |
| 10 | 27. | backpage.at (NetNames) |
| 11 | 28. | backpage.ax (NetNames) |
| 12 | 29. | backpage.be (NetNames) |
| 13 | 30. | backpage.bg (European domains) |
| 14 | 31. | backpage.bg (NetNames) |
| 15 | 32. | backpage.ca (NetNames) |
| 16 | 33. | backpage.cl (NetNames) |
| 17 | 34. | backpage.cn (European domains) |
| 18 | 35. | backpage.cn (NetNames) |
| 19 | 36. | backpage.co.id (NetNames) |
| 20 | 37. | backpage.co.nl (European domains) |
| 21 | 38. | backpage.co.nl (NetNames) |
| 22 | 39. | backpage.co.nz (NetNames) |
| 23 | 40. | backpage.co.uk (NetNames) |
| 24 | 41. | backpage.co.ve (NetNames) |
| 25 | 42. | backpage.co.za (NetNames) |
| 26 | 43. | backpage.com (NetNames) |
| 27 | 44. | backpage.com.ar (NetNames) |
| 28 | 45. | backpage.com.au (NetNames) |

| | | |
|---|---|---|
| 1 | 46. | backpage.com.ph (NetNames) |
| 2 | 47. | backpage.cz (NetNames) |
| 3 | 48. | backpage.dk (NetNames) |
| 4 | 49. | backpage.ec (NetNames) |
| 5 | 50. | backpage.ee (European domains) |
| 6 | 51. | backpage.ee (NetNames) |
| 7 | 52. | backpage.es (NetNames) |
| 8 | 53. | backpage.fi (European domains) |
| 9 | 54. | backpage.fi (NetNames) |
| 10 | 55. | backpage.fr (European domains) |
| 11 | 56. | backpage.fr (NetNames) |
| 12 | 57. | backpage.gr (European domains) |
| 13 | 58. | backpage.gr (NetNames) |
| 14 | 59. | backpage.hk (European domains) |
| 15 | 60. | backpage.hk (NetNames) |
| 16 | 61. | backpage.hu (European domains) |
| 17 | 62. | backpage.hu (NetNames) |
| 18 | 63. | backpage.ie (NetNames) |
| 19 | 64. | backpage.in (NetNames) |
| 20 | 65. | backpage.it (NetNames) |
| 21 | 66. | backpage.jp (NetNames) |
| 22 | 67. | backpage.kr (NetNames) |
| 23 | 68. | backpage.lt (NetNames) |
| 24 | 69. | backpage.lv (European domains) |
| 25 | 70. | backpage.lv (NetNames) |
| 26 | 71. | backpage.me (NetNames) |
| 27 | 72. | backpage.mx (NetNames) |
| 28 | 73. | backpage.my (NetNames) |

| | | |
|---|---|---|
| 1 | 74. | backpage.net (NetNames) |
| 2 | 75. | backpage.nl (NetNames) |
| 3 | 76. | backpage.no (European domains) |
| 4 | 77. | backpage.no (NetNames) |
| 5 | 78. | backpage.nz (NetNames) |
| 6 | 79. | backpage.pe (NetNames) |
| 7 | 80. | backpage.ph (NetNames) |
| 8 | 81. | backpage.pk (NetNames) |
| 9 | 82. | backpage.pl (NetNames) |
| 10 | 83. | backpage.porn (NetNames) |
| 11 | 84. | backpage.pt (NetNames) |
| 12 | 85. | backpage.ro (European domains) |
| 13 | 86. | backpage.ro (NetNames) |
| 14 | 87. | backpage.se (NetNames) |
| 15 | 88. | backpage.sex (NetNames) |
| 16 | 89. | backpage.sg (NetNames) |
| 17 | 90. | backpage.si (European domains) |
| 18 | 91. | backpage.si (NetNames) |
| 19 | 92. | backpage.sk (European domains) |
| 20 | 93. | backpage.sk (NetNames) |
| 21 | 94. | backpage.sucks (NetNames) |
| 22 | 95. | backpage.tw (NetNames) |
| 23 | 96. | backpage.uk (NetNames) |
| 24 | 97. | backpage.uk.com (NetNames) |
| 25 | 98. | backpage.us (NetNames) |
| 26 | 99. | backpage.vn (NetNames) |
| 27 | 100. | backpage.xxx (NetNames) |
| 28 | 101. | backpage.xyz (NetNames) |

| | | |
|---|---|---|
| 1 | 102. | backpagecompimp.com (NetNames) |
| 2 | 103. | backpagecompimps.com (NetNames) |
| 3 | 104. | backpagepimp.com (NetNames) |
| 4 | 105. | backpagepimps.com (NetNames) |
| 5 | 106. | backpagg.com (NetNames) |
| 6 | 107. | backpagm.com (NetNames) |
| 7 | 108. | backpagu.com (NetNames) |
| 8 | 109. | backpaoe.com (NetNames) |
| 9 | 110. | backpawe.com (NetNames) |
| 10 | 111. | backqage.com (NetNames) |
| 11 | 112. | backrage.com (NetNames) |
| 12 | 113. | backxage.com (NetNames) |
| 13 | 114. | bakkpage.com (NetNames) |
| 14 | 115. | bcklistings.com (NetNames) |
| 15 | 116. | bestofbackpage.com (NetNames) |
| 16 | 117. | bestofbigcity.com (NetNames) |
| 17 | 118. | bickpage.com (NetNames) |
| 18 | 119. | bigcity.com (NetNames) |
| 19 | 120. | bpclassified.com (NetNames) |
| 20 | 121. | bpclassifieds.com (NetNames) |
| 21 | 122. | carlferrer.com (NetNames) |
| 22 | 123. | clasificadosymas.com (NetNames) |
| 23 | 124. | clasificadosymas.net (NetNames) |
| 24 | 125. | clasificadosymas.org (NetNames) |
| 25 | 126. | classifiedsolutions.co.uk (NetNames) |
| 26 | 127. | classifiedsolutions.net (NetNames) |
| 27 | 128. | classyadultads.com (Versio) |
| 28 | 129. | columbusbackpage.com (NetNames) |

| 1 | 130. | connecticutbackpage.com (NetNames) |
| 2 | 131. | cracker.co.id (NetNames) |
| 3 | 132. | cracker.com (NetNames) |
| 4 | 133. | cracker.com.au (NetNames) |
| 5 | 134. | cracker.id (NetNames) |
| 6 | 135. | cracker.net.au (NetNames) |
| 7 | 136. | crackers.com.au (NetNames) |
| 8 | 137. | crackers.net.au (NetNames) |
| 9 | 138. | ctbackpage.com (NetNames) |
| 10 | 139. | dallasbackpage.com (NetNames) |
| 11 | 140. | denverbackpage.com (NetNames) |
| 12 | 141. | easypost123.com (Versio) |
| 13 | 142. | easyposts123.com (Versio) |
| 14 | 143. | emais.com.pt (NetNames) |
| 15 | 144. | evilempire.com (NetNames) |
| 16 | 145. | ezpost123.com (Versio) |
| 17 | 146. | fackpage.com (NetNames) |
| 18 | 147. | fastadboard.com (Versio) |
| 19 | 148. | guliettagroup.nl (Versio) |
| 20 | 149. | htpp.org (NetNames) |
| 21 | 150. | ichold.com (NetNames) |
| 22 | 151. | internetspeechfoundation.com (nameisp) |
| 23 | 152. | internetspeechfoundation.org (nameisp) |
| 24 | 153. | loads2drive.com (NetNames) |
| 25 | 154. | loadstodrive.com (NetNames) |
| 26 | 155. | loadtodrive.com (NetNames) |
| 27 | 156. | losangelesbackpage.com (NetNames) |
| 28 | 157. | mediafilecloud.com (NetNames) |

1    158.   miamibackpage.com (NetNames)
2    159.   minneapolisbackpage.com (NetNames)
3    160.   mobileposting.com (Versio)
4    161.   mobilepostings.com (Versio)
5    162.   mobilepostlist.com (Versio)
6    163.   mobilposting.com (Versio)
7    164.   naked.city (NetNames)
8    165.   nakedcity.com (NetNames)
9    166.   newyorkbackpage.com (NetNames)
10   167.   paidbyhour.com (NetNames)
11   168.   petseekr.com (NetNames)
12   169.   petsfindr.com (NetNames)
13   170.   phoenixbackpage.com (NetNames)
14   171.   posteasy123.com (Versio)
15   172.   postfaster.com (NetNames)
16   173.   postfastly.com (NetNames)
17   174.   postfastr.com (NetNames)
18   175.   postonlinewith.com (Versio)
19   176.   postonlinewith.me (Versio)
20   177.   postseasy123.com (Versio)
21   178.   postsol.com (GoDaddy)
22   179.   postszone24.com (Versio)
23   180.   postzone24.com (Versio)
24   181.   postzones24.com (Versio)
25   182.   rentseekr.com (NetNames)
26   183.   results911.com (NetNames)
27   184.   sandiegobackpage.com (NetNames)
28   185.   sanfranciscobackpage.com (NetNames)

1   186.   seattlebackpage.com (NetNames)

2   187.   sellyostuffonline.com (Versio)

3   188.   sfbackpage.com (NetNames)

4   189.   simplepost24.com (Versio)

5   190.   simpleposts24.com (Versio)

6   191.   svc.ws (NetNames)

7   192.   truckrjobs.com (NetNames)

8   193.   ugctechgroup.com (NetNames)

9   194.   universads.nl (Versio)

10  195.   villagevoicepimps.com (GoDaddy)

11  196.   websitetechnologies.co.uk (NetNames)

12  197.   websitetechnologies.com (NetNames)

13  198.   websitetechnologies.net (NetNames)

14  199.   websitetechnologies.nl (NetNames)

15  200.   websitetechnologies.org (NetNames)

16  201.   weprocessmoney.com (GoDaddy)

17  202.   wst.ws (NetNames)

18  203.   xn--yms-fla.com (NetNames)

19  204.   ymas.ar.com (European domains)

20  205.   ymas.br.com (European domains)

21  206.   ymas.br.com (NetNames)

22  207.   ymas.bz (European domains)

23  208.   ymas.bz (NetNames)

24  209.   ymas.cl (European domains)

25  210.   ymas.cl (NetNames)

26  211.   ymas.co.bz (European domains)

27  212.   ymas.co.bz (NetNames)

28  213.   ymas.co.cr (European domains)

214. ymas.co.cr (NetNames)

215. ymas.co.ni (European domains)

216. ymas.co.ni (NetNames)

217. ymas.co.ve (European domains)

218. ymas.co.ve (NetNames)

219. ymas.com (NetNames)

220. ymas.com.br (European domains)

221. ymas.com.br (NetNames)

222. ymas.com.bz (European domains)

223. ymas.com.bz (NetNames)

224. ymas.com.co (European domains)

225. ymas.com.co (NetNames)

226. ymas.com.do (European domains)

227. ymas.com.do (NetNames)

228. ymas.com.ec (European domains)

229. ymas.com.ec (NetNames)

230. ymas.com.es (European domains)

231. ymas.com.es (NetNames)

232. ymas.com.gt (European domains)

233. ymas.com.gt (NetNames)

234. ymas.com.hn (European domains)

235. ymas.com.hn (NetNames)

236. ymas.com.mx  (NetNames)

237. ymas.com.ni (European domains)

238. ymas.com.ni (NetNames)

239. ymas.com.pe (European domains)

240. ymas.com.pe (NetNames)

241. ymas.com.pr (European domains)

242. ymas.com.pr (NetNames)

243. ymas.com.pt (NetNames)

244. ymas.com.uy (European domains)

245. ymas.com.uy (NetNames)

246. ymas.com.ve (European domains)

247. ymas.com.ve (NetNames)

248. ymas.cr (European domains)

249. ymas.cr (NetNames)

250. ymas.do (European domains)

251. ymas.do (NetNames)

252. ymas.ec (European domains)

253. ymas.ec (NetNames)

254. ymas.es (European domains)

255. ymas.es (NetNames)

256. ymas.org (NetNames)

257. ymas.pe (European domains)

258. ymas.pe (NetNames)

259. ymas.pt (NetNames)

260. ymas.us (European domains)

261. ymas.us (NetNames)

262. ymas.uy (European domains)

263. ymas.uy (NetNames)

264. ymas.uy.com (European domains)

265. atlantabackpage.com (NetNames)

266. backpage.com.br (NetNames)

267. chicagobackpage.com (NetNames)

268. tampabackpage.com (NetNames)

    b.    To the extent such property is not available for forfeiture, a sum of money

1 equal to the total value of such property.

2       3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by

3 Title 18, United States Code, Section 982(b), each defendant convicted under Counts 52

4 through 100 of this Superseding Indictment shall forfeit substitute property, if, by any act

5 or omission of that defendant, the property described in the preceding paragraph, or any

6 portion thereof, cannot be located upon the exercise of due diligence; has been transferred,

7 sold to, or deposited with a third party; has been placed beyond the jurisdiction of the court;

8 has been substantially diminished in value; or has been commingled with other property

9 that cannot be divided without difficulty.

10

11                         A TRUE BILL

12

13                  *S/*_____
                 FOREPERSON OF THE GRAND JURY
                 Date: July 25, 2018

14

15 ELIZABETH A. STRANGE
First Assistant United States Attorney

16 District of Arizona

17 BRIAN BENCZKOWSKI Assistant Attorney General
Criminal Division, U.S. Department of Justice

18

19 *S/*_____

20 KEVIN M. RAPP
MARGARET PERLMETER

21 PETER KOZINETS
ANDREW STONE

22 Assistant U.S. Attorneys

23 JOHN J. KUCERA
Special Assistant U.S. Attorney

24 REGINALD E. JONES
Senior Trial Attorney

25 U.S. Department of Justice, Criminal Division
Child Exploitation and Obscenity Section

26

27

28

Exhibit 6



**U.S. Department of Justice**

United States Attorney
District of Arizona

Two Renaissance Square          Main:    (602) 514-7500
40 N. Central Ave., Suite 1800  Main Fax: (602) 514-7693
Phoenix, AZ 85004-4408

June 1, 2018

John Brunst
c/o Michael D. Kimerer
Rhonda Elaine Neff
KIMERER & DERRICK, P.C.
1313 E. Osborn Road, Suite 100
Phoenix, AZ 85014

rneff@kimerer.com
mdk@kimerer.com

<u>VIA U.S. MAIL and EMAIL</u>

Re:     Notice of Third Party Claimant Procedure for
        Property Forfeited in United States v. Carl Allen Ferrer
        Criminal No. CR 18-00464-PHX-SPL

Dear Sir/Madam:

        The United States District Court for the Arizona District has ordered that certain property belonging to the defendant in the above criminal case be forfeited to the United States. The enclosed Notice of Forfeiture describes the properties subject to forfeiture and the procedure for filing a claim to any of those properties in which you may have a legal right, title or interest.

        By receipt of this letter, you are given actual notice of the forfeiture of the properties referred to in the Notice of Forfeiture and of your right to assert a claim to them. Neither the defendant in the criminal case, nor his agent, is entitled to file a claim. This Notice is intended only to apprize you of your rights; service of this Notice in no way is intended to imply that the United States believes that you would have a valid claim to any of the forfeited property.

        The procedure for filing a claim is set forth more fully in Title 18, United States Code, Section 1963(1). Under Section 1963(1)(2) a person intending to file a claim must do so in the above criminal case within thirty (30) days of his receipt of the Notice of Forfeiture by mail or within 30 days of the last publication of the Order of Forfeiture in http://www.forfeiture.gov, whichever is earlier.

June 1, 2018
Page 2

Your petition must be filed under the above case name and number in the United States District Court for the District of Arizona with a copy to the undersigned attorney for the Government. The appropriate addresses appear in the enclosed Notice of Forfeiture.

Pursuant to 18 U.S.C. § 1963(1)(3), the petition must be signed by the petitioner under penalty of perjury and must identify the particular property or properties in which the petitioner claims a legal right, title or interest; the nature and extent of the right, title or interest claimed for each property; the time and circumstances of the petitioner's acquisition of the right, title and interest in each property; and any additional facts and documents supporting the petitioner's claim and the relief sought that you may wish to submit.

Pursuant to the Local Rules of the United States District Court for the Central District of California, you are further notified that this action is subject to the Electronic Case Filing System ("ECF"). If you are not already registered as an ECF User, then registration can be done at http://www.pacer.gov/.

Very truly yours,

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

/s John Kucera

JOHN KUCERA
Special Assistant United States Attorney

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

United States of America,

        Plaintiff,

v.

Carl Allen Ferrer,

        Defendant.

No. CR-18-00464-001-PHX-DJH

**PRELIMINARY ORDER OF FORFEITURE**

Upon consideration of the Stipulation for Entry of Preliminary Order of Forfeiture (Doc. 22) filed by the plaintiff, United States of America, and the defendant, Carl Ferrer ("defendant"), pursuant to the information, the defendant's guilty plea to said information, and Rule 32.2(b), Federal Rules of Criminal Procedure, and good cause appearing, the Court **ORDERS** as follows:

Any and all of the defendant's rights, title, and interest in and to the property listed below (the "Forfeited Property") is hereby forfeited to the United States on the ground that it represents or is traceable to proceeds of the underlying violation of conviction. Consistent with the express agreement of the parties, this Order is final as to defendant upon entry.

**IT IS FURTHER ORDERED** the Forfeited Property includes the following:

. . .

. . .

. . .

A.   <u>Bank Accounts</u>

    1.    Any and all bank funds, securities, or other assets on deposit or seized from account number x2912 held at ███████████.  (The estimated value is ██████.)

    2.    Any and all bank funds, securities, or other assets on deposit or seized from account number x2500 held at ███████████.  (The estimated value is ██████.)

    3.    Any and all bank funds, securities, or other assets on deposit or seized from account number x4832 held at ████████.  (The estimated value is ██████.)

    4.    Any and all bank funds, securities, or other assets on deposit or seized from account number x4155 at ████████ that were previously transferred into that account by the bail bonds service of the defendant.  (The estimated value is ██████.)

    5.    Any and all bitcoin cash or other assets on deposit or seized from bitcoin cash wallet address –t8v7e that were previously or will be transferred into that account from bitcoin cash wallet address *CYPw8Ms.  (The estimated amount of bitcoin cash is 55.)

B.   <u>Real Property</u>

    1.    The real property located at ████████, The Colony, Texas.

C.   <u>Domain Names</u>

    1.    admoderation.com (Versio)

    2.    admoderators.com (Versio)

    3.    adnet.ws (NetNames)

    4.    adplace24.com (Versio)

    5.    adplaces24.com (Versio)

    6.    adpost24.com (Versio)

    7.    adpost24.cz (GoDaddy)

| | | |
|---|---|---|
| 1 | 8. | adquick365.com (Versio) |
| 2 | 9. | adreputation.com (NetNames) |
| 3 | 10. | ads-posted-mp.com (Versio) |
| 4 | 11. | adsplace24.com (Versio) |
| 5 | 12. | adspot24.com (Versio) |
| 6 | 13. | adspots24.com (Versio) |
| 7 | 14. | adsspot24.com (Versio) |
| 8 | 15. | adtechbv.co.nl (NetNames) |
| 9 | 16. | adtechbv.com (NetNames) |
| 10 | 17. | adtechbv.nl (NetNames) |
| 11 | 18. | advert-ep.com (Versio) |
| 12 | 19. | adverts-mp.com (Versio) |
| 13 | 20. | axme.com (GoDaddy) |
| 14 | 21. | back0age.com (NetNames) |
| 15 | 22. | backpa.ge (NetNames) |
| 16 | 23. | backpaee.com (NetNames) |
| 17 | 24. | backpage-insider.com (NetNames) |
| 18 | 25. | backpage.adult (NetNames) |
| 19 | 26. | backpage.ae (NetNames) |
| 20 | 27. | backpage.at (NetNames) |
| 21 | 28. | backpage.ax (NetNames) |
| 22 | 29. | backpage.be (NetNames) |
| 23 | 30. | backpage.bg (European domains) |
| 24 | 31. | backpage.bg (NetNames) |
| 25 | 32. | backpage.ca (NetNames) |
| 26 | 33. | backpage.cl (NetNames) |
| 27 | 34. | backpage.cn (European domains) |
| 28 | 35. | backpage.cn (NetNames) |