1   *v. Sigalow*, 812 F.2d 783 (2d Cir. 1987). The conviction was for violating 18 U.S.C.

2   § 1952, one of the same crimes charged in this indictment.

3          19.   By 2000, the rise of the internet—and, in particular, the website

4   www.craigslist.com ("Craigslist"), which offered free classified ads—began to

5   significantly disrupt VVMH's business model, which depended on classified advertising

6   revenue for survival.

7          20.   LACEY and LARKIN, with assistance from C.F., sought to address this

8   threat by creating Backpage. Their decision to create Backpage was later described in an

9   internal company document as follows: "In 2004, in response to the Craigslist threat that

10  was decimating daily newspapers, VVM launched its own online classified site,

11  Backpage.com, named after the back page of VVM's print publication."

12         21.   During its first few years of operation, Backpage accounted for only a

13  fraction of VVMH's overall revenue. In January 2006, for example, VVMH estimated that

14  Backpage supplied only 1% of its overall advertising revenue but also noted that Backpage

15  had "tremendous upside potential."

16         22.   This prediction proved prophetic. By 2008, Backpage was generating over

17  $5 million in annual profit. This annual profit figure increased to over $10 million in 2009.

18         23.   In 2010, Craiglist chose to shut down its "adult" section due to the prevalence

19  of ads for prostitution and other illegal services. The BACKPAGE DEFENDANTS,

20  sensing an opportunity, made an aggressive push for Backpage to capture Craiglist's share

21  of this market. In one internal document, LARKIN commented: "Craigslist has folded . .

22  . . It is possible that this will mean a deluge of adult content ads for backpage.com . . . .

23  We have with the Village Voice probably the longest run of adult content advertising in

24  the US and it is, like it or not, in our DNA."

25         24.   This push was successful. In internal documents, Backpage stated that it

26  experienced "explosive growth" by "capitalizing on displaced Craigslist ad volume."

27  Backpage's annual profits grew to over $26 million in 2010, over $52 million in 2011, and

28

over $78 million in 2012.

25. These figures dwarfed the profits that VVMH's print publications were generating. In fact, Backpage became so profitable that the BACKPAGE DEFENDANTS decided to get rid of VVMH's publishing business so they could focus on Backpage's further development and expansion. Accordingly, in or around November 2012, the BACKPAGE DEFENDANTS spun off VVMH's print publications and began utilizing several new corporate entities, including Medalist Holdings, Inc. ("Medalist"), Dartmoor Holdings LLC ("Dartmoor"), and Camarillo Holdings, LLC ("Camarillo"), to serve as Backpage's parent companies.

26. Following these transactions, LACEY held an ownership interest in Medalist (and, therefore, in Backpage) of approximately 45%, LARKIN held an ownership interest of approximately 43%, BRUNST held an ownership interest of approximately 6%, and SPEAR held an ownership interest of approximately 4%.

27. Backpage's annual profits continued to skyrocket during and after these changes. They grew to over $112 million in 2013 and over $134 million in 2014.

28. In or around April 2015, LACEY, LARKIN, SPEAR, and BRUNST purported to sell their ownership interests in Backpage and several related entities for around $600 million to various Dutch entities. These Dutch entities included Atlantische Bedrijven, C.V., which agreed to purchase Backpage's U.S. operations for around $526 million, and UGC Tech Group C.V., which agreed to purchase Backpage's overseas operations for around $77 million.

29. In fact, these Dutch entities were controlled by C.F., who borrowed most of the $600 million from entities controlled by the sellers to finance the purchase. Due to this financial arrangement, LACEY, LARKIN, SPEAR, and BRUNST retained a significant financial interest in Backpage after the transactions were completed.

30. Additionally, LACEY, LARKIN, SPEAR, and BRUNST retained significant operational control over Backpage following these transactions. For example, the April

1   2015 loan agreement required C.F. to sign a six-year employment agreement, required C.F.

2   to provide the lenders with full access to Backpage's books and records, required C.F. to

3   provide the lenders with an annual listing of all of C.F.'s personal assets, and prohibited

4   C.F. from opening any new bank accounts on Backpage's behalf without the lenders'

5   consent.

6   C.    Backpage's Knowledge And Facilitation Of Prostitution Ads

7         31.    By 2008, if not earlier, the BACKPAGE DEFENDANTS were aware that

8   the overwhelming majority of the website's "adult" ads involved prostitution.

9   Nevertheless, the BACKPAGE DEFENDANTS made a financial decision to continue

10  displaying those ads.

11        32.    The BACKPAGE DEFENDANTS also sought to sanitize the ads by editing

12  them—that is, by removing terms and pictures that were particularly indicative of

13  prostitution and then publishing a revised version of the ad.  This process was sometimes

14  referred to as "moderation."

15        33.    For example, in April 2008, C.F. wrote an email explaining that, although he

16  was "under pressure to clean up phoenix's adult content," he was unwilling to delete

17  prostitution ads because doing so "would put us in a very uncompetitive position with

18  craig[slist]" and result in "lost pageviews and revenue."  Thus, he instructed Backpage's

19  technical staff to edit the wording of such ads, by removing particular terms that were

20  indicative of prostitution, and then allow the remainder of the ad to be featured on

21  Backpage's website.

22        34.    On February 26, 2009, C.F. received an email from the classified-ads

23  manager of a newspaper within the VVMH chain asking why Backpage's terms of service

24  purported to prevent customers from "suggest[ing] an exchange of sexual favors for

25  money" in light of the fact that "[c]learly everyone on the entire backpage network breaks

26  the rules."  In response, C.F. didn't dispute the author's characterization and explained that

27  Backpage had simply added the terms of service at the behest of "our attorney in SF" in an

28

1    attempt to avoid liability in civil lawsuits.

2        35.    On May 25, 2009, SPEAR received an email summarizing a plan to begin

3    "remov[ing] sex act pics and coded terms" from Backpage ads.  Later that day, C.F.

4    forwarded this email to HYER with the explanatory note that "We do not intend to be a

5    craig[slist] here, just get out the most egregious stuff."

6        36.    On March 8, 2010, C.F. testified in federal court (the United States District

7    Court for the Southern District of Florida) in the criminal trial of a pimp who had used

8    Backpage to post prostitution ads.  During his testimony, C.F. acknowledged the defendant

9    had used the email address "Youngpimpin86" when posting the ads.   C.F. also

10   acknowledged that the ads described one so-called escort as "five-foot-three, with a small

11   waist and amazing ass you'll have to see to believe. XL, XL, XL, Lollipop" and described

12   a different so-called escort as "discrete, sincere and extremely naughty. I am the type of

13   girl who absolutely adores a man who understands the many desires of a young beautiful

14   woman and how to accommodate a variety of fantasies."  This episode provided notice to

15   Backpage that it was implausible to pretend such ads were merely offering lawful escort

16   services.

17       37.    On September 1, 2010, PADILLA sent an email to HYER and C.F. stating

18   that customers who engaged in "extreme and repeat" violations of Backpage's posting rules

19   would have their ads deleted and be banned from the website.  However, PADILLA also

20   stated the bans would only be temporary and that "we'll do everything we can to affect

21   only the worst apples."

22       38.    On September 1, 2010, SPEAR received an email acknowledging that

23   Backpage's moderators were being instructed to "Remove any sex act pics in escorts [ads]"

24   and "Remove any illegal text in escorts [ads] to include any code words for sex act for

25   money."

26       39.    On September 21, 2010, a group of state attorneys general wrote a letter to

27   Backpage.  This letter observed that "ads for prostitution—including ads trafficking

28

- 9 -

children—are rampant on the site" and argued that "[b]ecause Backpage cannot, or will not, adequately screen these ads, it should stop accepting them altogether." The letter acknowledged that this step would cause Backpage to "lose the considerable revenue generated by the adult services ads" but stated that "no amount of money can justify the scourge of illegal prostitution, and the misery of the women and children who will continue to be victimized, in the marketplace provided by backpage."

40.    On September 25, 2010, C.F. wrote an email explaining that Backpage was unwilling to delete ads that included terms indicative of prostitution because doing so would "piss[] off a lot of users who will migrate elsewhere" and force Backpage to refund those customers' fees. Thus, C.F. announced that Backpage would "go back to having our moderators remove bad content in a post . . . ."

41.    On September 30, 2010, C.F. testified in federal court (the United States District Court for the District of Minnesota) in the criminal trial of a pimp who had used Backpage to post prostitution ads. During his testimony, C.F. acknowledged that Backpage's servers are located in Arizona and that the ads posted by the Minnesota-based defendant had therefore "traveled across state lines."

42.    On October 8, 2010, PADILLA sent an email (on which VAUGHT was cc'd) threatening to fire any Backpage employee who acknowledged, in writing, that a customer was a prostitute: "Leaving notes on our site that imply that we're aware of prostitution, or in any position to define it, is enough to lose your job over. . . . This isn't open for discussion. If you don't agree with what I'm saying completely, you need to find another job."

43.    On October 16, 2010, PADILLA sent an email to a large group of Backpage employees (including HYER and VAUGHT). The email had two attachments that provided guidance on how to "moderate" ads. The first was a Powerpoint presentation that displayed a series of 38 nude and partially-nude photographs, some of which depicted graphic sex acts. Next to each picture was an instruction as to whether it should be

approved or disapproved by a Backpage moderator. These instructions included "Approve. Nude rear shots are okay as long the model is not exposing her anus or genitalia." and "Approve. Rear shot okay. Transparent wet panties okay." The second was an Excel spreadsheet identifying 50 terms (all of which were indicative of prostitution) that should be "stripped" from ads before publication. PADILLA concluded the email by stating: "[I]t's the language in ads that's really killing us with the Attorneys General. Images are almost an afterthought to them."

44.   On October 16, 2010, PADILLA sent a separate internal email (which also included HYER and VAUGHT as recipients). In this email, PADILLA explained that "I'd like to still avoid Deleting ads when possible," that "we're still allowing phrases with nuance," and that "[i]n the case of lesser violations, editing should be sufficient."

45.   On October 25, 2010, C.F. sent an email to SPEAR, HYER, and PADILLA acknowledging that the "[i]llegal content removed" through Backpage's moderation processes was "usually money for sex act." This email also explained that, after the "sex act pics are removed," the "ad text may stay."

46.   On October 26, 2010, HYER and PADILLA received an email explaining: "We will not remove ads with vaginas or penis showing, just the images unless they are a frequent offender. We will not remove ads with rates under an hour, just the text with the minimum rates. Users need time to react to this change."

47.   On October 27, 2010, PADILLA sent an email to the head of a group of contractors from India who had been hired to moderate Backpage's adult ads. In this email, PADILLA criticized the contractors for deleting too many ads, stated that this approach was bad for business, and instructed the contractors to simply edit the ads to remove the more-obvious language: "As long as your crew is editing and not removing the ad entirely, we shouldn't upset too many users. Your crew has permission to edit out text violations and images and then approve the ad."

48.   On October 27, 2010, HYER sent an internal email stating that Backpage

- 11 -

was "editing 70 to 80%" of the ads it received from customers. In other words, HYER acknowledged that a large proportion of the ads originally submitted by Backpage's customers contained text and pictures that were indicative of prostitution and that Backpage was still choosing to publish those ads after editing them.

49.    On November 4, 2010, C.F. sent an email to Backpage's India-based moderators (on which PADILLA was cc'd) explaining that "[m]any of the ads need to have 15 minute and 30 minute pricing removed" and that "I'm being evaluated by lawyers [*i.e.,* state attorneys general] later this week so cleaning up old stuff is important."

50.    On November 17, 2010, HYER and PADILLA received an email acknowledging that the term Lolita is "code for under aged girl" but explaining that this term could simply be stripped out from ads (as opposed to refusing to publish the ad). The email also explained that customers should be allowed to include their identification numbers from a notorious prostitution website, The Erotic Review: "[A]llow users to put in TER IDs (just no live links)."

51.    On November 30, 2010, LARKIN, SPEAR, and other Backpage representatives participated in a conference call with representatives from NCMEC. During this call, the Backpage representatives were advised that a large portion of the ads on Backpage were blatant prostitution ads, that many of those ads featured children, and that the posting of such ads was illegal in every state.

52.    In December 2010, HYER, PADILLA, and others exchanged a series of emails entitled "Deep cleaning strip out." These emails identified a lengthy list of terms that were indicative of prostitution and discussed plans for removing the terms from the old ads in Backpage's archives. During this exchange, C.F. stated that Backpage wasn't willing to delete the old prostitution ads because "our users love" having access them, "[s]o, best to do deep cleaning and not kill a valuable feature." C.F. later encouraged Backpage's staff to complete the project quickly to avoid scrutiny: "This task is urgent since CNN is runing [sic] a report soon."

53.    On January 13, 2011, HYER and PADILLA received an email summarizing instructions that had been provided to members of Backpage's technical staff. It explained that the technical staff had been instructed "not to display the moderation log" in a particular section of Backpage's database "since we pdf this page for subpoenas. I would rather not testify in court as to why my staff 'approved' . . . postings."

54.    In January 2011, LARKIN and LACEY met with a representative from NCMEC. During this meeting, LACEY asked which types of sex ads would be acceptable from NCMEC's perspective. When the NCMEC representative declined to say that any such ads would be acceptable, LACEY made a statement to the effect of "adult prostitution is none of your business."

55.    On January 31, 2011, and February 1, 2011, C.F. engaged in an email exchange concerning whether to remove links to other prostitution websites (such as The Erotic Review) from expired Backpage ads. C.F. stated that, although SPEAR and his "internet safety guy" were recommending that such ads be removed, he thought this would "be a stupid move" because it would hurt Backpage financially (by reducing the number of referrals from other sites). C.F. added that "this overly zealous focus on moderation at the expense of other development is a lot of bullshit . . . ."

56.    On February 2, 2011, C.F. sent an email acknowledging that "[t]he strip out affects almost every adult ad." In other words, C.F. acknowledged that "almost every adult ad" on Backpage was a prostitution ad that had been edited to remove the most damning text and pictures.

57.    On February 3, 2011, a Backpage customer who went by the name "Licks Alot" wrote an email to Backpage complaining that all of the pictures in one of her ads (entitled "Athletic SWF Guaranteed Low Mileage Boys!!!") had been deleted. C.F. responded to "Licks Alot" by explaining that one of her photos had been removed because "[o]ur crazy internet safety experts do not want any genitalia showing up around the thong." However, C.F. proceeded to apologize to "Licks Alot" over the removal of her

- 13 -

1    remaining photos, allowed her ad (which was obviously for prostitution) to remain on the
2    website, and offered her a free upgrade.

3        58.    On February 8, 2011, C.F. testified in federal court (the United States District
4    Court for the Middle District of Florida) in the criminal trial of a pimp who had used
5    Backpage to post prostitution ads. During his testimony, C.F. authenticated one of the ads
6    the defendant had placed on Backpage, whose title was "Extra horny sexy newbie,"
7    confirmed that Backpage had allowed this ad to be posted multiple times in various East
8    Coast cities, and acknowledged that Backpage published "a lot" of similar ads. This
9    episode provided further notice to Backpage that it was implausible to pretend such ads
10   were merely offering lawful escort services.

11       59.    On February 16, 2011, PADILLA sent an email to Backpage's India-based
12   moderators (on which VAUGHT was cc'd) explaining that Backpage was adopting a
13   "more lenient policy" and that he was instructing his Phoenix-based employees to "go easy
14   on some types of violations." PADILLA acknowledged this approach would "likely" result
15   in more "violations" but emphasized that "moderators should err on the side of the user."

16       60.    On February 16, 2011, PADILLA sent a separate email discussing whether
17   several terms should remain on Backpage's "filtered terms" list. During this discussion,
18   PADILLA acknowledged—by placing quote marks around the term "companionship"—
19   that he didn't actually believe the women being advertised on Backpage were providing
20   lawful escort services: "[The term] implies some exchange of bodily fluids which kills our
21   'companionship' argument, but i don't think we've ever really gotten in trouble for it."

22       61.    On February 22, 2011, PADILLA received an email requesting Backpage's
23   "list of banned, stripped out adult terms." In response, PADILLA sent an Excel
24   spreadsheet entitled "Phrase List 02211," which PADILLA described as "the latest greatest
25   version of the list." The enclosed spreadsheet identified over 660 words or phrases that are
26   indicative of prostitution, including an array of terms that are suggestive of child
27   prostitution (e.g., "lolita," "fresh," "high school," "tight," "young"). The spreadsheet

28

- 14 -

1    explained that most such terms were simply to be "filtered" from the ads in which they

2    appeared.

3    62.    On February 23, 2011, PADILLA received an email concerning a particular

4    ad that had recently been edited by Backpage's India-based moderators. The ad was

5    obviously for prostitution—its title was "new-new-new-put me in your favorite position"

6    and the poster had attempted to include two photographs that violated Backpage's posting

7    rules. In response, the India-based moderators had deleted both of those photos, as well as

8    a third photo that depicted the prostitute's face, and then allowed the ad to be published.

9    The email received by PADILLA did not criticize the moderators for allowing an obvious

10    prostitution ad to be published after editing. To the contrary, it emphasized that the ad

11    should remain on Backpage and criticized the moderators for removing the third photo,

12    threatening to fire them if they did it again: "2 out of 3 pics should have been removed.

13    But [the] moderator deleted all three pics. This is plain wrong . . . . I would fire a moderator

14    in Phoenix if they did this."

15    63.    In March 2011, LARKIN, LACEY, SPEAR, and other Backpage

16    representatives met with representatives from NCMEC. During this meeting, the Backpage

17    representatives were again advised that a large portion of the ads on Backpage were blatant

18    prostitution ads. The Backpage representatives also were advised they could be criminally

19    prosecuted under federal law for their conduct.

20    64.    On April 5, 2011, PADILLA sent an email whose recipients included

21    VAUGHT and the supervisor of Backpage's Indian moderation team. The email was

22    entitled "relaxed image standards" and included, as an attachment, a document that

23    displayed a series of 30 nude and partially-nude photographs. Next to each picture was an

24    instruction as to whether it should be approved or disapproved by a moderator. One picture

25    showed a woman sitting on a bed, wearing only a bra and panties, with her legs spread

26    open and her hand partially covering her crotch. The caption provided in part: "okay –

27    but barely."

28

- 15 -

65.     Between April 2011 and March 2012, PADILLA, C.F., and others participated in an email exchange acknowledging that Backpage was deleting thousands of pictures from customer ads each week and seeking assistance in collecting all of the deleted pictures so they could be used for "entertainment" or to generate user "traffic for other projects." The email explained that the deleted pictures could be made available to the public on a new website called "nakedpics.backpage.com" or "badpics.backpage.com."

66.     On April 19, 2011, LARKIN and SPEAR received an email seeking permission to terminate the contract of a third-party vendor that had been receiving $17,000 per month to "remov[e] any nude pics" from the expired ads in Backpage's database. LARKIN responded: "do it!"

67.     On June 7, 2011, C.F. received an inquiry from a law enforcement official about a particular ad that included the term "amber alert." In response, C.F. acknowledged this might be "some kind of bizarre new code word for an under aged person." C.F. then forwarded this exchange to PADILLA and stated that he had instructed HYER to add "amber alert" to Backpage's "strip out" list. In other words, HYER, PADILLA, and C.F. did not require all future ads involving this particular coded term for the prostitution of a child to be blocked from Backpage—they merely required such ads to be edited before publication.

68.     On June 30, 2011, several Backpage representatives met with representatives from the office of the Washington State Attorney General. During this meeting, the Backpage representatives initially attempted to claim that no prostitution ads appeared on their website. In response, a representative from the Attorney General's office stated: "You mean to tell me that if someone responded to an advertisement, the woman they called for services would be offering to go out for coffee?" A Backpage representative responded to this question by looking at C.F., laughing, and acknowledging that Backpage couldn't "deny the undeniable."

69.     On July 27, 2011, C.F. sent an email to HYER and PADILLA, and a nearly-

identical email to LARKIN and LACEY, concerning the possibility of using age-verification software. In this email, C.F. acknowledged the software might be beneficial ("This might be our solution") but recommended against its wholesale adoption because it would cost "79 to 99 cents per query" and would thus cut into Backpage's profits.

70. On July 28, 2011, LACEY sent LARKIN a draft editorial entitled "BackPage understood." In this document, LACEY bragged about Backpage's contributions to the prostitution industry: "Backpage is part of the solution. Eliminating our adult advertising will in no way eliminate or even reduce the incidence of prostitution in this country. . . . For the very first time, the oldest profession in the world has transparency, record keeping and safeguards." LACEY also acknowledged that Backpage used an automatic filter to remove particular phrases from ads that were indicative of prostitution but still published the ads after editing them.

71. Soon afterward, LARKIN forwarded the editorial to C.F., with a cover note cautioning against some of LACEY's statements "being made public" because "we need to stay away from the very idea of 'editing' the posts, as you know." C.F., in turn, revised the editorial to take out the paragraph lauding Backpage's contributions to the prostitution industry.

72. On August 5, 2011, Backpage received a letter from the mayor of Seattle. This letter warned that "Seattle Police have identified an alarming number of juvenile prostitutes advertised on Backpage.com since January 2010" and explained that Backpage was dissimilar from other companies whose products and services are "occasionally or incidentally" utilized by criminals because "[y]our company is in the business of selling sex ads" and "your services are a direct vehicle for prostitution." The letter also recommended that Backpage require in-person age verification for all of the "escorts" depicted in its ads. Afterward, Backpage declined to adopt these recommendations.

73. On August 15, 2011, PADILLA received an email containing an updated version of Backpage's moderation guidelines. This six-page document provided the

- 17 -

following instructions concerning photographs: "Nude rear shots are okay as long the model is not exposing her anus or genitalia," "Transparent wet panties okay should not be able to see personal private part," and "cherry, Ice-cream keeping in mouth [is okay]." The document also explained that "Bikini, lingerie, g-string, thong, and hands covering nipples are all allowed," "Hourly rates are OK," and "Sessions are okay. E.g $50 session."

74.     On August 31, 2011, Backpage received a letter from the National Association of Attorneys General. This letter characterized Backpage as "a hub" for human trafficking, identified "more than 50 instances, in 22 states over three years, of charges filed against those trafficking or attempting to traffic minors on Backpage.com," and noted that "[n]early naked persons in provocative positions are pictured in nearly every adult services advertisement on Backpage.com and the site requires advertisements for escorts, and other similar 'services,' to include hourly rates. It does not require forensic training to understand that these advertisements are for prostitution."

75.     On October 6, 2011, C.F. sent an email discussing various proposals for addressing "the under aged issue." With respect to one particular proposal, C.F. acknowledged it was a good one but recommended against adopting it because Backpage would not derive any public-relations benefit from doing so: "This is a good idea but it is not visible to AG's [state attorneys general] so it has little PR value. It is a low priority."

76.     In the fall of 2011, Backpage sought the assistance of a public relations firm based in Washington, D.C. On October 12, 2011, C.F. received a written copy of the firm's presentation. Later, some of the BACKPAGE DEFENDANTS attended a meeting at which the presentation was discussed in more detail. The presentation warned that Backpage's business practices would inevitably result in legal trouble ("One day the proverbial is going to hit the fan") and characterized Backpage's "media strategy" as "Do not acknowledge the prostitution." The presentation also noted that the "ads on the backpage.com site" generally fall into three categories, one of which is "Pimps and Men Looking for Kids."

- 18 -

77.     On October 21, 2011, LARKIN received an email discussing whether the Backpage website should include a warning message concerning the prostitution of children. This email contained the following joke: "Andrew [PADILLA] thinks it to[o] heavy handed and thinks our web site name will be entrapment.com (Hilarious)."

78.     On November 16, 2011, HYER and PADILLA received an email asking for "urgent" assistance in eliminating the word "teen" from the ads appearing on Backpage's website: "Remove ads with teens or remove the text teen from . . . ads." The following day, PADILLA wrote back with an update that he had found "76 pages of results" and that he had simply "edited" all of the ads posted within the last two months (*i.e.,* allowed those ads to remain on the website after sanitizing them).

79.     Between around January and March 2012, many of Backpage's moderators (who were supervised in part by PADILLA and VAUGHT) underwent performance appraisals. These appraisals revealed that many of the moderators did "not report young looking escorts." Nevertheless, these moderators were allowed to keep their jobs, and sometimes were given strong overall performance ratings.

80.     On February 16, 2012, PADILLA sent an email to VAUGHT stating that Backpage should limit the number of child-exploitation referrals it was making to NCMEC: "If we don't want to blow past 500 this month, we shouldn't be doing more than 16 a day."

81.     On February 23, 2012, C.F. was forwarded a legal notice claiming that several of Backpage's ads included copyrighted content from two competing websites called RubMaps.com and EroticMP.com. C.F. also received copies of the underlying ads from the competing websites, which clearly involved prostitution. In one of the ads, a customer stated that, in return for $45 and a $5 tip, he had received a "Blow Job . . . w/ condom" from a woman who "had nice breasts." In a different ad, a customer stated that, in return for $60, he had oral and vaginal sex with a prostitute. And in a different ad, a customer stated: "Her bj was slow and erotic, and she was happy to go with whatever

1    position I wanted." When C.F. forwarded these materials to Backpage's staff, he was asked

2    whether the corresponding ads appearing on Backpage's website should be removed

3    immediately. C.F. replied that they should be allowed to remain on Backpage for another

4    few weeks without any modification.

5        82.    On March 15, 2012, HYER received an email concerning the ads with the

6    copyrighted material. This email stated that the ads shouldn't be deleted and that

7    Backpage's technical staff should merely "strip out" the names of the competing

8    prostitution websites: "Copyright infringement issue. We need to strip out every

9    appearance of rubmaps.com and eroticmp.com." When a staff member sought more

10    guidance, HYER interjected: "We don't need to delete ads or users."

11        83.    On April 7, 2012, PADILLA was informed that a woman had contacted

12    Backpage to report that one of the "escorts" depicted on the site was only 17 years old.

13    The woman provided the juvenile's full name and birth year and further stated that the

14    juvenile had been attempting to recruit the complaining party's daughter (who was 15). In

15    response, PADILLA instructed his staff to refuse to remove the ad because "she's isn't

16    claiming her own daughter is in the ad."

17        84.    On April 8, 2012, LACEY sent an email emphasizing that "jim [LARKIN]

18    and I believe in legalized prostitution" and stating that Backpage's efforts to prevent the

19    prostitution of children on the site were "not perfect, by any means."

20        85.    On April 25, 2012, a Backpage representative spoke at a meeting of the New

21    York City Council's Women's Issues Committee. During this meeting, the representative

22    stated it was better to have ads for sex work appear on Backpage than have them move to

23    other places on the internet. The representative further stated: "I don't deny that Backpage

24    is part of the problem, but the problem is the internet."

25        86.    On April 27, 2012, a woman wrote an email to Backpage's support

26    department stating that her underage daughter had been kidnapped, drugged, and was being

27    advertised as a prostitute against her will. The email identified the specific phone number

28

1  associated with the ads (754-229-xxxx), stated that the ads appeared on a website called

2  BackpagePics.com, and asked that the ads be removed immediately: "This is a drugged

3  and held against her will child who had photos taken under threat and duress . . . . Please

4  remove." This email was forwarded to PADILLA by a subordinate, who asked "should

5  we respond?" PADILLA replied by explaining that, because the website

6  BackpagePics.com wasn't owned by Backpage, there was no need to respond to the

7  mother.

8  87. On April 30, 2012 (three days later), the same woman wrote another email

9  to Backpage's support department. In this email, the woman stated that "I have contacted

10  backpage on several occassions [sic] to remove these pictures which were posted against

11  her will and while she was drugged and held captive. I have yet to receive a reply." This

12  time, the woman provided a link to her daughter's ad on Backpage (not

13  BackpagePics.com), which included the same phone number (754-229-xxxx) that had been

14  included in the other ad.

15  88. On May 1, 2012 (the next day), the same woman wrote a third email to

16  Backpage's support department. In this email, the woman included a link to another ad on

17  Backpage depicting her underage daughter and stated: "I also found a pix of my daughter

18  within this url both girls are in protective custody." Later that day, the woman received an

19  email from Backpage's support department stating: "The post is confirmed removed."

20  89. Some of these emails were forwarded to LACEY and LARKIN. In response,

21  LARKIN applauded Backpage's "good solid response" to the woman and remarked: "this

22  whole rigamarole seems a little odd to me."

23  90. On May 10, 2012, the television news station CNN ran an expose on

24  Backpage that emphasized "how young some of these girls look" and deemed the website

25  "a hub for the sex trade."

26  91. On May 11, 2012, PADILLA sent an email to VAUGHT and other Backpage

27  employees entitled "forbidden planet." Enclosed with the email was an Excel spreadsheet

28

- 21 -

that identified over 600 words and phrases that are indicative of prostitution. The spreadsheet also specified, for each word and phrase, whether an ad containing the offending language should be banned or whether Backpage should simply "strip term from ad" and then publish it after the revision.

92.     On July 12, 2012, PADILLA sent an email (which was also shared with VAUGHT) to the head of Backpage's Indian moderation team. In this email, PADILLA criticized the moderators for deleting too many ads and provided the following instruction: "I agree that 'over cautiousness' is as big of a problem as moderators that miss a lot of violations."

93.     In or around November 2012, a researcher at Arizona State University published a study concluding that most of the ads on Backpage's Phoenix page involved prostitution and that many of the ads depicted juvenile trafficking victims. On December 19, 2012, LACEY was forwarded a copy of the study's results. The researcher responsible for the study also met with a Backpage representative to propose various mechanisms for reducing or eliminating the prostitution of children on the website. Backpage declined to adopt these proposals.

94.     Between around September 2010 and October 2012, C.F. became aware that a particular Backpage customer, P.R., was posting prostitution ads. Rather than bar this customer from posting future ads, C.F. repeatedly restored her posting privileges and gave her advice on how to conform to Backpage's publication standards. The communications involving this woman's ads included the following:

•       On September 26, 2010, C.F. received an email from a woman who was obviously posting prostitution ads on Backpage. The woman, whose email address included the phrase "provider4u," wrote to complain that her escort ad ("50 Red Roses special – Dont Miss out !!!") had been removed even though "[o]ther women have more explicit ads than me and they are up!" The woman continued: "I can not afford to have this ad removed. This is the only way I can get by and if its not on all the time I will not

be able to pay my bills . . . . My fiancé is in jail and he is not able to help me at this point." In response, C.F. arranged for the woman to be allowed to continue posting ads.

• On October 6, 2010, C.F. received another email from the same woman. In this email, she complained that her most recent ad had been removed because it included an explicit picture of her body. She provided a copy of the picture to C.F. and stated: "If the person [who removed the ad] is such a prude well maybe they should check out the other women's ads in that [escorts] section." On November 15, 2010, C.F. wrote back to the woman to encourage her to edit the ad so it could be re-posted: "Ok, please try editing the ad now." After this exchange, the woman was permitted to resume posting ads on Backpage.

• On June 6, 2011, C.F. received another email from the same woman. It stated: "I would really appreciate it if you would please take the block off my ad for editing . . . . I wont post any more objectionable pics, ok?" In response, C.F. arranged for the woman's editing and posting privileged to be restored: "You should be able to edit now. Please let us know if you are still having any trouble." After this exchange, the woman resumed posting ads on Backpage.

• On July 14, 2012, C.F. received another email from the same woman. It stated: "would you please take the edit block off my ad. I need to change some info on it and update it. I promise i wont put no more nude pics in it, you have my word. . . . [M]y ad says: 50 red roses special – dont miss out." After this exchange, the woman was allowed to continue posting ads on Backpage.

• On September 17, 2012, C.F. received another email from the same woman. This time, she complained that Backpage was editing her ads (whose title continued to feature the obvious prostitution term "50 Red roses special") to remove the most explicit pictures. She stated: "I would like to know why my ad in the escort section of backpage keeps getting messed with. . . . [S]omeone keeps erasing the link to my pics on the ad. that is so wrong. I am being deprived of income that I sorely need . . . . There

- 23 -

1 are other woman posting pics on their ads that show more nudity . . . ." After this exchange,
2 the woman was permitted to continue posting ads on Backpage.

3     •     On October 16, 2012, the woman wrote another email to Backpage. In this
4 email, she again complained about how Backpage was editing her ads to remove the most
5 explicit pictures. She stated: "It is very hard for me to make any income from this ad as
6 they continually go into my ad and remove the link from the ad that goes to my
7 pictures. They wont allow me to post my pics on the ad yet other women with other ads
8 show more nudity than my pictures ever did."

9     •     This email was forwarded to VAUGHT and to PADILLA, who asked
10 another Backpage employee to "dig into this one a little." On October 17, 2012, PADILLA
11 received a follow-up email from his co-worker stating that the woman's ad had been posted
12 on September 27, was still on the Backpage website, and that the pictures the woman had
13 originally attempted to include in the ad (which had been stripped by Backpage) were
14 "topless shots."

15     •     Following these exchanges, between October 2012 and November 2015, the
16 same customer was allowed to post over a dozen new ads on Backpage, many of which
17 utilized the same identifying information, coded prostitution terms, and contact phone
18 number as before.

19     95.     On January 7, 2013, VAUGHT was informed by a moderator that Backpage
20 wasn't diligently pursuing reports of child exploitation: "We've supposedly been checking
21 them, but some seem to be ignored. They get 'marked as read', but nothing gets done with
22 them. It's aggravating and irresponsible."

23     96.     On June 6, 2013, Backpage received a letter from NCMEC recommending
24 the adoption of several specific security measures to prevent the trafficking of children.
25 The recommended security measures included (a) verifying the age and identity of users
26 who submitted adult ads, (b) verifying the age and identity of individuals depicted in
27 photographs within adult ads, (c) prohibiting the use of anonymous payment sources such
28

- 24 -

1  as prepaid credit cards, and (d) requiring users to utilize verified email addresses and

2  telephone numbers.  Afterward, Backpage declined to follow any of these

3  recommendations.

4      97.  On August 30, 2013, LARKIN, SPEAR, BRUNST, HYER, and C.F.

5  received an email notifying them that "Chase [Bank] was no longer accepting transactions

6  from Backpage.com, due to their involvement in human trafficking."  In response, C.F.

7  informed the group that he intended to begin "giv[ing] users free ads if they complain while

8  we wait on directly transactions to another processor."

9      98.  On September 11, 2013, a Backpage representative made a presentation to

10  the Arizona Governor's Task Force on Human Trafficking.  Following this presentation

11  (which took place in Phoenix), the representative was asked whether there would be any

12  "cons" to requiring verifiable identification of all escorts being advertised on Backpage's

13  website. In response, the representative did not identify any financial or logistical hurdles

14  to the adoption of such a requirement.  Instead, the representative stated that such a

15  requirement would simply cause Backpage to lose business to other prostitution websites

16  like myRedBook.com or to overseas prostitution websites.  During this meeting, members

17  of the task force also provided the representative with evidence showing that Backpage's

18  moderation efforts were ineffective at preventing the publication of prostitution ads.

19      99.  On April 3, 2014, PADILLA and VAUGHT were forwarded an email that

20  had been sent to Backpage by a credit card processing company in Canada.  The email

21  stated that "[w]e have multiple user accounts that are paying for your services for what I

22  understand to be prostitution advertisements" and sought information about "how you are

23  processing these transactions."

24      100.  On April 14, 2014, LARKIN and BRUNST received an email from C.F.

25  discussing why Backpage had experienced "past high growth" and identifying various

26  ideas for achieving "future growth."  This email stated that Backpage had been the

27  beneficiary of "[m]igration of content from other . . . marketplaces to the internet" and

28

1    identified one particular marketplace as a key source of Backpage's customers: "[N]et loss
2    for brick and mortar marketplaces: Strip clubs, hotels, and gathering spots displaced by the
3    internet." In other words, the email acknowledged that the supposed "escorts" advertising
4    on Backpage were actually prostitutes (lawful escorts did not congregate at strip clubs,
5    hotels, and other brick-and-mortar "gathering spots" during the pre-internet age). This
6    email also attributed Backpage's success in part to its adoption of policies that allowed
7    customers to post ads without leaving any meaningful identifying information—in a list of
8    Backpage's advantageous policies, it identified "Anonymous," "Prepaid card friendly,"
9    "User can post paid ads without a valid email address," and "bitcoin."

10    101. On April 24, 2014, VAUGHT sent an email to Backpage's moderators (while
11    cc'ing PADILLA). In this email, VAUGHT explained that if a moderator came across an
12    ad containing a link to a "sex for money" website, the moderator should add the link to a
13    list of banned terms but "don't bother removing it from the current ad."

14    102. On September 4, 2014, Backpage was served with a brief that had been filed
15    by NCMEC in a lawsuit in Washington state court. In this brief, NCMEC criticized the
16    sincerity of Backpage's efforts to prevent child sex trafficking: "Backpage has repeatedly
17    claimed in public statements and court filings that it is working to reduce child sex
18    trafficking on its website. The unpleasant reality is that Backpage publicizes carefully
19    selected operational processes as a subterfuge to avoid increased scrutiny, while providing
20    traffickers with easy access to an online venue to sell children for sex. In practice,
21    Backpage's stated interest in doing something meaningful to stop child sex trafficking ads
22    on its site is apparently overridden by the enormous revenue it generates from its escort
23    ads, including ads selling children for sex."

24    103. On March 17, 2015, a law enforcement officer with the California
25    Department of Justice spoke with a Backpage representative concerning the prevalence of
26    blatant prostitution ads on Backpage. In response, the representative did not dispute the
27    officer's characterization and said the internet and prostitution were not going away.

28

104. On July 30, 2015, a document entitled "trainingJuly2015" was distributed to Backpage's moderators. This training manual specifically told moderators that, if they saw a photograph depicting "a person [who] looks young/minor," they should "approve dont delete the ad unless it has a banned term." The training manual also identified, under the heading "THESE ARE ALL OKAY," a long list of terms that are indicative of prostitution, such as "99% CUM BACK FOR MORE," "car service," and "lollipop special."

105. In or around August 2015, as part of a lawsuit in Illinois, Backpage was served with an affidavit from a detective employed by the Seattle Police Department. In this affidavit, the detective avowed that "[t]o date, no Detective within the Seattle Police Department's Vice/High Risk Victims Unit has ever found a legitimate 'escort' (person who charges simply for companionship with no offer of sex) or 'masseuse' (person offering legitimate and licensed massage therapy rather than sex) while responding to ads placed in these categories on Backpage.com" and that "every time the Seattle Police Department's Vice/High Risk Victims Unit has responded to an ad in the adult section of Backpage.com, we have found that the ad was a posting for illegal activity."

106. In or around August 2015, during the same lawsuit in Illinois, Backpage was served with a different affidavit from a detective employed by the Boston Police Department. In this affidavit, the detective avowed that "Backpage.com is the number one site in Boston for prostitution and sex trafficking," that his unit had "[s]ince 2010 . . . arrested over 100 buyers of sex of both adults and minors through Backpage.com ads," and that "nearly all the cases we find associated with it [Backpage] involve pimp controlled prostitution."

107. On October 7, 2015, PADILLA received an email from another Backpage employee (which was later forwarded to VAUGHT) disclosing that there were "massive numbers of live ads with banned terms and pictures out on the site."

108. On December 9, 2015, Backpage received an email from a reporter stating that "[o]f the 359 sex trafficking incidents Toronto Police have been involved in since

1 | 2013, every single girl that was rescued was advertised on Backpage." The email also
2 | asked: "Why hasn't Backpage closed down the adult escort ads portion of its site like
3 | Craigslist when it's known that underage girls are being exploited via Backpage?"

4 |     109.   In or around January 2016, Company A was retained to serve as a payment
5 | processor for some of Backpage's websites. On April 29, 2016, Company A informed C.F.
6 | that it had conducted "a review of your website, and unfortunately we had to suspend your
7 | account . . . [because] advertising of illegal activities is strictly forbidden."

8 |     110.   Beginning in or around January 2016, Backpage's moderators were
9 | instructed to stop removing ads that contained the phrase "GFE." For example, on January
10 | 28, 2016, VAUGHT was sent an email from a Backpage moderator explaining that "As far
11 | as I am aware we are no longer removing ads for GFE." Similarly, on March 9, 2016, a
12 | Backpage moderator sent an email to his coworkers explaining that "Andrew [PADILLA]
13 | and I talked about the GFE thing, going forward we will not be removing ads for GFE"
14 | and clarifying "this includes even gfe with price." And again, on March 25, 2016, an email
15 | was sent to Backpage's moderation staff stating that "We are no longer removing ads for
16 | 'GFE' or 'PSE.'"

17 |     111.   In fact, the BACKPAGE DEFENDANTS repeatedly acknowledged that the
18 | term "GFE" (girlfriend experience) is a coded term for prostitution. For example:

19 |     •   On October 26, 2010, SPEAR, HYER, and PADILLA received an email
20 | from C.F. that explained: "No coded sex act for money: GFE, PSE, BBBJ, DATY, etc."

21 |     •   On May 4, 2011, HYER sent an email to PADILLA and others identifying
22 | GFE as a "code word" that should be forbidden.

23 |     •   On August 31, 2011, PADILLA and C.F. exchanged emails in which they
24 | discussed a list of 100 "solid sex for money terms." The list included "GFE = girlfriend
25 | experience."

26 |     •   On November 2, 2011, PADILLA and VAUGHT received an email from a
27 | co-worker identifying GFE in a list of "sex phrases and coded terms" that are "not

28 |

allowed."

112.   HYER, PADILLA, and other BACKPAGE DEFENDANTS periodically received a "Google alert" when articles discussing Backpage appeared in the news. Many of the news articles identified in these alerts discuss instances in which prostitutes who had been advertised on Backpage were kidnapped, raped, or murdered.

113.   In January 2017, after conducting a lengthy investigation, the Senate Subcommittee on Permanent Investigations ("Subcommittee") issued a 50-page report entitled "Backpage.com's Knowing Facilitation of Online Sex Trafficking." This report concluded, among other things, that virtually all of Backpage's "adult" ads are actually solicitations for illegal prostitution services and that "Backpage has maintained a practice of altering ads before publication by deleting words, phrases, and images indicative of criminality, including child sex trafficking . . . . Those practices served to sanitize the content of innumerable advertisements for illegal transactions—even as Backpage represented to the public and the courts that it merely hosted content others had created."

114.   In response to the Subcommittee's report, Backpage purported to shut down the "adult" section of its website. However, the prostitution ads simply migrated to other sections of the website, where they remain to this day.

D.   International Operations

115.   In addition to facilitating prostitution through its U.S. website, Backpage has also facilitated prostitution through its websites in foreign countries. In this context, Backpage often affirmatively creates the content of the illegal prostitution ads being published.

116.   Around 2013 or 2014, Backpage hired a Philippines-based company (Company B) in an attempt to increase the profitability of Backpage's international operations. Company B's employees were instructed to (1) visit rival prostitution websites in other countries, (2) obtain the email addresses of prostitutes who were posting ads on those websites (often by falsely posing as prospective customers), (3) use the information

1   from the other website to create a competing prostitution ad on Backpage (a process
2   referred to internally as "preboarding"), and then (4) transmit the new ad to the prostitute,
3   often using the previously-harvested email account information, in an attempt to persuade
4   the prostitute to become a Backpage customer. Company B's employees were paid
5   bonuses based on the amount of ad revenue they generated for Backpage using these
6   techniques.

7       117.   Backpage's executives were fully aware of the plan to use Company B to
8   create prostitution ads outside the United States. For example, on or around November 6,
9   2013, C.F. made a presentation to LARKIN, SPEAR, and BRUNST. Among other things,
10  this presentation summarized Backpage's plans for "International Planning and
11  Expansion." One of the plans was to use the Philippines as a "test" market and hire Filipino
12  contractors to "contact by email leads, secure email address, add ad and email address in
13  [computer system] and assign to American staff. American staff makes contact."

14      118.   On August 7, 2014, HYER sent an email stating that Company B was "an
15  efficient and cost effective way for us to bring new users to backpage." This email also
16  contained the following summary of how Company B would operate: "Process after hiring
17  company offering BPO services: 1. Backpage provides BPO with sites, categories &
18  countries to target. Backpage also provides sample 'scripts' and examples of phone
19  calls. 2. BPO contacts users via phone from sites backpage provided, obtains user email
20  address & permission to preboard. 3. BPO preboards ad as public user. 4. After ad is
21  preboarded, users receive verification link to verify the ad." This email also stated that
22  Backpage would offer a "bonus per verified authenticated ad."

23      119.   On April 10, 2015, a "five-year business plan" was emailed to LARKIN,
24  BRUNST, SPEAR, and C.F. One of the goals for 2015 was "Off shore marketing staff in
25  the Philippines to grow to 166 and main task is international market content acquisition."
26  This email also included a separate attachment stating that HYER should be considered for
27  promotion because "his strengths are strong marketing and revenue growth skills" and he

28

1   had been "heavily involved in the user experience development" and that VAUGHT should

2   be considered for a promotion because "[h]er strengths include six years of experience

3   managing moderators."

4       120.   On May 15, 2015, a Company B employee posing as a Backpage employee

5   sent an email to an apparent prostitute. The subject line was "Offering Free Advertisement

6   from Backpage.com" and the text of the email sought to persuade the prostitute to "upgrade

7   your ad with sponsor placement or automatic repost." In response, the prostitute wrote

8   back that she had "managed to activate my ad and could buy credits as well. thanks for

9   your help. I'm traveling today to [London] how can I change my location." This email

10  exchange was later forwarded by HYER to C.F. with a cover note stating: "[I]deal scenario

11  for [Company B] agent – user activates ad, user purchases credit."

12      121.   On December 14, 2015, C.F. was part of an email exchange concerning an

13  ad that had an IP address associated with Company B. This email contained the following

14  description of Company B's process for creating and selling prostitution ads on Backpage:

15  (1) "Staff found lead in assigned area." (2) "Staff entered all relevant into [database]

16  (phone/email/etc.)" (3) "Staff called lead to discuss creation of free ad" (4) Staff created

17  free ad for lead (verification email sent). (5) Staff followed under with an email reminding

18  lead of phone conversation and detailing verification of ad."

19  E.    Select Victim Summaries

20      122.   Between in or around 2009 and 2013, Victim 1 was sold for sex, through the

21  use of Backpage ads, in Ohio, Indiana, and Georgia. Victim 1's Backpage ads often

22  included words and phrases that were indicative of prostitution, such as "roses" (money).

23  On at least one occasion, Victim 1 contacted Backpage after a proposed ad had been

24  rejected because it contained banned words and phrases. In response, a Backpage

25  representative coached Victim 1 on how to re-write the ad using different words. Victim

26  1's trafficker took all of the money that was earned through her acts of prostitution.

27      123.   Between in or around 2009 and 2011, Victim 2 was sold for sex, through the

28

1    use of Backpage ads, in Arizona, Georgia, North Carolina, Texas, New York, New Jersey,
2    and Louisiana. Victim 2's trafficker drafted her Backpage ads and Victim 2 initially did
3    not know she was being offered on Backpage. The ads contained words and phrases to
4    make customers believe Victim 2 was "barely legal" and also contained words and phrases
5    indicative of prostitution, such as "roses" (money).

6        124.   Between in or around 2009 and 2012, Victim 3 was sold for sex, through the
7    use of Backpage ads, in Colorado and North Dakota. Victim 3's pimp instructed her to
8    review existing prostitution ads on Backpage to learn how to draft her own ads. During a
9    portion of this period, Victim 3 was required by her pimp to make week-long trips to North
10   Dakota to work as a prostitute. During these trips, which would generate as much as $2,000
11   in prostitution-derived revenue each day, Victim 3 was forced to leave her children at home
12   in the care of her pimp.

13       125.   In or around 2010, Victim 4 was sold for sex, through the use of Backpage
14   ads, in Washington. During this period, Victim 4 was a juvenile (15 years old). Victim
15   4's pimp drafted the ads that were placed on Backpage. The wording of these ads was
16   edited by Backpage before publication. The ads contained words and phrases such as
17   "W'E'L'L_W'O'R'T'H_I'T***^***150HR" and "IT WONT TAKE LONG AT ALL"
18   and included pictures of Victim 4 in provocative positions showing her breasts and
19   buttocks.

20       126.   Between in or around 2011 and 2016, Victim 5 was sold for sex, through the
21   use of Backpage ads, in Massachusetts and Rhode Island. During much of this period,
22   Victim 5 was a juvenile (14-19 years old). Victim 5's female pimp instructed Victim 5
23   that Backpage was the safest place to advertise because it did not require age verification.
24   On one occasion, Backpage declined to accept a proposed ad that indicated Victim 5 was
25   only 17 years old. In response, the ad was simply resubmitted with a new (false) age of
26   19. On other occasions, Backpage removed provocative pictures of Victim 5 from ads and
27   then allowed edited versions of the ads to be published. Victim 5's Backpage ads included

28

1   words and phrases that were indicative of prostitution, such as "roses" (money) and "back

2   door" (anal sex). Some of the customers who responded Victim 5's Backpage ads forced

3   Victim 5 to perform sexual acts at gun point, choked her to the point of having seizures,

4   and gang-raped her.

5       127.   In or around June 2012, Victim 6 was sold for sex, through the use of

6   Backpage ads, in Arizona. Her traffickers utilized Backpage ads that did not offer a

7   specific person but instead generally offered a woman with a particular type of hair color

8   and build. On June 22, 2012, Victim 6 was dispatched to a customer who had responded

9   to a Backpage ad featuring "Nadia," who was described as a slender brunette woman.

10   Upon her arrival at the location, Victim 6 was stabbed to death.

11       128.   Between in or around 2012 and 2015, Victim 7 was sold for sex, through the

12   use of Backpage ads, in Washington and Oregon. Victim 7's pimp drafted the ads that

13   were placed on Backpage. The wording of these ads was edited by Backpage before

14   publication. The ads contained provocative nude pictures of Victim 7.

15       129.   Between in or around 2013 and 2014, Victim 8 was sold for sex, through the

16   use of Backpage ads, in Maine, Connecticut, and Massachusetts. During this period,

17   Victim 8 was a juvenile (15 years old). Victim 8's uncle, as well as his friends, placed the

18   ads on Backpage, which included words and phrases that were indicative of prostitution,

19   such as "roses" (money), "fetish friendly," and 150 for 1/2 hour, 200 for full hour.

20   Through these ads, Victim 8 was forced to do "in-calls" (where she was raped in hotels) as

21   well as "out-calls" (where she was raped at other locations chosen by the men paying for

22   her).

23       130.   In or around 2013, Victim 9 was sold for sex, through the use of Backpage

24   ads, in Florida. Victim 9's pimp taught her how to use code words in her Backpage ads to

25   indicate how much she was charging for certain sex acts. Victim 9 was brutally attacked

26   by her trafficker, causing bruises and a fractured cheek bone.

27       131.   Between in or around 2014 and 2015, Victim 10 was sold for sex, through

28

- 33 -

the use of Backpage ads, in California and Arizona. During some of this period, Victim 10 was a juvenile (17 years old). An associate of Victim 10's pimp took pictures of her and drafted the ads that were placed on Backpage. The Backpage ads contained words and phrases such as "NEW IN TOWN," "sexy sweet," and "sweet like honey but super hot like fire" and included pictures of Victim 10 in provocative positions showing her legs, stomach, shoulder, and buttocks.

132. Between in or around 2014 and 2015, Victim 11 was sold for sex, through the use of Backpage ads, in Arizona, Colorado, Minnesota, Oregon, California, Montana, Nevada, New Mexico, and Utah. The Backpage ads contained words and phrases indicative of prostitution and included pictures of Victim 11 in provocative positions. On some occasions, Backpage would remove certain explicit photos from the ads but publish the remaining text and other photos. Victim 11's trafficker gave her drugs, took her identification documents, sexually assaulted her with a firearm, and forced her to work full-time as a prostitute.

133. In or around 2015, Victim 12 was sold for sex, through the use of Backpage ads, in California and Arizona. Victim 12 was first advertised on Backpage in San Bernardino, California, but moved to the Phoenix metro area because the Super Bowl was being held there. Victim 12's advertisements on Backpage contained words and phrases such as "New In Town" and "Sexy Dark Asian Bombshell with a Nice & Tight {Booty}" and included pictures showing Victim 12's legs, stomach, shoulders and buttocks.

134. In or around 2015, Victim 13 was sold for sex, through the use of Backpage ads, in California. During this period, Victim 13 was a juvenile (15 years old). Victim 13 and her trafficker both posted the Backpage ads, which falsely represented that Victim 13 was 19 years old and showed pictures of her face and body. On at least one occasion, a Backpage representative contacted Victim 13 with instructions on how to fix an ad so it could be published.

135. In or around June 2015, Victim 14 was sold for sex, through the use of a

- 34 -

Backpage ad, in Texas. This ad contained words and phrases such as "fun, young, exotic," "Ready to be your fantasy girl," "OUT CALLS ONLY," and "NO BLACK MEN" and included pictures of Victim 14's stomach, breasts, shoulders, and buttocks. On or around June 20, 2015, Victim 14 was murdered by a customer. Afterward, the customer attempted to destroy Victim 14's corpse by lighting it on fire. Victim 14's father later contacted Backpage to request that the ads showing his deceased daughter be removed. Backpage did not immediately comply with this request.

136. In or around June 2015, Victim 15 was sold for sex, through the use of Backpage ads, in Texas and Louisiana. These ads contained words and phrases such as "Thick Glass of Chocolate Milk Looking for a GoodTime!!!" and "sexy certified freak" and contained pictures showing Victim 15's legs, shoulders and buttocks. On June 10, 2015, Victim 15 was forced into a vehicle with her trafficker, who was attempting to take her to Texas against her will. In an attempt to escape, Victim 15 jumped out of the vehicle onto Interstate 10 and was killed after being hit by several vehicles at high speeds.

137. In or around July and August 2015, Victim 16 was sold for sex, through the use of Backpage ads, in Michigan. These ads contained words and phrases such as "OUTCALLS ONLY," "Juicy Caramel Lady On Duty," "Sexy, Erotic Caramel Dream," and "No Thugs, Pimps Or Weirdos" and contained pictures showing Victim 16's breasts, legs, lips, buttocks, and face. On August 15, 2015, Victim 16 was murdered by a customer. Afterward, the customer dumped her corpse in a park.

138. Between in or around 2015 and 2016, Victim 17 was sold for sex, through the use of Backpage ads, in Arizona and California. Victim 17 averaged ten customers a day during this time and turned over all of her prostitution earnings (approximately $1,500 per day) to her pimp. An associate of Victim 17's pimp took pictures of her and drafted the ads that were placed on Backpage. The Backpage ads contained words and phrases such as "IN/CALLS ONLY," "I'm here to make your wildest fantasies come true!" and "Sorry, but NO BLACK MEN" and included pictures of Victim 17's buttocks and face.

- 35 -

F.    Money Laundering Activities

139.    Backpage's customers have overwhelmingly used the proceeds of criminal activity (*i.e.,* money earned from pimping and prostitution) when purchasing ads on Backpage. In addition, because Backpage's publication of such ads is an independent crime (*e.g.,* violation of 18 U.S.C. § 1952), the fees it collects from customers posting prostitution ads—estimated at more than $500 million since 2004—constitute the proceeds of unlawful activity.

140.    For these and other reasons, banks and financial institutions have repeatedly refused to do business with Backpage. In response, the BACKPAGE DEFENDANTS have pursued a variety of money laundering strategies. For example, on August 27, 2013, C.F. was forwarded an array of emails from Backpage customers who were complaining that their credit card companies had refused to process Backpage-related transactions. One customer wrote: "Have you resolved the issue of Chase Bank not honoring payment for you for ethical reasons?" C.F. forwarded these complaint emails to LARKIN, SPEAR, and BRUNST and proposed, as a "solution" to the problem, that Backpage reconfigure its website to fool credit card companies into believing the charges were being incurred on a different website.

141.    During a November 2013 presentation by C.F. to LARKIN, SPEAR, and BRUNST, C.F. again discussed strategies for fooling credit card companies into believing that Backpage-associated charges were being incurred on different websites, including a proposal to set up shell companies without any apparent connection to Backpage ("create new companies with new principals") and use their bank accounts to accept payment. Another "solution" was to "allow users to fund an account thru several other sites" that "have no adult or images."

142.    On November 6, 2013, LARKIN, SPEAR, and BRUNST received an email entitled "Options for the future of Backpage." This email discussed various strategies for creating new entities to process Backpage-related payments "without ever disclosing ties

1    to Backpage."

2        143.    On April 1, 2015, BRUNST and C.F. were informed that Mastercard was
3    "snooping around" Backpage and might stop processing payments for Backpage. In
4    response, C.F. offered several suggestions for setting up new payment channels that would
5    conceal Backpage's involvement. One such proposal was to begin routing Backpage-
6    related transactions through banks located in the country of Mauritius. In response,
7    BRUNST stated: "Didnt we go down the Mauritius path once and the banks had the same
8    issue with our content?"

9        144.    Notwithstanding these strategies, the three major credit card companies
10   stopped doing business with Backpage. On or about April 30, 2015, Backpage learned that
11   American Express would no longer allow its cards to be used for any purchases in
12   Backpage's adult section. In or around July 2015, Backpage learned that Mastercard would
13   no longer allow its cards to be used for Backpage-related transactions. When discussing
14   this decision, MasterCard stated that it "has rules that prohibit our cards from being used
15   for illegal activities." Around the same time, Backpage learned that Visa would no longer
16   allow its cards to be used for Backpage-related transactions. When discussing this
17   decision, Visa stated that its "rules prohibit our network from being used for illegal
18   activity."

19       145.    Similarly, some banks closed accounts that were held by Backpage (or
20   Backpage-related entities) out of concern the accounts were being used for illegal purposes.
21   For example, on April 2, 2014, BRUNST received a letter from U.S. Bank that was
22   addressed to "Backpage.com." The letter explained: "Dear Jed . . . please be advised that
23   we have elected to close your Account with us."

24       146.    Backpage responded to these developments in several ways. One was to
25   encourage customers to send checks and money orders to a Post Office box held in the
26   name of a seemingly-unrelated entity called Posting Solutions LLC ("Posting Solutions")
27   and give such customers a corresponding credit on Backpage. For example, on July 31,

28

- 37 -