# ORIGINAL

1   Janey Henze Cook (AZ022496) (CA 244088)
    HENZE COOK MURPHY PLLC
2   722 East Osborn Road, Suite 120
3   Phoenix, Arizona 85014
    Telephone: (602) 956-1730
4   Facsimile: (602) 956-1220
5   janey@henzecookmurphy.com

6   *Attorneys for Claimant*
7   Michael Lacey

8

## UNITED STATES DISTRICT COURT
9   ## FOR THE CENTRAL DISTRICT OF CALIFORNIA
    ## WESTERN DIVISION
10

11  | **In the Matter of the Seizure of:** | CASE NO.2:18-cv-6742-RGK (MAAx) |
12  | | 18-MJ-00722-PJW |

13  Any and all funds held in Republic Bank
    of Arizona Account(s) xxxx1889,          [Related to Case Nos. 18-MJ-00712,
14  xxxx2592, xxxx1938, xxxx2912, and         18-MJ-00713, 18-MJ-00715,
    xxxx2500.                                 18-MJ-00716, 18-MJ-00718,
15                                            18-MJ-00719, 18-MJ-00720,
                                              18-MJ-00721, 18-MJ-00723,
16                                            18-MJ-00724, 18-MJ-00751,
                                              18-MJ-00797, 18-MJ-00798,
17                                            18-MJ-00996, 18-MJ-00997,
                                              18-MJ-01427, and 18-MJ-1863]
18
                                             DECLARATION OF JANEY HENZE
19                                           COOK IN SUPPORT OF CLAIMANT
20                                           MICHAEL LACEY'S MOTION FOR
                                             RELEASE OF CERTAIN UNTAINTED
21                                           FUNDS
22
                                             (First request)
23                                           (Oral Argument Requested)
24  I, JANEY HENZE COOK declare:

25      1.      I am an attorney at law duly licensed to practice in the State of Arizona

26  and the State of California, and am a Partner at the firm Henze Cook Murphy PLLC

27

28

FILED

2018 AUG 10  PM 3:44

Janey Henze Cook (AZ022496) (CA 244088)
HENZE COOK MURPHY PLLC
722 East Osborn Road, Suite 120
Phoenix, Arizona 85014
Telephone: (602) 956-1730
Facsimile:   (602) 956-1220
janey@henzecookmurphy.com

*Attorneys for Claimant*
Michael Lacey

## UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| **In the Matter of the Seizure of:**<br><br>Any and all funds held in Republic Bank of Arizona Account(s) xxxx1889, xxxx2592, xxxx1938, xxxx2912, and xxxx2500. | CASE NO.2:18-cv-6742-RGK (MAAx)<br>18-MJ-00722-PJW<br><br>[Related to Case Nos. 18-MJ-00712, 18-MJ-00713, 18-MJ-00715, 18-MJ-00716, 18-MJ-00718, 18-MJ-00719, 18-MJ-00720, 18-MJ-00721, 18-MJ-00723, 18-MJ-00724, 18-MJ-00751, 18-MJ-00797, 18-MJ-00798, 18-MJ-00996, 18-MJ-00997, 18-MJ-01427, and 18-MJ-1863]<br><br>DECLARATION OF JANEY HENZE COOK IN SUPPORT OF CLAIMANT MICHAEL LACEY'S MOTION FOR RELEASE OF CERTAIN UNTAINTED FUNDS<br><br>(First request)<br>(Oral Argument Requested) |

I, JANEY HENZE COOK declare:

1.        I am an attorney at law duly licensed to practice in the State of Arizona

and the State of California, and am a Partner at the firm Henze Cook Murphy PLLC

("HCM"). I have personal knowledge of the facts set forth below and if called as a witness, I could and would competently testify to them.

## BACKGROUND

2.      On March 28, 2018, a grand jury sitting in the District of Arizona issued an indictment ("Indictment") against Mr. Lacey and his co-defendants in the case captioned *United States v. Lacey*, 18-CR-00422-PHX-SPL (BSB) ("Arizona Prosecution"). The Indictment sought to hold Mr. Lacey accountable for content posted to the website www.backpage.com ("Backpage") by third-party users, based on his former involvement with Backpage.

3.      The Indictment listed a number of bank accounts with Republic Bank of Arizona ("Republic Bank") as potentially subject to forfeiture. However, none of the accounts with Republic Bank listed in the Indictment belonged to Mr. Lacey.

4.      Subsequently, I learned that, in connection with the Arizona Prosecution, the government also sought and obtained seizure warrants from this Court authorizing the government to restrain Mr. Lacey's monetary resources long before commencement of the January 2020 trial in the Arizona Prosecution.

5.      First, on March 28, 2018, the government obtained a seizure warrant authorizing it to seize the contents of certain bank accounts that belong to Mr. Lacey under a separate miscellaneous docket and those accounts are not the subject of the instant motion.

6.      Then, on April 26, 2018, the government obtained a seizure warrant to seize six additional bank accounts that belong to Mr. Lacey and are held with Republic Bank. (True and correct copies of the Apr. 26, 2018 Seizure Warrant, Application, and accompanying Affidavit of Lyndon A. Versoza are attached hereto as Exhibit A.) Those accounts are identified as subject accounts 16(A)-16(F). (*See id.* at ¶¶ 10.a-f.)

2

7.      Three of the accounts seized through the April 26, 2018 Seizure Warrant—account ending 2485 (subject account 16(A)), account ending 1897 (subject account 16(B)), and account ending 3126 (subject account 16(C))—are the focus of the instant motion.

8.      On July 25, 2018, a grand jury sitting in the District of Arizona issued a superseding indictment ("Superseding Indictment").   The Superseding Indictment proceeds on the same theory of liability.  Notably, the three accounts that are the subject of the instant motion were identified as subject to potential seizure in the Superseding Indictment.

## I.      The government's pretrial restraint of Mr. Lacey's accounts causes an undue hardship on a daily basis.

9.      The government's pretrial restraint of Mr. Lacey's assets causes him undue hardship on a daily basis.  Mr. Lacey is unable to meet basic financial obligations.   Mr. Lacey has several outstanding bills that he is unable to pay. In addition to regular living expenses, such as utilities, homeowners' association fees, and insurance, Mr. Lacey has several past-due bills pertaining to repair and remodeling projects that were in progress at the time of his arrest on April 6, 2018.   Contractors (who had already performed work prior to his arrest) have repeatedly requested payment.  Further, Mr. Lacey and his new wife were scheduled to host a wedding celebration on April 7, 2018, which was cancelled due to his arrest the day before. Even though his wedding celebration was cancelled, he is under obligation to pay wedding-related businesses for rental of supplies, catering, flowers, and entertainment, and had prepaid the expenses associated with his honeymoon, including the costs of flights, hotel rooms, and entertainment, which were lost.  These small businesses have repeatedly asked for payment.  However, Mr. Lacey is unable to pay them the money

that they are owed.  Indeed, in light of the hardship caused by the pretrial restraint of his assets, Mr. Lacey recently borrowed money from his brother and sister to meet basic living expenses.

10.     Aside from the difficulty he is experiencing without access to his funds, the government's pretrial restraint of his assets has even impacted his ability to comply with his conditions of release in the Arizona Prosecution.  On one occasion, when Mr. Lacey's wife was out of town to attend her brother's funeral, local counsel had to arrange a ride for Mr. Lacey to his meeting with pretrial services because Mr. Lacey's Arizona cars had been seized, and Mr. Lacey had no credit card in his name to place on file with Uber to hire an Uber driver.

11.     Further, Mr. Lacey is required to wear an electronic monitoring anklet, which must be paid for on a periodic basis. The company that provides the anklet requested payment by credit card, which Mr. Lacey was unable to do until recently. These are just two of the many examples of difficulties Mr. Lacey is experiencing on a daily basis.

12.     Compounding these daily struggles, the government's pretrial restraint of Mr. Lacey's assets has rendered him unable to pay lawyers to defend him in the Arizona Prosecution, which impairs his Sixth Amendment rights.

## II.   Defense counsel has struggled to obtain any information from the government about Mr. Lacey's seized accounts.

13.     Defense counsel has struggled to obtain any information from the government about Mr. Lacey's seized accounts.

14.     On April 13, 2018, the first business day following Mr. Lacey's release in connection with the Arizona Prosecution, he went to Republic Bank. As of that date, Mr. Lacey had two accounts which were not seized.  He intended to use the funds in those accounts to pay legal fees, living expenses, and outstanding bills. Upon

recommendation of Republic Bank, Mr. Lacey opened an additional account to pay online bills associated with living expenses and to pay legal fees (subject account 16(C)). He transferred some of the funds from his existing money market account (subject account 16(A)) to his new bill paying account (subject account 16(C)).

15.     Critically, Mr. Lacey sought and obtained approval for these transactions *in advance* from his pretrial services officer.

16.     At that time, Mr. Lacey and his counsel were completely unaware of any pending forfeiture actions in this District.

17.     Three days later, Mr. Lacey's Republic Bank debit card was declined at a restaurant, which alerted him to potential problems with his new bank account.

18.     The next day, April 20, 2018, Mr. Lacey visited Republic Bank to resolve the issue with his debit card. One of Republic Bank's compliance officers told Mr. Lacey that the Bank had been visited by a United States Postal Inspector regarding his accounts and there was a problem with his accounts.

19.     Later that day, I contacted A.U.S.A. Dominic Lanza to inquire as to why a postal inspector was attempting to shut down a bank account that held funds unrelated to Backpage. Mr. Lanza agreed to contact A.U.S.A. John Kucera, who was handling the forfeiture matter for the government, to set up a telephone call with counsel the next week.

20.     On Monday, April 23, 2018, Paul J. Cambria and I spoke with Mr. Lanza and Mr. Kucera via telephone. During the call, the government asked counsel to provide bank records for the Republic Bank accounts in question.

21.     For the next several days, counsel worked to gather bank records, which the government had requested. The bank statements were sent to the government on the morning of April 26, 2018.

22.     That afternoon, using the information provided by undersigned counsel, the government applied for a seizure warrant with this Court for those same accounts (subject accounts 16 (A), (B) and (C)).

23.     On April 27, 2017, I spoke with Mr. Kucera and U.S. Postal Inspector Lyndon Versoza via telephone regarding Republic Bank accounts ending in 2485, 1897 and 3126 (subject accounts 16 (A), (B) and (C).[1]  During that call, defense counsel learned, *for the first time*, that the government had sought and obtained seizure of the account ending in 2485 (subject 16 (A)) through civil forfeiture proceedings.

24.     Mr. Versoza stated that the account was seized because the account received a wire transfer from a purportedly tainted source on June 8, 2017, and the deposit of those funds meant that the government deemed the entire account tainted and subject to seizure.

25.     This allegation surprised me because Mr. Lacey had diligently segregated the funds deposited into the account ending in 2485 (subject account 16(A)) from any Backpage-related revenues.  Mr. Lacey, with help from counsel, began an investigation of the account to determine the source of the purportedly tainted funds deposited on June 8, 2017.

26.     For the next several days, I turned my attention to addressing the government's concerns about the June 8, 2017 wire transfer that Mr. Versoza claimed had purportedly tainted the entire account.  Mr. Versoza's allegation was puzzling because none of Mr. Lacey's bank records identified receipt of *any* funds via wire transfer on June 8, 2018.  Counsel spent the next several days poring over bank account statements and records to locate the June 8, 2017 wire transfer.

---

[1]     Account ending in 2485 (subject account 16(A)) was the main focus of the conversation.  That account, subject account 16(A), is allegedly tainted because of receipt of a wire.  Subject accounts 16(B) and 16 (C) are allegedly tainted simply because they received funds from 16(A).

27.     On May 2, 2018, more than one month after the Indictment was issued in the Arizona Prosecution, defense counsel learned, *for the first time*, that the government had undertaken its seizure actions in this District (through this action and other miscellaneous actions), rather than in the District of Arizona. Counsel immediately requested copies of seizure warrants, warrant applications, and forfeiture orders, which the government declined on the ground that such documents were subject to a sealing order.

28.     On May 7, 2018, Mr. Cambria and I met in person with Mr. Lanza and A.U.S.A. Peggy Perlmeter to discuss the June 8, 2017 wire. Mr. Rapp and Mr. Kucera participated by phone.

29.     During this meeting, defense counsel questioned the government as to how a wire transfer could move money into a bank account without documentation of the transfer appearing on the relevant bank statements because there was no statement that showed a June 8, 2017 deposit of funds into the account ending in 2485 (subject account 16(A)). Mr. Kucera stated that he "could not speak for" what Mr. Versoza said about the purported June 8, 2017 wire transfer. Instead, he stated that it was actually a *May 31, 2017* deposit—not the previously identified June 8, 2017 deposit—that the government claimed had purportedly tainted the account.

30.     It was clear that Mr. Lacey and his defense counsel had wasted significant time and effort searching for a June 8, 2017 deposit that counsel then learned had nothing to do with the account at issue.

31.     Meanwhile, Mr. Lacey continued to suffer. Pacific Gas and Electric intended to shut off power to his home. Several other accounts were in arrears. Bill collectors continued to call daily. Mr. Lacey received notification that he had three days to pay his insurance bill or all of his insurance policies would be terminated for

non-payment.  Although Mr. Lacey was able to get past these financial problems, the process by which he was able to do so was not without its own hurdles.[2]

32.     On May 8, 2018, after learning information from undersigned counsel the day before, Mr. Kucera filed a Notice of Errata with this Court in which he requested that this Court replace the allegations about the June 8, 2017 wire transfer with allegations about the May 31, 2017 wire transfer.  Notably, the government did not submit an amended, sworn affidavit from Mr. Versoza in connection with its Notice of Errata.  (A true and correct copy of the Notice of Errata is attached hereto as Ex. B.)

33.     In light of Mr. Lacey's tenuous financial position, and that the seized assets included assets unrelated to Backpage, as well as assets derived from Mr. Lacey's participation in First Amendment activities, defense counsel renewed its request that the government promptly disclose the seizure warrants, warrant applications, and forfeiture orders filed and issued in this District to enable defense counsel to review the validity of the government's vast and onerous seizures.

34.     The government declined on the ground that those documents remained subject to a sealing order.

35.     After additional discussion and repeated requests that the government provide the Defendants with details about the seizure actions filed in this District, the government stated that it would be unable to disclose those documents to defense counsel before the end of May.

---

[2]     Mr. Lacey possessed a sizeable check from his 401(k), but had no idea whether his 401(k) account had been seized.  Additionally, he did not have a bank account in which to deposit the check, even if his 401(k) account had not been seized.  In any event, the bills he had accumulated by that point exceeded the value of the check.  Given the urgency of the situation, we proposed that the government allow us to deposit the 401(k) check into an HCM IOLTA account.  While this solution would not fix Mr. Lacey's financial problems, it would allow Mr. Lacey to keep the power on and to keep his insurance policies in place.  On May 8, 2018, the government agreed to allow us to deposit the check into the HCM's IOLTA account.

36.     On May 11, 2018, Lacey and his co-defendants moved for disclosure of those documents in the District of Arizona (because the docket numbers of the forfeiture actions pending in this District were unknown to them).

37.     On May 18, 2018, the date that the government's opposition to the motion for disclosure was due, the government began disclosure of the requested documents.

### III.     Subject accounts 16(A), (B), and (C) contain no tainted funds.

38.     Amid these disclosure disputes, counsel's investigation into the purportedly tainted May 31, 2017 wire transfer revealed that the deposit at issue was demonstrably unrelated to Backpage. Those funds—dispersed into three accounts held by Mr. Lacey at Republic Bank (accounts ending in 2485 (subject account 16(A)), 1897 (subject account 16(B)), and 3126 (subject account 16(C)))—are the subject of the instant motion.[3]   At present, those three seized accounts held approximately $1 million.

39.     As defense counsel's investigation determined, on May 5, 2017, almost a year before the government commenced the Arizona Prosecution, Cereus Properties LLC ("Cereus") issued a check payable to Mr. Lacey in the amount of $451,205.36. (A true and correct copy of the May 5, 2017 check is attached hereto as Exhibit C.) On May 23, 2017, Cereus issued a second check payable to Mr. Lacey in the amount of $225,602.68. (A true and correct copy of the May 23, 2017 check is attached hereto as Exhibit D.) The total of the two checks issued from Cereus to Mr. Lacey was $676,808.04. (*See* Exs. C, D.)

---

[3]     Each of the three accounts listed (subjects accounts 16(A), (B) and (C)) are the focus of this Motion. However, the only allegations of taint regarding subject accounts 16(B) and (C) is that they are tainted by virtue of receiving funds from subject account 16(A). Consequently, if this Court determines that subject account 16(A) is untainted from the May 31, 2017 deposit, such a determination means that the funds held in subject accounts 16(B) and (C) are clean, too.

40.     The two checks issued to Mr. Lacey were distributions from the sale of Village Voice Media Holdings, a newspaper conglomerate formerly owned by Mr. Lacey and Jim Larkin (a co-defendant in the Arizona Prosecution).   Each month, monies from the sale of the newspapers and rent monies from the Phoenix New Times building are sent to Cereus to be distributed (based on the terms of the sale) to Mr. Lacey, Mr. Larkin, and other former owners of Village Voice Media Holdings.  Cereus calculates the amounts due to each of the previous owners and sends a distribution on a monthly or approximately monthly basis.

41.     For several years, Cereus has segregated the distributions generated from the sale of Village Voice Media Holdings and rental income for the Phoenix New Times building from distributions generated from Backpage.   Mr. Lacey earned substantial income long before formation of Backpage and, continues to generate substantial income from the sale of Village Voice Media Holdings and rental income for the Phoenix New Times building that is separate and apart from the revenue generated from Backpage.

42.     Based on defense counsel's investigation, Mr. Lacey did not cash the two checks Cereus had issued him.  Instead, they were voided.  (*See* Exs. C, D.)

43.     The subsequent events involving the $676,808.04 distribution paid to Mr. Lacey is memorialized in a declaration provided by Michele McSherry, the Office Manager for Cereus.  (A true and correct copy of May 14, 2018 Declaration of Michele McSherry is attached hereto as Exhibit E.)

44.     Ms. McSherry indicated that Mr. Lacey contacted Cereus in May of 2017, asked that the checks be voided, and asked that Cereus instead wire his distributions to his Republic Bank account ending in 2485. (*See id.* ¶ 6.)

45.     It is important to note that Mr. Lacey's Republic Bank account ending in 2485 (subject account 16(A)) was purposefully segregated from any Backpage-related revenue.  The sole purpose of that account was to receive funds derived from the sale

of Village Voice Media Holdings and rent from the Phoenix New Times newspaper building. Indeed, Mr. Lacey had advised Cereus that the only funds that Cereus had authority to wire into that account were funds generated from Village Voice Media Holdings and the rent from the Phoenix New Times newspaper building.

46. On May 31, 2017, Ms. McSherry intended to wire the funds to Mr. Lacey's account from a Cereus account ending in 4862 ("4862 Cereus Account"). (*See id.* at ¶ 7.) The 4862 Cereus Account contains funds generated solely from Village Voice Media Group and rents from the Phoenix New Times newspaper building. In other words, the 4862 Cereus Account, too, is segregated from any revenue derived from Backpage.

47. However, by virtue of nothing more than a clerical error on her part, Ms. McSherry wired the funds to Mr. Lacey's account from a Cereus account ending in 3873 ("3873 Cereus Account"). Unlike the segregated account 4862, the 3873 Cereus Account holds funds related to Backpage.

48. Critically, on June 1, 2017, long before commencement of the Arizona Prosecution, Ms. McSherry recognized her clerical mistake and transferred $676,808.04 from the 4862 Cereus Account to the 3873 Cereus Account to rectify the two Cereus accounts. (*See id.* at ¶¶ 9-11.)

49. A contemporaneous bank statement for the 4862 Cereus Account indicates that Ms. McSherry did, in fact, rectify those two accounts on June 1, 2017, less than 24 hours after the mistake occurred, as she told defense counsel. (A true and correct copy of the June 2017 Statement for 4862 Cereus Account is attached hereto as Exhibit F.)

50. Mr. Lacey had no knowledge about this clerical error until after his arrest in the Arizona Prosecution.

## IV.    Defense counsel attempts to obtain government approval for release of these funds.

51.       In light of the foregoing, on May 16, 2018, Mr. Lacey's counsel contacted the government to seek the immediate release of the approximately $1 million dollars held in subject accounts 16(A), (B), and (C) subject to seizure under this docket. (A true and correct copy of the May 16, 2018 Email from J. Henze Cook to J. Kucera is attached hereto as Exhibit G.)

52.       The reason for the request is that the funds are demonstrably unrelated to Backpage.  To allay the government's concern about the propriety of those funds, counsel provided the government with the McSherry Declaration, the voided checks, and the June 2017 statement for the 4862 Cereus Account. (*See id.*)

53.       Further, Mr. Cambria told the government that Ms. McSherry was willing to speak with the government about the wire transfer and her clerical error.  (A true and correct copy of the May 22, 2018 Email from P. Cambria to J. Kucera is attached hereto as Exhibit H.)

54.       To Mr. Lacey's detriment, the government has refused to release the funds to him. (*See* Exs. G, H.)

55.       After being repeatedly pressed by defense counsel for a decision on the release of these untainted funds, which is vital to funding Mr. Lacey's living expenses and defense to the Arizona Prosecution, the government indicated that it would not meet with Ms. McSherry or investigate the issue any further because the government intended to pursue this issue in the context of a civil seizure action, with full civil discovery available, including a deposition of Ms. McSherry.  (*See* Ex. C to the Declaration of Paul J. Cambria.)

56.       Recently, a grand jury sitting in the District of Arizona issued a Superseding Indictment.  The Superseding Indictment adds additional charges and identifies the funds held in subject accounts 16(A), (B), and (C) as subject to potential

seizure.  In light of Mr. Lacey's ever-mounting living expenses, and the necessity to fund a defense to the complex Arizona Prosecution, Mr. Lacey brings the instant motion seeking release of the funds held in subject accounts 16(A), (B), and (C).

I declare, under penalty of perjury under the laws of the State of California, that the foregoing is true and correct of my own knowledge, and that this declaration is executed on August 10, 2018, at Phoenix, Arizona.

Respectfully submitted,

*/s/ Janey Henze Cook*
HENZE COOK MURPHY, PLLC
Attorneys for Defendant Michael Lacey

**EXHIBIT A**

# United States District Court

**CENTRAL**                **DISTRICT OF**                **CALIFORNIA**

**In the Matter of the Seizure of**
(Address or Brief description of property or premises to be seized)

Any and all funds held in Republic Bank of
Arizona Account #11402485; 11101897;
11003126; 1021078316; 1021078324;
1021078332; 1021078103; 1021078162; and
1021078189

**SEIZURE WARRANT**

**CASE NUMBER:**  2:18-MJ-00996

TO:  __United States Postal Service  (USPIS)__ and any Authorized Officer of the United States, Affidavit(s) having been made before
me by __POSTAL INSPECTOR LYNDON A. VERSOZA__ who has reason to believe that in the Northern District of California and
elsewhere there is now certain property which is subject to forfeiture to the United States, namely (describe the property to be seized)

Any and all funds held in Republic Bank of Arizona Account #11402485; 11101897; 11003126; 1021078316;
1021078324; 1021078332; 1021078103; 1021078162; and 1021078189

**which is** (state one or more bases for seizure under United States Code)

subject to seizure and forfeiture under  18 U.S.C. § 981(a)(1)(A) and (C)

concerning a violation of Title  __18__  United States Code, Sections __1952, 1956, and 1957__ .

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the property so described is subject
to seizure and that grounds exist for the issuance of this seizure warrant.

__Republic Bank of Arizona__  is ordered to deliver said funds immediately and forthwith upon presentation of this warrant to the law
enforcement agent serving the warrant, in the form of a cashier's check made payable to the United States Postal Service.

YOU ARE HEREBY COMMANDED to seize within 14 days the property specified, serving this warrant and making the seizure in the
daytime - 6:00 A.M. to 10:00 P.M., leaving a copy of this warrant and receipt for the property seized, and prepare a written inventory
of the property seized and promptly return this warrant to the undersigned judicial officer as required by law.

__4/26/2018 at 3:30pm__
**Date and Time Issued**

__Los Angeles, California__
**City and State**

*John E. McDermott*

**Hon. JOHN E. MCDERMOTT, U.S. Magistrate Judge**
**Name and Title of Judicial Officer**

Signature of Judicial Officer

**JOHN J. KUCERA/drb**

| RETURN | | |
|---|---|---|
| DATE WARRANT RECEIVED | DATE AND TIME WARRANT EXECUTED | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH |

INVENTORY MADE IN THE PRESENCE OF

INVENTORY OF PROPERTY SEIZED PURSUANT TO THE WARRANT

## CERTIFICATION

*I declare under penalty of perjury that I am an officer who executed this warrant and that this inventory is correct and will be returned through a filing with the Clerk's Office.*

Date: _____      _____
                                              *Executing Officer's Signature*


                                              _____
                                              *Printed Name and Title*

# United States District Court

__CENTRAL__          **DISTRICT OF**          __CALIFORNIA__

| In the Matter of the Seizure of | APPLICATION AND AFFIDAVIT |
| (Address or Brief description of property or premises to be seized) | FOR SEIZURE WARRANT |

Any and all funds held in Republic Bank of
Arizona Account #11402485; 11101897;
11003126; 1021078316; 1021078324;
1021078332; 1021078103; 1021078162; and
1021078189

**APPLICATION AND AFFIDAVIT
FOR SEIZURE WARRANT**

**CASE NUMBER:**  2:18-MJ-00996

I, __LYNDON A. VERSOZA__, being duly sworn, depose and say:

I am a United States Postal Inspector with the United States Postal Inspection Service, and I have reason to believe that
in the District of _____ARIZONA_____ and elsewhere there is now concealed a certain person or property,
namely (describe the person or property to be seized)

Republic Bank of Arizona Account #11402485; 11101897; 11003126; 1021078316; 1021078324; 1021078332; 1021078103; 1021078162; and 1021078189

which is (state one or more bases for seizure under United States Code)

subject to seizure and forfeiture under18 U.S.C. § 981(a)(1)(A) and (C)

concerning a violations of Title  18  United States Code, Sections 1952. 1956 and 1957.

The facts to support a finding of Probable Cause for issuance of a Seizure Warrant are as follows:

Continued on the attached sheet and made a part hereof.     _X_ Yes _ No

_____
Signature of Affiant

Sworn to before me, and subscribed in my presence

_____          _____
Date                                         City and State

_____          _____
Hon. JOHN E. MCDERMOTT, U.S. Magistrate Judge          Signature of Judicial Officer
Name and Title of Judicial Officer

John Kucera/drb

## AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT

I, Lyndon A. Versoza, being duly sworn, hereby depose and state as follows:

### I.   TRAINING AND EXPERIENCE

1.   I am a United States Postal Inspector employed by the United States Postal Inspection Service ("USPIS"), Los Angeles Division, in Los Angeles, California, where I have served since June 2005.  Currently, I am responsible for investigating criminal violations of money laundering and structuring laws, such as when United States Postal Service ("USPS") Money Orders or the United States Mail are used as a means to launder or structure funds.  During my career as a Postal Inspector, I have participated in or investigated financial violations including money laundering, darknet investigations, digital currency investigations, structuring, bank, wire and mail fraud, and identity theft.  In addition, I have received both formal and informal training from USPIS and other agencies regarding money laundering and financial crimes.  For approximately five years prior to investigating money laundering, I was assigned to investigate child exploitation and sex trafficking.  In that assignment, I worked both independently and in a task force where I led and participated in investigations related to crimes involving the exploitation of children and sex trafficking.

2.    Prior to my service as a U.S. Postal Inspector, I attended the University of Southern California in Los Angeles, where, in 2001, I received a bachelor's degree.  While in college, I was the website administrator for a non-profit media company in Los Angeles where, among other things, I learned about domain names, domain name servers, and remote hosting. Following college, from 2002 to 2005, I served as a law enforcement officer with the U.S. Immigration and Naturalization Service, which later became U.S. Customs and Border Protection. There, among other things, I worked on cases involving human smuggling and international sex trafficking.

3.    I am familiar with the facts and circumstances described herein.  This affidavit is based upon my personal involvement in this investigation, my training and experience, and information obtained from various law enforcement personnel and witnesses, including information that has been reported to me either directly or indirectly.  This affidavit does not purport to set forth my complete knowledge or understanding of the facts related to this investigation.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only.  All figures, times, and calculations set forth herein are approximate.

## II.  <u>SUMMARY AND PURPOSE OF AFFIDAVIT</u>

4.   This affidavit is made in support of applications for warrants to seize all funds held in certain SUBJECT ACCOUNTS, all owned or controlled by "Backpage.com" (referred to herein as "Backpage"), associated entities, and their owners and operators.

### A.  <u>Background</u>

5.   This case is being investigated by the USPIS, the Federal Bureau of Investigation ("FBI") and the Internal Revenue Service-Criminal Investigation ("IRS-CI"), with assistance from the Los Angeles Joint Regional Intelligence Center.

6.   The focus of the investigation has been on violations by Backpage, its associated entities, and their owners and operators, of Title 18, United States Code, Sections 1952(a)(3)(A) and (b)(i)(1) (Interstate and Foreign Travel in Aid of Racketeering Enterprise); and Title 18 U.S.C. §§ 1956 and 1957, (Money Laundering).

7.   From speaking with other agents in this investigation, and reviewing emails, internal documents, and other records related to this investigation, I know the following:

a.   Backpage.com, LLC, incorporated in Delaware in 2004, is an internet-based company that allows customers to post on-line classified advertisements.  These advertisements include sections dedicated to a variety of matters, including adult,

- 3 -

automotive, community, dating, jobs, local places, musicians,

rentals and services.  Backpage receives between 75 million to

100 million unique internet visitors per month.

      b.   Backpage realizes profits in the tens of millions

of dollars per year from adult advertisement.  Historically,

adult ads, where Backpage advertisers post sex trafficking ads,

constitute less than ten percent of all advertisements posted on

the website.  However, the adult ads generate over 90 percent of

Backpage's revenue.  In short, Backpage derives almost all its

revenue and profits from adult service ads, including

advertising for sex trafficking.[1]

      c.   In or about 2004, operators Michael Lacey

("Lacey"), James Larkin ("Larkin"), and Carl Ferrer ("Ferrer")

created Backpage.  There were also two minority owners; John

Brunst ("Brunst"), who owned 5.67 percent; and Scott Spear

---

[1] According to Backpage accounting records, for the period May 1
to May 31, 2014, over 90% of Backpage's revenues derived from
what they characterized as "adult entertainment."  Backpage's
internal documents suggest that this 90% figure has been
consistent since its 2004 inception.

For example, between October 6, 2014, and May 31, 2015,
Backpage grossed almost $105 million from advertising "adult
entertainment."  During this same period, Backpage grossed only
$1.6 million from all other advertisements combined.  Assuming
that Backpage has accurately estimated that 90% of its revenues
are generated from "adult" and "escort" ads, Backpage has
generated as much as $500 million in prostitution-related
revenue since 2004.

- 4 -

("Spear"), who owned 4.09 percent.  From 2004 until 2015, Lacey and Larkin oversaw the website's policies and strategic direction.  In 2015, Lacy and Larkin purportedly sold all or substantially all of their interests in Backpage to Ferrer.[2] However Lacey and Larkin retained significant control over the website, and both Lacey and Larkin continue to receive tens of millions of dollars of annual distributions of Backpage revenue.

     d.   While not an original owner, Ferrer was one of the original officers of Backpage, having initially served as Backpage's vice-president, and later as CEO.  Ferrer is also the CEO of several Backpage related entities in the Netherlands, including "Website Technologies," "Amstel River Holdings," and "Ad Tech BV."

     e.   Michael Thomas Gage ("Gage") has no formal position at Backpage, but is the President, Chief Executive Officer, Treasurer, and Secretary of another Backpage controlled entity, "Posting Solutions," a wholly owned subsidiary of Backpage that receives payments from Backpage advertisers. According to his social media profile, Gage is also the Chief

---

[2] From my review of financial records related to Ferrer's 2015 agreement to purchase Backpage, it appears that, through a series of loans from other Backpage Operators to be repaid by Ferrer, Ferrer agreed to purchase Backpage for approximately $400 million.

Financial Officer of Website Technologies.  Based on emails he has sent and wire transfer information, Gage appears to control much of the international and domestic financial transactions of Backpage and its related entities.

       f.    Daniel Hyer ("Hyer") at one time was the Sales and Marketing Director of Backpage.  He remains an account signatory for Backpage controlled entities, including Website Technologies.

      8.    Throughout this affidavit, the individuals identified in paragraphs 7(c) through (f), along with others not named in this affidavit, are collectively referred to as the "Backpage Operators."

      9.    Based on a review of publicly available materials obtained in the course of the investigation, and my review of the Backpage website, I have learned the following:

      a.    The majority of the paid advertisements on the Backpage website relate to prostitution activities in violation of 18 U.S.C. §§ 1591 and 1252.

      b.    As further described below, Backpage itself, as well as its operators, who are in control of the SUBJECT ACCOUNTS (as defined below), is in the business of promoting the trafficking of children and adults for sex.  Sex trafficking of adults is a violation of 18 U.S.C. § 1952, and sex trafficking of children is a violation of 18 U.S.C. 1591, each of which

statutes is a Specified Unlawful activity ("SUA") within the
meaning of federal law. (see 18 U.S.C. § 1956(c)(7)(vii)).

     c.   The SUBJECT ACCOUNTS are located both inside and
outside the United States.  The domestic accounts have received
wire transfers from places outside of the United States or have
received funds traceable to wire transfers from places outside
of the United States, which funds Backpage has used to promote
sex trafficking, in violation of 18 U.S.C. § 1956(a)(2)(A)
(International Money Laundering).  Some of the SUBJECT ACCOUNTS
have received transfers or deposits in excess of $10,000
traceable to the SUA, in violation of 18 U.S.C. § 1957 (Money
Laundering Spending Statute).

     d.   Backpage, until recently, controlled numerous
domain names that have since been seized by the government
pursuant to a seizure warrant issued in this district in case
no. CR. Misc. 2:18-MJ-00711.[3]  The Seized Domains are registered
by "ASCIO TECHNOLOGIES INC" DBA "NETNAMES," a domain registrar
that manages the reservation of internet domain names.  A domain
registrar serves to ensure that a registered domain name, like
each of the Seized Domains, is not double sold.  Additionally, a
domain registration will allow the owner of the domain to direct

---

[3] The domain names seized pursuant to that warrant are referred to
herein as the "seized domains."