1  Paul J. Cambria, Jr. (CA 177957)
2  LIPSITZ GREEN SCIME CAMBRIA LLP
3  42 Delaware Avenue, Suite 120
   Buffalo, New York 14202
4  Telephone: (716) 849-1333
5  Facsimile:  (716) 855-1580
   pcambria@lglaw.com
6
7  *Attorneys for Claimant*
   Michael Lacey
8

9           UNITED STATES DISTRICT COURT
10    FOR THE CENTRAL DISTRICT OF CALIFORNIA
                WESTERN DIVISION
11

12 | **In the Matter of the Seizure of:** | CASE NO.2:18-cv-6742-RGK (MAAx)
                                              18-MJ-00722-PJW

13 Any and all funds held in Republic Bank    [Related to Case Nos. 18-MJ-00712,
   of Arizona Account(s) xxxx1889,            18-MJ-00713, 18-MJ-00715,
14 xxxx2592, xxxx1938, xxxx2912, and          18-MJ-00716, 18-MJ-00718,
   xxxx2500.                                  18-MJ-00719, 18-MJ-00720,
15                                            18-MJ-00721, 18-MJ-00723,
                                              18-MJ-00724, 18-MJ-00751,
16                                            18-MJ-00797, 18-MJ-00798,
                                              18-MJ-00996, 18-MJ-00997,
17                                            18-MJ-01427, and 18-MJ-1863]

18                                            DECLARATION OF PAUL J.
19                                            CAMBRIA, JR. IN SUPPORT OF
                                              CLAIMANT MICHAEL LACEY'S
20                                            MOTION FOR RELEASE OF CERTAIN
                                              UNTAINTED FUNDS
21

22                                            (First request)
23                                            (Oral Argument Requested)
24
25
26
27
28

1    Paul J. Cambria, Jr. (CA 177957)
2    LIPSITZ GREEN SCIME CAMBRIA LLP
     42 Delaware Avenue, Suite 120
3    Buffalo, New York 14202
4    Telephone: (716) 849-1333
     Facsimile:  (716) 855-1580
5    pcambria@lglaw.com
6

7    *Attorneys for Claimant*
     Michael Lacey
8

9                  UNITED STATES DISTRICT COURT
         FOR THE CENTRAL DISTRICT OF CALIFORNIA
10                     WESTERN DIVISION

11

12    **In the Matter of the Seizure of:**

13    Any and all funds held in Republic Bank
     of Arizona Account(s) xxxx1889,
14    xxxx2592, xxxx1938, xxxx2912, and
     xxxx2500.
15

16

17

18

19

20

21

22

23

| | |
|---|---|
| | CASE NO.2:18-cv-6742-RGK (MAAx)<br>18-MJ-00722-PJW |
| | [Related to Case Nos. 18-MJ-00712, 18-MJ-00713, 18-MJ-00715, 18-MJ-00716, 18-MJ-00718, 18-MJ-00719, 18-MJ-00720, 18-MJ-00721, 18-MJ-00723, 18-MJ-00724, 18-MJ-00751, 18-MJ-00797, 18-MJ-00798, 18-MJ-00996, 18-MJ-00997, 18-MJ-01427, and 18-MJ-1863] |
| | DECLARATION OF PAUL J. CAMBRIA, JR. IN SUPPORT OF CLAIMANT MICHAEL LACEY'S MOTION FOR RELEASE OF CERTAIN UNTAINTED FUNDS |
| | (First request)<br>(Oral Argument Requested) |

24

25

26

27

28

I, PAUL J. CAMBRIA, JR., declare:

1.      I am an attorney at law duly licensed to practice before all courts within the State of California, am a Senior Partner at the firm Lipsitz, Green, Scime, Cambria LLP, and am counsel of record for claimant Michael Lacey in this case.  As such, I have personal knowledge of the facts set forth below and if called as a witness, I could and would competently testify to them.

2.      On March 28, 2018, a grand jury sitting in the District of Arizona issued an indictment ("Indictment") against Mr. Lacey and his co-defendants in the case captioned *United States v. Lacey*, 18-CR-00422-PHX-SPL (BSB) ("Arizona Prosecution").  (A true and correct copy of the Indictment is attached hereto as Exhibit A.)  The Indictment seeks to hold Mr. Lacey accountable for content posted to the website www.backpage.com ("Backpage") by third-party users, based on his former involvement with Backpage.

3.      The Indictment lists a number of bank accounts with Republic Bank as potentially subject to forfeiture.  However, none of Mr. Lacey's bank accounts with Republic Bank were identified.

4.      It is now known that, in connection with the Arizona Prosecution, the government sought and obtained seizure warrants from this Court authorizing the government to restrain Mr. Lacey's monetary resources long before the scheduled commencement of the January 2020 trial in the Arizona Prosecution.

5.      On March 28, 2018, the government obtained a seizure warrant authorizing it to seize the contents of certain bank accounts of Mr. Lacey's under a separate miscellaneous docket and those accounts are not the subject of the instant motion.

6.      Then, on April 26, 2018, the government obtained a seizure warrant to seize an additional nine accounts held with Republic Bank.

7.       Three of Mr. Lacey's seized accounts—accounts with Republic Bank of Arizona ending in 2485, 1897, and 3126—are the subject of the instant motion.

8.       The release of funds to Mr. Lacey, that are unrelated to Backpage, even under the government's theory of this case, is critical to his ability to meet his daily financial obligations and to defend against the charges pending against him in the Arizona Prosecution.

9.       Consequently, I began requesting any and all seizure warrants, warrant applications, and forfeiture orders in the beginning of May.

10.       However, the government declined to provide any information, stating that all of the forfeiture documents were subject to sealing orders.

11.       In light of Mr. Lacey's tenuous financial position, and that the seized assets included assets unrelated to Backpage, as well as assets derived from Mr. Lacey's participation in First Amendment activities, defense counsel renewed its request that the government promptly disclose the seizure warrants, warrant applications, and forfeiture orders filed and issued in this District to enable defense counsel to review the validity of the government's vast and onerous seizures.

12.       The government declined, stating that those documents remained subject to a sealing order.

13.       After additional discussion and repeated requests that the government provide the Defendants with details about the seizure actions filed in this District, the government stated that it would be unable to disclose those documents to defense counsel before the end of May.

14.       On May 11, 2018, Mr. Lacey and his co-defendants moved for disclosure of those documents in the District of Arizona (because the docket numbers of the forfeiture actions pending in this District were unknown to them). (A true and correct copy of Mr. Lacey's Motion for Disclosure is attached hereto as Exhibit B.)

15.     Due to Mr. Lacey's mounting bills, the motion included a request for an accelerated hearing of the motion. (*See id.*)

16.     On May 18, 2018, the date that the government's opposition to the motion for disclosure was due, the government began disclosure of the requested documents. Notably, this disclosure occurred thirteen days earlier than the date the government claimed it would be able to provide those documents to defense counsel.

17.     As indicated in greater detail in Ms. Henze Cook's declaration, the government's disclosures were telling. It was clear that the government could have provided the documents to defense counsel earlier than it had stated and that the government had benefited from keeping defendants in the dark.

18.     Defense counsel's request for release of the untainted funds at issue in this motion has fared no better. Ms. Henze Cook provided the government with documentation of the clerical error and a declaration from Michele McSherry, the Office Manager for Cereus Properties LLC, who inadvertently made the accounting error, which was contrary to Mr. Lacey's instructions.

19.     I have offered the government the opportunity to interview Ms. McSherry.

20.     The government has made no known attempts to contact Ms. McSherry.

21.     The government has been unable or unwilling to commit to a date to complete its investigation of the untainted funds even though as early as May 18, 2018, I indicated, via email, that I would file the instant motion to seek release of these funds, if the government was unable to identify a date by which its investigation would be completed.

22.     More recently, the government indicated that it will not take any action on resolution of this issue outside the context of a civil forfeiture action (which it has not pursued) with civil discovery.

23.     Then, on July 25, 2018, a grand jury sitting in the District of Arizona issued a superseding indictment.  (A true and correct copy of the Superseding Indictment is attached hereto as Ex. C.)    The parties have had no further communications about the government's erroneous seizure.

24.     At this point, the parties have reached an impasse on this issue, and due to the hardship that Mr. Lacey experiences each day that he is denied access to the funds at issue, Mr. Lacey files the instant motion.


I declare, under penalty of perjury under the laws of the State of California, that the foregoing is true and correct of my own knowledge, and that this declaration is executed on August 10, 2018, at Buffalo, New York.

Respectfully submitted,


/s/     *Paul J. Cambria, Jr.*
          LIPSITZ GREEN SCIME CAMBRIA LLP
          Attorneys for Defendant Michael Lacey

# EXHIBIT A

Case 2:18-cr-00422-SPL   Document 3   Filed 03/28/18   Page 1 of 61

___ FILED ___ LODGED
___ RECEIVED ___ COPY

MAR 28 2018

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ ᴋᴇᴍ M DEPUTY

# SEALED

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>              Plaintiff,<br><br>        v.<br><br>1. Michael Lacey<br>Counts 1-70, 81, 83-84, 86, 88-92<br><br>2. James Larkin<br>Counts 1-68, 80, 87<br><br>3. Scott Spear<br>Counts 1-68, 71-78, 85, 93<br><br>4. John "Jed" Brunst<br>Counts 52-70, 78-84, 86-93<br><br>5. Dan Hyer<br>Counts 1-68<br><br>6. Andrew Padilla<br>Counts 1-51<br><br>7. Joye Vaught<br>Counts 1-51<br><br>                     Defendants. | CR-18-00422-PHX-SPL (BSB)<br><br>**INDICTMENT**<br><br>VIO:  18 U.S.C. § 371<br>(Conspiracy)<br>Count 1<br><br>18 U.S.C. § 1952(a)(3)(A)<br>(Travel Act—Facilitate Prostitution)<br>Counts 2-51<br><br>18 U.S.C. § 1956(h)<br>(Conspiracy to Commit Money<br>Laundering)<br>Count 52<br><br>18 U.S.C. § 1956(a)(1)(B)(i)<br>(Concealment Money Laundering)<br>Counts 53-62<br><br>18 U.S.C. § 1956(a)(2)(A)<br>(International Promotional Money<br>Laundering)<br>Counts 63-68<br><br>18 U.S.C. § 1957(a)<br>(Transactional Money Laundering)<br>Counts 69-93<br><br>18 U.S.C. §§ 981, 982<br>21 U.S.C. § 853, 28 U.S.C. § 2461<br>(Forfeiture Allegations) |

THE GRAND JURY CHARGES:

A.    Introduction

1.     The website www.backpage.com ("Backpage") is notorious for being the

1  internet's leading source of prostitution advertisements.   Backpage derives the

2  overwhelming majority of its revenue from such ads.   These practices have enabled

3  Backpage to earn over $500 million in prostitution-related revenue since its inception.

4      2.    Backpage was created in 2004 by defendant MICHAEL LACEY

5  ("LACEY"), defendant JAMES LARKIN ("LARKIN"), and a third individual, C.F. From

6  2004-15, LACEY and LARKIN oversaw the website's policies and strategic direction.

7  Additionally, LACEY and LARKIN have retained significant control over the website (and

8  have continued receiving tens of millions of dollars of Backpage-related distributions)

9  since purportedly selling their interests in Backpage in 2015.

10      3.    Defendant SCOTT SPEAR served as the Executive Vice President of one of

11  Backpage's parent companies and held, at times, an ownership interest in Backpage of

12  approximately 4%.

13      4.    Defendant JOHN "JED" BRUNST ("BRUNST") served as the Chief

14  Financial Officer of Backpage and several of Backpage's parent companies and held, at

15  times, an ownership interest in Backpage of approximately 6%.

16      5.    Defendant DAN HYER ("HYER") joined Backpage's marketing department

17  in or around 2006 and served as Backpage's Sales and Marketing Director.

18      6.    Defendant ANDREW PADILLA ("PADILLA") served as Backpage's

19  Operations Manager.

20      7.    Defendant JOYE VAUGHT ("VAUGHT") served as Backpage's assistant

21  Operations Manager.

22      8.    The defendants identified above are referred to at times in this indictment as

23  the "BACKPAGE DEFENDANTS."

24      9.    As explained in detail below, the BACKPAGE DEFENDANTS have utilized

25  a variety of strategies to make it appear that the prostitution ads appearing on Backpage

26  are actually ads for "escort" services, "adult" companionship, dating, or other lawful

27  activities. For example, Backpage purports to bar customers from offering illegal services

28

1   and has periodically used computerized filters and human "moderators" to edit the wording

2   of (or block) ads that explicitly offer sexual services in return for money.

3       10.   These strategies are a fiction designed to conceal the true nature of

4   Backpage's ads and customers.   Indeed, the BACKPAGE DEFENDANTS have

5   admitted—in internal company documents and during private meetings—that they know

6   the overwhelming majority of the website's ads involve prostitution.   In one internal

7   document, LACEY actually bragged about the company's contributions to the prostitution

8   industry: "Backpage is part of the solution.  Eliminating adult advertising will in no way

9   eliminate or even reduce the incidence of prostitution in this country. . . .  For the very first

10   time, the oldest profession in the world has transparency, record keeping and safeguards."

11       11.   Notwithstanding these private admissions, the BACKPAGE

12   DEFENDANTS have taken pains to mislead the public, regulators, and law enforcement

13   officials concerning the supposed sincerity of Backpage's efforts to prevent the publication

14   of prostitution-related ads.  For example, after reviewing LACEY's written description of

15   Backpage's contributions to the prostitution industry and editing practices, LARKIN

16   instructed C.F. to prevent "any of the information in this being made public." PADILLA,

17   who helped supervise Backpage's moderators, threatened to fire any employee who

18   acknowledged in writing that the "escorts" depicted in the website's ads were actually

19   prostitutes: "Leaving notes . . . implying that we're aware of prostitution . . . is enough to

20   lose your job over."   And in one internal document, Backpage's media strategy was

21   described simply as "Do not acknowledge the prostitution."

22       12.   Many of the ads published on Backpage depicted children who were victims

23   of sex trafficking.  Once again, although Backpage has sought to create the perception that

24   it diligently attempts to prevent the publication of such ads, the reality is that Backpage has

25   allowed such ads to be published while declining—for financial reasons—to take necessary

26   steps to address the problem.  For example, for several years, Backpage's official policy,

27   when presented with an ad featuring the prostitution of a child, was to delete the particular

28

- 3 -

1   words in the ad denoting the child's age and then publish a revised version of the ad. Such

2   editing, of course, did nothing to change the fact the ad featured the prostitution of a child—

3   it only created a veneer of deniability and helped Backpage's customers (*i.e.,* pimps

4   trafficking children) evade detection.

5          13.   Backpage has also contributed to the proliferation of ads featuring the

6   prostitution of children in other ways. For example, an anti-sex trafficking organization

7   once suggested that Backpage provide an automatic warning message whenever a customer

8   searched for particular terms indicative of the prostitution of a child. In response, C.F.

9   acknowledged the proposal was a good one but declined to adopt it because Backpage

10   would not derive any public-relations benefit from doing so: "This is a good idea but it is

11   not visible to AGs [state attorneys general] so it has little PR value. It is a low priority."

12   Backpage has also claimed it does everything in its power to alert the National Center for

13   Missing and Exploited Children ("NCMEC") whenever it becomes aware that a child is

14   being advertised on its website. However, the BACKPAGE DEFENDANTS implemented

15   policies to artificially limit such referrals. In one email, PADILLA instructed VAUGHT

16   that "if we don't want to blow past 500 [referrals to NMCEC] this month, we shouldn't be

17   doing more than 16 per day." In another training document, moderators were instructed

18   not to send emergency alerts to NCMEC in response to complaints filed by the

19   grandparents and other extended family members of children being advertised on the

20   website: "Neice [sic], nephew, grandchild, cousin, etc. doesn't count."

21         14.   Virtually every dollar flowing into Backpage's coffers represents the

22   proceeds of illegal activity. In fact, by 2015, the major credit card companies stopped

23   processing payments for Backpage and some banks closed Backpage's accounts out of

24   concern they were being used for illegal purposes. In response, the BACKPAGE

25   DEFENDANTS have pursued an array of money laundering strategies. These strategies

26   have included (a) instructing customers to send checks and money orders to particular Post

27   Office box, depositing those payments in bank accounts held in the name of entities with

28

-4-

1    no apparent connection to Backpage, and then giving customers a corresponding "credit"

2    on Backpage to purchase new ads, (b) wiring the proceeds of Backpage's business to bank

3    accounts held in foreign countries and then redistributing the funds to certain BACKPAGE

4    DEFENDANTS (as compensation) or redepositing the funds in bank accounts held in the

5    United States (to conceal the nature of those funds and promote Backpage's ongoing

6    operations), and (c) converting customer payments, and the proceeds of Backpage's

7    business, into and out of cryptocurrency.

8         15.    The BACKPAGE DEFENDANTS have also engaged in other financial

9    transactions designed to conceal their misconduct and evade seizure by law enforcement.

10   For example, in November 2016, LACEY asked employees of an Arizona-based bank for

11   advice on how to move his assets "offshore" to protect them from seizure by the

12   government.   Soon afterward, $16.5 million in Backpage-derived cash was wired from

13   LACEY's bank accounts in the United States to an overseas bank account in Hungary.

14        16.    For all of these reasons, the BACKPAGE DEFENDANTS are charged in this

15   indictment with the crimes of facilitating prostitution (18 U.S.C. § 1952), concealment,

16   transactional, and international promotional money laundering (18 U.S.C. §§ 1956 and

17   1957), and/or conspiracy to commit these offenses (18 U.S.C § 371 and 1956).

18   B.   Backpage's Origins, Ownership, and Control

19        17.    LACEY and LARKIN are the founders of the *Phoenix New Times*, an

20   alternative newspaper based in Arizona.   Over time, LACEY and LARKIN acquired

21   several other alternative newspapers, which they came to operate through an entity called

22   Village Voice Media Holdings ("VVMH").   Additionally, SPEAR served as VVMH's

23   Executive Vice President and BRUNST served as VVMH's Chief Financial Officer.

24        18.    The publications within the VVMH newspaper chain routinely featured

25   illegal prostitution ads.   In fact, more than 30 years ago, a federal court affirmed the

26   conviction of the operator of a prostitution business (which masqueraded as a massage

27   parlor) for publishing ads in the classified section of the *Village Voice*. *See United States*

28

1    *v. Sigalow*, 812 F.2d 783 (2d Cir. 1987). The conviction was for violating 18 U.S.C.

2    § 1952, one of the same crimes charged in this indictment.

3        19. By 2000, the rise of the internet—and, in particular, the website

4    www.craigslist.com ("Craigslist"), which offered free classified ads—began to

5    significantly disrupt VVMH's business model, which depended on classified advertising

6    revenue for survival.

7        20. LACEY and LARKIN, with assistance from C.F., sought to address this

8    threat by creating Backpage. Their decision to create Backpage was later described in an

9    internal company document as follows: "In 2004, in response to the Craigslist threat that

10   was decimating daily newspapers, VVM launched its own online classified site,

11   Backpage.com, named after the back page of VVM's print publication."

12       21. During its first few years of operation, Backpage accounted for only a

13   fraction of VVMH's overall revenue. In January 2006, for example, VVMH estimated that

14   Backpage supplied only 1% of its overall advertising revenue but also noted that Backpage

15   had "tremendous upside potential."

16       22. This prediction proved prophetic. By 2008, Backpage was generating over

17   $5 million in annual profit. This annual profit figure increased to over $10 million in 2009.

18       23. In 2010, Craigslist chose to shut down its "adult" section due to the prevalence

19   of ads for prostitution and other illegal services. The BACKPAGE DEFENDANTS,

20   sensing an opportunity, made an aggressive push for Backpage to capture Craiglist's share

21   of this market. In one internal document, LARKIN commented: "Craigslist has folded . .

22   . . It is possible that this will mean a deluge of adult content ads for backpage.com . . . .

23   We have with the Village Voice probably the longest run of adult content advertising in

24   the US and it is, like it or not, in our DNA."

25       24. This push was successful. In internal documents, Backpage stated that it

26   experienced "explosive growth" by "capitalizing on displaced Craigslist ad volume."

27   Backpage's annual profits grew to over $26 million in 2010, over $52 million in 2011, and

28

over $78 million in 2012.

25.     These figures dwarfed the profits that VVMH's print publications were generating. In fact, Backpage became so profitable that the BACKPAGE DEFENDANTS decided to get rid of VVMH's publishing business so they could focus on Backpage's further development and expansion.  Accordingly, in or around November 2012, the BACKPAGE DEFENDANTS spun off VVMH's print publications and began utilizing several new corporate entities, including Medalist Holdings, Inc. ("Medalist"), Dartmoor Holdings LLC ("Dartmoor"), and Camarillo Holdings, LLC ("Camarillo"), to serve as Backpage's parent companies.

26.     Following these transactions, LACEY held an ownership interest in Medalist (and, therefore, in Backpage) of approximately 45%, LARKIN held an ownership interest of approximately 43%, BRUNST held an ownership interest of approximately 6%, and SPEAR held an ownership interest of approximately 4%.

27.     Backpage's annual profits continued to skyrocket during and after these changes.  They grew to over $112 million in 2013 and over $134 million in 2014.

28.     In or around April 2015, LACEY, LARKIN, SPEAR, and BRUNST purported to sell their ownership interests in Backpage and several related entities for around $600 million to various Dutch entities.  These Dutch entities included Atlantische Bedrijven, C.V., which agreed to purchase Backpage's U.S. operations for around $526 million, and UGC Tech Group C.V., which agreed to purchase Backpage's overseas operations for around $77 million.

29.     In fact, these Dutch entities were controlled by C.F., who borrowed most of the $600 million from entities controlled by the sellers to finance the purchase.  Due to this financial arrangement, LACEY, LARKIN, SPEAR, and BRUNST retained a significant financial interest in Backpage after the transactions were completed.

30.     Additionally, LACEY, LARKIN, SPEAR, and BRUNST retained significant operational control over Backpage following these transactions.  For example, the April

- 7 -

1   2015 loan agreement required C.F. to sign a six-year employment agreement, required C.F.

2   to provide the lenders with full access to Backpage's books and records, required C.F. to

3   provide the lenders with an annual listing of all of C.F.'s personal assets, and prohibited

4   C.F. from opening any new bank accounts on Backpage's behalf without the lenders'

5   consent.

6   C.    Backpage's Knowledge And Facilitation Of Prostitution Ads

7            31.    By 2008, if not earlier, the BACKPAGE DEFENDANTS were aware that

8   the overwhelming majority of the website's "adult" ads involved prostitution.

9   Nevertheless, the BACKPAGE DEFENDANTS made a financial decision to continue

10  displaying those ads.

11           32.    The BACKPAGE DEFENDANTS also sought to sanitize the ads by editing

12  them—that is, by removing terms and pictures that were particularly indicative of

13  prostitution and then publishing a revised version of the ad.  This process was sometimes

14  referred to as "moderation."

15           33.    For example, in April 2008, C.F. wrote an email explaining that, although he

16  was "under pressure to clean up phoenix's adult content," he was unwilling to delete

17  prostitution ads because doing so "would put us in a very uncompetitive position with

18  craig[slist]" and result in "lost pageviews and revenue."  Thus, he instructed Backpage's

19  technical staff to edit the wording of such ads, by removing particular terms that were

20  indicative of prostitution, and then allow the remainder of the ad to be featured on

21  Backpage's website.

22           34.    On February 26, 2009, C.F. received an email from the classified-ads

23  manager of a newspaper within the VVMH chain asking why Backpage's terms of service

24  purported to prevent customers from "suggest[ing] an exchange of sexual favors for

25  money" in light of the fact that "[c]learly everyone on the entire backpage network breaks

26  the rules."  In response, C.F. didn't dispute the author's characterization and explained that

27  Backpage had simply added the terms of service at the behest of "our attorney in SF" in an

28

- 8 -

1   attempt to avoid liability in civil lawsuits.

2      35.   On May 25, 2009, SPEAR received an email summarizing a plan to begin

3   "remov[ing] sex act pics and coded terms" from Backpage ads.   Later that day, C.F.

4   forwarded this email to HYER with the explanatory note that "We do not intend to be a

5   craig[slist] here, just get out the most egregious stuff."

6      36.   On March 8, 2010, C.F. testified in federal court (the United States District

7   Court for the Southern District of Florida) in the criminal trial of a pimp who had used

8   Backpage to post prostitution ads. During his testimony, C.F. acknowledged the defendant

9   had used the email address "Youngpimpin86" when posting the ads.   C.F. also

10  acknowledged that the ads described one so-called escort as "five-foot-three, with a small

11  waist and amazing ass you'll have to see to believe. XL, XL, XL, Lollipop" and described

12  a different so-called escort as "discrete, sincere and extremely naughty. I am the type of

13  girl who absolutely adores a man who understands the many desires of a young beautiful

14  woman and how to accommodate a variety of fantasies." This episode provided notice to

15  Backpage that it was implausible to pretend such ads were merely offering lawful escort

16  services.

17     37.   On September 1, 2010, PADILLA sent an email to HYER and C.F. stating

18  that customers who engaged in "extreme and repeat" violations of Backpage's posting rules

19  would have their ads deleted and be banned from the website.   However, PADILLA also

20  stated the bans would only be temporary and that "we'll do everything we can to affect

21  only the worst apples."

22     38.   On September 1, 2010, SPEAR received an email acknowledging that

23  Backpage's moderators were being instructed to "Remove any sex act pics in escorts [ads]"

24  and "Remove any illegal text in escorts [ads] to include any code words for sex act for

25  money."

26     39.   On September 21, 2010, a group of state attorneys general wrote a letter to

27  Backpage.   This letter observed that "ads for prostitution—including ads trafficking

28

1    children—are rampant on the site" and argued that "[b]ecause Backpage cannot, or will

2    not, adequately screen these ads, it should stop accepting them altogether." The letter

3    acknowledged that this step would cause Backpage to "lose the considerable revenue

4    generated by the adult services ads" but stated that "no amount of money can justify the

5    scourge of illegal prostitution, and the misery of the women and children who will continue

6    to be victimized, in the marketplace provided by backpage."

7        40.   On September 25, 2010, C.F. wrote an email explaining that Backpage was

8    unwilling to delete ads that included terms indicative of prostitution because doing so

9    would "piss[] off a lot of users who will migrate elsewhere" and force Backpage to refund

10   those customers' fees. Thus, C.F. announced that Backpage would "go back to having our

11   moderators remove bad content in a post . . . ."

12       41.   On September 30, 2010, C.F. testified in federal court (the United States

13   District Court for the District of Minnesota) in the criminal trial of a pimp who had used

14   Backpage to post prostitution ads.   During his testimony, C.F. acknowledged that

15   Backpage's servers are located in Arizona and that the ads posted by the Minnesota-based

16   defendant had therefore "traveled across state lines."

17       42.   On October 8, 2010, PADILLA sent an email (on which VAUGHT was cc'd)

18   threatening to fire any Backpage employee who acknowledged, in writing, that a customer

19   was a prostitute: "Leaving notes on our site that imply that we're aware of prostitution, or

20   in any position to define it, is enough to lose your job over. . . .  This isn't open for

21   discussion. If you don't agree with what I'm saying completely, you need to find another

22   job."

23       43.   On October 16, 2010, PADILLA sent an email to a large group of Backpage

24   employees (including HYER and VAUGHT).   The email had two attachments that

25   provided guidance on how to "moderate" ads. The first was a Powerpoint presentation that

26   displayed a series of 38 nude and partially-nude photographs, some of which depicted

27   graphic sex acts.   Next to each picture was an instruction as to whether it should be

28

1    approved or disapproved by a Backpage moderator. These instructions included "Approve.
2    Nude rear shots are okay as long the model is not exposing her anus or genitalia." and
3    "Approve. Rear shot okay. Transparent wet panties okay." The second was an Excel
4    spreadsheet identifying 50 terms (all of which were indicative of prostitution) that should
5    be "stripped" from ads before publication. PADILLA concluded the email by stating:
6    "[I]t's the language in ads that's really killing us with the Attorneys General. Images are
7    almost an afterthought to them."

8         44.   On October 16, 2010, PADILLA sent a separate internal email (which also
9    included HYER and VAUGHT as recipients). In this email, PADILLA explained that "I'd
10   like to still avoid Deleting ads when possible," that "we're still allowing phrases with
11   nuance," and that "[i]n the case of lesser violations, editing should be sufficient."

12        45.   On October 25, 2010, C.F. sent an email to SPEAR, HYER, and PADILLA
13   acknowledging that the "[i]llegal content removed" through Backpage's moderation
14   processes was "usually money for sex act." This email also explained that, after the "sex
15   act pics are removed," the "ad text may stay."

16        46.   On October 26, 2010, HYER and PADILLA received an email explaining:
17   "We will not remove ads with vaginas or penis showing, just the images unless they are a
18   frequent offender. We will not remove ads with rates under an hour, just the text with the
19   minimum rates. Users need time to react to this change."

20        47.   On October 27, 2010, PADILLA sent an email to the head of a group of
21   contractors from India who had been hired to moderate Backpage's adult ads. In this email,
22   PADILLA criticized the contractors for deleting too many ads, stated that this approach
23   was bad for business, and instructed the contractors to simply edit the ads to remove the
24   more-obvious language: "As long as your crew is editing and not removing the ad entirely,
25   we shouldn't upset too many users. Your crew has permission to edit out text violations
26   and images and then approve the ad."

27        48.   On October 27, 2010, HYER sent an internal email stating that Backpage

28

1   was "editing 70 to 80%" of the ads it received from customers.  In other words, HYER

2   acknowledged that a large proportion of the ads originally submitted by Backpage's

3   customers contained text and pictures that were indicative of prostitution and that

4   Backpage was still choosing to publish those ads after editing them.

5        49.    On November 4, 2010, C.F. sent an email to Backpage's India-based

6   moderators (on which PADILLA was cc'd) explaining that "[m]any of the ads need to have

7   15 minute and 30 minute pricing removed" and that "I'm being evaluated by lawyers [*i.e.*,

8   state attorneys general] later this week so cleaning up old stuff is important."

9        50.    On November 17, 2010, HYER and PADILLA received an email

10   acknowledging that the term Lolita is "code for under aged girl" but explaining that this

11   term could simply be stripped out from ads (as opposed to refusing to publish the ad).  The

12   email also explained that customers should be allowed to include their identification

13   numbers from a notorious prostitution website, The Erotic Review:  "[A]llow users to put

14   in TER IDs (just no live links)."

15        51.    On November 30, 2010, LARKIN, SPEAR, and other Backpage

16   representatives participated in a conference call with representatives from NCMEC.

17   During this call, the Backpage representatives were advised that a large portion of the ads

18   on Backpage were blatant prostitution ads, that many of those ads featured children, and

19   that the posting of such ads was illegal in every state.

20        52.    In December 2010, HYER, PADILLA, and others exchanged a series of

21   emails entitled "Deep cleaning strip out."  These emails identified a lengthy list of terms

22   that were indicative of prostitution and discussed plans for removing the terms from the

23   old ads in Backpage's archives.  During this exchange, C.F. stated that Backpage wasn't

24   willing to delete the old prostitution ads because "our users love" having access them,

25   "[s]o, best to do deep cleaning and not kill a valuable feature."  C.F. later encouraged

26   Backpage's staff to complete the project quickly to avoid scrutiny:  "This task is urgent

27   since CNN is runing [sic] a report soon."

28

53. On January 13, 2011, HYER and PADILLA received an email summarizing instructions that had been provided to members of Backpage's technical staff. It explained that the technical staff had been instructed "not to display the moderation log" in a particular section of Backpage's database "since we pdf this page for subpoenas. I would rather not testify in court as to why my staff 'approved' . . . postings."

54. In January 2011, LARKIN and LACEY met with a representative from NCMEC. During this meeting, LACEY asked which types of sex ads would be acceptable from NCMEC's perspective. When the NCMEC representative declined to say that any such ads would be acceptable, LACEY made a statement to the effect of "adult prostitution is none of your business."

55. On January 31, 2011, and February 1, 2011, C.F. engaged in an email exchange concerning whether to remove links to other prostitution websites (such as The Erotic Review) from expired Backpage ads. C.F. stated that, although SPEAR and his "internet safety guy" were recommending that such ads be removed, he thought this would "be a stupid move" because it would hurt Backpage financially (by reducing the number of referrals from other sites). C.F. added that "this overly zealous focus on moderation at the expense of other development is a lot of bullshit . . . ."

56. On February 2, 2011, C.F. sent an email acknowledging that "[t]he strip out affects almost every adult ad." In other words, C.F. acknowledged that "almost every adult ad" on Backpage was a prostitution ad that had been edited to remove the most damning text and pictures.

57. On February 3, 2011, a Backpage customer who went by the name "Licks Alot" wrote an email to Backpage complaining that all of the pictures in one of her ads (entitled "Athletic SWF Guaranteed Low Mileage Boys!!!") had been deleted. C.F. responded to "Licks Alot" by explaining that one of her photos had been removed because "[o]ur crazy internet safety experts do not want any genitalia showing up around the thong." However, C.F. proceeded to apologize to "Licks Alot" over the removal of her

- 13 -

1   remaining photos, allowed her ad (which was obviously for prostitution) to remain on the

2   website, and offered her a free upgrade.

3       58.   On February 8, 2011, C.F. testified in federal court (the United States District

4   Court for the Middle District of Florida) in the criminal trial of a pimp who had used

5   Backpage to post prostitution ads.  During his testimony, C.F. authenticated one of the ads

6   the defendant had placed on Backpage, whose title was "Extra horny sexy newbie,"

7   confirmed that Backpage had allowed this ad to be posted multiple times in various East

8   Coast cities, and acknowledged that Backpage published "a lot" of similar ads.  This

9   episode provided further notice to Backpage that it was implausible to pretend such ads

10   were merely offering lawful escort services.

11       59.   On February 16, 2011, PADILLA sent an email to Backpage's India-based

12   moderators (on which VAUGHT was cc'd) explaining that Backpage was adopting a

13   "more lenient policy" and that he was instructing his Phoenix-based employees to "go easy

14   on some types of violations."  PADILLA acknowledged this approach would "likely" result

15   in more "violations" but emphasized that "moderators should err on the side of the user."

16       60.   On February 16, 2011, PADILLA sent a separate email discussing whether

17   several terms should remain on Backpage's "filtered terms" list.  During this discussion,

18   PADILLA acknowledged—by placing quote marks around the term "companionship"—

19   that he didn't actually believe the women being advertised on Backpage were providing

20   lawful escort services: "[The term] implies some exchange of bodily fluids which kills our

21   'companionship' argument, but i don't think we've ever really gotten in trouble for it."

22       61.   On February 22, 2011, PADILLA received an email requesting Backpage's

23   "list of banned, stripped out adult terms."   In response, PADILLA sent an Excel

24   spreadsheet entitled "Phrase List 02211," which PADILLA described as "the latest greatest

25   version of the list."  The enclosed spreadsheet identified over 660 words or phrases that are

26   indicative of prostitution, including an array of terms that are suggestive of child

27   prostitution (*e.g.*, "lolita," "fresh," "high school," "tight," "young").  The spreadsheet

28

1   explained that most such terms were simply to be "filtered" from the ads in which they

2   appeared.

3         62.    On February 23, 2011, PADILLA received an email concerning a particular

4   ad that had recently been edited by Backpage's India-based moderators. The ad was

5   obviously for prostitution—its title was "new-new-new-put me in your favorite position"

6   and the poster had attempted to include two photographs that violated Backpage's posting

7   rules. In response, the India-based moderators had deleted both of those photos, as well as

8   a third photo that depicted the prostitute's face, and then allowed the ad to be published.

9   The email received by PADILLA did not criticize the moderators for allowing an obvious

10   prostitution ad to be published after editing. To the contrary, it emphasized that the ad

11   should remain on Backpage and criticized the moderators for removing the third photo,

12   threatening to fire them if they did it again: "2 out of 3 pics should have been removed.

13   But [the] moderator deleted all three pics. This is plain wrong . . . . I would fire a moderator

14   in Phoenix if they did this."

15         63.    In March 2011, LARKIN, LACEY, SPEAR, and other Backpage

16   representatives met with representatives from NCMEC. During this meeting, the Backpage

17   representatives were again advised that a large portion of the ads on Backpage were blatant

18   prostitution ads. The Backpage representatives also were advised they could be criminally

19   prosecuted under federal law for their conduct.

20         64.    On April 5, 2011, PADILLA sent an email whose recipients included

21   VAUGHT and the supervisor of Backpage's Indian moderation team. The email was

22   entitled "relaxed image standards" and included, as an attachment, a document that

23   displayed a series of 30 nude and partially-nude photographs. Next to each picture was an

24   instruction as to whether it should be approved or disapproved by a moderator. One picture

25   showed a woman sitting on a bed, wearing only a bra and panties, with her legs spread

26   open and her hand partially covering her crotch. The caption provided in part: "okay –

27   but barely."

28

65.    Between April 2011 and March 2012, PADILLA, C.F., and others participated in an email exchange acknowledging that Backpage was deleting thousands of pictures from customer ads each week and seeking assistance in collecting all of the deleted pictures so they could be used for "entertainment" or to generate user "traffic for other projects." The email explained that the deleted pictures could be made available to the public on a new website called "nakedpics.backpage.com" or "badpics.backpage.com."

66.    On April 19, 2011, LARKIN and SPEAR received an email seeking permission to terminate the contract of a third-party vendor that had been receiving $17,000 per month to "remov[e] any nude pics" from the expired ads in Backpage's database. LARKIN responded:  "do it!"

67.    On June 7, 2011, C.F. received an inquiry from a law enforcement official about a particular ad that included the term "amber alert." In response, C.F. acknowledged this might be "some kind of bizarre new code word for an under aged person." C.F. then forwarded this exchange to PADILLA and stated that he had instructed HYER to add "amber alert" to Backpage's "strip out" list. In other words, HYER, PADILLA, and C.F. did not require all future ads involving this particular coded term for the prostitution of a child to be blocked from Backpage—they merely required such ads to be edited before publication.

68.    On June 30, 2011, several Backpage representatives met with representatives from the office of the Washington State Attorney General. During this meeting, the Backpage representatives initially attempted to claim that no prostitution ads appeared on their website. In response, a representative from the Attorney General's office stated: "You mean to tell me that if someone responded to an advertisement, the woman they called for services would be offering to go out for coffee?" A Backpage representative responded to this question by looking at C.F., laughing, and acknowledging that Backpage couldn't "deny the undeniable."

69.    On July 27, 2011, C.F. sent an email to HYER and PADILLA, and a nearly-

1    identical email to LARKIN and LACEY, concerning the possibility of using age-

2    verification software. In this email, C.F. acknowledged the software might be beneficial

3    ("This might be our solution") but recommended against its wholesale adoption because it

4    would cost "79 to 99 cents per query" and would thus cut into Backpage's profits.

5         70.    On July 28, 2011, LACEY sent LARKIN a draft editorial entitled "BackPage

6    understood." In this document, LACEY bragged about Backpage's contributions to the

7    prostitution industry: "Backpage is part of the solution. Eliminating our adult advertising

8    will in no way eliminate or even reduce the incidence of prostitution in this country. . . .

9    For the very first time, the oldest profession in the world has transparency, record keeping

10   and safeguards." LACEY also acknowledged that Backpage used an automatic filter to

11   remove particular phrases from ads that were indicative of prostitution but still published

12   the ads after editing them.

13        71.    Soon afterward, LARKIN forwarded the editorial to C.F., with a cover note

14   cautioning against some of LACEY's statements "being made public" because "we need

15   to stay away from the very idea of 'editing' the posts, as you know." C.F., in turn, revised

16   the editorial to take out the paragraph lauding Backpage's contributions to the prostitution

17   industry.

18        72.    On August 5, 2011, Backpage received a letter from the mayor of Seattle.

19   This letter warned that "Seattle Police have identified an alarming number of juvenile

20   prostitutes advertised on Backpage.com since January 2010" and explained that Backpage

21   was dissimilar from other companies whose products and services are "occasionally or

22   incidentally" utilized by criminals because "[y]our company is in the business of selling

23   sex ads" and "your services are a direct vehicle for prostitution." The letter also

24   recommended that Backpage require in-person age verification for all of the "escorts"

25   depicted in its ads. Afterward, Backpage declined to adopt these recommendations.

26        73.    On August 15, 2011, PADILLA received an email containing an updated

27   version of Backpage's moderation guidelines. This six-page document provided the

28

1  following instructions concerning photographs: "Nude rear shots are okay as long the
2  model is not exposing her anus or genitalia," "Transparent wet panties okay should not be
3  able to see personal private part," and "cherry, Ice-cream keeping in mouth [is okay]." The
4  document also explained that "Bikini, lingerie, g-string, thong, and hands covering nipples
5  are all allowed," "Hourly rates are OK," and "Sessions are okay. E.g $50 session."

6       74.   On August 31, 2011, Backpage received a letter from the National
7  Association of Attorneys General.   This letter characterized Backpage as "a hub" for
8  human trafficking, identified "more than 50 instances, in 22 states over three years, of
9  charges filed against those trafficking or attempting to traffic minors on Backpage.com,"
10 and noted that "[n]early naked persons in provocative positions are pictured in nearly every
11 adult services advertisement on Backpage.com and the site requires advertisements for
12 escorts, and other similar 'services,' to include hourly rates.   It does not require forensic
13 training to understand that these advertisements are for prostitution."

14      75.   On October 6, 2011, C.F. sent an email discussing various proposals for
15 addressing "the under aged issue."   With respect to one particular proposal, C.F.
16 acknowledged it was a good one but recommended against adopting it because Backpage
17 would not derive any public-relations benefit from doing so: "This is a good idea but it is
18 not visible to AG's [state attorneys general] so it has little PR value.   It is a low priority."

19      76.   In the fall of 2011, Backpage sought the assistance of a public relations firm
20 based in Washington, D.C. On October 12, 2011, C.F. received a written copy of the firm's
21 presentation.   Later, some of the BACKPAGE DEFENDANTS attended a meeting at
22 which the presentation was discussed in more detail.   The presentation warned that
23 Backpage's business practices would inevitably result in legal trouble ("One day the
24 proverbial is going to hit the fan") and characterized Backpage's "media strategy" as "Do
25 not acknowledge the prostitution."   The presentation also noted that the "ads on the
26 backpage.com site" generally fall into three categories, one of which is "Pimps and Men
27 Looking for Kids."

28