The initial appearance and arraignment for Defendant Vaught was held on April 6, 2018, at which she pleaded not guilty and was released. (*See* Min. Entry, Doc. 18.) The initial appearance and arraignment for Defendants Spear and Brunst was held on April 9, 2018, at which they pleaded not guilty and were released. (*See* Min. Entry, Doc. 30.) The initial appearance and arraignment for Defendants Hyer and Padilla was held on April 18, 2018, at which they pleaded not guilty and were released. (*See* Min. Entry, Doc. 109.)

**II.     The government seized the majority of Defendants assets prior to trial.**

The government has seized the vast majority of several of the Defendants' assets, even though Defendants must be presumed to be innocent of the crimes charged at this stage, and the conduct upon which the indictment is based involves presumptively protected First Amendment activities.

On May 1, 2018, Defendants learned that the government obtained pretrial restraint of their assets through civil forfeiture by obtaining seizure warrants in the Central District of California, even though Defendants and their assets, for the most part, are located in this District or in Texas, and the instant prosecution is pending in this District. It is unknown the extent to which the government has seized any of Defendants' assets through criminal forfeiture proceedings in this District or elsewhere.

The government's pretrial restraint of various of the Defendants' assets has hampered them from paying living expenses and funding the defense of the instant charges with counsel of choice, especially considering the government's representation that 7 to 9 million pages of documents will need to be reviewed. Defendants intend to move for release of their assets as soon as possible, in particular, for the release of any and all funds improperly

5

restrained, but they cannot do so without first obtaining the documents upon which the government sought the seizures.

**III.    The government refuses to promptly disclose any documents related to the pretrial restraint of Defendants' assets.**

On April 30, 2018, the parties appeared before the Court, at which point the Court entered the Scheduling Order for the instant prosecution. (*See* Min. Entry, Doc. 126; Scheduling Or., Doc. 131.) The next day, Defendants learned that the government had sought the pretrial restraint of Defendants' assets through *civil* forfeiture proceedings originating in the Central District of California.

In light of this development, Defendants immediately requested that the government disclose to Defendants the documents upon which the government relied in seeking its pretrial restraint of Defendants' assets. (A true and correct copy of Defendants' disclosure demand is attached hereto as Exhibit A.) The government declined to disclose the demanded documents, indicating that the documents were filed under seal, and would remain under seal until the government files its complaints in the civil forfeiture actions. Since then, the government indicated that it would provide defense counsel with bank records purportedly used by the government to trace Defendants' assets, but not the underlying documents used to effect the massive pretrial restraint of those assets.

Most recently, the government has claimed that the disclosure in this case— potentially 9 million pages of documents—is so onerous that the government cannot move along the initial production of documents to Defendants any sooner than the end of this month. Critically, Defendants have not asked for advance production of the *discovery*

6

underling the instant criminal action, other than as set forth in the Scheduling Order. Instead, Defendants seek disclosure of the documents that allegedly support the government's massive asset seizure as necessary for the protection of Defendant's fundamental constitutional rights, and so Defendants can fund their defense and pay their living expenses.

Defense counsel has requested that the government file an unopposed motion to unseal the civil forfeiture proceedings to provide defense counsel with the seizure warrants, warrant applications, and forfeiture orders. The government has not filed such a motion.

## ARGUMENT

### I.   The government's refusal to disclose the seizure warrants is indefensible.

Defendants do not have *any* of the documents upon which the government relied in seeking pretrial seizure of their assets. Without review of those documents, it is impossible for Defendants to move for release of their assets in any meaningful manner as Defendants would be speculating about the government's theories on seizure. Defendants even are in the dark on the docket number(s) assigned to the civil forfeiture actions and cannot take any action against the government's pretrial restraint in the appropriate forum without disclosure of the case caption(s), at the very least, which the government has refused to do. As a potential remedy to any sealing order, defense counsel has informed the government that Defendants have no objection to a motion to unseal the dockets or documents related to the government's pretrial restraint of Defendants' assets. However, no motion has been filed.

The government's continued refusal to promptly disclose the asset seizure documents to Defendants is unacceptable. First, the government's secret seizure of Defendants' assets, and the government's refusal to promptly provide any documentation relating to the seizures

7

deprives Defendants of due process. There can be no legitimate argument that disclosing the

documents supporting the seizures now to Defendants would impair a criminal investigation,

because the government has indicted the Defendants, the indictment has been unsealed, and

the assets have been restrained.

Second, it is critical that the government provide these documents to defense counsel.

It is believed that the government has seized assets that it is not entitled to seize and which

are needed by the Defendants to support their defense and to fund their daily living expenses

and pre-existing financial obligations. This is especially so considering the overarching First,

Fourth, Fifth, and Sixth Amendment considerations which apply to this case. Defendants

must have access to the seizure warrants, warrant applications, and the forfeiture orders to

assess the propriety of the government's wholesale seizure of their assets. As the Ninth

Circuit has explained, discoverable material that could reveal a Fourth Amendment Violation

is material to a defense. *See United States v. Soto-Zuniga*, 837 F.3d 992, 1000 (9th Cir. 2016).

Indeed, the government has provided no reason as to why these documents should

remain under seal. At the very least, these documents should be disclosed to defense counsel

under a protective order, if a sufficient basis exists for a protective order, to enable defense

counsel to provide meaningful representation to the Defendants, and to do so without

unnecessary delay. There is simply no reason to delay the disclosure of these documents,

except to interfere with Defendants' right to defend the charges in the Indictment and to

impose undue financial pressure on Defendants. Nor for that matter, is there any reason to

require, as the government maintains, that Defendants must litigate these issues in Los

8

Angeles when this indictment, Defendants, and the bulk of the assets seized are located in this District. No valid reason exists for proceeding in Los Angeles.

Finally, the sealing of documents in a federal proceeding is to be treated as the exception, not the norm. There is a presumption of openness with respect to judicial proceedings *and* judicial records. *See Press-Enter. Co. v. Sup. Ct. of Cal.*, 464 U.S. 501, 509 (1984) ("Closed proceedings, although not absolutely precluded, must be rare and only for cause shown that outweighs the value of openness." (footnote omitted)); *Nixon v. Warner Commc'ns Inc.*, 435 U.S. 589, 597 (1978) (recognizing a "general right to inspect and copy public records and documents, including judicial records and documents"). For this reason, documents may be sealed only if specific, on the record, findings are made that the sealing is necessary to preserve compelling government interests and is narrowly tailored to that interest. *See Press-Enter. Co. v. Sup. Ct. of Cal.*, 478 U.S. 1, 13-14 (1986). Consequently, if the government fails to demonstrate a compelling interest for the continued sealing of seizure documents, the sealing order must be vacated.

## II.     The government's wholesale seizure of Defendants' assets is subject to numerous constitutional challenges.

The Supreme Court has cautioned courts to scrutinize the pretrial restraint of a defendant's assets, describing pretrial restraint as the "nuclear weapon of the law." *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 329 (1999) (alteration omitted). Courts must safeguard the rights of a defendant whose assets have been restrained prior to trial because the defendant, at this stage, is presumed to be innocent. In

this case, there are numerous ways that the government's wholesale pretrial restraint of Defendants' assets has the potential to violate Defendants' constitutional rights.

First, the government has no authority to seize so-called untainted assets prior to trial. *See Luis v. United States*, 578 U.S. ___, 136 S.Ct. 1083, 1094 (2016) ("We have found no decision of this Court authorizing unfettered, pretrial forfeiture of the defendant's own 'innocent' property—property with no connection to the charged crime."); *cf. United States v. Ripinsky*, 20 F.3d 359, 363 (9th Cir. 1994) ("[S]ubstitute assets are not subject to pretrial restraint."). Consequently, any seizure of untainted assets is subject to challenge by Defendants as outside the scope of what is permissible under the civil and criminal forfeiture statutes at this stage.

The risk of seizure of so-called untainted assets is particularly troubling in this case because the government has acknowledged that it cannot show how much of the revenue generated by Backpage was attributable to advertisements allegedly for prostitution. (*See* Doc. 3 at ¶ 1 ("Backpage derives the overwhelming majority of its revenue from [prostitution] ads.").) Yet, the government has seized *all* of the revenue attributed to Backpage that was dispersed to Defendants, as well as assets not attributed to Backpage. Indeed, Defendants generated sizeable income, and acquired substantial assets, long before formation of Backpage as well as separate from Backpage after its creation. That income and those assets are not subject to pretrial restraint.

Second, each day Defendants' funds remain subject to pretrial restraint without any opportunity for the Defendants to be heard on the propriety of the government's seizure, a new due process violation occurs. It is beyond cavil that "[n]o person shall be . . . deprived

10

of life, liberty, or property, without due process of law." U.S. Const. amend. V. The touchstone of due process is that "a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it." *Matthews v. Eldridge*, 424 U.S. 319, 348 (1976). Here, Defendants have been deprived of the opportunity to challenge the government's pretrial restraint of their assets.

Third, the government's wholesale seizure of the Defendants' funds violates the Sixth Amendment because defendants have "a Sixth Amendment right to use [their] own 'innocent' property to pay a reasonable fee for the assistance of counsel." *Luis*, 136 S.Ct. at 1096 (vacating order freezing the defendant's untainted funds).

Fourth, the government's seizure of Defendants' funds has violated their First Amendment rights, as will be fully set forth in Defendants' motion for the return of their seized assets. Review of the documents supporting the seizure is necessary to fully analyze the government's rationale, but the Indictment suggests that the government justified its actions based on Defendants' prior ownership of Backpage, and its presumption that all publishing activities related to Backpage were illegal. However, the First Amendment does not permit the government to presume illegality of a website's contents. *See, e.g.*, *Backpage.com, LLC v. Dart*, 807 F.3d 229, 234 (7th Cir. 2015). Moreover, the First Amendment does not permit pretrial seizure of a publisher's output (*i.e.*, books, website). *See Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46 (1989); *Adult Video Ass'n v. Barr*, 960 F.2d 781, 788 (9th Cir. 1992) (enjoining 18 U.S.C. § 1963(d) authorizing government action "to preserve the availability of property . . . for forfeiture"). These same principles constrain the government's ability to freeze assets that are alleged to be derived from "illegal"

11

publishing activities. *See Simon & Schuster, Inc. v. Members of the New York State Crime Victims Bd.*, 502 U.S. 105 (1991). The First Amendment does not permit seizing such assets even when it is assumed "the income escrowed . . . represents the fruits of crime." *Id.* at 118.

Fifth, in light of the fact that the government has sought the pretrial restraint of assets derived from Defendants' well-documented exercise of their First Amendment rights as assets purportedly traceable to the charged crimes, the seizure applications likely include statements which violate *Franks v. Delaware*, 438 U.S. 154 (1978). In the First Amendment context, however, even a showing of probable cause would be insufficient to support pretrial seizure that infringes constitutionally-protected interests. *See, e.g., Fort Wayne Books*, 489 U.S. at 66; *Barr*, 960 F.2d at 788.

Even under the government's theory of the case, the risk of defective seizure warrants is particularly high with respect to its applications for the seizure of Defendants' assets. *Some*, but certainly not *all*, of Defendants' assets are attributable to the revenue generated by Backpage. Defendants had sizeable income unrelated to Backpage, including income earned long before formation of Backpage.

Even with respect to the funds attributable to revenue generated by Backpage, no court has ever held Defendants criminally liable for content posted to Backpage by third-party users. Instead, courts have uniformly rejected the same theories of liability the government pursues in the instant indictment. *See People v. Ferrer*, Case No. 16FE019224, 2016 WL 7237305 (Cal. Super. Ct. Dec. 16, 2016), No. 16FE024013 (Cal. Super. Ct. Aug. 23, 2017). Civil litigants have fared no better in the pursuit to hold the operators of web-publishing sites liable for the content posted to their sites by third-party users. *See Doe ex*

12

*rel. Roe v. Backpage.com LLC*, 104 F. Supp. 3d 149 (D. Mass. 2015), *aff'd sub nom.*, *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12 (1st Cir. 2016); *M.A. v. Village Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041, 1053-54 (E.D. Mo. 2011) *see also Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961, 962-63, 967-68 (N.D. Ill. 2009).

As the Seventh Circuit explained, "Backpage is an intermediary between the advertisers of adult services and visitors to Backpage's website," and intermediaries "do not become liable for the sponsor's deeds" even if they "know the information's content." *Backpage.com, LLC v. Dart*, 807 F.3d 229, 234 (7th Cir. 2015), *cert. denied*, 137 S. Ct. 46 (2016). Even if a showing of probable cause were sufficient to seize Defendants' assets, the warrant applications would have to set forth specific facts alleging how the particular assets at issue are traceable to the crime charged, but cannot include the conclusory facilitation theory that has been rejected in criminal and civil actions nationwide. In light of the numerous decisions rejecting the facilitation theory as a ground for holding the Defendants liable for the content of third-party users, the inclusion of such allegations would constitute the inclusion of a statement of "deliberate falsehood" or made "with reckless disregard for the truth." *Franks*, 438 U.S. at 171.

Further, the government is not free to presume that *all* of the income attributable to Backpage constitutes proceeds of crime simply because the government is able to point to a handful of advertisements that it claims advertise prostitution. Under *Fort Wayne Books* and its progeny, no such presumption exists in the context of assets derived from a defendant's participation in First Amendment activities. Instead, the government must provide the court reviewing its warrant applications with proof that each dollar seized was attributable to a

13

charged crime and Defendants must be afforded the opportunity to challenge the government's proof at a hearing.

Sixth, Defendants have the right to challenge the government's seizures for failure to comply with the specific requirements for pretrial seizure set forth in the civil and criminal forfeiture statutes, and as mandated by the First, Fourth, Fifth, and Sixth Amendments.

In light of these constitutional challenges, Defendants intend to move for accelerated hearings on the government's seizure of their assets, including, but not limited to, a traceability hearing, a *Luis* hearing, and a *Franks* hearing.

## CONCLUSION

In light of the foregoing, Defendants move, pursuant to Rule 16 of the Federal Rules of Criminal Procedure, for an order requiring the government to expeditiously disclose the seizure warrants, seizure applications, and forfeiture orders to the defense. Any further delay in the government's disclosure will further undermine Defendants' First, Fourth, Fifth, and Sixth Amendment rights in this action. Further, because the violation of Defendants' constitutional rights compounds with each day that passes, Defendants respectfully request an accelerated hearing on the instant motion.

14

RESPECTFULLY SUBMITTED this 11th day of May, 2018.

PICCARRETA DAVIS KEENAN FIDEL PC

/s/    Paul J. Cambria, Jr.
LIPSITZ GREEN SCIME CAMBRIA LLP
Attorneys for Defendant Michael Lacey

/s/    Thomas Henry Bienert, Jr.
BIENERT MILLER & KATZMAN PLC
Attorneys for Defendant James Larkin

/s/    Bruce S. Feder
FEDER LAW OFFICE PA
Attorneys for Defendant Scott Spear

/s/    Michael D. Kimerer
KIMERER & DERRICK PC
Attorneys for Defendant John Brunst

/s/    K.C. Maxwell
BROWNE GEORGE ROSS LLP
Attorneys for Defendant Dan Hyer

/s/    Michael L. Piccarreta
PICCARRETA DAVIS KEENAN FIDEL PC
Attorneys for Defendant Andrew Padilla

/s/    Stephen M. Weiss
KARP & WEISS PC
Attorneys for Defendant Joye Vaught

15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

On May 11, 2018, a PDF version of this document was filed with the Clerk of Court using the CM/ECF System for filing and for Transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Dominic Lanza, dominic.lanza@usdoj.gov
Kevin Rapp, kevin.rapp@usdoj.gov

# EXHIBIT A

PICCARRETA DAVIS KEENAN FIDEL PC

LAWYERS

MICHAEL L. PICCARRETA
JEFFERSON KEENAN
LOUIS S. FIDEL

BARRY M. DAVIS
(1948-2016)

2 EAST CONGRESS STREET, SUITE 1000
TUCSON, ARIZONA 85701
(520) 622-6900
FAX (520) 622-0521
WWW.PD-LAW.COM

May 1, 2018

VIA EMAIL

Dominic Lanza (Dominic.Lanza@usdoj.gov)
Kevin Rapp (Kevin.Rapp@usdoj.gov)
United States Attorney's Office
Two Renaissance Square
40 N. Central Avenue, Ste. 1200
Phoenix, AZ 85004-4408

      Re:    United States v. Lacey, et al.

Dear Dom and Kevin:

      Please accept this as a formal request that the government provide all search/seizure warrants, affidavits, inventories, judicial petitions, or orders to the affected parties whose property has been seized and/or frozen or whose property has been the subject of a search and seizure.

      I recognize that this does not apply to Mr. Padilla, but I am forwarding this communication in hopes that this will move the production along to the parties whose rights have been affected. I would request that this be done immediately so that the affected party can have access to the information and review it and make a determination as to what, if anything, needs to be done. Every day that goes by is a deprivation of an asset without a hearing that raises numerous legal and constitutional issues.

                      Sincerely,

                      Michael L. Piccarreta

MLP:mh
cc:    Tom Bienert (via email: tbienert@bmkattorneys.com)
       Paul Cambria (via email: pcambria@lglaw.com)
       Bruce Feder (via email: bf@federlawpa.com; fl@federlawpa.com)
       Mike Kimerer (via email: mdk@kimerer.com)
       Gary Lincenberg (via email: gsl@birdmarella.com)
       KC Maxwell (via email: kmaxwell@bgrfirm.com)
       Steve Weiss (via email: sweiss@karpweiss.com)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America,<br><br>                    Plaintiff,<br><br>vs.<br><br>Michael Lacey, *et al.*,<br><br>                   Defendants. | NO. CR-18-00422-PHX-SPL (BSB)<br><br>CERTIFICATE OF PAUL J. CAMBRIA, JR., IN SUPPORT OF DEFENDANTS' MOTION FOR DISCLOSURE OF DOCUMENTS RELATED TO PRETRIAL SEIZURE OF DEFENDANTS' ASSETS |
| --- | --- |

STATE OF NEW YORK  )
COUNTY OF ERIE     ) ss.:
CITY OF BUFFALO    )

Paul J. Cambria, Jr., Esq., being duly sworn, certifies that:

         1)    I am an attorney at law duly licensed to practice in the State of New York and am a partner in the law firm of Lipsitz Green Scime Cambria LLP, located at 42 Delaware Avenue, Suite 300, Buffalo, New York, attorneys for Defendant Michael Lacey. I was admitted to this Court *pro hac vice* for the instant prosecution.

2)      I make this certificate based on personal knowledge and in support of Defendants' Motion for Disclosure of Documents Related to Pretrial Seizure of Defendants' Assets ("Defendants' Motion").

3)      As set forth in greater detail in the Memorandum of Points and Authorities in Defendants' Motion, Defendants have requested the government to provide Defendants with prompt disclosure of the documents upon which the government relied to seek the pretrial seizure of Defendants' assets.

4)      Initially, the government declined Defendants' request on the ground that the documents Defendants sought were subject to a sealing order. More recently, the government has stated that it would promptly provide bank records the government used to trace Defendants' assets, but would not be able to provide the requested seizure warrants, warrant applications, and forfeiture orders and earlier than the end of this month, which is nearly two months after the assets were seized.

5)      I have personally consulted with the government in a good faith and sincere effort to resolve this discovery dispute without the filing of a motion.

6)      Unfortunately, the parties have reached an impasse and are unable to reach a satisfactory resolution of Defendants' discovery demand. In light of this impasse, it was necessary to file Defendants' Motion with this Court.

7)      I therefore certify, pursuant to LRCrim 12.1 and LRCiv 7.2(j), that after personal consultation and sincere efforts to do so, counsel have been unable to satisfactorily resolve this matter.

1    DATED:        May 11, 2018        Respectfully Submitted,
2                                      LIPSITZ GREEN SCIME CAMBRIA LLP

3                                      /s/     Paul J. Cambria, Jr.
4                                            PAUL J. CAMBRIA, JR.
                                             Attorneys for Defendant Michael Lacey
5

6    Sworn to before me this
7    11th day of May, 2018.

8    s/ April Kelly
9    Commissioner of Deeds
     In and For the City of Buffalo, N.Y.
10   My Commission expires December 31, 2018

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT C

FILED _____ LODGED
RECEIVED _____ COPY

JUL 2 5 2018

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

REDACTED FOR
PUBLIC DISCLOSURE

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR 18-422-PHX-SPL (BSB) |
| Plaintiff, | |
| v. | **SUPERSEDING INDICTMENT** |
| | |
| 1. Michael Lacey | VIO: 18 U.S.C. § 371 |
|    (Counts 1-70, 81, 83-84, 86, 88-92, and 94-100) | (Conspiracy) Count 1 |
| 2. James Larkin | 18 U.S.C. § 1952(a)(3)(A) |
|    (Counts 1-68, 80, and 87) | (Travel Act—Facilitate Prostitution) Counts 2-51 |
| 3. Scott Spear | 18 U.S.C. § 1956(h) |
|    (Counts 1-68, 71-78, 85, and 93) | (Conspiracy to Commit Money Laundering) Count 52 |
| 4. John "Jed" Brunst | 18 U.S.C. § 1956(a)(1)(B)(i) |
|    (Counts 1-70, 78-84, and 86-93) | (Concealment Money Laundering) Counts 53-62 |
| 5. Dan Hyer | 18 U.S.C. § 1956(a)(2)(A) |
|    (Counts 1-68) | (International Promotional Money Laundering) Counts 63-68 |
| 6. Andrew Padilla | 18 U.S.C. § 1957(a) |
|    (Counts 1-51) | (Transactional Money Laundering) Counts 69-99 |
| 7. Joye Vaught | 18 U.S.C. § 1956(a)(2)(B)(i) |
|    (Counts 1-51) | (International Concealment Money Laundering) Count 100 |
| Defendants. | |

1

2

3

4

18 U.S.C. §§ 981(a)(1)(C),
982(a)(1) and (b); 21 U.S.C.
§ 853(p); 28 U.S.C. § 2461(c)
(Forfeiture Allegations)

5    THE GRAND JURY CHARGES:

6    **A.   Introduction**

7         1.     The website www.backpage.com ("Backpage") was, until being shut down

8    by federal law enforcement authorities in April 2018, notorious for being the internet's

9    leading source of prostitution advertisements.   Backpage derived the overwhelming

10   majority of its revenue from such ads.   These practices enabled Backpage to earn over $500

11   million in prostitution-related revenue during its fourteen years of existence.

12        2.     Backpage was created in 2004 by defendant MICHAEL LACEY

13   ("LACEY"), defendant JAMES LARKIN ("LARKIN"), and a third individual, C.F.   From

14   2004-15, LACEY and LARKIN oversaw the website's policies and strategic direction.

15   Additionally, LACEY and LARKIN retained significant control over the website (and

16   continued receiving tens of millions of dollars of Backpage-related distributions) after

17   purportedly selling their interests in Backpage in 2015.

18        3.     Defendant SCOTT SPEAR served as the Executive Vice President of one of

19   Backpage's parent companies and held, at times, an ownership interest in Backpage of

20   approximately 4%.

21        4.     Defendant JOHN "JED" BRUNST ("BRUNST") served as the Chief

22   Financial Officer of Backpage and several of Backpage's parent companies and held, at

23   times, an ownership interest in Backpage of approximately 6%.

24        5.     Defendant DAN HYER ("HYER") joined Backpage's marketing department

25   in or around 2006 and served as Backpage's Sales and Marketing Director.

26        6.     Defendant ANDREW PADILLA ("PADILLA") served as Backpage's

27   Operations Manager.

28

7.      Defendant JOYE VAUGHT ("VAUGHT") served as Backpage's assistant Operations Manager.

8.      The defendants identified above are referred to at times in this Superseding Indictment as the "BACKPAGE DEFENDANTS."

9.      As explained in detail below, the BACKPAGE DEFENDANTS were aware that the vast majority of the "adult" and "escort" ads appearing on Backpage were actually ads for prostitution and took steps to intentionally facilitate that illegal activity.   For example, during Backpage's early years of operation, the company's employees were actually trained to—and paid bonuses for—identifying prostitutes who were posting ads on rival websites, creating free ads on Backpage for them, and using the resulting Backpage ads (which would only remain free for a trial period) in an attempt to secure the prostitutes' future business.   These affirmative content-creation efforts, which were described internally as "content aggregation" or the "Dallas Plan," were vital to Backpage's early growth and success.

10.     Backpage also employed other business strategies that were specifically intended to promote and facilitate prostitution.   For example, for several years, Backpage had a reciprocal link agreement with The Erotic Review ("TER"), a website that permitted customers to post explicit "reviews" of their encounters with prostitutes, including descriptions of prices charged for particular sex acts.   Backpage paid tens of thousands of dollars to TER in return for assistance in getting TER's customer base to start using Backpage.

11.     In addition to affirmatively creating prostitution-related content and intentionally soliciting prostitution-related business, Backpage also utilized a variety of strategies to conceal the true nature of the ads being posted on its website. Most notably, Backpage periodically used computerized filters and human "moderators" to edit the wording of (or block) ads that explicitly offered sexual services in return for money.   The BACKPAGE DEFENDANTS admitted—in internal company documents and during private meetings—that, despite these editing practices, they knew the overwhelming

majority of the website's ads still involved prostitution.  In one internal document, LACEY

actually bragged about the company's contributions to the prostitution industry:

"Backpage is part of the solution.  Eliminating adult advertising will in no way eliminate

or even reduce the incidence of prostitution in this country. . . .  For the very first time, the

oldest profession in the world has transparency, record keeping and safeguards."

12.     Notwithstanding these private admissions, the BACKPAGE

DEFENDANTS took pains to mislead the public, regulators, and law enforcement officials

concerning the supposed sincerity of Backpage's efforts to prevent the publication of

prostitution-related ads.  For example, after reviewing LACEY's written description of

Backpage's contributions to the prostitution industry and editing practices, LARKIN

instructed C.F. to prevent "any of the information in this being made public."  PADILLA,

who helped supervise Backpage's moderators, threatened to fire any employee who

acknowledged in writing that the "escorts" depicted in the website's ads were actually

prostitutes: "Leaving notes . . . implying that we're aware of prostitution . . . is enough to

lose your job over."  And in one internal document, Backpage's media strategy was

described simply as "Do not acknowledge the prostitution."

13.     Many of the ads published on Backpage depicted children who were victims

of sex trafficking.  Once again, although Backpage sought to create the perception that it

was diligently attempting to prevent the publication of such ads, the reality is that Backpage

allowed such ads to be published while declining—for financial reasons—to take necessary

steps to address the problem.  For example, for several years, Backpage's official policy,

when presented with an ad featuring the prostitution of a child, was to delete the particular

words in the ad denoting the child's age and then publish a revised version of the ad.  Such

editing, of course, did nothing to change the fact the ad featured the prostitution of a child—

it only created a veneer of deniability and helped Backpage's customers (*i.e.,* pimps

trafficking children) evade detection.  Similarly, in April 2011, several BACKPAGE

DEFENDANTS were warned that the term "New In Town" was a coded phrase used by

"pimps who shuttle children to locations where they do not know anyone and cannot get

- 4 -

1    help." Nevertheless, Backpage continued for the next seven years to permit ads using the

2    phrase "New In Town" to be published on its website.

3        14.    Backpage also contributed to the proliferation of ads featuring the

4    prostitution of children in other ways. For example, an anti-sex trafficking organization

5    once suggested that Backpage provide an automatic warning message whenever a customer

6    searched for particular terms indicative of the prostitution of a child. In response, C.F.

7    acknowledged the proposal was a good one but declined to adopt it because Backpage

8    would not derive any public-relations benefit from doing so: "This is a good idea but it is

9    not visible to AGs [state attorneys general] so it has little PR value. It is a low priority."

10   Backpage also claimed it did everything in its power to alert the National Center for

11   Missing and Exploited Children ("NCMEC") whenever it became aware that a child was

12   being advertised on its website. However, the BACKPAGE DEFENDANTS implemented

13   policies to artificially limit such referrals. In one training document, moderators were

14   instructed not to send emergency alerts to NCMEC in response to complaints filed by the

15   grandparents and other extended family members of children being advertised on the

16   website: "Neice [sic], nephew, grandchild, cousin, etc. doesn't count."

17       15.    Virtually every dollar flowing into Backpage's coffers represented the

18   proceeds of illegal activity. In fact, by 2015, the major credit card companies stopped

19   processing payments for Backpage and some banks closed Backpage's accounts out of

20   concern they were being used for illegal purposes. In response, the BACKPAGE

21   DEFENDANTS pursued an array of money laundering strategies. These strategies

22   included (a) instructing customers to send checks and money orders to a particular Post

23   Office box, depositing those payments in bank accounts held in the name of entities with

24   no apparent connection to Backpage, and then giving customers a corresponding "credit"

25   on Backpage to purchase new ads, (b) wiring the proceeds of Backpage's business to bank

26   accounts held in foreign countries and then redistributing the funds to certain BACKPAGE

27   DEFENDANTS (as compensation) or redepositing the funds in bank accounts held in the

28   United States (to conceal the nature of those funds and promote Backpage's ongoing

- 5 -

1    operations), and (c) converting customer payments, and the proceeds of Backpage's

2    business, into cryptocurrency.

3          16.    The BACKPAGE DEFENDANTS also engaged in other financial

4    transactions designed to conceal their misconduct and evade seizure by law enforcement.

5    For example, in July 2016, LACEY wrote an email seeking assistance in "put[ting] some

6    assets in place[s] where . . . government parties . . . can not access my accounts." A few

7    months later, LACEY asked employees of an Arizona-based bank for advice on how to

8    move his assets "offshore" to protect them from seizure by the government. Soon

9    afterward, $16.5 million in Backpage-derived cash was wired from LACEY's bank

10    accounts in the United States to an overseas bank account in Hungary. At the time of the

11    Hungarian transfer, LACEY was facing criminal charges in California state court and was

12    aware of the federal grand jury investigation in this matter.

13          17.    For all of these reasons, the BACKPAGE DEFENDANTS are charged in this

14    superseding indictment with the crimes of facilitating prostitution (18 U.S.C. § 1952),

15    concealment, transactional, international promotional, and international concealment

16    money laundering (18 U.S.C. §§ 1956 and 1957), and/or conspiracy to commit these

17    offenses (18 U.S.C § 371 and 1956).

18    **B.**    **Backpage's Origins, Ownership, and Control**

19          18.    LACEY and LARKIN are the founders of the *Phoenix New Times*, an

20    alternative newspaper based in Arizona. Over time, LACEY and LARKIN acquired

21    several other alternative newspapers, which they came to operate through entities called

22    New Times Media and Village Voice Media Holdings (referred to collectively for ease of

23    reference as "VVMH"). Additionally, SPEAR served as VVMH's Executive Vice

24    President and BRUNST served as VVMH's Chief Financial Officer.

25          19.    The publications within the VVMH newspaper chain routinely featured

26    illegal prostitution ads. In fact, more than 30 years ago, a federal court affirmed the

27    conviction of the operator of a prostitution business (which masqueraded as a massage

28    parlor) for publishing ads in the classified section of the *Village Voice. See United States*

1   *v. Sigalow*, 812 F.2d 783 (2d Cir. 1987).  The conviction was for violating 18 U.S.C.
2   § 1952, one of the same crimes charged in this Superseding Indictment.

3       20.   By 2000, the rise of the internet—and, in particular, the website
4   www.craigslist.com ("Craigslist"), which offered free classified ads—began to
5   significantly disrupt VVMH's business model, which depended on classified advertising
6   revenue for survival.

7       21.   LACEY and LARKIN, with assistance from C.F., sought to address this
8   threat by creating Backpage.  Their decision to create Backpage was later described in an
9   internal company document as follows: "In 2004, in response to the Craigslist threat that
10  was decimating daily newspapers, VVM launched its own online classified site,
11  Backpage.com, named after the back page of VVM's print publication."

12      22.   During its first few years of operation, Backpage accounted for only a
13  fraction of VVMH's overall revenue.  In January 2006, for example, VVMH estimated that
14  Backpage supplied only 1% of its overall advertising revenue but also noted that Backpage
15  had "tremendous upside potential."

16      23.   This prediction proved prophetic.  By 2008, Backpage was generating over
17  $5 million in annual profit.  This annual profit figure increased to over $10 million in 2009.

18      24.   In 2010, Craiglist chose to shut down its "adult" section due to the prevalence
19  of ads for prostitution and other illegal services.  The BACKPAGE DEFENDANTS,
20  sensing an opportunity, made an aggressive push for Backpage to capture Craiglist's share
21  of this market.  In one internal document, LARKIN commented:  "Craigslist has folded
22  . . . . It is possible that this will mean a deluge of adult content ads for backpage.com . . . .
23  We have with the Village Voice probably the longest run of adult content advertising in
24  the US and it is, like it or not, in our DNA."

25      25.   This push was successful.  In internal documents, Backpage stated that it
26  experienced "explosive growth" by "capitalizing on displaced Craigslist ad volume."
27  Backpage's annual profits grew to over $26 million in 2010, over $52 million in 2011, and
28  over $78 million in 2012.