NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section
JOHN J. KUCERA (California Bar No. 274184)
DAN G. BOYLE (California Bar No. Pending)
Assistant United States Attorneys
  1400 United States Courthouse
  312 North Spring Street
  Los Angeles, California 90012
  Telephone: (213) 894-3391/2426
  Facsimile: (213) 894-0142
  E-mail: John.Kucera@usdoj.gov
     Daniel.Boyle2@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE SEIZURE OF:<br><br>ANY AND ALL FUNDS HELD IN REPUBLIC BANK OF ARIZONA ACCOUNTS XXXX1889; XXXX2592, XXXX1938, XXXX2912, AND XXXX2500. | No. CV 18-06742-RGK (PJWx)<br><br>UNITED STATES OF AMERICA'S CORRECTED COMBINED RESPONSE TO LARKIN'S BRIEF RE "LEGAL AUTHORITY FOR OPPOSITION TO SEIZURE WARRANTS AND BASIS FOR RELIEF" (Doc. 106) AND LACEY'S MOTION FOR RELEASE OF CERTAIN UNTAINED FUNDS (Doc. 105).<br><br>Hon. R. Gary Klausner |

   Plaintiff United States of America respectfully submits this Corrected Combined Response to Movant James Larkin's Brief Re: "Legal Authority for Opposition to Seizure Warrants and Basis for Relief" (Doc. 106) and Movant Michael Lacey's Motion for Release of Certain Untainted Funds (Doc. 105).

//

For purposes of judicial economy and efficiency, the United States has combined its responses to Larkin and Lacey's separate filings into this consolidated brief.

Dated: October 28, 2019

Respectfully submitted,

NICOLA T. HANNA
United States Attorney

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division

STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section

/s/
DAN G. BOYLE
JOHN J. KUCERA
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# **TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT ................................................................. 1

II.     BACKGROUND ...................................................................................... 2

    A.   Overview of Backpage ...................................................................... 2

    B.   Backpage's Knowing Facilitation of Prostitution ........................... 2

    C.   Arizona Grand Jury Proceedings and the Indictment ..................... 3

    D.   Backpage and Ferrer Plead Guilty and Agree to Forfeitures ......... 4

    E.   The Civil Seizure Warrants .............................................................. 4

III.    ARGUMENT ............................................................................................ 5

    A.   Larkin's Authorities Do Not Support a Blanket Prohibition Against the Pretrial Seizure of Website "Proceeds." ...................... 5

    B.   Seizure of Funds Is Not Subject to "Special Rules." ..................... 7

    C.   Larkin Has Failed to Make the Substantial Preliminary Showing Necessary to Obtain a Franks Hearing. ......................................... 8

    D.   Lacey and Larkin Have Not Met the Required Threshold Showing for a Sixth Amendment Claim. ....................................... 12

    E.   The Remaining Relief Requested Is Premature. ........................... 13

# <u>TABLE OF AUTHORITIES</u>

<u>Adult Video Ass'n v. Barr</u>,
 960 F.2d 781 (9th Cir. 1992) ...................................................................5

<u>Alexander v. United States</u>,
 509 U.S. 544 (1993) ...............................................................................6

<u>Am. Lib. Ass'n v. Thornburgh</u>,
 713 F. Supp. 469 (D.D.C. 1989) ...........................................................6

<u>Backpage.com LLC v. Dart</u>,
 807 F.3d 229 (7th Cir. 2015) ...............................................................10

<u>Backpage.com, LLC v. McKenna</u>,
 881 F. Supp. 2d 1262 (W.D. Wash. 2012) ..........................................10

<u>Florida v. Nixon</u>,
 543 U.S. 175 (2004) ...............................................................................6

<u>Fort Wayne Books, Inc. v. Indiana</u>,
 489 U.S. 46 (1989) .................................................................................5

<u>Franks v. Delaware</u>,
 438 U.S. 154 (1978) ...............................................................................8

<u>Illinois v. Gates</u>,
 462 U.S. 213 (1983) ...............................................................................9

<u>Kaley v. United States</u>,
 571 U.S. 320 (2014) ...............................................................................8

<u>Luis v. United States</u>,
 136 S. Ct. 1083 (2016) ....................................................................13, 14

<u>People v. Ferrer</u>,
 No. 16FE019224 (Cal. Super. Ct. Dec. 9, 2016) ..................................9

<u>Senate Permanent Subcommittee v. Ferrer</u>,
 199 F. Supp. 3d 125 (D.D.C. 2016) .......................................................3

<u>Simon & Schuster, Inc. v. Members of the N.Y. State Crime Bd.</u>,
 502 U.S. 105 (1991) ...............................................................................6

<u>Smith v. California</u>,
 361 U.S. 147 (1959) ...............................................................................7

<u>Thomas v. Chicago Park District</u>,
 534 U.S. 316 (2002) ...............................................................................5

<u>United States v. $506,069.09 Seized from First Merit Bank</u>,
 72 F. Supp. 3d 818 (N.D. Ohio 2014) .................................................15

United States v. Bonventre,
    720 F.3d 126 (2d Cir. 2013) ................................................................ 12

United States v. Fitzen,
    80 F.3d 387 (9th Cir.1996) ................................................................. 13

United States v. Four Contiguous Parcels,
    191 F.3d 461 (6th Cir. 1999) .............................................................. 15

United States v. Hoeffener,
    2018 WL 2996317 (E.D. Mo. May 9, 2018) ...................................... 11

United States v. Kivanc,
    714 F.3d 782 (4th Cir. 2013) .............................................................. 15

United States v. Lazarenko,
    564 F.3d 1026 (9th Cir. 2009) ........................................................... 14

United States v. Lindell,
    2016 WL 4707976 (D. Haw. Sept. 8, 2016) ...................................... 15

United States v. Lindell,
    766 F. App'x 525 (9th Cir. 2019) ...................................................... 12

United States v. Meling,
    47 F.3d 1546 (9th Cir. 1995) ............................................................... 9

United States v. Monsanto,
    491 U.S. 600 (1989) ..................................................................... 8, 12

United States v. Perkins,
    850 F.3d 1109 (9th Cir. 2017) ........................................................... 11

United States v. Playboy Entm't Grp., Inc.,
    529 U.S. 803 (2000) ........................................................................... 7

United States v. Ray,
    731 F.2d 1361 (9th Cir.1984) ....................................................... 12, 13

United States v. Stanert,
    762 F.2d 775 (9th Cir. 1985) ............................................................. 11

United States v. Tham,
    960 F.2d 1391 (9th Cir. 1991) ............................................................. 9

United States v. Unimex, Inc.,
    991 F.2d 546 (9th Cir. 1993) ............................................................. 12

United States v. Wetselaar,
    2013 WL 8206582 (D. Nev. Dec. 31, 2013) ...................................... 12

Woodhull Freedom Found. v. United States,
    334 F. Supp. 3d 185 (D.D.C. 2018) ..................................................... 8

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   PRELIMINARY STATEMENT

Backpage.com, LLC was the leading source for online prostitution advertising from approximately 2010 to 2018. (Ind.¶1.)[1] In March 2018, an Arizona federal grand jury indicted Backpage executives on conspiracy, Travel Act and money laundering charges, and included criminal forfeiture allegations (the "Indictment"). On April 5, 2018, Backpage and its CEO and 100% owner, Carl Ferrer, pleaded guilty, admitted the great majority of Backpage's paid ads were for prostitution, and consented to shut down the Backpage website and forfeit all assets traceable to or involved in the crimes.

On a parallel track, four magistrate judges in this District issued civil warrants resulting in the seizure of funds from numerous bank accounts. The warrants were supported by a 55-page probable cause Affidavit and the 61-page Indictment.

James Larkin, an Arizona defendant, moved to vacate or modify the seizure warrants in this Court (Doc. 6). After the government filed civil forfeiture complaints, the Court granted the government's motion to stay pursuant to 18 U.S.C. § 981(g) pending the conclusion of the Arizona criminal proceedings. Larkin (with Michael Lacey, Scott Spear and John Brunst) (collectively "Claimants") appealed.  Claimants argued this Court should have heard: (1) their request for a Franks hearing; and (2) their claim that the First Amendment bars pretrial seizures of "publishing proceeds" based on probable cause.  (App.Doc. 28 at 4, 41-44.) The government agreed Claimants were entitled to review of their Franks request to the extent review did not involve civil discovery under 18 U.S.C. § 981(g), but disagreed with the First Amendment claim. The Ninth Circuit wrote: "Since both parties agree that [Claimants'] motion should have been

---

[1] "Ind." refers to the Indictment in United States v. Lacey, et. al., CR-18-422-PHX-SMB, appended as Attachment A to U.S. Postal Inspector Lyndon Versoza's Affidavit in Support of Seizure Warrant ("Aff."). (See Doc. 6, Ex. 1). "App.Doc." Refers to filings in Ninth Circuit Appeal No. 18-56455. "SR" or "Senate Report" refers to the Senate Permanent Subcommittee on Investigations January 2017 report, BACKPAGE.COM'S KNOWING FACILITATION OF ONLINE SEX TRAFFICKING, available at https://www.hsgac.senate.gov/imo/media/doc/Backpage%20Report%202017.01.10%20FINAL.pdf. "SApp." refers to the Senate Report Appendix, available at https://www.hsgac.senate.gov/imo/media/doc/ Final%20Appendix%202017.01.09.pdf.

adjudicated prior to issuance of the stay, we vacate the Stay Order and remand [for] further proceedings." (App.Doc. 78-1 at 2-3.)

Larkin and Lacey have submitted supplemental briefs regarding their respective Motions to Vacate and for Release of Certain Untainted Funds. The Motions should be denied.

*First*, Larkin's First Amendment claim boils down to the notion that funds generated by an internet business can never be seized prior to an adjudication of guilt. No case supports that extreme view. *Second*, Larkin's authorities do not require a heightened showing beyond probable cause. *Third*, Larkin's <u>Franks</u> challenge is meritless. Larkin has made no effort to demonstrate that any alleged omissions in the Affidavit were deliberate or reckless, and has not shown any material omissions or falsehoods. *Fourth*, Larkin's assertion that the seized property includes assets unconnected to Backpage, and Lacey's related Sixth Amendment arguments, are not properly before the Court.

## II.   BACKGROUND

### A.    Overview of Backpage

The great majority of Backpage's "adult" ads consisted of offers to sell adults or children for sex. (Aff.¶¶7.b,9.a,31-32; Ind.¶¶48,51,56,74,76,100-114; SR2,6; SApp719,839.) For most of its existence, Backpage charged for posting "adult" ads—and generated more than 90% of its revenue, or approximately a half-billion dollars, from those ads. (Aff.¶7.b and n.1, ¶23; Ind.¶139; SR44.)

As of November 2012, Claimants owned the following approximate percentages of Backpage's corporate parent: Lacey—45%, Larkin—43%, Brunst—6%, and Spear—4%. (Ind.¶¶25-26.) In April 2015, Claimants (through non-party corporate entities) purported to sell their shares in Backpage and related entities for around $600 million to entities controlled by Ferrer. (Ind.¶28.)

### B.    Backpage's Knowing Facilitation of Prostitution

Backpage's executives repeatedly admitted in internal company documents and

2

private meetings that the overwhelming majority of the website's "adult" ads involved prostitution. (Ind.¶¶10,31,34,48,50, 56,58,61,67,70-71,76,81-82,100,110-11.) At the same time, Backpage faced withering outside criticism. First, law enforcement officers across the country presented Backpage with evidence that the overwhelming portion of its "adult" ads were for prostitution. (Aff.¶¶29,32; Ind.¶¶36,39,41,58,68, 72,74,98,103,105-06.) Second, the National Center for Missing and Exploited Children, news organizations and others repeatedly notified Backpage of the prevalence of prostitution and sex trafficking ads on its website. (Ind.¶¶51,54,63,90,93,102,108; SApp764-65; <u>United States v. Lacey, et al.</u>, CR-18-422-PHX-SMB, Docs. 446 and 446-1 Ex. E.)

Third, in April 2015, the U.S. Senate Permanent Subcommittee on Investigations commenced an investigation into internet sex trafficking and issued a subpoena to Backpage. <u>Senate Permanent Subcommittee v. Ferrer</u>, 199 F. Supp. 3d 125, 129 (D.D.C. 2016). After a district court overruled Backpage's First Amendment objections to the subpoena, Backpage produced 552,983 documents. <u>Id.</u> at 140; (SR12,16,nn.61-62.) In January 2017 the Subcommittee issued a 50-page report, BACKPAGE.COM'S KNOWING FACILITATION OF ONLINE SEX TRAFFICKING. Backpage's documents revealed that nearly all of Backpage's "adult" ads were solicitations for illegal prostitution, Backpage was fully aware of the true nature of these ads, and Backpage had taken an array of affirmative steps to help pimps and traffickers "sanitize" these ads and conceal their illegality—"even as Backpage represented to the public and the courts that it merely hosted content others had created." (Ind.¶113; SR1.) Backpage's employee-moderators testified they knew Backpage's adult ads were for prostitution. (SR37-39.)

### C.    Arizona Grand Jury Proceedings and the Indictment

In 2016, an Arizona federal grand jury issued a subpoena for the same documents Backpage produced to the Senate. Citing the First Amendment, Backpage refused to comply. The district court ordered compliance, and the Ninth Circuit unanimously affirmed on June 29, 2017. (<u>See</u> <u>United States v. Lacey, et al.</u>, CR-18-422-PHX-SMB,

3

Doc. 194-1 to 194-4.) On March 28, 2018, the grand jury returned an indictment charging Claimants and others with knowingly facilitating prostitution and engaging in money laundering designed to conceal misconduct and evade law enforcement. (Ind.)

### D.     Backpage and Ferrer Plead Guilty and Agree to Forfeitures

On April 5, 2018, Backpage pleaded guilty to an information charging one count of money laundering. Backpage admitted it "derived the great majority of its revenue from fees charged in return for publishing advertisements for 'adult' and 'escort' services," and "[t]he great majority of these advertisements are, in fact, advertisements for prostitution services." (United States v. Backpage.com, LLC, CR-18-465-PHX-SMB, Doc. 8-2 at 11.) It agreed to forfeit all assets it owned or controlled that were traceable to or involved in its crime, including shutting down the Backpage.com website. (Id. at 6-8.) The court entered a Preliminary Order of Forfeiture identifying a non-exhaustive list of assets Backpage would forfeit; the list overlaps with many of the assets at issue here. (Id., Doc. 22.) Backpage CEO Ferrer pleaded guilty to conspiracy and agreed to the same forfeitures. (United States v. Ferrer, CR-18-464-PHX-SMB, Doc. 7-2.)

On April 6, 2018, the government seized the Backpage website pursuant to Backpage's guilty plea and plea agreement. (United States v. Backpage.com, LLC, CR-18-465-PHX-SMB, Doc. 8-2 at 6-7.)

In July 2018, the grand jury issued a Superseding Indictment ("SI"). (United States v. Lacey, et al., CR-18-422-PHX-SMB, Doc. 230.)  In August 2018, Backpage Sales and Marketing Director Daniel Hyer pleaded guilty to Count 1 of the SI (Travel Act conspiracy). (United States v. Hyer, CR-18-422-5-PHX-SMB, Doc. 271 at 8-10.)

Recently, Judge Brnovich denied Claimants' motion to dismiss the federal criminal charges in the SI, rejecting Claimant's First Amendment-based arguments. (Doc. 112-1; United States v. Lacey, et al., 2019 WL 5448351 (D. Ariz. Oct. 24, 2019).)

### E.     The Civil Seizure Warrants

Between March 28 and June 4, 2018, magistrate judges in this District found probable cause to issue warrants to seize many of the same assets covered by the

4

1  forfeiture allegations in the Arizona criminal cases. (Doc. 53.) Execution of these

2  warrants resulted in the seizure of the funds at issue. (Doc. 53.) The probable cause

3  determinations were based the Versoza Affidavit, which discussed the Senate Report,

4  law enforcement reports, Backpage documents, and the Indictment (which it attached

5  and incorporated, Aff.¶35).

6  **III.   ARGUMENT**

7      **A.    Larkin's Authorities Do Not Support a Blanket Prohibition Against the**

8          **Pretrial Seizure of Website "Proceeds."**

9      Larkin asserts the First Amendment flatly prohibits the seizure of "proceeds" from

10  the use of a website absent a "judicial determination of guilt." (App.Doc. 67 at 1, 3; see

11  Doc. 106 at 2-5.) If adopted, his proposed rule would eviscerate the government's ability

12  to ensure the appearance of such assets at trial—and effectively repeal 18 U.S.C.

13  § 981—in cases involving criminal activity conducted via the internet. None of Larkin's

14  authorities supports this far-reaching view of the law. (See Doc. 106 at 2-5.)

15      In Larkin's first case, Fort Wayne Books, Inc. v. Indiana, 489 U.S. 46 (1989), the

16  Supreme Court did *not* hold that a determination of guilt is necessary before the proceeds

17  of an allegedly criminal enterprise can be seized. Rather, the Court held that the pretrial

18  seizure of allegedly obscene books and films, based merely on probable cause and

19  "without a prior adversarial hearing on their obscenity," constituted a prior restraint. 489

20  U.S. at 63. A prior restraint freezes speech before it occurs; it is the "core abuse against

21  which [the First Amendment] was directed." Thomas v. Chicago Park District, 534 U.S.

22  316, 320 (2002). Because the seizure in Fort Wayne Books "interrupt[ed] the flow of

23  expressive materials" by halting their sale or dissemination, it triggered prior-restraint

24  "special rules applicable to removing First Amendment materials from circulation." 489

25  U.S. at 65-66. The Court expressly did "not hold" that "the pretrial seizure of petitioner's

26  nonexpressive property was invalid" or subject to "special rules." 489 U.S. at 67 n.12.

27      Three years later, in Adult Video Ass'n v. Barr, 960 F.2d 781 (9th Cir. 1992),

28  readopted in Adult Video Ass'n v. Reno, 41 F.3d 503 (9th Cir. 1994), the Ninth Circuit

1   applied <u>Fort Wayne Books</u> to invalidate a portion of the federal RICO statute, 18 U.S.C.

2   § 1963(d), that permitted pretrial seizures of allegedly obscene films or videotapes

3   without a hearing. <u>Barr</u>, 960 F.2d at 788. However, the court expressly "uph[e]ld §

4   1963(d)'s provision for the pre-trial preservation of assets." <u>Id.</u> at 792. Accordingly, like

5   <u>Fort Wayne Books</u>, nothing in <u>Barr</u> prohibits the pretrial seizure of *funds*.

6       Larkin's next case, <u>Am. Lib. Ass'n v. Thornburgh</u>, 713 F. Supp. 469, 484 n.19

7   (D.D.C. 1989), <u>vacated sub nom. Am. Lib. Ass'n v. Barr</u>, 956 F.2d 1178 (D.C. Cir.

8   1992), concerned the seizure of assets used to operate an active ongoing publishing

9   business. Larkin has not identified any active publishing business whose operations were

10  jeopardized by the seizures of the funds at issue here. Backpage is defunct; it pleaded

11  guilty in Arizona and agreed to cease operations and forfeit its assets. <u>See</u> <u>Florida v.</u>

12  <u>Nixon</u>, 543 U.S. 175, 187 (2004) (guilty plea is a conviction); <u>Alexander v. United</u>

13  <u>States</u>, 509 U.S. 544, 551-52 (1993) (post-conviction forfeiture of expressive material is

14  not a prior restraint). <u>Thornburgh</u>—a 30-year-old, out-of-circuit outlier—is inapposite.

15      <u>Simon & Schuster, Inc. v. Members of the N.Y. State Crime Bd.</u>, 502 U.S. 105

16  (1991), is inapt for several reasons. (<u>Cf.</u> Doc. 106 at 3-4.) First, it invalidated New

17  York's "Son of Sam" statute, which required that a "criminal" place into an escrow

18  account any income from works that he authored "on *any* subject, provided that they

19  contained the author's thoughts or recollections about his crime, however tangentially or

20  incidentally." 502 U.S. at 121. As the Court observed, a person never accused or

21  charged, "but who admits in a book or other work to having committed a crime, is within

22  the statute's coverage." <u>Id.</u> The Court invalidated the statute as "significantly

23  overinclusive" and confined its holding to that statute. <u>Id.</u> at 121-23.

24      Second, the Son of Sam statute was a content-based regulation of storytelling

25  about an author's criminal past. 18 U.S.C. § 981, in contrast, is a law of general

26  applicability akin the New York's laws providing for pretrial remedies and post-trial

27  forfeiture. The Court struck the Son of Sam law, which operated as a special tax on

28  publishing, but left untouched New York's underlying statutory scheme for ensuring the

1  appearance of assets at trial. <u>See</u> <u>id.</u> at 111.

2       Third, in contrast to the Son of Sam statute, which required escrowing funds based

3  on uncharged conduct, <u>id.</u> at 123, the seizures here were based on: (1) the probable cause

4  determination of the Arizona federal grand jury; (2) probable cause affidavits approved

5  by four neutral magistrates; and (3) for warrants issued after April 6, 2018, the guilty

6  pleas of Backpage and Ferrer. (<u>See, e.g.,</u> <u>In the Matter of the Seizure of Any and All</u>

7  <u>Funds Held in Republic Bank of Arizona Account #XXXXXXXX, et al.</u>, 2:18-MJ-

8  00996, Doc. 3-2, Aff. ¶65.) The one sentence from <u>Citizens United v. FEC</u> Larkin cites

9  merely refers back to <u>Simon & Schuster</u>. 558 U.S. 310, 336-337 (2010); (Doc. 106 at 3.)

10       Cases like <u>McKenna</u> and <u>Dart</u> are inapposite for reasons discussed on pages 9-10,

11  <u>infra</u>. (<u>Cf.</u> Doc. 106 at 5.) In sum, Larkin's authorities do not support his Motion.

12      **B.**     **Seizure of Funds Is Not Subject to "Special Rules."**

13       Larkin next argues that even if seizures are permitted, the government must meet

14  "special rules" and "heightened standards" beyond probable cause. (Doc. 106 at 5-7.) He

15  cites several *prior restraint* cases in support. (Doc. 106 at 5-6 (citing, *e.g.*, <u>Southeastern</u>

16  <u>Promotions, Ltd. v. Conrad</u>, 420 U.S. 546 (1975)). Yet, as discussed above, Larkin isn't

17  challenging a prior restraint—an order enjoining *expressive materials*; rather, he's

18  challenging the pretrial seizure of *funds*. (<u>See, e.g.</u>, App.Doc. 51 at 7.)

19       Larkin's remaining authorities are also inapposite. In <u>United States v. Playboy</u>

20  <u>Entm't Grp., Inc.</u>, 529 U.S. 803, 816 (2000) (Doc. 106 at 2), for example, the Court

21  invalidated a law requiring cable operators to scramble sexually explicit channels. The

22  Court nowhere held the government could not seek to restrain funds based on a showing

23  of probable cause; that issue wasn't addressed or discussed.  Larkin's claim that the

24  government "must link any seized assets to specific illegal ads known to Defendants and

25  for which they had the specific intent to further the illegal activity" is likewise flawed.

26  (<u>See</u> Doc. 106 at 6.) None of his cited authorities supports that notion. <u>Smith v.</u>

27  <u>California</u>, 361 U.S. 147, 153-54 (1959), for example, merely held that some level of

28  *mens rea* must be read into criminal statutes that regulate the distribution of obscenity; it

did not fix a particular standard and did not discuss seizures of funds. <u>Woodhull Freedom Found. v. United States</u>, 334 F. Supp. 3d 185 (D.D.C. 2018), involved a separate statute and was dismissed on standing grounds. The District of Arizona recently rejected Claimants' reliance on these authorities. <u>Lacey</u>, 2019 WL 5448351, at *7-9.

Moreover, Larkin's attempt to discount the Versoza Affidavit as one investigator's "belief" is belied by the record. (<u>See</u> Doc. 106 at 6.) The 55-page Affidavit discusses years of scrutiny of Backpage by state and local law enforcement agencies, the Senate, and the Arizona federal grand jury. (Aff. and Ind., <u>passim</u>.)

Further, Larkin's proposed standards would put the government to the unfair choice of litigating its case well before trial or allowing the seized assets to be dissipated—a choice the Supreme Court has squarely rejected. <u>See</u> <u>Kaley v. United States</u>, 571 U.S. 320, 333-36 (2014). The Court has repeatedly held probable cause is all that is required to support pretrial seizure of assets. <u>Id</u>. at 333 ("A defendant has no right to judicial review of a grand jury's determination of probable cause to think a defendant committed a crime"; rejecting defendants' challenge to pretrial seizure in which they sought "to relitigate such a grand jury finding"); <u>United States v. Monsanto</u>, 491 U.S. 600, 616 (1989) (just as probable cause justifies bringing criminal charges and the arrest and detention of suspects, "we find no constitution infirmity in § 853(e)'s authorization of a similar restraint on respondent's property to protect its 'appearance' at trial").

### C.   Larkin Has Failed to Make the Substantial Preliminary Showing Necessary to Obtain a <u>Franks</u> Hearing.

To challenge the validity of a warrant affidavit, a defendant must make "a substantial preliminary showing" that "(1) the affidavit contains intentionally or recklessly false statements or misleading omissions, and (2) the affidavit cannot support a finding of probable cause without the allegedly false information." <u>United States v. Reeves</u>, 210 F.3d 1041, 1044 (9th Cir. 2000); <u>Franks v. Delaware</u>, 438 U.S. 154, 171 (1978). Here, Larkin complains the Affidavit: (1) improperly failed to discuss caselaw in which Backpage defeated civil claims or successfully challenged state legislative or

law enforcement actions; and (2) cherry-picked statements from decade-old emails. (Doc. 6 at 20-29.) Larkin cannot make a substantial <u>Franks</u> showing on either ground.

### 1.    *No Showing of Malice or Recklessness*

To meet <u>Franks</u>' first prong, Larkin must make specific allegations of deliberate falsehood or reckless disregard for the truth, accompanied by an offer of proof; negligence is not enough. <u>Franks</u>, 438 U.S. at 171. Alternatively, he must show the affiant deliberately or recklessly omitted material information. <u>United States v. Tham</u>, 960 F.2d 1391, 1395 (9th Cir. 1991). Larkin's Motion to Vacate is devoid of any attempt to demonstrate that any alleged statements or omissions were made with malice or reckless disregard for the truth. His <u>Franks</u> request fails for this reason alone.

### 2.    *No Showing of Materiality*

Whether a misstatement is material depends on whether the Affidavit, "once corrected and supplemented, would provide…a substantial basis for concluding that probable cause existed." <u>United States v. Meling</u>, 47 F.3d 1546, 1554 (9th Cir. 1995). Probable cause is "a fair probability that contraband or evidence of a crime" exists. <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983). Even with the omitted material, the Affidavit and Indictment would still have provided abundant evidence of probable cause.

### a.    *No Need to Cite to Inapposite Case Law*

Larkin asserts the Affidavit should have mentioned cases in which Backpage successfully invoked Section 230 of the Communications Decency Act of 1996 (CDA), which courts have construed to provide near absolute *civil* and *state criminal* law immunity for websites that publish content created by third-parties. (Doc. 6 at 11-12, 22-23).  See, e.g., <u>People v. Ferrer</u> ("<u>Ferrer I</u>"), No. 16FE019224 (Cal. Super. Ct. Dec. 9, 2016) (dismissing California state law pimping-related criminal charges against Lacey, Larkin and Ferrer pursuant to CDA immunity; concluding "**Congress has spoken on this matter, and it is for Congress, not this Court, to revisit**" the CDA's scope) (Doc. 6, Ex. 13 at 15 (emphasis in original)); <u>People v. Ferrer</u>  ("<u>Ferrer II</u>"), No. 16FE024013 (Cal. Super. Ct. Aug. 23, 2017) (concluding that the court had to dismiss new pimping-

1   related charges "until Congress sees fit to amend…the broad reach of section 230 of the

2   [CDA]"—but allowing other criminal charges to proceed) (Doc. 6, Ex. 14 at 18).

3          Larkin relies on still other CDA-based cases. (Doc. 6 at 23 n.31). <u>See, e.g.</u>, <u>Jane</u>

4   <u>Doe No. 1 v. Backpage.com, LLC</u>, 817 F.3d 12, 17, 29 (1st Cir. 2016) (trafficked minors

5   "made a persuasive case" that "Backpage has tailored its website to make sex trafficking

6   easier"; nevertheless dismissing under CDA); <u>M.A. v. Village Voice Media Holdings,</u>

7   <u>LLC</u>, 809 F. Supp. 2d 1041, 1058 (E.D. Mo. 2011) (dismissing civil case under CDA).

8          Larkin also cites a case finding Backpage's "adult" section protected by the First

9   Amendment—premised on the notion that Backpage merely hosted third-party content.

10  <u>Backpage.com LLC v. Dart</u>, 807 F.3d 229, 233-34 (7th Cir. 2015). (Doc. 6 at 23.) He

11  cites other cases that invalidated state laws for vagueness or overbreadth. (Doc. 6 at 23

12  n.31 (<u>e.g.</u>, <u>Backpage.com, LLC v. McKenna</u>, 881 F. Supp. 2d 1262 (W.D. Wash. 2012)).

13         These cases are inapposite, most obviously, because the CDA does not apply at all

14  to federal criminal prosecutions. 47 U.S.C. § 230(e)(1). As the District of Arizona

15  confirmed in denying Larkin's motion to dismiss his parallel federal criminal charges:

16  "This case, however, does not concern civil liability, and the CDA has 'no effect' on

17  'any other Federal criminal statute.' 47 U.S.C. § 230(e)(1)." <u>Lacey</u>, 2019 WL 5448351,

18  at *7. Furthermore, since these cases were decided, there has been a sea-change in the

19  availability of evidence concerning Backpage. These cases were decided before

20  Backpage's compelled disclosure of more than 500,000 documents to the Senate and the

21  grand jury in 2016 and 2017; before the Senate issued its Report in 2017 detailing

22  Backpage's knowing facilitation of prostitution; and before Backpage and its CEO

23  admitted in 2018 that Backpage derived the great majority of its revenue from

24  prostitution ads. These developments undermined the false notion that Backpage was

25  merely a passive conduit for third parties—and prompted the Illinois federal court to

26  dismiss <u>Dart</u> as moot and impose $250,000 in sanctions on Backpage for perpetuating a

27  fraud on the court. (<u>Backpage.com, LLC v. Dart</u>, 1:15-CV-6340, Doc. 253 (N.D. Ill.

28  Mar. 25, 2019).)

In all events, Larkin fails to cite any <u>Franks</u> violations based on an affiant's failure to present a legal analysis of reported caselaw. At most, he references cases where affiants presented partial accounts of defendants' criminal history. <u>See</u> <u>United States v. Perkins</u>, 850 F.3d 1109, 1116-17 (9th Cir. 2017) (affiant stated defendant had been charged with possession of child pornography in Canada, but failed to mention the charges were dropped); <u>United States v. Stanert</u>, 762 F.2d 775, 781, <u>amended</u>, 769 F.2d 1410 (9th Cir. 1985). The Affidavit doesn't contain any similar discussions. Moreover, the Affidavit contains substantial independent evidence of probable cause (from state and local law enforcement, the Senate and the Indictment)—and any lack of wholly inapplicable caselaw was immaterial. <u>See</u> <u>Meling</u>, 47 F.3d at 1555 (denying <u>Franks</u> motion where "considerable independent evidence" corroborated testimony of informant with convictions for crimes of dishonesty).

### b.    *Incriminating Emails*

Larkin erroneously asserts the Affidavit inaccurately described emails from 2008 and 2010. (Doc. 6 at 25-28.) For example, he claims an April 3, 2008 email "does not mention prostitution ads." (Doc. 6 at 26-27.) The email, however, is highly incriminating: Ferrer writes he is "under pressure to clean up Phoenix's adult content," and asks about blocking several terms that are clearly indicative of prostitution, including "Oral, Back-door, FS [Full Service], Blow." (Doc. 6, Ex. 9.) Larkin also complains that Versoza selectively quoted an October 8, 2010, email threatening to fire any Backpage employee who acknowledged in writing that a customer was advertising prostitution. (Doc. 6 at 27.) Even with the omitted portion, the email contains a searing dressing-down of an employee who had the temerity to leave a "note" about prostitution. (<u>See</u> Doc. 6, Ex. 10.)

Larkin's quibbles with how Versoza described particular emails is insufficient to meet his heavy burden. <u>United States v. Hoeffener</u>, 2018 WL 2996317, at *8 (E.D. Mo. May 9, 2018) ("[s]omething more is needed than mere disagreement with the agent's descriptions of the images or the desire for a greater context"). Moreover, the emails

constitute only a small part of the Affidavit, which contains substantial additional evidence. Larkin falls far short of making the substantial showing required by Franks.

### D. Lacey and Larkin Have Not Met the Required Threshold Showing for a Sixth Amendment Claim.

Lacey focuses his separate briefing on an argument that certain seizures must be vacated so that seized funds might be used to pay counsel in the Arizona criminal action. (Doc. 105 at 3-7.) Before a defendant can seek to unfreeze funds on Sixth Amendment grounds, however, she must make a prima facia showing of a Sixth Amendment harm – i.e., that she cannot retain counsel of choice using only her unseized funds, and thus, will be denied counsel she otherwise could retain but for the seizure. Here, neither Lacey nor Larkin has attempted to make such a showing.

Before a defendant is entitled to a hearing under United States v. Monsanto, 491 U.S. 600, 615 (1989), she must establish that "a substantial claim is presented." United States v. Unimex, Inc., 991 F.2d 546, 551 (9th Cir. 1993). As courts interpreting Unimex have held, "a Sixth Amendment concern is not raised until the unseized assets are exhausted or counsel represent that he or she is unable to continue the representation due to a lack of funds." United States v. Wetselaar, 2013 WL 8206582, at *23 (D. Nev. Dec. 31, 2013) (citing United States v. Ray, 731 F.2d 1361 (9th Cir.1984); see also United States v. Lindell, 766 F. App'x 525, 528 (9th Cir. 2019) (finding no Sixth Amendment concern where defendants "failed to clearly demonstrate that those [seized] funds were needed to pay for counsel of choice"); United States v. Bonventre, 720 F.3d 126, 128 (2d Cir. 2013) ("a defendant seeking a Monsanto or Monsanto-like hearing must demonstrate, beyond the bare recitation of the claim, that he or she has insufficient alternative assets to fund counsel of choice").[2]

---

[2] In fact, Lacey's initial motion to vacate focused largely on his personal hardship and business troubles from the seizures, rather than an inability to obtain counsel. (See Doc. 24 at ¶9-12.) In such circumstances, the Ninth Circuit has indicated that courts need not facially credit a defendants' claimed Sixth Amendment harm. See Lindell, 766 F. App'x at 528-529.

While this Circuit has not provided a definite standard for such a showing, in <u>Ray</u>, 731 F.2d at 1366, it held that there is no Sixth Amendment issue where, notwithstanding an asset restraint, a party is nonetheless represented by the counsel of her choice. It is difficult to see how defendants could meet this standard here: Lacey and Larkin combined are represented by at least four law firms and ten lawyers, including some of the most renowned counsel in the nation. There is no indication that any of these counsel haven't been paid or anticipate withdrawing for lack of payment; neither have they explained how they would be prejudiced at trial for lack of the seized resources. <u>See Ray</u>, 731 F.2d, at 1366 (defendant failed to show prejudice where asset restraint deprived him of ability to hire a "net worth analysis" expert).[3]  Because the defendants have not made any showing of Sixth Amendment harm, their motion to vacate on these grounds must be denied as premature.

### E.    The Remaining Relief Requested Is Premature.

Larkin and Lacey raise a variety of other meritless demands for the return of the seized funds.

Procedurally, Lacey and Larkin have not offered any justification for their motions. They continue to style their requests for the return of property as "Motion[s] to Vacate" rather than admitting that these requests are really Motions to Return Property pursuant to Federal Rule of Criminal Procedure 41(g). But the law is clear that such motions are not available once the government has initiated civil or criminal forfeiture proceedings against the assets at issue. <u>See e.g., Wetselaar</u>, 2013 WL 8206582, *19 ("It is well-settled that the Government may defeat a Rule 41(g) motion be demonstrating that the property is subject to federal forfeiture.") (citing <u>United States v. Fitzen</u>, 80 F.3d 387, 389 (9th Cir.1996)).

---

[3] In contrast, in defendant's cited case law, the Sixth Amendment injuries were plain and undisputed. For example, in <u>Luis</u>, the Court recognized that the restraint there would "prevent Luis from obtaining counsel of her choice" in her criminal case. <u>Luis v. United States</u>, 136 S. Ct. 1083, 1088 (2016).

Substantively, Larkin and Lacey's demand for a tracing hearing (Doc. 105 at 5-6; Doc. 106 at 9-10) is misplaced, as their proffered standard for such a hearing has been rejected in the criminal action, and their own version of the facts establishes all the tracing that is required here.

First, while Larkin argues the government must trace all seized funds in each seized account "to specific illegal advertisements for which it alleges that Claimants are criminally culpable" (Doc. 106 at 9-10), this argument is foreclosed by the recent decision of Judge Brnovich in the criminal action. (See Doc. 112-1 at 15 (rejecting defendants' argument that "the First Amendment requires the Government to prove that each Defendant was aware of each ad that make up the fifty Travel Act counts and knew that each ad proposed illegal transactions.")). It is sufficient that defendants conspired to operate Backpage to facilitate interstate prostitution, and then commingled the proceeds of that conspiracy with other accounts. (See Doc. 112-1 at 18-19); United States v. Lazarenko, 564 F.3d 1026, 1035 (9th Cir. 2009) ("[T]he commingling of tainted money with clean money taints the entire account ... It is enough that the money, even if innocently obtained, was commingled in an account with money that was obtained illegally.") (citing United States v. English, 92 F.3d 909, 916 (9th Cir. 1996)).

Second, regarding seized funds which Lacey claims to be un-tainted, Lacey nonetheless admits that funds derived from the operation of Backpage were transferred into the seized accounts. (See Doc. 23 at 4-6 (Defendant Lacey's motion describing the transfer of approximately $676,808.04 in funds from Backpage.com into seized accounts).) Thus, there is no real dispute that these accounts were commingled. As the Supreme Court noted in Luis, Lacey's primary cited authority, to separate a "defendant's (1) tainted funds and (2) innocent funds needed to pay for counsel . . . the law has tracing rules that help courts implement the kind of distinction." 136 S. Ct. 1083, 1095 (2016). A recent opinion analyzed Luis in these very circumstances, holding that in these cases, courts apply the "Lowest Intermediate Balance Rule," which states that once tainted and untainted funds are comingled, a presumption arises that un-tainted funds are transferred

14

out first, leaving tainted funds for last. See United States v. Lindell, 2016 WL 4707976, at *5-6, n.7 (D. Haw. Sept. 8, 2016), aff'd, 766 F. App'x 525 (9th Cir. 2019).[4] Thus, unless the seized account were ever fully-exhausted, up to $676,808.04 remains presumptively subject to forfeiture.

Further, all property that is "involved in" a money laundering transaction is subject to forfeiture. See 18 U.S.C. § 981(a)(1)(A). Allegedly "untainted funds" that were comingled with illicit funds in a money laundering transaction also can be subject to forfeiture. See e.g., United States v. $506,069.09 Seized from First Merit Bank, 72 F. Supp. 3d 818 (N.D. Ohio 2014) (denying motion to release "untainted" portion of funds seized from investment accounts where claimant allegedly laundered drug proceeds by commingling funds from other sources before making investments); United States v. Kivanc, 714 F.3d 782, 794–95 (4th Cir. 2013) (residence in which fraud proceeds were invested is subject to forfeiture in its entirety as property involved in a money laundering offense, even though legitimate funds were also invested in the property); United States v. Four Contiguous Parcels, 191 F.3d 461, 1999 WL 701914, *6–7 (6th Cir. 1999) (where defendant invested both clean and tainted funds in purchase of real property and used the purchase as a device for laundering the dirty money, the real property was forfeitable in its entirety).

The core of Lacey's argument is that the funds were *accidentally* commingled due to a clerical error by an assistant. (See Doc. 105 at 5.) This sort of fact-laden question is contingent on discovery, and any resolution would first require defendants to answer special interrogatories, see FRCP Supp. Rule G(6), and potentially require depositions of Lacey, Larkin, and their allegedly at fault bookkeeper, Ms. McSherry. For the reasons

---

[4] Lindell also highlights why Lacey's reliance on Luis is misplaced. In Luis, the plurality assumed that the seized property was "innocent," see, e.g., 136 S. Ct. at 1094, which is not the case here, where Lacey admits the seized funds were in fact commingled with those traceable to Backpage. Instead, Lacey claims this commingling was accidental and lacked specific intent, but exploring a defendant's claimed innocent mistake in commingling funds is a question which requires discovery, and is thus notably premature.

15

stated in the government's Motion to Stay this case pending the resolution of the criminal action (Doc. 79), beginning discovery here would risk prejudicing the criminal action, and is thus premature at this time. Because Claimants have made no showing of any Sixth Amendment harm, and because seized funds were at least commingled with allegedly-tainted funds, Lacey's arguments over allegedly-accidental commingling should await the resolution of the Arizona criminal action.

Dated: October 28, 2019

Respectfully submitted,

NICOLA T. HANNA
United States Attorney

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division

STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section

    /s/ *Dan G. Boyle*
DAN G. BOYLE
JOHN J. KUCERA
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA